**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

07 CIV 6316

| | |
|---|---|
| BUYERS AND RENTERS UNITED TO SAVE HARLEM; MARJORIE and THEODORE CHARRON; ANTHONY CASASNOVAS; KAREN FLANNAGAN; ANDRES MARES-MURO; TRACEY MOORE; RAYMOND ANDREW STAHL-DAVID; RUSSELL TAYLOR; and DIANE TRUMMER, | ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| PINNACLE GROUP CORP. and JOEL WIENER | ) ) ) |
| Defendants. | ) ) |

PLAINTIFFS DEMAND TRIAL BY JURY

**COMPLAINT**

No. _____

JUL 11 2007
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs, Buyers and Renters United to Save Harlem ("BRUSH"), Marjorie and

Theodore Charron, Anthony Casasnovas, Karen Flannagan, Andres Mares-Muro, Tracey Moore,

Raymond Andrew Stahl-David, Russell Taylor, and Diane Trummer ("Individual Plaintiffs," and

collectively with BRUSH, "Plaintiffs"), by their attorneys, for their complaint against

Defendants Pinnacle Group Corp. ("Pinnacle") and Joel Wiener ("Wiener"), state as follows:

**BACKGROUND**

**The Loss of Affordable Rental Housing Units in
New York City, Caused in Part by Illegal Tactics
and Unscrupulous Landlords**

1.       The City of New York ("New York City") has struggled with the loss of

affordable rental housing units.  Despite a statutory scheme of state and local rent regulation,

unscrupulous landlords have employed harassing and other unlawful tactics to evade the

requirements of rent regulation to artificially increase rents or to free apartments from regulation

altogether.  The over-arching goal of these unscrupulous landlords is to drive low- and middle-income tenants from their apartments and improperly inflate the landlords' profits.

2.      In the face of such pressure, tenants in increasing numbers are faced with either paying unlawful rents -- if they can -- or being forced out of their homes.  Landlords often commence unjustified eviction actions to remove such tenants to make way for "market" rents or condominium and cooperative conversions.

3.      The depletion and deterioration of affordable housing and tenant mistreatment have been recognized as major contributing causes to other social problems affecting New York City, such as the displacement of the middle class, racial and ethnic tension, and homelessness.

**The Illegal Tactics of These Unscrupulous Landlords
and the Need for Affordable Housing Have Been
Recognized by New York City Public Officials**

4.      New York City public officials repeatedly have emphasized that the affordable housing situation has become dire.  For instance, at a community workshop on housing law and tenants' rights for Harlem residents held on September 9, 2006, and co-sponsored by Public Advocate Betsy Gotbaum, Congressman Charles Rangel, and Manhattan Borough President Scott M. Stringer, the Public Advocate, Ms. Gotbaum, stated: "One of my top priorities as Public Advocate is ensuring safe, affordable housing and fair treatment for all of our city's tenants."  At the City Council Hearing on Department of Housing Preservation & Development ("HPD") Budget for Fiscal Year 2006 which took place on March 6, 2007, Ms. Gotbaum submitted written testimony further stating:

> As of June 2006, HPD had fewer than 40 attorneys in its Housing Litigation Division to deal with the 12,662 cases it initiated in Fiscal Year 2005. The fact is, despite the best intentions, HPD is overwhelmed by its responsibility to enforce housing maintenance code violations and protect tenants from irresponsible landlords. The result is that the deck is stacked against tenants who rely on

the city to take their landlords to court.  My office has encountered
example after example in which families have no choice but to go
on living in unsanitary and dangerous conditions: leaky ceilings,
broken doors, rats scurrying across the floor.

5.      Similarly, as the Manhattan Borough President, Scott M. Stringer, recognized in

his 2006 Strategic Policy Statement (dated September 1, 2006):

> Accessing affordable housing is one of the biggest challenges
> facing out borough and our city.  Across incomes and populations,
> residents are struggling to find and maintain housing.  The number
> of rental units available to low- and moderate-income households
> has fallen significantly over the past three years.  At the same time,
> 29% of New York City residents pay more than half of their
> incomes in rent.  People come to our borough from around the
> world to pursue opportunities as teachers, actors, entrepreneurs,
> financiers, and artists.  Those who came years ago, who helped
> Manhattan grow and thrive, are left fearing buy-outs, opt-outs,
> demolitions, major capital improvements, rent increases, condo
> conversions, and any number of other threats while new New
> Yorkers are struggling to find first homes.

6.      As recently as May 31, 2007, the *New York Sun* reported that the Manhattan

District Attorney, Robert Morgenthau, has held a forum on tenant-landlord issues including

evictions, and has expressed concern that

> ". . . [w]ith landlords pushing out people who fail to pay rent or are not registered
> on leases, . . . a portion of owners are forcing out residents on false grounds. . . .
> Some of them are just interested in making a quick buck out of this."

**The Devastating Effect on Tenants of These Illegal
Tactics Has Increased Dramatically as Affordable
Housing Has Come into the Hands of Larger and
More Powerful Landlords**

7.      In years past, it was primarily individual landlords and property owners who

resorted to harassing, illegal, and sometimes physically threatening tactics to extort illegal rents

from tenants while letting properties deteriorate into dangerously unsafe conditions.  Public and

governmental reaction to the tactics of these individual "slumlords" has been a driving force

behind New York City's continued efforts to maintain a rent regulation and housing maintenance code enforcement scheme.

8.    More recently, the effects of the assault on affordable housing have become magnified when the ownership of numerous buildings in an affected geographic area becomes concentrated in a single landlord or real estate operator. In the 1990s, for example, an individual named Baruch Singer (who later sold many of his apartment buildings to Pinnacle) amassed a sizeable empire of properties in Harlem and Upper Manhattan that included numerous rent-regulated apartments. Singer became infamous for reportedly using a variety of tactics to harass tenants in more than one hundred buildings, which collectively had more than 4,000 housing maintenance code violations.

**Pinnacle Group, a Defendant Here, and Its Owner, Joel Wiener, Own More Than 21,000 Apartments And Are Financed by a $6 Billion Fund, the Praedium Group**

9.    In late 2005, Singer reportedly sold 104 buildings in Manhattan to Pinnacle. Pinnacle further concentrated its ownership of Manhattan's rent-regulated housing stock through additional acquisitions. Pinnacle is headed by a local real estate operator and investor, Defendant Joel Wiener.

10.    Pinnacle's acquisitions of rent-regulated housing units largely were funded by The Praedium Group ("Praedium"), a massive real estate investment firm that boasts in excess of $6 billion in nationwide real estate investments made through various Praedium-controlled real estate investment funds.

**Pinnacle's Business Strategy, Funded by Praedium,
Is To Fraudulently Inflate Rents, Fail To Make Needed
Repairs and To Use Other Tactics To Harass Tenants
and Force Them Out of Rent-Regulated Units**

11.    Pinnacle's apparent business strategy -- consistent with the strategic direction provided by its financial backer Praedium -- is to fraudulently inflate rents, to fail to make needed repairs and to groundlessly harass and force tenants out from rent-regulated housing units.  These actions serve Pinnacle's ultimate goal of the eventual elimination of rent-regulated units without regard for the lawfulness of the tactics used.  Pinnacle and its investment partner are thus able to turn what they perceive to be "underperforming" assets into higher value assets through inflated rents, building sales, or condominium and cooperative conversions -- all at the expense of existing tenants.

12.    Moreover, Defendants undertake to make repairs and renovations on a preferential basis that focuses on creating "showplace" units when units are available for rent at market rates or for condominium or cooperative sales.  Tenants who reside in rent-regulated units receive disparate treatment with respect to repairs, which often are done sloppily or not performed at all.

13.    The unlawful tactics employed by Pinnacle and funded by Praedium that are the subject of this Complaint are aimed at serving Praedium's euphemistically named "value enhancement program."  Praedium's website (www.praediumgroup.com) describes Praedium as a "real estate investor focusing on underperforming and undervalued assets."  Praedium acknowledges that its investment strategy is to join with "local operators and investment partners" such as Pinnacle and Wiener, to identify and acquire "middle market" properties.

14.    The subsequent strategy of forcing out tenants and freeing units from rent-regulation is driven by the self-described "value enhancement program" that Praedium touts as

including "aggressively manag[ing] the current tenant/leasing base" making only "strategic capital improvements" and "asset repositioning." In essence, Pinnacle and Praedium, by virtue of their massive investments, vast holdings and "value enhancement" tactics, have pioneered a new era in the attack on affordable housing that can only be described as "corporate slumlording." Left unchecked, the unlawful conduct employed by the Defendants will force countless more tenants from their long-time homes and accelerate the unlawful demise of affordable housing in New York City.

## NATURE OF THE ACTION

15.    BRUSH is a non-profit association founded to promote tenants' rights in the West Harlem and Northern Manhattan communities. Many of the individuals within BRUSH's constituency are tenants in apartments owned by Defendants. The Individual Plaintiffs are lawful tenants of rent-regulated apartments in buildings owned by Defendants. Plaintiffs bring this action against Pinnacle, a real estate company that, among other things, owns, operates, and manages more than 420 residential rental buildings that contain more than 21,000 apartments with approximately 60,000 tenants in New York City, and its principal, Joel Wiener. Defendants have engaged, and are continuing to engage, in a pattern and practice of willfully, wantonly, and maliciously harassing rent-regulated tenants with the intent and effect of collecting illegal rents from tenants, forcing them from their homes, and terminating their tenancies. Defendants are acting in complete disregard of the law and tenants' rights.

16.    Defendants Pinnacle and Joel Wiener engage in reckless and intentional systematic acts and business practices of demanding and collecting rents in amounts beyond those permitted under the law, including but not limited to New York's Rent Stabilization Laws and Rent Stabilization Code. Defendants' conduct also violates the New York Consumer

Protection Act ("NYCPA"), N.Y. General Business Law § 349, *et seq.*  In addition, Defendants'

ongoing pattern of fraudulent practices violate the Federal Racketeer Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. § 1962.

17.    Defendants' unlawful acts are part of an overall pattern and practice of tenant

harassment, which include: (i) seeking to collect rent in amounts that are not permitted under the

law based on claimed individual apartment improvements or major capital improvements that

have not been made; (ii) failing to timely make necessary and reasonable repairs, to address

housing maintenance code violations, or to provide essential, required services and then

threatening and taking action to evict tenants who have reasonably and legally withheld rent

because of such illegal conduct; (iii) commencing unfounded eviction actions to demand rent

that already has been paid; (iv) commencing unfounded proceedings to challenge  tenants'

succession rights and harassing and intimidating tenants by demanding an unduly burdensome,

unjustified, and unwarranted amount of evidence regarding a tenant's succession rights; (v)

unjustifiably refusing to accept tenants' rent checks and then claiming non-payment of rent and

commencing eviction actions or other proceedings challenging succession rights; (vi) directing,

encouraging and allowing the superintendents of its buildings to, among other things, harass

tenants by making unacceptable and shoddy repairs or making false promises to conduct repairs;

scheduling appointments that the superintendents do not attend; issuing false notices and

documents regarding tenants' activities or conduct; and ignoring tenants' complaints and acting

in a hostile and retaliatory manner to tenants who have made complaints; (vii) failing to offer

tenants lease renewals, or lease renewals on proper terms; (viii) failing to comply with orders

issued by the New York Department of Housing and Community Renewal requiring Pinnacle to

pay monetary awards to tenants for rent overcharges and rent reductions; (ix) seeking to restore

original rents that have been reduced in accordance with Department of Housing and Community Renewal orders, knowing that the housing violations giving rise to the rent reductions have not been resolved; and (x) refusing to respond to and ignoring tenants' inquiries and requests for documents relating to rental histories, rent increases based on individual apartment improvements and major capital improvements, and lease renewals.

18.     In connection with their fraudulent practices, Defendants have employed the U.S. mails and interstate wires as part of an ongoing scheme to increase rents unlawfully, to receive illegal rents, and ultimately to free their properties from New York's rent control and rent stabilization requirements.  Defendants' pattern of racketeering activity and unlawful tactics has injured countless tenants, deprived them of their lawful property interests in their apartments and forced them to pay money to which Defendants are not entitled.

19.     Plaintiffs seek a judgment from this Court, as set forth below, providing (1) declaratory relief; (2) injunctive relief; (3) the creation of an independent body appointed by the Court, which shall monitor and ensure the lawful operation and management of rent-regulated buildings owned by Defendants and assist in the resolution of disputes between Defendants and their tenants;  (4) an audit and accounting of rents demanded by Defendants and disgorgement of any rent overcharges; (5) compensatory, statutory, and punitive damages; (6) reasonable attorneys' fees and costs; and (7) any other relief as this Court deems appropriate.

## PARTIES

20.     Plaintiff BRUSH is a non-profit association formed under the laws of the State of New York for the purpose of promoting tenants' rights in the West Harlem and Northern Manhattan communities.  BRUSH is an advocate for, and represents the interests of, tenants in those areas, a large number of whom occupy rent-regulated apartments in buildings owned by

Defendants. BRUSH also organizes tenants and defends them against harassment and unlawful acts by landlords, and acts as one of the umbrella organizations of other local tenant groups and associations.

21.     Plaintiffs Marjorie and Ted Charron are residents of New York City and the State of New York, and lawful tenants of a rent-stabilized apartment at 706 Riverside Drive, New York, New York, a building owned by Defendants and operated as 706 Realty Company, LLC.

22.     Plaintiff Anthony Casasnovas is a resident of New York City and the State of New York, and a lawful tenant of a rent-stabilized apartment at 3657 Broadway, New York, New York, a building owned by Defendants and operated as 3657 Realty Company, LLC.

23.     Plaintiff Karen Flannagan is a resident of New York City and the State of New York, and a lawful tenant of a rent-controlled apartment at 706 Riverside Drive, New York, New York, a building owned by Defendants and operated as 706 Realty Company, LLC.

24.     Plaintiff Andres Mares-Muro is a resident of New York City and the State of New York, and a lawful tenant of a rent-stabilized apartment at 635 Riverside Drive, New York, New York, a building owned by Defendants and operated as 635 Riverside Drive LLC, a/k/a 635 Riverside LLC, a/k/a 635 Riverside Drive NY LLC.

25.     Plaintiff Tracey Moore is a resident of New York City and the State of New York, and a lawful tenant of a rent-stabilized apartment at 509 West 155 Street, New York, New York, a building owned by Defendants and operated as 509 Realty Co., LLC.

26.     Plaintiff Raymond Andrew Stahl-David is a resident of New York City and the State of New York, and a lawful tenant of a rent-stabilized apartment at 516 West 143 Street, New York, New York, a building owned by Defendants and operated as 516 Realty NY LLC.

27.     Plaintiff Russell Taylor is a resident of New York City and the State of New York, and a lawful tenant of a rent-stabilized apartment at 75 St. Nicholas Place, New York, New York, a building owned by Defendants and operated as Pinnacle Hamilton LLC.

28.     Plaintiff Diane Trummer is a resident of New York City and the State of New York, and a lawful tenant of a rent-stabilized apartment at 680 Riverside Drive, New York, New York, a building owned by Defendants and operated as 680 Realty Co. LLC, a/k/a 680 Riverside Realty Co. LLC.

29.     On information and belief, Defendant Pinnacle is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 1 Penn Plaza, New York, New York.

30.     On information and belief, Defendant Joel Wiener is a resident of the State of New York, with his principal place of residence in Woodmere, New York.  On information and belief, Mr. Wiener is the founder, Chief Executive Officer, and an investor and owner of the Pinnacle Group Corporation.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction of this action pursuant to 18 U.S.C. § 1962, 28 U.S.C. § 1331.

32.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

33.     Venue is proper in this Court under 28 U.S.C. § 1391(a) because all Plaintiffs and at least one Defendant reside in this judicial district, and a substantial part of the events, acts, or omissions giving rise to the claims occurred in this judicial district.

## STATUTORY AND REGULATORY SCHEME

**A.    New York Rent-Regulation Laws**

34.    The Rent Stabilization Laws ("RSL"), and the Rent Stabilization Code ("RSC") issued by the New York State Division of Housing and Community Renewal ("DHCR"), act to limit the rent owners may charge and circumscribe the manner in which owners may recover the cost of improvements, terminate tenancies, or commence other proceedings against tenants.

35.    These laws form part of the backdrop to Defendants' unlawful RICO scheme to collect inflated rents, evade obligations imposed by rent regulations, and remove apartments from rent-regulated status.

**Renewal and Vacancy Leases**

36.    Upon expiration of any lease after initial legal rents are established, owners of occupied rent-stabilized apartments must offer existing tenants the option of a one- or two-year renewal lease in which they are permitted to charge a statutory rent increase per annum, as established by the Rent Guidelines Board ("RGB") each year. RSL § 26-510. Owners of rent-stabilized apartments that become vacant or of rent-controlled apartments that become rent-stabilized upon vacancy, must offer new tenants one- or two-year leases and are permitted to charge the first tenants of such apartments the statutory rent increase that the RGB may set per annum, plus twenty percent. RSC § 2522.5 (a)(1) & (b)(1).

37.    For all rent-regulated apartments, "an owner shall furnish to each tenant signing a vacancy or renewal lease, a rider in a form promulgated or approved by the DHCR, in larger type than the lease, describing the rights and duties of the owners and tenants as provided under the RSL. . . . For vacancy leases, such rider shall in addition also include a notice of the prior legal regulated rent, if any, which was in effect immediately prior to the vacancy, an explanation of

how the rental amount provided for in the vacancy lease has been computed above the amount shown in the most recent annual registration statement, and a statement that any increase above the amount set forth in such registration statement is in accordance with the adjustments permitted by the Rent Guidelines Board and [the RSC]."  RSC § 2522.5 (c)(1).

**Additional Rent For MCIs and IAIs**

38.    Owners of rent-stabilized apartments may be entitled to an additional rent increase where they have performed certain kinds of improvements either for individual apartments, known as Individual Apartment Increases ("IAIs"), or building-wide, known as Major Capital Improvements ("MCIs").  RSC § 2522.4.

39.    Owners who undertake an IAI may be entitled to a rent increase equal to 1/40th of the total costs of improvements per month, including installation costs but not finance charges. Owners may make IAIs in an occupied apartment only upon written consent of the tenants in possession; no written consent is required for vacant housing accommodations.  If tenants in possession deny the improvements that the owners offer, then no additional charge may be added to the tenant's rent.  RSC § 2522.4 (a)(1) & (4).  When a tenant timely challenges any claimed IAIs, owners of rent-regulated apartment buildings must demonstrate that the charges are supported by adequate documentation.

40.    Owners who undertake an MCI for a residential apartment building subject to rent-regulation laws may be permitted to adjust the rent of rent-regulated apartments in the building based on the actual, verified cost of the improvements, as submitted to DHCR by the owner within two years of the improvement having been made.  The rent increase to which the owner may be entitled equals 1/60th of the cost, including installation but excluding finance charges, divided by the number of rooms in the building, charged per apartment based on the

number of rooms.  To be eligible for a rent adjustment an MCI must be, among other things, a new installation for the operation, preservation, and maintenance of the building that directly or indirectly benefits all tenants and is deemed depreciable under the Internal Revenue Code.  If DHCR approves the application, it also establishes the amount of the rent adjustment for the MCI.  RSC § 2522.4 (a)(2), (4) & (12).

**Succession Rights**

41.    Any "family member" of a rent-regulated tenant, including persons with similar familial-like ties as described in paragraph 42, may have the right to a renewal lease and/or protection from eviction when the tenant dies or permanently leaves the apartment, provided that the family member has resided with the tenant as a primary resident in the apartment for at least two years immediately prior to the death of, or permanent departure from the apartment of, the prior tenant (one year for senior citizens).  The family member may also have the right to a renewal lease or protection from eviction if she/he resided with the tenant from the inception of the tenancy or from the commencement of the relationship.  RSC § 2523.5 (b)(1) & (2).

42.    The term "family member" is defined as a husband, wife, son, daughter, stepson, stepdaughter, father, mother, stepfather, stepmother, brother, sister, grandfather, grandmother, grandson, granddaughter, father-in-law, mother-in-law, son-in-law, or daughter-in-law of the tenant.  It also includes any other person(s) residing with the tenant in the apartment as a primary resident, who can prove emotional or financial commitment and interdependence between such person and the tenant.  RSC § 2520.6 (o).

**Owners' Obligations -- and the Consequences
If Owners Do Not Meet Them**

43.    Owners of rent-stabilized apartments must maintain all essential services provided by the RSC, known as required services, which may include but are not limited to reasonable

repairs, decorating and maintenance, the furnishing of light, heat, hot and cold water, elevator services, janitorial services, and removal of refuse. In addition, owners must provide certain building-wide services, known as ancillary services, which may include garage facilities, laundry facilities, recreational facilities, and security, for which owners may not require additional payment (except for security) as a condition of renting a housing accommodation. RSC § 2520.6 (r)(1) & (3). Failure to maintain required services may entitle tenants to a reduction of the legal regulated rent. RSC § 2523.4.

44.    It is unlawful "for any person to demand or receive any rent for any housing accommodation in excess of the legal regulated rent, or otherwise to do or omit to do any act, in violation of any regulation, order or requirement under the RSL or [RSC], or to offer, solicit, attempt or agree to do any of the foregoing." RSC § 2525.1; *see also* RSL § 26-512 (a). It is also unlawful for owners to evade, directly or indirectly, legal regulated rents. RSC § 2525.2 (a).

45.    Owners are prohibited from harassing tenants of rent-regulated apartments for any reason; it is unlawful for "any owner or any person acting on his or her behalf, directly or indirectly, to engage in any course of conduct (including but not limited to interruption or discontinuance of required services, or unwarranted or baseless court proceedings) which interferes with, disturbs, or is intended to interfere with or disturb, the privacy, comfort, peace, repose or quiet enjoyment of the tenant in his or her use or occupancy of the housing accommodation, or intended to cause the tenant to vacate such housing accommodation or waive any right afforded under [the RSC]." RSC § 2525.5; *see also* RSL § 26-516. It is also unlawful for any person to remove or attempt to remove a tenant because the tenant has taken or proposes to take any action authorized or required by the RSL, RSC, or any order of the DHCR. RSC § 2524.1 (b).

46.     The RSC provides that "[a]ny owner who is found by DHCR . . . to have collected any rent or other consideration in excess of the legal regulated rent shall be ordered to pay the tenant a penalty equal to three times the amount of such excess," unless "the owner establishes by a preponderance of the evidence that the overcharge was not willful," in which case the penalty shall equal the amount of overcharge plus interest from the date of the first overcharge. RSC § 2526.1.

47.     DHCR also has the authority to impose civil penalties against owners of housing accommodations who knowingly violate the laws and regulations by charging illegal rents or harassing tenants.  In addition to any other penalties, it may impose a civil penalty up to $250.00 for each knowing violation of the RSL or RSC.  If DHCR finds an owner "to have harassed a tenant to obtain a vacancy of a housing accommodation, the DHCR may impose . . . a penalty in the amount of up to $1,000.00 for a first such offense and up to $2,500 for each subsequent offense or for a violation consisting of conduct directed at the tenants of more than one housing accommodation."  RSC § 2526.2(b) & (c); *see also* RSL § 26-516(c)(1) & (2).

48.     Any owner found to have overcharged a tenant may be assessed and ordered to pay the reasonable costs and attorneys' fees of the proceeding and interest from the date of the overcharge.  RSC § 2526.1 (d); RSL § 26-516(a)(4).

**B.      Unlawful Deceptive Practices**

49.     The New York Consumer Protection Act (the "NYCPA"), NY General Business Law § 349, prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state."  Defendants' conduct, as described herein, violates the NYCPA.

**C.    Pattern of Racketeering Activity**

50.    The Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18

U.S.C. § 1962(c), makes it "unlawful for any person employed by or associated with any

enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's

affairs through a pattern of racketeering activity."  Defendants' unlawful scheme conducted

through the pattern of racketeering activity described herein violates RICO.

## FACTS

**A.    General Allegations**

51.    Pinnacle owns, manages, and operates numerous properties, including residential

properties in which tenants on whose behalf BRUSH advocates live.

52.    Wiener, as a founder, investor, owner, and Chief Executive Officer of Pinnacle,

has principal responsibility for overseeing Pinnacle's operations.

53.    Pinnacle holds title to property, manages, operates, and does business as "LLCs"

under the names of the buildings it owns, but generally does not disclose Pinnacle's role as the

ultimate owner, manager or operator.

54.    Praedium has provided funding for at least some of Pinnacle's real estate

acquisitions.  Praedium's self-described investment strategy is centered on pursuing "value

enhancement" opportunities, which involves, among other things, investing in ownership

residential properties that it perceives to be deteriorated or have a history of inadequate repairs

and maintenance.

55.    Pinnacle, Wiener, Praedium, and at least the LLCs identified in paragraphs 21

through 28 have formed an enterprise that is associated-in-fact (the "Enterprise") for the purpose

of evading New York City's stringent rent control and rent stabilization requirements at the

expense of BRUSH and Pinnacle's tenants. Defendants purchase distressed, rent-regulated properties with financial backing and strategic direction provided by Praedium. Since 2002, Defendants have caused the Enterprise to undertake numerous fraudulent practices and unlawful tactics for the purpose of increasing rent beyond legal limits and systematically forcing tenants to vacate their leasehold interests.

56.    On information and belief, over about the past two and a half years, Defendants together have caused Pinnacle to file thousands of eviction actions in housing court for the approximately 21,000 units that it owns, operates, and manages in New York City. On information and belief, in certain of Defendants' buildings, as many as one quarter to one half of the residents have been involved in housing court actions initiated by or against Defendants.

57.    On information and belief, many of the housing court actions that Defendants have initiated and prosecuted, and continue to initiate and prosecute, against rent-regulated tenants, including those on whose behalf BRUSH advocates, are unfounded, fraudulent in nature, and not based on good cause.

58.    Defendants have engaged in a pattern and practice of overcharging and collecting illegal rents from tenants of vacated rent-regulated units, including those on whose behalf BRUSH advocates, based on alleged individual apartment improvements or major capital improvements that do not justify the rent increases charged.

59.    On information and belief, Defendants have engaged in a pattern and practice of overcharging and collecting illegal rents from new and existing tenants of rent-regulated units, including those on whose behalf BRUSH advocates, based on alleged major capital improvements that do not justify the rent increases charged.

60.     Defendants have relied on the U.S. mails and the interstate wires as an essential part of their scheme in overcharging tenants, including those on whose behalf BRUSH advocates, based on fraudulent individual apartment improvements and fraudulent major capital improvements.

61.     Defendants have engaged in a pattern and practice of failing or refusing to make necessary and reasonable repairs in their apartment units, such that the rent-regulated tenants residing in those units, including those on whose behalf BRUSH advocates, have the legal right to withhold rent until the repairs are made.  Rather than making the repairs, Defendants have initiated eviction proceedings against those tenants based on their failure to pay rent lawfully withheld.

62.     On information and belief, Defendants have engaged in a pattern and practice of refusing to accept rent payments from rent-regulated tenants, including those on whose behalf BRUSH advocates, based on a false and unsupported claim that the occupants of the apartment units are not the proper tenants or individuals who have succession rights to the apartment, and then initiating eviction proceedings against those tenants based on their failure to pay rent that Defendants refused to accept.

63.     On information and belief, Defendants have engaged in a pattern and practice of initiating unreasonable and unnecessary proceedings against lawful rent-regulated tenants, including those on whose behalf BRUSH advocates, requiring them to produce an unduly burdensome and harassing amount of evidence of their succession rights to the unit they occupy and in which they have resided often times for many years.

64.     The vast majority of Defendants' rent-regulated tenants, including those on whose behalf BRUSH advocates, lack the resources to retain a private attorney to represent them in the

legal proceedings that Defendants have commenced against them. On information and belief, the vast majority of Defendants' rent-regulated tenants, including those on whose behalf BRUSH advocates, are unable to obtain affordable or free legal representation in the legal proceedings that Defendants have commenced against them.

65.    As a result of these proceedings, Defendants' rent-regulated tenants, including those on whose behalf BRUSH advocates, unwillingly or unknowingly miss court dates and have default judgments entered against them for rent and other charges that they do not owe or in amounts beyond that which they may owe.

66.    On information and belief, as a result of these proceedings, Defendants' rent-regulated tenants, including those on whose behalf BRUSH advocates, are unable to meet court dates or unknowingly miss court dates. As a result, warrants of eviction are issued against them based on claims for rent and other charges that they do not owe.

67.    On information and belief, in some instances certain of Defendants' rent-regulated tenants, including those on whose behalf BRUSH advocates, are evicted based on their failure or inability to satisfy claims for rent and other charges that they do not owe or in amounts beyond that which they may owe.

68.    On information and belief, in some instances certain of Defendants' rent-regulated tenants, including those on whose behalf BRUSH advocates, unwillingly or unknowingly miss court dates and are subject to further court proceedings, harassment, or eviction based on their failure or inability to produce evidence of their lawful tenancy by succession.

69.     On information and belief, as a result of these proceedings, Defendants' rent-regulated tenants, including those on whose behalf BRUSH advocates, feel intimidated or coerced to consent to pay rent or other charges they do not owe.

70.     On information and belief, as a result of these proceedings, Defendants' rent-regulated tenants, including those on whose behalf BRUSH advocates, whether or not they are represented by counsel, lose wages, experience severe physical and emotional distress, incur unnecessary transportation and child-care expenses, and suffer through endless hours of aggravation and anxiety in housing court, in their apartments, in their jobs, and in their daily lives, often times over the course of several years.

71.     On information and belief, Defendants are aware of the facts regarding the harm inflicted on their rent-regulated tenants, and have intentionally and unlawfully taken advantage of their tenants' situations, with the objective of realizing their business goal, namely overcharging tenants, collecting illegal rents, and ultimately deregulating rent-regulated apartments in order to increase rents, and to convert properties to cooperatives or condominiums.

72.     Due to the prevalence of issues involving Defendants that BRUSH has been required to focus its efforts on, BRUSH has devoted the overwhelming majority of its resources to those issues involving Defendants and therefore has been unable to devote resources to its educational and advocacy activities in connection with tenants' rights and in championing access to affordable housing.

**B.     Pattern of Building Violations**

73.     The City of New York Department of Housing Preservation & Development ("HPD") maintains a website at http://www.nyc.gov/html/hpd/html/pr/violation.shtml, which provides a listing of all of the open violations of the New York City's Housing Maintenance

Code and the State's Multiple Dwelling Law for all residential buildings in New York City. Depending on the seriousness of a violation, HPD establishes different time periods within which it must be corrected. The HPD website also indicates when an owner has not certified that the violation was corrected within the specified time period. Moreover, the website indicates when a violation constitutes a "rent impairing violation," which if not promptly corrected, becomes a fire hazard or serious threat to the life, health, or safety of the occupants thereof.

74.    An examination of this publicly available website for each of the buildings in which the individual Plaintiffs reside shows scores of long uncorrected violations, including multiple outstanding "rent impairing violations" and numerous uncorrected Class C violations, which are deemed "immediately hazardous" by HPD and include such serious violations as "inadequate fire exits, rodents, lead-based paint, lack of heat, hot water, electricity, or gas." Many of these Class C violations have not been addressed for years, despite the fact that HPD requires an owner to correct all Class C violations within 24 hours.

## C.    Allegations Related to Individual Plaintiffs

75.    The facts alleged below are individual, illustrative examples of instances in which rent-regulated tenants, including those on whose behalf BRUSH advocates, have been victimized by Defendants' unlawful activities as part of an ongoing RICO scheme:

**Marjorie and Ted Charron**

76.    For several years, Plaintiffs Marjorie and Ted Charron have been embroiled in multiple lawsuits against Pinnacle to correct egregious illegal overcharges based on inflated individual apartment improvements -- overcharges which the Charrons continue to be forced to pay to this very day. In or about June 2001, the Charrons moved into a rent-regulated apartment in a building presently owned by Defendants. By law, Defendants were required to notify the

Charrons that their apartment was rent-stabilized, but they failed to do so. Defendants charged the Charrons a "preferential" rent of $1,900 per month for their rent-stabilized, two-bedroom apartment. Defendants represented, however, that the "legal" rent on the Charrons' lease was $2,500 and further represented to the Charrons that they could have charged as much as $2,500 based on approximately $20,000 of renovations Defendants had allegedly undertaken in the unit.

77.    When the Charrons investigated the alleged renovations that Defendants purportedly made, they discovered that Defendants had submitted fraudulent receipts to DHCR for "renovations" to justify a fraudulent rent overcharge. These receipts included, among other things, 160 light bulbs, 75 pounds of grout, 130 gallons of paint, a $198 nail gun, a $424 drain cleaning device, and various other items listed as installed but not used. In a further attempt to justify the rent overcharge to the Charrons, Defendants fraudulently submitted to DHCR other costs for maintenance work which may not legally be passed on from a landlord to a tenant under the relevant rent-regulation laws. After causing the Charrons to file two Article 78 Petitions and to defend against a third Article 78 Petition, Defendants ultimately acknowledged that they had made "mistakes" in their calculation of the Charrons' rent.

78.    Defendants currently owe the Charrons more than $10,000 (without interest or treble damages permitted under the law) for rent overcharges for the period June 2001 to June 2003. When the Charrons attempted to withhold rent based on the credit they should have received as a result of past overcharges, the Charrons received a "Thirty Day Notice to Debtor" dated April 26, 2006, and a "Three Day Notice" from Pinnacle dated April 26, 2006. The aforementioned notices were false and the amounts stated therein were misrepresented because they were based on unlawfully inflated rent amounts.

79.     Defendants subsequently filed a demand for rent, requiring the Charrons to appear in housing court.  Moreover, based on DHCR's order with respect to the proper rent for the Charrons' apartment, Defendants also owe the Charrons approximately $14,000 (without interest or treble damages permitted under the law) for the period June 2003 to present.  Defendants continue to overcharge the Charrons to this day, collecting rent in amounts beyond what is allowable under the law, and have issued only one credit to the Charrons in the amount of $890.  On information and belief, Defendants intentionally and systematically and/or with reckless disregard submitted fraudulent documents to DHCR, other government agencies and to the court, to justify rent overcharges.  As a result, Defendants have demanded and received rent in excess of the legally permissible rent from the Charrons.

**Anthony Casasnovas**

80.     Despite multiple efforts over the course of over a year, Plaintiff Anthony Casasnovas was unable to get Defendants to provide information required by law regarding the alleged individual apartment improvements made prior to his tenancy, that purportedly provide the basis for a significant increase in the unit's legal rent.  Rather than answer his questions, Defendants filed eviction proceedings against Mr. Casasnovas, which he continues to fight to this day.

81.     In June 2005, Mr. Casasnovas and his friend, Veronica Gonzalez, moved into a two-bedroom rent-stabilized apartment in a building presently owned by Defendants.  Defendants charged Mr. Casasnovas a "preferential" rent of $1,800 per month, although they identified the purported "legal" rent on Mr. Casasnovas' lease as $2,200.  By law, Defendants were required to notify Mr. Casasnovas that his apartment was rent-stabilized, but failed to do so.

82.    In or about February 2006, Defendants sent Mr. Casasnovas a renewal lease form, which contained a typewritten amount of "new rent". This amount was crossed out by hand, however, and another amount, which reflected a $100.00 rental increase to his "preferential rent" of $1800, along with the words "new preferential rent", was inserted in its place. Moreover, the "additional deposit required amount" was scratched out and a new amount was handwritten in instead. Mr. Casasnovas tried on multiple occasions to contact Defendants by phone and by mail to discuss the renewal lease and the new rental amounts. When he failed to hear back from Defendants, Mr. Casasnovas requested a rental history for his apartment from DHCR.

83.    Mr. Casasnovas learned that his apartment's registered rent was only $683 in 2002, but that year, when a new tenant moved in, Pinnacle nearly tripled the rent to $1700. Based on the apartment's rental history, Mr. Casasnovas computed that Defendants would have had to have made more than $40,000 in renovations to his apartment to justify the increased rent that they charged, a virtual impossibility given the condition of the apartment. Unable to get any answers or even a response from Defendants, Mr. Casasnovas finally sent a letter informing them that he would withhold rent until they justified the rent they were charging and provided documentation substantiating any alleged renovations which they conducted and filed a complaint with DHCR based on the overcharge in rent on or about May 25, 2006.

84.    Rather than receiving a response to his letters, Mr. Casasnovas received a "Thirty Day Notice to Debtor" dated July 24, 2006 demanding $4400 of back rent. In addition, Mr. Casasnovas received a "Three Day Notice to Debtor" from Pinnacle dated July 24, 2006 also demanding $4400 of back rent. The aforementioned notices were false and the amounts stated therein were misrepresented because they were based on unlawfully inflated rent amounts.

85.    Mr. Casasnovas immediately responded to the letters he received from Defendants' attorneys, Horing Welikson & Rosen, P.C., and from Pinnacle by informing them of the overcharge complaint which was pending in DHCR and of his issues with the rent.  In response to Mr. Casasnovas' correspondence, Mr. Casasnovas was served with an action in Housing Court on August 8, 2006, brought by Horing, Welikson & Rosen, P.C. on behalf of Defendants, seeking to evict Mr. Casasnovas for non-payment of rent.  Mr. Casasnovas asserted several defenses and a counterclaim against Defendants based on the rental overcharge.  Each of Mr. Casasnovas' first three court appearances, for which he has had to miss days of work, resulted in adjournments because Defendants' attorneys were not prepared and purportedly needed additional time to review Defendants' file.  It was not until June 2007, that Mr. Casanovas received documents from Pinnacle.  The documents Mr. Casanovas received do not justify the rental increase and he continues to fight Pinnacle in court to this day.

**Karen Flannagan**

86.    Despite having maintained continuous residence for nearly a decade in the same rent-controlled apartment in which she grew up, Plaintiff Karen Flannagan was repeatedly harassed by Defendants' demands -- stretching over the course of years and ending as abruptly as they began -- to produce excessive and unduly burdensome documentation of her succession rights to the apartment upon the death of her mother.  In 1969, at the age of 16, Ms. Flannagan moved with her parents into a rent-controlled apartment presently owned by Defendants.  After moving out at the age of 20, Ms. Flannagan returned to the apartment, where she has maintained continuous residence with her daughter and her mother since 1997.

87.    Shortly after her mother's death in March 2004, Defendants stopped accepting rent checks from Ms. Flannagan.  On or about May 11, 2004, Defendants sent Ms. Flannagan a

letter enclosing a check that she had drawn on her own account to pay rent because she was not the "primary tenant" on the lease. Ms. Flannagan immediately called Pinnacle and was told by a representative that she must submit extensive evidence and documentation of her succession rights. Although the requests were excessive and unduly burdensome, on or about May 13, 2004 Ms. Flannagan dutifully mailed Defendants the requested evidence and documentation, including jury duty notices, driver's license, bank account statements, utility bills and letters from her daughter's school. Defendants then cashed Ms. Flannagan's May 2004 and June 2004 rent checks.

88.    Defendants subsequently continued to harass Ms. Flannagan, sending additional letters dated January 10, 2005 and January 13, 2005, stating that they would not accept her checks for rent because she was not the "primary tenant" on the lease and returning seven personal checks from her. Defendants made additional demands that culminated in the issuance of a "Ten Days Notice to Quit Licensee" dated January 19, 2005, which was placed under her door.

89.    On or about February 17, 2005, Horing Welikson & Rosen, P.C., on behalf of Defendants, instituted a holdover proceeding against Ms. Flannagan. As a result of the legal actions Defendants commenced against her, Ms. Flannagan was required to appear in housing court no fewer than 10 times over a two-year period. On or about May 26, 2005, Ms. Flannagan again turned over the aforementioned documents to Defendants' attorneys, but again, Defendants refused to dismiss their frivolous case and continued to harass against Ms. Flannagan.

90.    On or about April 26, 2006, Defendants abruptly dropped their case. To date, Ms. Flannagan has received no redress or apology from Defendants for their treatment and harassment of her and her family.

**Tracy Moore**

91.     For more than a year, Plaintiff Tracy Moore has been subjected to varying demands for rent in amounts higher than that which Defendants have acknowledged is appropriate, requiring her to appear in court on several occasions to defend against claims for rent arrears that she had already satisfied or that should have been offset by overcharges.  In July 2004, Ms. Moore signed a one-year lease to rent a two-bedroom, rent-stabilized apartment in a building presently owned by Defendants for $1400 per month.  Ms. Moore has renewed her lease each year for the past two years at the statutory rent increase amounts.

92.     Ms. Moore subsequently received a "Thirty Day Notice to Debtor" from Horing Welikson & Rosen, P.C. dated May 15, 2006, and a "Three Day Notice to Debtor" from Pinnacle also dated May 15, 2006, both seeking to collect rent arrears totaling $3,158.44.  Those notices were false and misrepresented the amount of back rent due because they were based on unlawfully inflated rent amounts.

93.     Notwithstanding, Ms. Moore's subsequent payment of the inflated amount, Defendants forced her to appear in housing court in June 2006, at which time the action against her was dismissed.  Shortly thereafter, Ms. Moore discovered that she was being overcharged for rent and initiated a rent overcharge claim against Defendants.

94.     DHCR documentation established that the previous occupant of Ms. Moore's apartment paid $464 per month in rent.  As a result, Defendants acknowledged to DHCR, in a letter dated October 17, 2006, that they had overcharged Ms. Moore based on "items claimed earlier in the 1/40th calculation [that] should not be included in said calculation," and offered to credit Ms. Moore almost $5000 in overcharged rent.

95.    Nevertheless, Defendants' harassment continued. When Ms. Moore presented the Pinnacle documents admitting the overcharge to a Horing, Welikson & Rosen, P.C. attorney at a hearing in housing court several days later, the attorney requested two continuances over the next several months (requiring Ms. Moore to appear each time) to review the materials. Meanwhile, Ms. Moore continued, through DHCR, to challenge some of the purported costs of and materials used in the individual apartment increases, such as charges for a new microwave, new refrigerator, and various appliances or fixtures not actually installed. Most recently, Defendants sent Ms. Moore back-to-back rent statements in different amounts, including amounts both higher and lower than the "correct" rent Defendants had acknowledged in their letter to DHCR. Moreover, Defendants sent Ms. Moore a rent renewal application in or about January 2007 that contains a calculation of the new rent based on the original, overcharged rent figure. These conflicting claims for rent by Defendants force Ms. Moore into the Hobson's choice of having to sign a lease agreement for an amount higher than she should be paying or refusing to sign, which may lead to efforts to terminate her tenancy.

**Andrew Stahl-David**

96.    Not only did Defendants base the rent charged to Plaintiff Raymond Andrew Stahl-David on alleged individual apartment improvements that appear to be inflated, they fraudulently forced him to sign a lease for an apartment that purported to be free from rent regulation, even though it was in fact rent-stabilized. Mr. Stahl-David and his roommates moved into a four-bedroom, rent-stabilized unit in September 2005, around the same time that the building's ownership was transitioning from a prior owner to Defendants. At that time, Mr. Stahl-David and his roommates signed a one-year lease for $1850 per month.

97.     By law, Defendants were required to notify Mr. Stahl-David that their apartment was rent-stabilized, but failed to do so. Indeed, the lease Mr. Stahl-David and his roommates were asked to sign contained a rider requiring them to agree that "the apartment is not subject to any form of rent regulation."

98.     Mr. Stahl-David subsequently learned the unit was rent-stabilized, a fact that Pinnacle itself confirmed when Mr. Stahl-David and his roommates received their lease renewal application for the following year, which indicated that their apartment was subject to the rent stabilization statutory rent increase amount.

99.     In August 2006, upon learning that a prior tenant in the same unit had paid $976 per month in rent two years prior to his tenancy, Mr. Stahl-David filed a rent overcharge claim with DHCR, which is pending. In addition, Mr. Stahl-David has requested and received documentation from Defendants suggesting that they had installed appliances, such as a dishwasher, that his apartment in fact does not have. Mr. Stahl-David continues to try, in vain, to seek answers from Defendants as to the justification for the claimed significant rent increase prior to his tenancy.

**Russell Taylor**

100.    Almost immediately after Defendants purchased the building in which Plaintiff Russell Taylor resided, Defendants began subjecting him to repeated harassment for almost a year in an effort to remove him from a rent-stabilized apartment. Mr. Taylor has lived in the same apartment since 2000, when he first moved in with his friend, Saidah Nash, the apartment's leaseholder at that time. After Ms. Nash moved out one year later, Mr. Taylor asked his then-landlord, Baruch Singer (from whom Defendants purchased the building), that his name be

added as the tenant of record. Mr. Singer's agents agreed to do so. Mr. Taylor continued to reside in the apartment and pay rent for three years.

101. After the building was acquired by Defendants in or about September 2005, they immediately moved to evict Mr. Taylor, falsely claiming that he owed approximately $3,000 in back rent. Mr. Taylor received, via first class mail, a "Three Day Notice to Pay Rent" dated September 7, 2005 from Defendants which was addressed to Ms. Nash. Mr. Taylor was required to appear in housing court and successfully proved that he had in fact paid in full, and no rent was due.

102. On or about September 19, 2005, Mr. Taylor received another notice from Defendants, initiating an eviction proceeding against him alleging that he was not the proper leaseholder. Mr. Taylor sent copies of his rent checks to Defendants via certified mail, but they claimed that they did not receive his correspondence. Mr. Taylor continued to be harassed by Defendants for eight months and was required to appear in housing court on multiple occasions. It was not until on or about April 2006 -- after Mr. Wiener was contacted by a reporter from the *New York Daily News* and a story appeared in that paper covering Mr. Taylor's situation -- that Defendants sent Mr. Taylor a letter informing him that Defendants were dropping their case. To date, Mr. Taylor has not received any formal apology or compensation from Defendants.

**Dianne Trummer**

103. Plaintiff Diane Trummer moved into a rent-stabilized apartment in a building presently owned by Defendants in or about February 2004, only to be subjected to multiple inconveniences and overcharged without adequate explanation and without regard to her needs and rights. When Ms. Trummer moved into the apartment in February 2004, Defendants charged Ms. Trummer $1275 in rent. Soon after moving into her apartment, Ms. Trummer

became suspicious of the amount of rent she was being charged in light of the minimal

improvements made to her apartment and the amounts certain other tenants were paying in rent.

Ms. Trummer immediately requested the initial apartment registration for her apartment from

Defendants. Although Defendants promised to send her the requested document, they failed to

do so. After obtaining the rental history of her apartment from DHCR, Ms. Trummer learned

that her apartment was previously rent-controlled, with the last tenant of record paying $497.53

in rent. On or about June 24, 2004, Ms. Trummer filed a complaint for overcharge with DHCR.

As a result of Defendants' failure to submit the initial apartment registration form to Ms.

Trummer or to DHCR as requested on February 9, 2005, Ms. Trummer's rent overcharge case

was processed by DHCR as a fair market rent appeal.

104.    By letters dated September 29, 2004 and October 5, 2004, Defendants sent DHCR

their objections to Ms. Trummer's complaint on the grounds that the increased rent resulted from

$24,000 in alleged improvements that were performed on the apartment and that Ms. Trummer's

fair market rent appeal should be barred by a 90-day statute of limitations applicable to fair

market rent appeals where a tenant is mailed a certified copy of his or her initial apartment

registration. Ultimately, DHCR denied Ms. Trummer's fair market rent appeal because DHCR's

rent registration database showed a higher rent for a neighboring apartment in Defendants'

building. However, upon information and belief, Defendants unlawfully increased the rent for

Ms. Trummer's apartment based on fraudulent receipts and alleged renovations, including

improper charges in the amount of approximately $11,000 in labor costs from their own super,

which were not examined by DHCR in the fair market appeal proceeding. Upon information and

belief, the comparable apartment used to establish the fair market value of Ms. Trummer's

apartment was fraudulently and artificially inflated by Defendants.

105.    Further, four months after moving in, on or about June 20, 2004, there was a fire in a neighboring apartment that required her to vacate her apartment. Defendants never informed Ms. Trummer when she could move back into her apartment; when she finally did, she discovered that her kitchen was made twenty-feet smaller. Defendants then petitioned to restore the rent, which had been reduced because of the fire, and set January 1, 2005 as the date when the apartment was allegedly habitable so that Defendants could collect back rent. Defendants, however, never provided any evidence of habitability.

**Andres Mares-Muro**

106.    Plaintiff Andres Mares-Muro moved into a rent-stabilized apartment in a building then owned by Baruch Singer on or about September 15, 2003, signing a two-year lease at that time for $1,400 per month. Defendants acquired the building complex in August 2005, which, according to the Department of Housing Preservation & Development website, currently has 186 open housing maintenance code violations, several dating back more than a decade. One hundred and thirteen of these uncorrected violations are deemed "hazardous," and no fewer than 29 of them are deemed "immediately hazardous."

107.    On or about July 19, 2005, Mr. Mares-Muro went to DHCR and requested the rental history for his apartment, where he discovered that the rent charged had nearly doubled between 2000 and 2001, from $648 per month to $1,275 per month. Mr. Mares-Muro filed a complaint for rent overcharge with DHCR on or about July 27, 2005. Because of a four-year regulatory limitation on the ability to contest a rent increase, however, Mr. Mares-Muro was unable to challenge the rent overcharges for his apartment.

108.    On information and belief, Defendants, as a sophisticated entity and business person, know or should have known that many of the rents for apartments in buildings that it

acquired were so inflated as to be illegal, based on unsupported and fraudulent rent increases.
On information and belief, Defendants also know or should have known, based on Mr. Singer's
reputation and prior business practices, that it was not reasonable to rely on the accuracy of
Mr. Singer's records. On information and belief, Defendants are also aware of the four-year
regulatory limitation on a tenant's ability to contest a rent increase, and take unfair and deliberate
advantage of this limitation so that they can unjustly enrich themselves from the unsupported and
fraudulent rent overcharges that they assume as a result of their apartment building acquisitions.

**Mark Gordon**

109.    Mark Gordon has expended more than $10,000 of his own money over three years
on litigation against Defendants challenging rent overcharges they imposed on him based on
charges of individual apartment improvements ("IAIs") allegedly made to his unit prior to his
tenancy. Defendants later acknowledged that such charges were not appropriate. On or about
July 1, 2001, Mr. Gordon moved into a rent-stabilized, two-bedroom apartment in a building
presently owned by Defendants. At that time, Defendants charged Mr. Gordon a "preferential"
rent of $1,900 a month. However, Defendants identified the "legal" rent on Mr. Gordon's lease
as $2,100 and represented to Mr. Gordon that they could have charged as much as $2,100 based
on renovations they had undertaken in the unit. Further, based on the amount of "legal rent,"
Defendants claimed on the lease that the unit was de-regulated.

110.    Suspicious of the basis for rent he was charged, Mr. Gordon requested a rental
history for his apartment from DHCR. Mr. Gordon learned that his apartment's last registered
rent was only $426.53 in 1998 for the last listed tenant before Mr. Gordon's legal rent amount of
$2100. Based on the rental history of the apartment, Mr. Gordon determined that any alleged
improvements or renovations would have had to amount to over $55,000 to justify the increased

rent that Defendants charged him. After further investigation, Mr. Gordon learned that the rent increase was based upon, among other things, double-billed labor charges for the installation of kitchen cabinets, the cost of replacing electrical wiring that appeared not to have been done, and the alleged installation of five toilets in a two-bathroom apartment. In light of Defendants fraudulent rent overcharge, Mr. Gordon withheld rent and commenced an action against Defendants in New York Supreme Court on or about July 31, 2002.

111.    Mr. Gordon received a "Three Day Notice" from Pinnacle dated August 13, 2002 demanding $4000 of back rent. That notice was false because it was based on unlawfully inflated rent amounts. On or about August 27, 2002, Horing Welikson & Rosen, P.C., on behalf of Defendants, instituted a non-payment proceeding against Mr. Gordon. Only after Mr. Gordon spent three years and more than $10,000 in legal fees to challenge the propriety of the alleged renovation charges -- causing him great emotional and financial distress, inconveniences, uncertainty, and disruption in his daily life -- did Defendants finally agree to resolve the case by lowering his rent and re-classifying his apartment as rent stabilized. Although Mr. Gordon is barred by a Settlement Agreement from joining as a Plaintiff in this action, his story is illustrative of the types of the harassing and unlawful tactics in which Defendants are engaged and constitutes evidence of Defendants' pervasive and ongoing scheme directed at multiple victims.

**Myrtle D. Butler**

112.    On information and belief, Defendants also engage in a pattern and practice of intentionally inflating the Maximum Base Rent ("MBR") of their rent-controlled units, many of which are occupied by senior citizens who are unfamiliar with the rent-regulation laws and thus lack the knowledge to challenge Landlord Defendants' calculations. Myrtle Butler, a long-time

rent-controlled tenant in a building presently owned by Defendants, is a prime example of an unwitting victim of this unethical and illegal practice. Ms. Butler has maintained continuous residence in a two-bedroom apartment since 1970, when she first moved in with her then-husband, the late Henry Butler.

113.    Every other year, owners are entitled a statutory increase in the Maximum Base Rent ("MBR") for their rent-controlled apartments. The increase is calculated by the owner on a DHCR form to be submitted to the DHCR and the tenant; the form requires the owner to multiply the most recent approved MBR by a standard increase factor provided by DHCR, which varies depending on when the prior MBR increase was granted.

114.    With regard to Ms. Butler's apartment, for the 2006-2007 period, Defendants were entitled to a statutory increase in the MBR as described above. However, Defendants did not use the multiplier based on Ms. Butler's apartment's most recent MBR increase, which was granted in the 2004-2005 period. Instead, Defendants hand wrote onto the form the rent as of 1974-1975 and used a much larger corresponding multiplier to calculate the MBR, resulting in an MBR amount that is almost $180.00 more per month than if the correct figures had been used. The form is signed by "Joel Wiener, an "owner, officer or agent" of Defendants, and was submitted to DHCR with an affirmation "under penalties provided by law, that the computations and statements made on this form, are true and correct" to the best knowledge of the affiant.

115.    By inflating the MBR of rent-controlled apartments like Ms. Butler's, Defendants open the door to collecting and charging higher rents. Ms. Butler was only able to discover Defendants' misrepresentation as to the date of her apartment's last approved MBR increase (and the computation of her current, 2006-2007 MBR based on that amount) with the assistance of a representative from her tenants' association. Since the discovery of this misrepresentation, other

rent-controlled tenants, both in Ms. Butler's building and others owned by Defendants, also have identified similar misrepresentations in their respective 2006-2007 MBR increase forms.

**COUNT I**

**VIOLATION OF NEW YORK
CONSUMER PROTECTION ACT ("NYCPA")**

116.    Plaintiffs incorporate and restate the allegations of paragraphs 1 through 115 as if fully set forth herein.

117.    Defendants have engaged and continue to engage in deceptive consumer-oriented acts and practices by subjecting rent-subsidized tenants, including Plaintiffs and those on whose behalf BRUSH advocates, to demands of rents above those permitted under law based upon its representations of alleged renovations of individual units and major capital improvements not made or insufficient to justify the dramatic rent increases charged, for the purposes of illegal commercial gain.

118.    Defendants have engaged and continue to engage in deceptive consumer-oriented acts and practices filing eviction notices against rent-regulated tenants, including those on whose behalf BRUSH advocates, and making demands for rents already paid or lawfully withheld, and seeking unreasonable evidence of succession rights from lawful tenants, for the purposes of harassment and unfair and illegal commercial gain.

119.    Defendants' deceptive consumer-oriented acts and practices are misleading to a reasonable consumer in a material way.

120.    Plaintiffs and other of Defendants' tenants, including those on whose behalf BRUSH advocates, have suffered injury as a result of Defendants' deceptive consumer-oriented acts and practices in the form of overpayment in rent, unlawful eviction, lost wages, severe

emotional distress, transportation and child care expenses, shoddy repairs and/or failure to make reasonable repairs, and endless hours of aggravation and anxiety in housing court.

121.    Defendants' deceptive consumer-oriented acts and practices have a broad impact on consumers at large and cause injury and harm to the public interest.

122.    Defendants' practices, acts, communications, and representations violate the New York Consumer Protection Act, New York General Business Law § 349, because they constitute deceptive acts or practices in the conduct of business, trade, and commerce, and/or in the furnishing of services.

## COUNT II

### VIOLATION OF THE FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")

123.    Plaintiffs incorporate and restate the allegations of paragraphs 1 through 122 as if fully set forth herein.

124.    Defendants Pinnacle and Wiener are "persons" as defined under 18 U.S.C. § 1961(3).

125.    Beginning in 2002, Pinnacle, Wiener, Praedium, and at least the LLCs identified in paragraphs 21 through 28, *supra*, constituted an enterprise associated-in-fact within the meaning of 18 U.S.C. § 1961. At all material times the Enterprise operated for the purpose of owning and operating residential properties, collection of rents and development of condominium and cooperative conversions.

126.    At all material times, the Enterprise was separate and apart from the pattern of racketeering activity in which it was engaged.

127.    At all material times, the Enterprise affected interstate commerce in that it used the U.S. mails and the interstate wires to conduct its business.

128.    Beginning in as early as 2002, Defendants Pinnacle and Wiener conducted the affairs of the Enterprise through a pattern of racketeering activity. This included the predicate acts of mail fraud in violation of 18 U.S.C. § 1341 and/or wire fraud in violation of 18 U.S.C. § 1343.

129.    On numerous occasions, Defendants used the U.S. mails and the interstate wires to perpetrate their fraudulent scheme, acted with the knowledge that the use of the mails and interstate wires would follow in the ordinary course of business and could reasonably foresee such use of the mails and interstate wires.

130.    Defendants' use of the U.S. mails and interstate wires included communications among Pinnacle, Praedium and Wiener, and communications between Defendants and various tenants, regulatory agencies and officials; all in furtherance of Defendants' fraudulent scheme.

131.    Defendants' fraudulent scheme and pattern of racketeering activity is ongoing, and has been directed at other victims besides the plaintiffs named herein, such as additional tenants in Pinnacle-controlled buildings that have been targeted by Defendants.

132.    As a proximate result of the fraudulent conduct perpetrated by Defendants, Plaintiffs have suffered and will continue to suffer damages, including:

a.    Plaintiffs have been harmed and will continue to be harmed by the excessive amount of rent they have paid directly to Pinnacle.

b.    Plaintiffs have been harmed and will continue to be harmed by the unlawful evictions Defendants have perpetrated and the fraudulent eviction proceedings Defendants have initiated.

c.    Plaintiffs have been harmed and will continue to be harmed by the diminution in value of their leasehold interests in their apartments.

d.      Plaintiffs have been harmed and will continue to be harmed by incurring lost wages for time spent defending fraudulent eviction claims and responding to fraudulent succession rights claims.

e.      Plaintiffs have been harmed and will continue to be harmed by incurring child-care expenses and unnecessary transportation expenses in defending fraudulent eviction claims.

f.      Plaintiffs have been harmed and will continue to be harmed by the diminution in value of their leasehold interests in their apartments.

WHEREFORE, Plaintiffs request judgment in the form of:

(a)     declaratory relief, declaring as follows:

(1)     that Defendants' actions and practices of seeking to collect rent in amounts above what is permitted under the law, based on alleged individual apartment improvements or major capital improvements not actually made or in excess of those actually made, violate the New York Consumer Protection Act;

(2)     that Defendants' actions and practices of refusing to make necessary and reasonable repairs or to address housing maintenance code violations as required by law, and then moving to evict tenants who have lawfully withheld rent based on Pinnacle's failure to make the repairs or address the code violations violate the New York Consumer Protection Act;

(3)     that Defendants' actions and practices of commencing unfounded eviction actions in housing court to demand rent that has already been paid violate the New York Consumer Protection Act;

(4)     that Defendants' actions and practices of commencing unfounded proceedings to challenge a tenant's succession rights or harassing and intimidating tenants by demanding an unduly burdensome, unjustified, and intrusive amount of evidence regarding a tenant's succession rights violate the New York Consumer Protection Act;

(5)     that Defendants' repeated practice of ignoring, delaying compliance, and/or failing to comply with housing court orders and rulings from the DHCR violate the New York Consumer Protection Act; and

(6)     that Defendants' operation of an Enterprise through a pattern of racketeering activity violates the Racketeer Influenced and Corrupt Organizations Act;

(b)     injunctive relief, in the form of a preliminary and permanent injunction restraining Defendants, their agents, employees, successors, and all others acting in concert or conjunction with them, from continuing practices declared unlawful pursuant to paragraph (a) above, and

(c)  directing Defendants to implement Court-approved procedures designed to avoid such unlawful practices in the future, including but not limited to the creation of an independent body appointed by the Court, which shall monitor and ensure the lawful operation of buildings and management of tenant relations in buildings owned by Defendants and assist in the resolution of disputes between Defendants and their tenants; and the auditing and accounting of rents demanded by Defendants and disgorgement of any rent overcharges;

(d)     an award of compensatory, statutory, and punitive damages pursuant to New York General Business Law § 349(h);

(e)    revocation of rent increases and disgorgement of Defendants' unjust gains and profits;

(f)    an award of attorneys' fees and costs pursuant to New York General Business Law § 349(h);

(g)    all damages caused by Defendants' violations of 18 U.S.C. § 1962(c) including treble damages;

(h)    attorneys' fees and costs;

(i)    pre- and post-judgment interest to the extent permitted by law; and

(j)    such other and further relief as this Court deems equitable and just.

PLAINTIFFS DEMAND A TRIAL BY JURY

Dated: July 11, 2007

Respectfully submitted,

BUYERS AND RENTERS UNITED TO SAVE
HARLEM, MARJORIE and THEODORE
CHARRON, KAREN FLANNAGAN,
ANDRES MARES-MURO, TRACEY
MOORE, RAYMOND ANDREW STAHL-
DAVID, RUSSELL TAYLOR, and DIANE
TRUMMER

By: _____

Richard F. Levy (RL-9825)
Ronald M. Daignault (RD-2672)
Katya Jestin (KJ-6047)
Susan J. Kohlmann (SK-1855)
Chinh Q. Le (CL-9036)
Carletta F. Higginson (CH-6491)
Elizabeth Valentina (EV-4345)
JENNER & BLOCK LLP
919 Third Avenue, 37th Floor
New York, NY 10022-3908
(212) 891-1600
(212) 891-1699 facsimile

*Of counsel:*

Andrew A. Jacobson
JENNER & BLOCK LLP
330 North Wabash Avenue
Chicago, IL 60611
(312) 222-9350
(312) 587-0484 facsimile