**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BUYERS AND RENTERS UNITED TO SAVE HARLEM; and<br><br>MARJORIE and THEODORE CHARRON; ANTHONY CASASNOVAS; KAREN FLANNAGAN; ANDRES MARES-MURO; TRACEY MOORE; RAYMOND ANDREW STAHL-DAVID; RUSSELL TAYLOR; DIANE TRUMMER, and KIM POWELL, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PINNACLE GROUP NY LLC; PINNACLE GROUP, LLC; and JOEL WIENER,<br><br>Defendants. | PLAINTIFFS DEMAND TRIAL BY JURY<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>No. 07 CIV 6316 |

RECEIVED
SEP 1 4 2007
U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiffs, Buyers and Renters United to Save Harlem ("BRUSH") and Marjorie and

Theodore Charron, Anthony Casasnovas, Karen Flannagan, Andres Mares-Muro, Tracey Moore,

Raymond Andrew Stahl-David, Russell Taylor, Diane Trummer, and Kim Powell, individually

and on behalf of all others similarly situated (the "Individual Plaintiffs," and collectively with

BRUSH, the "Plaintiffs"), by their attorneys, for their complaint against Defendants Pinnacle

Group NY LLC; Pinnacle Group, LLC (collectively, "Pinnacle") and Joel Wiener ("Wiener"),

state as follows:

## BACKGROUND

1.      The Plaintiffs bring this lawsuit to redress and to end the illegal, fraudulent, and

harassing practices employed by Pinnacle against its tenants in over 400 apartment buildings it

owns or controls in the City of New York.  Pinnacle and its CEO, Wiener, have adopted a

scheme designed to inflate rents over and above the amounts they are legally permitted to charge under New York's rent control and rent stabilization provisions. That scheme has been accomplished through, among other things, a pattern of fraudulent conduct, including misrepresenting the legally chargeable rent, misrepresenting the status and cost of repair work, misrepresenting and refusing to acknowledge tenants' succession rights under their leases, misrepresenting tenants' rent delinquency status and filing meritless eviction suits even though tenants have in fact paid their rent, and harassment, including eavesdropping and surveillance.

2. The Defendants' scheme is intended to intimidate tenants and to create a climate of fear among tenants and to discourage and prevent them from challenging the Defendants' illegal actions, all in a blatant attempt to circumvent the carefully balanced New York rent regulation process at the expense of tenants who lack the resources to oppose the Defendants' tactics on their own.

**The Loss of Affordable Rental Housing Units in
New York City, Caused in Part by Illegal Tactics
and Unscrupulous Landlords**

3. The City of New York ("New York City") has struggled with the loss of affordable rental housing units. Despite a statutory scheme of state and local rent regulation, unscrupulous landlords have employed harassing and other unlawful tactics to evade the requirements of rent regulation, to artificially increase rents, or to free apartments from regulation altogether. The over-arching goal of these unscrupulous landlords is to drive low- and middle-income tenants from their apartments and improperly inflate rents and thus the landlords' profits.

4. In the face of such pressure, tenants in increasing numbers are faced with either paying unlawful rents -- if they can -- or being forced out of their homes. Landlords often

commence unjustified eviction actions to remove such tenants to make way for higher "market" rents or condominium and cooperative conversions.

5.      The depletion and deterioration of affordable housing and tenant mistreatment have been recognized as major contributing causes to other social problems affecting New York City, such as the displacement of the middle class, racial and ethnic tension, and homelessness.

**The Illegal Tactics of These Unscrupulous Landlords
and the Need for Affordable Housing Have Been
Recognized by New York City Public Officials**

6.      New York City public officials repeatedly have emphasized that the affordable housing situation has become dire.  For instance, at a community workshop on housing law and tenants' rights for Harlem residents held on September 9, 2006, and co-sponsored by Public Advocate Betsy Gotbaum, Congressman Charles Rangel, and Manhattan Borough President Scott M. Stringer, the Public Advocate, Ms. Gotbaum, stated: "One of my top priorities as Public Advocate is ensuring safe, affordable housing and fair treatment for all of our city's tenants."  At the City Council Hearing on Department of Housing Preservation & Development ("HPD") Budget for Fiscal Year 2006 which took place on March 6, 2007, Ms. Gotbaum submitted written testimony further stating:

> As of June 2006, HPD had fewer than 40 attorneys in its Housing Litigation Division to deal with the 12,662 cases it initiated in Fiscal Year 2005.  The fact is, despite the best intentions, HPD is overwhelmed by its responsibility to enforce housing maintenance code violations and protect tenants from irresponsible landlords. The result is that the deck is stacked against tenants who rely on the city to take their landlords to court.  My office has encountered example after example in which families have no choice but to go on living in unsanitary and dangerous conditions: leaky ceilings, broken doors, rats scurrying across the floor.

7.      Similarly, as the Manhattan Borough President, Scott M. Stringer, recognized in his 2006 Strategic Policy Statement (dated September 1, 2006):

Accessing affordable housing is one of the biggest challenges facing out borough and our city. Across incomes and populations, residents are struggling to find and maintain housing. The number of rental units available to low- and moderate-income households has fallen significantly over the past three years. At the same time, 29% of New York City residents pay more than half of their incomes in rent. People come to our borough from around the world to pursue opportunities as teachers, actors, entrepreneurs, financiers, and artists. Those who came years ago, who helped Manhattan grow and thrive, are left fearing buy-outs, opt-outs, demolitions, major capital improvements, rent increases, condo conversions, and any number of other threats while new New Yorkers are struggling to find first homes.

8.      As recently as May 31, 2007, the *New York Sun* reported that the Manhattan

District Attorney, Robert Morgenthau, has held a forum on tenant-landlord issues including

evictions, and has expressed concern that

". . . [w]ith landlords pushing out people who fail to pay rent or are not registered on leases, . . . a portion of owners are forcing out residents on false grounds. . . . Some of them are just interested in making a quick buck out of this."

**The Devastating Effect on Tenants of These Illegal
Tactics Has Increased Dramatically as Affordable
Housing Has Come into the Hands of Larger and
More Powerful Landlords**

9.      In years past, it was primarily individual landlords and property owners who

resorted to harassing, illegal, and sometimes physically threatening tactics to extort illegal rents

from tenants while letting properties deteriorate into dangerously unsafe conditions. Public and

governmental reaction to the tactics of these individual "slumlords" has been a driving force

behind New York City's continued efforts to maintain a rent regulation and housing maintenance

code enforcement scheme.

10.     More recently, however, the effects of the assault on affordable housing have

become magnified when the ownership of numerous buildings in an affected geographic area

becomes concentrated in a single landlord or real estate operator. In the 1990s, for example, an

individual named Baruch Singer (who later sold many of his apartment buildings to Pinnacle) amassed a sizeable empire of properties in Harlem and Upper Manhattan that included numerous rent-regulated apartments.  Singer became infamous for reportedly using a variety of tactics to harass tenants in more than one hundred buildings, which collectively had more than 4,000 housing maintenance code violations.

**Pinnacle and Its Owner,
Joel Wiener, Own More Than 21,000 Apartments
And Are Financed by a $6 Billion Fund, the
Praedium Group**

11.     Pinnacle has been accumulating residential apartment buildings in New York City for many years.  In late 2005, Pinnacle reportedly bought 104 buildings in Manhattan from Baruch Singer.  Pinnacle and Wiener own, dominate, and control a large number of entities, in the form of corporations, LLC, partnerships, or otherwise that hold legal title to and manage apartment buildings in New York City under the "Pinnacle Group" umbrella name.  In addition, entities owned, dominated, or controlled by Wiener within the Pinnacle Group are in the business of converting rental apartment units to condominium or cooperative ownership.

12.     Also among the entities owned, dominated, or controlled by Wiener is SecureWatch 24, which is in the business of providing residential electronic surveillance.  SecureWatch 24 shares the Pinnacle Group's office suite.  It operates digital video and audio surveillance devices in buildings owned by the Defendants.  Those surveillance devices are connected through a "hub" system to a central observation point so that activities in the buildings can be observed on a real-time basis.  SecureWatch 24 employs off-duty and former law-enforcement officers to conduct additional surveillance.  Though some of SecureWatch 24's

activities serve legitimate purposes, it is used by the Defendants to conduct improper surveillance and to intimidate tenants.

13.    Pinnacle's acquisitions of rent-regulated housing units largely were funded by The Praedium Group ("Praedium"), a massive real estate investment firm that boasts in excess of $6 billion in nationwide real estate investments made through various Praedium-controlled real estate investment funds.

**Pinnacle's Business Strategy, Funded by Praedium,
Is To Fraudulently Inflate Rents, Fail To Make Needed
Repairs and To Use Other Tactics To Harass Tenants
and Force Them Out of Rent-Regulated Units**

14.    Pinnacle's apparent business strategy -- consistent with the strategic direction provided by its financial backer Praedium -- is to inflate rents fraudulently, to fail to make needed repairs, and to groundlessly harass and force tenants out from rent-regulated housing units.  These actions serve Pinnacle's ultimate goal of charging higher rents than is legally permissible, avoiding the expense of necessary and legally required repairs, and eliminating rent-regulated units in its buildings without regard for the lawfulness of the tactics used.  Pinnacle and its investment partner are thus able to turn what they perceive to be "underperforming" assets into higher value assets through inflated rents, building sales, or condominium and cooperative conversions -- all at the expense of existing tenants.

15.    Moreover, Defendants improperly favor market-rate units when making repairs and renovations, creating "showplace" apartments, while neglecting rent-regulated apartments needing repairs or renovation.  Tenants residing in rent-regulated apartments often wait unconscionable amounts of time for repairs and must commence proceedings in housing court to obtain repairs.

16.     The unlawful tactics employed by Pinnacle and funded by Praedium that are the subject of this Complaint are aimed at serving Praedium's euphemistically named "value enhancement program." Praedium's website (www.praediumgroup.com) describes Praedium as a "real estate investor focusing on underperforming and undervalued assets." Praedium acknowledges that its investment strategy is to join with "local operators and investment partners," such as Pinnacle and Wiener, to identify and acquire "middle market" properties.

17.     The resulting strategy of forcing out tenants and freeing units from rent-regulation and of failing to make necessary and legally required repairs is driven by the self-described "value enhancement program" that Praedium touts as including "aggressively manag[ing] the current tenant/leasing base" making only "strategic capital improvements" and "asset repositioning." In essence, Pinnacle and Praedium, by virtue of their massive investments, vast holdings and "value enhancement" tactics, have pioneered a new era in the attack on affordable housing that can only be described as "corporate slumlording." Left unchecked, the unlawful conduct employed by the Defendants will force countless more tenants from their long-time homes and accelerate the unlawful demise of affordable housing in New York City.

## NATURE OF THE ACTION

18.     Defendants Pinnacle and Joel Wiener engage in reckless and intentional systematic acts and business practices of demanding and collecting rents in amounts beyond those permitted under the law, including but not limited to New York's Rent Stabilization Laws and Rent Stabilization Code. Defendants' conduct also violates the New York Consumer Protection Act ("NYCPA"), N.Y. General Business Law § 349, *et seq.* In addition, Defendants' ongoing pattern of fraudulent practices violates the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

7

19.    The Defendants' unlawful acts are part of an overall pattern and practice of tenant harassment, which includes: (i) seeking to collect rent in amounts that are not permitted under the law based on misrepresentations as to individual apartment improvements or major capital improvements that have not been made; (ii) failing to timely make necessary and reasonable repairs, to address housing maintenance code violations, or to provide essential, required services and then threatening and taking action to evict tenants who have reasonably and legally withheld rent because of such illegal conduct; (iii) commencing unfounded eviction actions based on misrepresentations that rent has not been paid; (iv) commencing unfounded proceedings to challenge  tenants' succession rights and harassing and intimidating tenants based on misrepresentations as to the amount and type of evidence needed to establish a tenant's succession rights; (v) unjustifiably refusing to accept tenants' rent checks and then misrepresenting that rent has not been paid, as a basis for commencing fraudulent eviction actions or other proceedings challenging succession rights; (vi) directing, encouraging and allowing the superintendents of its buildings to, among other things, harass tenants by making unacceptable and shoddy repairs or making false promises to conduct repairs; scheduling appointments that the superintendents do not attend; issuing false notices and documents regarding tenants' activities or conduct; and ignoring tenants' complaints and acting in a hostile and retaliatory manner to tenants who have made complaints; (vii) failing to offer tenants lease renewals, or lease renewals on proper terms; (viii) failing to comply with orders issued by the New York Department of Housing and Community Renewal requiring Pinnacle to pay monetary awards to tenants for rent overcharges and rent reductions; (ix) misrepresenting that it is entitled to collect original rents that have been reduced in accordance with Department of Housing and Community Renewal orders, knowing that the housing violations giving rise to the rent

reductions have not been resolved; (x) refusing to respond to and ignoring tenants' inquiries and requests for documents relating to rental histories, rent increases based on individual apartment improvements and major capital improvements, and lease renewals, all with the purpose of preventing tenants from discovering that the rent being charged is excessive; and (xi) altering documents relating to rental histories as a means of misrepresenting the amount of rent it is entitled to collect.

20.     In connection with their fraudulent practices, Defendants have employed the U.S. mails and interstate wires as part of an ongoing scheme to increase rents unlawfully, to receive illegal rents, and ultimately to free their properties from New York's rent control and rent stabilization requirements.  Defendants' pattern of racketeering activity and unlawful tactics has injured countless tenants, deprived them of their lawful property interests in their apartments and forced them to pay money to which Defendants are not entitled.

21.     Plaintiffs seek a judgment from this Court, as set forth below, providing (1) declaratory relief; (2) injunctive relief; (3) appointment of an independent monitor to oversee  the lawful operation and management of rent-regulated buildings owned by Defendants and assist in the resolution of disputes between Defendants and their tenants;  (4) an audit and accounting of rents demanded by Defendants and disgorgement of any rent overcharges; (5) compensatory, statutory, and punitive damages; (6) reasonable attorneys' fees and costs; and (7) any other relief as this Court deems appropriate.

## PARTIES

22.     Plaintiff BRUSH is a non-profit association formed under the laws of the State of New York for the purposes of educating tenants in the West Harlem and Northern Manhattan communities about their rights and of advocating for the betterment of the West Harlem and

Northern Manhattan communities. BRUSH is an advocate for, and represents the interests of, tenants in those areas, a large number of whom occupy rent-regulated apartments in buildings owned by Defendants. BRUSH also organizes tenants and helps them to defend against harassment and unlawful acts by landlords, and acts as one of the umbrella organizations of other local tenant groups and associations.

23.     Plaintiffs Marjorie and Ted Charron are residents of New York City, citizens of the State of New York, and lawful tenants of a rent-stabilized apartment at 706 Riverside Drive, New York, New York, a building owned by Defendants and operated as 706 Realty Company, LLC.

24.     Plaintiff Anthony Casasnovas is a resident of New York City, a citizen of the State of New York, and a lawful tenant of a rent-stabilized apartment at 3657 Broadway, New York, New York, a building owned by Defendants and operated as 3657 Realty Company, LLC.

25.     Plaintiff Karen Flannagan is a resident of New York City, a citizen of the State of New York, and a lawful tenant of a rent-controlled apartment at 706 Riverside Drive, New York, New York, a building owned by Defendants and operated as 706 Realty Company, LLC.

26.     Plaintiff Andres Mares-Muro is a resident of New York City and the State of New York, and a lawful tenant of a rent-stabilized apartment at 635 Riverside Drive, New York, New York, a building owned by Defendants and operated as 635 Riverside Drive LLC, a/k/a 635 Riverside LLC, a/k/a 635 Riverside Drive NY LLC.

27.     Plaintiff Tracey Moore is a resident of New York City and the State of New York, and a lawful tenant of a rent-stabilized apartment at 509 West 155 Street, New York, New York, a building owned by Defendants and operated as 509 Realty Co., LLC.

28.    Plaintiff Raymond Andrew Stahl-David is a resident of New York City, a citizen of the State of New York, and a lawful tenant of a rent-stabilized apartment at 516 West 143 Street, New York, New York, a building owned by Defendants and operated as 516 Realty NY LLC.

29.    Plaintiff Russell Taylor is a resident of New York City, a citizen of the State of New York, and a lawful tenant of a rent-stabilized apartment at 75 St. Nicholas Place, New York, New York, a building owned by Defendants and operated as Pinnacle Hamilton LLC.

30.    Plaintiff Diane Trummer is a resident of New York City, a citizen of the State of New York, and a lawful tenant of a rent-stabilized apartment at 680 Riverside Drive, New York, New York, a building owned by Defendants and operated as 680 Realty Co. LLC, a/k/a 680 Riverside Realty Co. LLC.

31.    Plaintiff Kim Powell is a resident of New York City, a citizen of the State of New York, and a lawful tenant of a rent-stabilized apartment at 706 Riverside Drive, New York, New York, a building owned by Defendants and operated as 706 Realty Company, LLC.

32.    Defendant Pinnacle Group NY LLC is a limited liability corporation organized and existing under the laws of the State of New York, having its principal place of business in New York.

33.    Defendant Pinnacle Group, LLC is a limited liability corporation organized and existing under the laws of the State of Delaware, having its principal place of business in New York.

34.    Defendant Joel Wiener is a citizen of the State of New York, with his principal residence in Woodmere, New York. Mr. Wiener is the founder, Chief Executive Officer, and an investor in, and owner of, Pinnacle Group NY LLC and Pinnacle Group, LLC. Mr. Weiner

operates Pinnacle Group NY LLC, Pinnacle Group, LLC, and their subsidiaries and affiliates under the umbrella doing-business-as ("d/b/a") name "The Pinnacle Group."  Mr. Wiener dominates and controls the Pinnacle Group's affairs.

## JURISDICTION AND VENUE

35.     This Court has jurisdiction of this action pursuant to 18 U.S.C. § 1962 and 28 U.S.C. § 1331.

36.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

37.     Venue is proper in this Court under 28 U.S.C. § 1391(a) because all Plaintiffs and at least one Defendant reside in this judicial district, and a substantial part of the events, acts, or omissions giving rise to the claims occurred in this judicial district.

## STATUTORY AND REGULATORY SCHEME

**A.     New York Rent-Regulation Laws**

38.     The Rent Stabilization Laws ("RSL"), and the Rent Stabilization Code ("RSC") issued by the New York State Division of Housing and Community Renewal ("DHCR"), act to limit the rent owners may charge and circumscribe the manner in which owners may recover the cost of improvements, terminate tenancies, or commence other proceedings against tenants.

39.     These laws form part of the backdrop to Defendants' unlawful RICO scheme to collect inflated rents, evade obligations imposed by rent regulations, and remove apartments from rent-regulated status.

**Renewal and Vacancy Leases**

40.     Upon expiration of any lease after initial legal rents are established, owners of occupied rent-stabilized apartments must offer existing tenants the option of a one- or two-year

renewal lease in which they are permitted to charge a statutory rent increase per annum, as established by the Rent Guidelines Board ("RGB") each year. RSL § 26-510. Owners of rent-stabilized apartments that become vacant or of rent-controlled apartments that become rent-stabilized upon vacancy, must offer new tenants one- or two-year leases and are permitted to charge the first tenants of such apartments the statutory rent increase that the RGB may set per annum, plus twenty percent. RSC § 2522.5 (a)(1) & (b)(1).

41.    For all rent-regulated apartments, "an owner shall furnish to each tenant signing a vacancy or renewal lease, a rider in a form promulgated or approved by the DHCR, in larger type than the lease, describing the rights and duties of the owners and tenants as provided under the RSL. . . . For vacancy leases, such rider shall in addition also include a notice of the prior legal regulated rent, if any, which was in effect immediately prior to the vacancy, an explanation of how the rental amount provided for in the vacancy lease has been computed above the amount shown in the most recent annual registration statement, and a statement that any increase above the amount set forth in such registration statement is in accordance with the adjustments permitted by the Rent Guidelines Board and [the RSC]." RSC § 2522.5 (c)(1).

**Additional Rent For MCIs and IAIs**

42.    Owners of rent-stabilized apartments may be entitled to an additional rent increase where they have performed certain kinds of improvements either for individual apartments, known as Individual Apartment Increases ("IAIs"), or building-wide, known as Major Capital Improvements ("MCIs"). RSC § 2522.4.

43.    Owners who undertake an IAI may be entitled to a rent increase equal to 1/40th of the total costs of improvements per month, including installation costs but not finance charges. Owners may make IAIs in an occupied apartment only upon written consent of the tenants in

possession; no written consent is required for vacant housing accommodations. If tenants in possession deny the improvements that the owners offer, then no additional charge may be added to the tenant's rent. RSC § 2522.4 (a)(1) & (4). When a tenant timely challenges any claimed IAIs, owners of rent-regulated apartment buildings must demonstrate that the charges are supported by adequate documentation.

44.    Owners who undertake an MCI for a residential apartment building subject to rent-regulation laws may be permitted to adjust the rent of rent-regulated apartments in the building based on the actual, verified cost of the improvements, as submitted to DHCR by the owner within two years of the improvement having been made. The rent increase to which the owner may be entitled equals 1/60th of the cost, including installation but excluding finance charges, divided by the number of rooms in the building, charged per apartment based on the number of rooms. To be eligible for a rent adjustment an MCI must be, among other things, a new installation for the operation, preservation, and maintenance of the building that directly or indirectly benefits all tenants and is deemed depreciable under the Internal Revenue Code. If DHCR approves the application, it also establishes the amount of the rent adjustment for the MCI. RSC § 2522.4 (a)(2), (4) & (12).

**Succession Rights**

45.    Any "family member" of a rent-regulated tenant, including persons with similar familial-like ties as described in paragraph 46 below, may have the right to a renewal lease and/or protection from eviction when the tenant dies or permanently leaves the apartment, provided that the family member has resided with the tenant as a primary resident in the apartment for at least two years immediately prior to the death of, or permanent departure from the apartment of, the prior tenant (one year for senior citizens). The family member may also

have the right to a renewal lease or protection from eviction if she/he resided with the tenant from the inception of the tenancy or from the commencement of the relationship. RSC § 2523.5 (b)(1) & (2).

46.    The term "family member" is defined as a husband, wife, son, daughter, stepson, stepdaughter, father, mother, stepfather, stepmother, brother, sister, grandfather, grandmother, grandson, granddaughter, father-in-law, mother-in-law, son-in-law, or daughter-in-law of the tenant. It also includes any other person(s) residing with the tenant in the apartment as a primary resident, who can prove emotional or financial commitment and interdependence between such person and the tenant. RSC § 2520.6 (o).

**Owners' Obligations -- and the Consequences**
**If Owners Do Not Meet Them**

47.    Owners of rent-stabilized apartments must maintain all essential services provided by the RSC, known as required services, which may include but are not limited to reasonable repairs, decorating and maintenance, the furnishing of light, heat, hot and cold water, elevator services, janitorial services, and removal of refuse. In addition, owners must provide certain building-wide services, known as ancillary services, which may include garage facilities, laundry facilities, recreational facilities, and security, for which owners may not require additional payment (except for security) as a condition of renting a housing accommodation. RSC § 2520.6 (r)(1) & (3). Failure to maintain required services may entitle tenants to a reduction of the legal regulated rent. RSC § 2523.4.

48.    It is unlawful "for any person to demand or receive any rent for any housing accommodation in excess of the legal regulated rent, or otherwise to do or omit to do any act, in violation of any regulation, order or requirement under the RSL or [RSC], or to offer, solicit,

15

attempt or agree to do any of the foregoing." RSC § 2525.1; *see also* RSL § 26-512 (a). It is also unlawful for owners to evade, directly or indirectly, legal regulated rents. RSC § 2525.2 (a).

49.     Owners are prohibited from harassing tenants of rent-regulated apartments for any reason; it is unlawful for "any owner or any person acting on his or her behalf, directly or indirectly, to engage in any course of conduct (including but not limited to interruption or discontinuance of required services, or unwarranted or baseless court proceedings) which interferes with, disturbs, or is intended to interfere with or disturb, the privacy, comfort, peace, repose or quiet enjoyment of the tenant in his or her use or occupancy of the housing accommodation, or intended to cause the tenant to vacate such housing accommodation or waive any right afforded under [the RSC]." RSC § 2525.5; *see also* RSL § 26-516. It is also unlawful for any person to remove or attempt to remove a tenant because the tenant has taken or proposes to take any action authorized or required by the RSL, RSC, or any order of the DHCR. RSC § 2524.1 (b).

50.     The RSC provides that "[a]ny owner who is found by DHCR . . . to have collected any rent or other consideration in excess of the legal regulated rent shall be ordered to pay the tenant a penalty equal to three times the amount of such excess," unless "the owner establishes by a preponderance of the evidence that the overcharge was not willful," in which case the penalty shall equal the amount of overcharge plus interest from the date of the first overcharge. RSC § 2526.1.

51.     DHCR also has the authority to impose civil penalties against owners of housing accommodations who knowingly violate the laws and regulations by charging illegal rents or harassing tenants. In addition to any other penalties, it may impose a civil penalty up to $250.00 for each knowing violation of the RSL or RSC. If DHCR finds an owner "to have harassed a

tenant to obtain a vacancy of a housing accommodation, the DHCR may impose . . . a penalty in the amount of up to $1,000.00 for a first such offense and up to $2,500 for each subsequent offense or for a violation consisting of conduct directed at the tenants of more than one housing accommodation." RSC § 2526.2(b) & (c); *see also* RSL § 26-516(c)(1) & (2).

52.     Any owner found to have overcharged a tenant may be assessed and ordered to pay the reasonable costs and attorneys' fees of the proceeding and interest from the date of the overcharge.  RSC § 2526.1 (d); RSL § 26-516(a)(4).

**B.**     **Unlawful Deceptive Practices**

53.     The New York Consumer Protection Act (the "NYCPA"), NY General Business Law § 349, prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state."  Defendants' conduct, as described herein, violates the NYCPA.

**C.**     **Pattern of Racketeering Activity**

54.     The Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), makes it "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  Defendants' unlawful scheme conducted through the pattern of racketeering activity described herein violates RICO.

## FACTS

**A.**     **GENERAL ALLEGATIONS**

55.     Pinnacle owns, manages, and operates numerous properties throughout New York City, including residential properties in which tenants on whose behalf BRUSH advocates live.

56.     Wiener, as a founder, investor, owner, and Chief Executive Officer of Pinnacle, has principal authority and responsibility for overseeing Pinnacle's operations.

57.     Pinnacle typically holds title to property, manages, operates, and does business as separate "LLCs" under the names of each building it owns, but generally does not disclose to tenants Pinnacle's role as the ultimate owner, manager or operator.

58.     Praedium has provided funding for at least some of Pinnacle's real estate acquisitions.  Praedium's self-described investment strategy is centered on pursuing "value enhancement" opportunities, which involves, among other things, investing in ownership residential properties that it perceives to be deteriorated or have a history of inadequate repairs and maintenance.

59.     Pinnacle, Wiener, SecureWatch 24, Praedium, and at least the LLCs identified in paragraphs 23 through 31 form an enterprise that is an association-in-fact (the "Pinnacle Enterprise") for the purpose of evading New York City's stringent rent control and rent stabilization requirements at the expense of BRUSH and Pinnacle's tenants.  Defendants purchase distressed, rent-regulated properties with financial backing and strategic direction provided by Praedium.  Since 2002, Defendants have caused the Pinnacle Enterprise to undertake numerous fraudulent practices and unlawful tactics for the purpose of increasing rent beyond legal limits and systematically forcing tenants to vacate their leasehold interests.

60.     Over about the past two and a half years, Pinnacle or its affiliated entities have filed a multitude of eviction actions in housing court relating to the approximately 21,000 units that it owns, operates, and manages in New York City.  On information and belief, in certain of Defendants' buildings, as many as one quarter to one half of the residents have been involved in housing court actions initiated by or against Defendants.

61.    Many of the housing court actions that Defendants have initiated and prosecuted, and continue to initiate and prosecute, against rent-regulated tenants, including those on whose behalf BRUSH has been forced to spend its resources advocating, are unfounded, fraudulent in nature, and not based on good cause.

62.    Defendants have engaged in a pattern and practice of overcharging and collecting illegal rents from tenants of vacated rent-regulated units, including those on whose behalf BRUSH has been forced to spend its resources advocating, based on misrepresentations as to the nature and cost of alleged individual apartment improvements or major capital improvements that do not justify the rent increases charged.

63.    Defendants have engaged in a pattern and practice of overcharging and collecting illegal rents from new and existing tenants of rent-regulated units, including those on whose behalf BRUSH has been forced to spend its resources advocating, based on misrepresentations as to the nature and cost of alleged major capital improvements that do not justify the rent increases charged.

64.    Defendants have relied on the U.S. mails and the interstate wires as an essential part of their scheme in overcharging tenants, including those on whose behalf BRUSH has been forced to spend its resources advocating, based on fraudulent individual apartment improvements and fraudulent major capital improvements.

65.    Defendants have engaged in a pattern and practice of failing or refusing to make necessary and reasonable repairs in their apartment units, such that the rent-regulated tenants residing in those units, including those on whose behalf BRUSH has been forced to spend its resources advocating, have the legal right to withhold rent until the repairs are made.  Rather than making the repairs, Defendants have initiated eviction proceedings against those tenants,

misrepresenting that they have failed to pay rent when in fact they had the legal right to withhold it.

66.    Defendants have engaged in a pattern and practice of refusing to accept rent payments from rent-regulated tenants, including those on whose behalf BRUSH has been forced to spend its resources advocating, based on the misrepresentation that the occupants of the apartment units are not the proper tenants or individuals who have succession rights to the apartment, and then initiating eviction proceedings against those tenants based on the misrepresentation that they have failed to pay rent when in fact the Defendants had refused to accept rent that was timely paid.

67.    Defendants have engaged in a pattern and practice of initiating unreasonable and unnecessary proceedings against lawful rent-regulated tenants, including those on whose behalf BRUSH has been forced to spend its resources advocating, misrepresenting to them the amount and nature of evidence required to confirm their succession rights to the unit they occupy and in which they have resided often times for many years.

68.    The vast majority of Defendants' rent-regulated tenants, including those on whose behalf BRUSH has been forced to spend its resources advocating, lack the resources to retain a private attorney to represent them in the legal proceedings that Defendants have commenced against them. The vast majority of Defendants' rent-regulated tenants, including those on whose behalf BRUSH has been forced to spend its resources advocating, are unsophisticated and are unable to obtain affordable or free legal representation in the legal proceedings that Defendants have commenced against them.

69.    As a result of those proceedings, Defendants' rent-regulated tenants, including those on whose behalf BRUSH has been forced to spend its resources advocating, unwillingly or

unknowingly miss court dates and have default judgments entered against them for rent and other charges that they do not owe or in amounts beyond that which they may owe.

70.    As a result of those proceedings, Defendants' rent-regulated tenants, including those on whose behalf BRUSH has been forced to spend its resources advocating, are unable to meet court dates or unknowingly miss court dates.  As a result, warrants of eviction are issued against them based on claims for rent and other charges that they do not owe.

71.    In connection with those proceedings, Defendants' rent-regulated tenants, including those on whose behalf BRUSH has been forced to spend its resources advocating, unwillingly or unknowingly miss court dates and are subject to further court proceedings, harassment, or eviction based on the Defendants' misrepresentations as to their rights of lawful tenancy by succession.

72.    As a result of those proceedings, Defendants' rent-regulated tenants, including those on whose behalf BRUSH has been forced to spend its resources advocating, are intimidated or coerced to consent to pay rent or other charges they do not owe.

73.    Also as a result of those proceedings, Defendants' rent-regulated tenants, including those on whose behalf BRUSH has been forced to spend its resources advocating, whether or not they are represented by counsel, lose wages, experience severe physical and emotional distress, incur unnecessary transportation and child-care expenses, and suffer through endless hours of aggravation and anxiety in housing court, in their apartments, in their jobs, and in their daily lives, often times over the course of several years.

## B.    THE CLIMATE OF FEAR AND INTIMIDATION

74.    A common tactic used by the Defendants to further their scheme is to employ tactics aimed at making tenants afraid to exercise their legal rights or to object to the Defendants;

conduct. By keeping tenants in fear of reprisals directly from the Defendants or of other adverse consequences, the Defendants have been able to chill the tenants' exercise of their rights. The Defendants' tactics take several forms.

**Blacklisting**

75.     For example, the Defendants know that one consequence for any tenant objecting to mistreatment or exercising his or her rights is the potential for that tenant to be "blacklisted" in connection with efforts to find future rental housing. "Blacklisting" is a practice where commercial tenant screening bureaus purchase electronic housing court case data from the Office of Court Administration, use this data to prepare so-called "tenant screening reports" based on that data, and then sell such reports to prospective landlords.

76.     The Defendants know or should know that these tenant screening reports are derived from housing court data that is known to be and inaccurate and incomplete, and thus result in landlords regularly denying housing to blameless individuals.

77.     On information and belief, Defendants threaten or actually initiate housing court actions against their tenants with the knowledge that the tenants may be further harmed, regardless of whether they prevail in housing court, by their inability subsequently to obtain future alternative rental housing as a result of their involvement in a prior housing court action and the blacklisting practice.

78.     On information and belief, the Defendants obtain rent in amounts beyond that to which they are legally entitled by threatening their tenants with the initiation of housing court actions, knowing that tenants are afraid that merely being named in any legal action, regardless of its merits, will likely result in blacklisting.

79.    On information and belief, the Defendants refuse or fail to make necessary and needed repairs in tenants' buildings and apartments knowing that tenants are afraid to initiate housing court actions to enforce their rights or to undertake self-help measures, such as withholding of rent, for fear of being blacklisted.

80.    The Defendants use the existence of blacklisting as part of their overall effort to intimidate tenants and create a climate of fear and thus to stifle tenant opposition to the Defendants' unlawful conduct.

**Surveillance and Eavesdropping**

81.    As part of its campaign to intimidate those who oppose their unlawful aims, the Defendants, through SecureWatch 24, have initiated unauthorized surveillance and eavesdropping on prominent tenant leaders.

82.    For example, the President of BRUSH, Kim Powell, resides in an apartment on the seventh floor of a Pinnacle-owned building located at 706 Riverside Drive.  The Defendants know that Ms. Powell is a leader of BRUSH and an advocate of tenants' rights because, in the months preceding the filing of Plaintiffs' original Complaint, Wiener and other Pinnacle representatives met on several occasions with Ms. Powell and other BRUSH representatives and have openly but falsely claimed that Ms. Powell has improperly incited tenants to complain about Pinnacle.

83.    During the week of July 10, 2007, at about the same time BRUSH and others sued Pinnacle and Wiener, a device was installed approximately three feet opposite Ms. Powell's apartment door.  The installation was carried out by agents of SecureWatch 24, a security company owned or controlled by Pinnacle or Wiener.

84.    The device consisted of an electrical junction box with a hole drilled into the faceplate. The hole in the device pointed directly at Ms. Powell's apartment. Wiring leading from the junction box to the basement of the building appeared to be connected to surveillance hub facilities maintained by SecureWatch 24. There were no other similar devices installed on any other floor of the 706 Riverside Drive building.

85.    Inside the junction box, at the Defendants' direction, the SecureWatch 24 employee placed a surveillance device to record Ms. Powell's activities, conversations, or other private matters; or, alternatively, at the Defendants' direction, the SecureWatch 24 gave the impression of having installed a surveillance device, intended by the Defendants to intimidate Ms. Powell and other tenants by making them believe that they were targeted for surveillance and eavesdropping.

86.    On August 10, 2007, counsel for BRUSH sent a letter (dated August 9, 2007) to Pinnacle's attorneys raising concerns over the possible surveillance and eavesdropping and requesting an explanation of the nature and purposes of the device. The letter also requested that representatives of the Plaintiffs be permitted to inspect the device, and it also notified Defendants of their duty to preserve evidence relating to any surveillance and eavesdropping. Neither the Defendants nor their attorneys ever responded to the letter.

87.    But just a few hours after the letter was transmitted, a representative of SecureWatch 24 arrived at 706 Riverside Drive, opened the junction box, removed and pocketed something from inside it, and replaced the faceplate of the box with a new one that did not have a hole through which surveillance could be conducted. Photographs of the junction box as installed and after the device was removed are attached hereto as Exhibits A and B.

24

**The Defendants' Attempts to Buy Silence**

88.    Consistent with their ongoing efforts to stifle opposition, the Defendants also have attempted to "buy-off" tenants whose opposition to their misconduct has become a public-relations liability to them.

89.    For example, as set forth below, plaintiff Anthony Casasnovas has been engaged in a protracted dispute with Pinnacle relating to Pinnacle's ongoing rent overcharges for his apartment.  Consisted with the Defendants' usual tactics, Mr. Casasnovas was not able to make any significant progress in resolving his dispute with Pinnacle – until he became a plaintiff in this lawsuit.  Previously, the Defendants had refused to provide any information to Mr. Casasnovas justifying the amount of rent they sought to charge in connection with a renewal lease and had instead commenced baseless eviction proceedings against him.

90.    On July 18, 2007, shortly after the filing of Plaintiffs' original Complaint in this lawsuit, a Pinnacle attorney approached Mr. Casasnovas at a separate housing court hearing. Pinnacle's attorney in that matter offered to settle the housing court matter on very attractive terms, including a substantial cash payment, provided that Mr. Casasnovas withdraw as a plaintiff in this separate litigation.  At that time, Mr. Casasnovas was accompanied by counsel who only represented him in the housing court action.  That counsel did not represent Mr. Casasnovas with respect to this lawsuit, nor did Pinnacle's attorney have authorization to communicate with Mr. Casasnovas with respect to this lawsuit. Indeed, Pinnacle knew that Mr. Casasnovas was being represented by separate counsel in this matter.

91.    Puzzled by Pinnacle's abrupt about-face and its demand that Mr. Casasnovas agree on the spot to withdraw as a plaintiff from this action, Mr. Casasnovas was able to obtain a temporary postponement of his housing court hearing.  That day, Mr. Casasnovas' counsel in this

lawsuit informed Pinnacle's counsel that its approach to Mr. Casasnovas about this lawsuit violated the ethical rules governing lawyers' conduct. When confronted with the inappropriate demand and unauthorized communications with Mr. Casasnovas, Pinnacle dropped its insistence that Mr. Casasnovas withdraw from this action as a condition of resolving Mr. Casasnovas' overcharge dispute with Pinnacle.

92.     Similarly, Pinnacle has attempted to silence Plaintiffs Marjorie and Theodore Charron. The original Complaint in this lawsuit alleged that the Defendants owed the Charrons over $24,000 in rent overcharges (before adding interest and trebling as provided by law) dating back to June 2001, based on the legal rents established in a DHCR proceeding (*see* paragraphs 100-101 below). Shortly after that Complaint was filed, Pinnacle mailed the Charrons checks for less than the amount owed, with no explanation and with their names misspelled. The Charrons requested an explanation. Pinnacle then mailed them a new check, with their names properly spelled, but with release language providing that, by cashing the check they would give up all of their claims against Pinnacle, including their claims in this lawsuit. Because the amount of the new check was less than the amount the Charrons are owed and the damages they have suffered, they have rejected it.

93.     Another example of the Defendants' to buy silence only after this lawsuit was filed is their treatment of Ms. Georgia Wright, a 74-year-old lady who lives alone in the Dunbar Apartments at 211 W. 149th Street. Early in 2007, an electrical fire in the basement of the building or in a wall spread to Ms. Wright's first-floor apartment. As a result, her apartment was rendered uninhabitable by smoke, water damage and debris, and Ms. Wright, who did not have sufficient money to rent another apartment was forced for a time to move to a public shelter. Pinnacle, the landlord, did not make any effort to repair the damage caused by the fire. On July

12, 2007, the day this lawsuit was filed, there was considerable television coverage of Ms. Wright's burned out apartment, and an interview with Mrs. Wright, and the New York City Public Advocate, Betsy Gotbaum and the Manhattan Borough President Scott Stringer. Within days Pinnacle agreed to move Ms. Wright temporarily to another nearby apartment, and to repair her fire-damaged apartment.

94.    In sum, the Defendants are aware of their tenants' vulnerabilities and have intentionally and unlawfully taken advantage of their tenants' situations, with the objective of realizing their business goal, namely overcharging tenants, collecting illegal rents, and ultimately deregulating rent-regulated apartments in order to increase rents, and to convert properties to cooperatives or condominiums.

## C.    **THE PATTERN OF BUILDING VIOLATIONS**

95.    The City of New York Department of Housing Preservation & Development ("HPD") maintains a website at http://www.nyc.gov/html/hpd/html/pr/violation.shtml, which provides a listing of all of the open violations of the New York City's Housing Maintenance Code and the State's Multiple Dwelling Law for all residential buildings in New York City. HPD classes violations into three classes: A ("non-hazardous"), B ("hazardous"), and C ("immediately hazardous"). Depending on the seriousness of a violation, HPD establishes different time periods within which it must be corrected. For example, a Class C violation is to be remedied within 24 hours. The HPD website also indicates when an owner has not certified that the violation was corrected within the specified time period. Moreover, the website indicates when a violation constitutes a "rent impairing violation," which if not promptly corrected, becomes a fire hazard or serious threat to the life, health, or safety of the occupants thereof.

27

96.      An examination of this publicly available website for each of the buildings in which the individual Plaintiffs reside shows scores of long uncorrected violations, including multiple outstanding "rent impairing violations" and numerous uncorrected Class C violations, which are deemed "immediately hazardous" by HPD and include such serious violations as "inadequate fire exits, rodents, lead-based paint, lack of heat, hot water, electricity, or gas." Many of these Class C violations have not been addressed for years, despite the fact that HPD requires an owner to correct all Class C violations within 24 hours.

## D.    HARM SUFFERED BY INDIVIDUAL PLAINTIFFS

97.      The facts alleged below are individual, illustrative examples of instances in which rent-regulated tenants, including those on whose behalf BRUSH advocates, have been victimized by Defendants' unlawful activities as part of an ongoing RICO scheme:

**Marjorie and Ted Charron**

98.      For several years, Plaintiffs Marjorie and Ted Charron have been embroiled in multiple lawsuits against Pinnacle to correct egregious illegal overcharges based on inflated individual apartment improvements -- overcharges which the Charrons continue to be forced to pay to this very day.  In or about June 2001, the Charrons moved into a rent-regulated apartment in a building presently owned by Defendants.  By law, Defendants were required to notify the Charrons that their apartment was rent-stabilized, but they failed to do so.  Defendants charged the Charrons a "preferential" rent of $1,900 per month for their rent-stabilized, two-bedroom apartment.  Defendants represented, however, that the "legal" rent on the Charrons' lease was $2,500 and further represented to the Charrons that they could have charged as much as $2,500 based on approximately $20,000 of renovations Defendants had allegedly undertaken in the unit.

99.     When the Charrons investigated the alleged renovations that Defendants purportedly made, they discovered that Defendants had submitted fraudulent receipts to DHCR for "renovations" to justify a fraudulent rent overcharge.  These receipts included, among other things, 160 light bulbs, 75 pounds of grout, 130 gallons of paint, a $198 nail gun, a $424 drain cleaning device, and various other items listed as installed but not used.  In a further attempt to justify the rent overcharge to the Charrons, Defendants fraudulently submitted to DHCR other costs for maintenance work which may not legally be passed on from a landlord to a tenant under the relevant rent-regulation laws.  After causing the Charrons to file two Article 78 Petitions and to defend against a third Article 78 Petition, Defendants ultimately acknowledged that they had made "mistakes" in their calculation of the Charrons' rent.

100.     Defendants currently owe the Charrons more than $10,000 (before adding interest or treble damages provided under the law) for rent overcharges for the period June 2001 to June 2003.  When the Charrons attempted to withhold rent based on the credit they should have received as a result of past overcharges, the Charrons received a "Thirty Day Notice to Debtor" dated April 26, 2006, and a "Three Day Notice" from Pinnacle dated April 26, 2006.  The aforementioned notices were false and the amounts stated therein were misrepresented because they were based on unlawfully inflated rent amounts.

101.     Defendants subsequently filed a demand for rent, requiring the Charrons to appear in housing court.  Defendants intentionally and systematically and/or with reckless disregard submitted fraudulent documents to DHCR, other government agencies and to the court, to justify rent overcharges.  But based on DHCR's order with respect to the proper rent for the Charrons' apartment, Defendants also owe the Charrons approximately $14,000 (before adding interest or treble damages provided under the law) for the period June 2003 to present.  Defendants

continue to overcharge the Charrons to this day, collecting rent in amounts beyond what is allowable under the law. On several occasions, Pinnacle has sent the Charrons lease renewal forms through the U.S. mail that called for payment of rent amounts in excess of the legally proper amount. As a result, Defendants have demanded and received rent in excess of the legally permissible rent from the Charrons.

**Anthony Casasnovas**

102.    Despite multiple efforts over the course of over a year, Plaintiff Anthony Casasnovas was unable to get Defendants to provide information required by law regarding the alleged individual apartment improvements made prior to his tenancy, that purportedly provide the basis for a significant increase in the unit's legal rent. Rather than answer his questions, Defendants filed eviction proceedings against Mr. Casasnovas and used tactics calculated to prolong the proceedings in a manner intended to maximize the burden on Mr. Casasnovas' time and expense.

103.    In June 2005, Mr. Casasnovas and his friend, Veronica Gonzalez, moved into a two-bedroom rent-stabilized apartment in a building presently owned by Defendants. Defendants charged Mr. Casasnovas a "preferential" rent of $1,800 per month, although they identified the purported "legal" rent on Mr. Casasnovas' lease as $2,200. By law, Defendants were required to notify Mr. Casasnovas that his apartment was rent-stabilized, but failed to do so.

104.    In or about February 2006, Defendants sent Mr. Casasnovas a renewal lease form, which contained a typewritten amount of "new rent". This amount was crossed out by hand, however, and another amount, which reflected a $100.00 rental increase to his "preferential rent" of $1800, along with the words "new preferential rent", was inserted in its place. Moreover, the "additional deposit required amount" was scratched out and a new amount was handwritten in

instead. Mr. Casasnovas tried on multiple occasions to contact Defendants by phone and by mail to discuss the renewal lease and the new rental amounts. When he failed to hear back from Defendants, Mr. Casasnovas requested a rental history for his apartment from DHCR.

105.    Mr. Casasnovas learned that his apartment's registered rent was only $683 in 2002, but that year, when a new tenant moved in, Pinnacle nearly tripled the rent to $1700. Based on the apartment's rental history, Mr. Casasnovas computed that Defendants would have had to have made more than $40,000 in renovations to his apartment to justify the increased rent that they charged, a virtual impossibility given the condition of the apartment. Unable to get any answers or even a response from Defendants, Mr. Casasnovas finally sent a letter informing them that he would withhold rent until they justified the rent they were charging and provided documentation substantiating any alleged renovations which they conducted and filed a complaint with DHCR based on the overcharge in rent on or about May 25, 2006.

106.    Rather than receiving a response to his letters, Mr. Casasnovas received a "Thirty Day Notice to Debtor" dated July 24, 2006 demanding $4400 of back rent. In addition, Mr. Casasnovas received a "Three Day Notice to Debtor" from Pinnacle dated July 24, 2006 also demanding $4400 of back rent. The aforementioned notices were false and the amounts stated therein were misrepresented because they were based on unlawfully inflated rent amounts.

107.    Mr. Casasnovas immediately responded to the letters he received from Defendants' attorneys, Horing Welikson & Rosen, P.C., and from Pinnacle by informing them of the overcharge complaint which was pending in DHCR and of his issues with the rent. In response to Mr. Casasnovas' correspondence, Mr. Casasnovas was served with an action in Housing Court on August 8, 2006, brought by Horing, Welikson & Rosen, P.C. on behalf of Defendants, seeking to evict Mr. Casasnovas for non-payment of rent. Mr. Casasnovas asserted

31

several defenses and a counterclaim against Defendants based on the rental overcharge. Each of Mr. Casasnovas' first three court appearances, for which he has had to miss days of work, resulted in adjournments because Defendants' attorneys were not prepared and purportedly needed additional time to review Defendants' file. It was not until June 2007 that Mr. Casanovas received documents from Pinnacle. The documents Mr. Casanovas ultimately received did not justify the claimed rental increase and included invoices for costs not legally includable in the rent computation, along with invoices for work done other tenants' apartments.

108.    As described in paragraphs 90-91 above, on July 18, 2007, one week after the Complaint in this lawsuit was filed, Pinnacle suddenly changed its obstructionist tactics and offered Mr. Casasnovas a settlement that included a reduced rent rate and a lease renewal, along with payment of substantial treble damages provided Mr. Casasnovas withdrew as a plaintiff in this lawsuit. After Mr. Casasnovas' counsel in this lawsuit confronted Pinnacle over its unethical conduct, Pinnacle agreed to settle without that condition.

109.    When Mr. Casasnovas' next rent payment became due, he called Pinnacle to confirm the amount to be paid. Consistent with the Defendants' scheme, Pinnacle ignored the settlement, telling him that its records showed his rent payment was still in the pre-settlement amount. To date Pinnacle has refused to provide him with a rent bill in the correct amount agreed in the settlement.

**Karen Flannagan**

110.    Despite having maintained continuous residence for nearly a decade in the same rent-controlled apartment in which she grew up, Plaintiff Karen Flannagan was repeatedly harassed by Defendants' demands -- stretching over the course of years and ending as abruptly as they began -- to produce excessive and unduly burdensome documentation of her succession

32

rights to the apartment upon the death of her mother. In 1969, at the age of 16, Ms. Flannagan moved with her parents into a rent-controlled apartment presently owned by Defendants. After moving out at the age of 20, Ms. Flannagan returned to the apartment, where she has maintained continuous residence with her daughter and her mother since 1997.

111.    Shortly after her mother's death in March 2004, Defendants stopped accepting rent checks from Ms. Flannagan. On or about May 11, 2004, Defendants sent Ms. Flannagan a letter enclosing a check that she had drawn on her own account to pay rent because she was not the "primary tenant" on the lease. Ms. Flannagan immediately called Pinnacle and was told by a representative that she must submit extensive evidence and documentation of her succession rights. Although the requests were excessive and unduly burdensome, on or about May 13, 2004 Ms. Flannagan dutifully mailed Defendants the requested evidence and documentation, including jury duty notices, driver's license, bank account statements, utility bills and letters from her daughter's school. Defendants then cashed Ms. Flannagan's May 2004 and June 2004 rent checks.

112.    Defendants subsequently continued to harass Ms. Flannagan, sending additional letters dated January 10, 2005 and January 13, 2005, stating that they would not accept her checks for rent because she was not the "primary tenant" on the lease and returning seven personal checks from her. Defendants made additional demands that culminated in the issuance of a "Ten Days Notice to Quit Licensee" dated January 19, 2005, which was placed under her door.

113.    On or about February 17, 2005, Horing Welikson & Rosen, P.C., on behalf of Defendants, instituted a holdover proceeding against Ms. Flannagan. As a result of the legal actions Defendants commenced against her, Ms. Flannagan was required to appear in housing

court no fewer than 10 times over a two-year period.  On or about May 26, 2005, Ms. Flannagan again turned over the aforementioned documents to Defendants' attorneys, but again, Defendants refused to dismiss their frivolous case and continued to harass against Ms. Flannagan.

114.    On or about April 26, 2006, Defendants abruptly dropped their case.  To date, Ms. Flannagan has received no redress or apology from Defendants for their treatment and harassment of her and her family.

**Tracy Moore**

115.    For more than a year, Plaintiff Tracy Moore has been subjected to varying demands for rent in amounts higher than that which Defendants have acknowledged is appropriate, requiring her to appear in court on several occasions to defend against claims for rent arrears that she had already satisfied or that should have been offset by overcharges.  In July 2004, Ms. Moore signed a one-year lease to rent a two-bedroom, rent-stabilized apartment in a building presently owned by Defendants for $1400 per month.  Ms. Moore has renewed her lease each year for the past two years at the statutory rent increase amounts.

116.    Ms. Moore subsequently received a "Thirty Day Notice to Debtor" from Horing Welikson & Rosen, P.C. dated May 15, 2006, and a "Three Day Notice to Debtor" from Pinnacle also dated May 15, 2006, both seeking to collect rent arrears totaling $3,158.44.  Those notices were false and misrepresented the amount of back rent due because they were based on unlawfully inflated rent amounts.

117.    Notwithstanding, Ms. Moore's subsequent payment of the inflated amount, Defendants forced her to appear in housing court in June 2006, at which time the action against her was dismissed.  Shortly thereafter, Ms. Moore discovered that she was being overcharged for rent and initiated a rent overcharge claim against Defendants.

118.    DHCR documentation established that the previous occupant of Ms. Moore's apartment paid $464 per month in rent.  As a result, Defendants acknowledged to DHCR, in a letter dated October 17, 2006, that they had overcharged Ms. Moore based on "items claimed earlier in the 1/40th calculation [that] should not be included in said calculation," and offered to credit Ms. Moore almost $5000 in overcharged rent.

119.    Nevertheless, Defendants' harassment continued.  When Ms. Moore presented the Pinnacle documents admitting the overcharge to a Horing, Welikson & Rosen, P.C. attorney at a hearing in housing court several days later, the attorney requested two continuances over the next several months (requiring Ms. Moore to appear each time) to review the materials.  Meanwhile, Ms. Moore continued, through DHCR, to challenge some of the purported costs of and materials used in the individual apartment increases, such as charges for a new microwave, new refrigerator, and various appliances or fixtures not actually installed.  Most recently, Defendants sent Ms. Moore back-to-back rent statements in different amounts, including amounts both higher and lower than the "correct" rent Defendants had acknowledged in their letter to DHCR. Moreover, Defendants sent Ms. Moore a lease renewal application in or about January 2007 that contains a calculation of the new rent based on the original, overcharged rent figure.  These conflicting claims for rent by Defendants force Ms. Moore into the Hobson's choice of having to sign a lease agreement for an amount higher than she should be paying or refusing to sign, which may lead to efforts to terminate her tenancy.

**Raymond Andrew Stahl-David**

120.    Not only did Defendants base the rent charged to Plaintiff Raymond Andrew Stahl-David on alleged individual apartment improvements that appear to be inflated, they fraudulently forced him to sign a lease for an apartment that purported to be free from rent regulation, even though it was in fact rent-stabilized.  Mr. Stahl-David and his roommates moved into a four-bedroom, rent-stabilized unit in September 2005, around the same time that the building's ownership was transitioning from a prior owner to Defendants.  At that time, Mr. Stahl-David and his roommates signed a one-year lease for $1850 per month.

121.    By law, Defendants were required to notify Mr. Stahl-David that their apartment was rent-stabilized, but failed to do so.  Indeed, the lease Mr. Stahl-David and his roommates were asked to sign contained a rider requiring them to agree that "the apartment is not subject to any form of rent regulation."

122.    Mr. Stahl-David subsequently learned the unit was rent-stabilized, a fact that Pinnacle itself confirmed when Mr. Stahl-David and his roommates received their lease renewal application for the following year, which indicated that their apartment was subject to the rent stabilization statutory rent increase amount.

123.    In August 2006, upon learning that a prior tenant in the same unit had paid $976 per month in rent two years prior to his tenancy, Mr. Stahl-David filed a rent overcharge claim with DHCR.  In addition, Mr. Stahl-David obtained documents from Pinnacle suggesting that it had installed appliances, such as a dishwasher, that his apartment in fact does not have.

124.    On July 20, 2007, Mr. Stahl-David received from DHCR an "Order Finding Rent Overcharge," which held in his favor that "the legal regulated rent is established as of September 1, 2005 in the amount of $534.29," not the $1,850 the Defendants had fraudulently demanded.

Further, the Order directed Pinnacle to roll back the rent to the legal regulated rent and to offer Mr. Stahl-David a lease renewal based on that rate.

125.    After receiving the DHCR Order, Mr. Stahl-David tendered rent to Pinnacle in the amount established by the Order.  Consistent with its scheme, Pinnacle has refused to deposit Mr. Stahl-David's payment and has instead sent him a rent bill fraudulently stating that he is in arrears and putting him in fear of further eviction proceedings.  In addition, rather than complying with the DHCR Order, Pinnacle mailed Mr. Stahl-David a lease renewal form that called for rent payments in the amount invalidated by the Order.

**Russell Taylor**

126.    Almost immediately after Defendants purchased the building in which Plaintiff Russell Taylor resided, Defendants began subjecting him to repeated harassment for almost a year in an effort to remove him from a rent-stabilized apartment.  Mr. Taylor has lived in the same apartment since 2000, when he first moved in with his friend, Saidah Nash, the apartment's leaseholder at that time.  After Ms. Nash moved out one year later, Mr. Taylor asked his then-landlord, Baruch Singer (from whom Defendants purchased the building), that his name be added as the tenant of record.  Mr. Singer's agents agreed to do so.  Mr. Taylor continued to reside in the apartment and pay rent for three years.

127.    After the building was acquired by Defendants in or about September 2005, they immediately moved to evict Mr. Taylor, falsely claiming that he owed approximately $3,000 in back rent.  Pinnacle sent Mr. Taylor, via U.S. mail, a "Three Day Notice to Pay Rent" dated September 7, 2005 from Defendants which was addressed to Ms. Nash.  Mr. Taylor was required to appear in housing court and successfully proved that he had in fact paid in full, and no rent was due.

128.    On or about September 19, 2005, Mr. Taylor received another notice from Defendants, initiating an eviction proceeding against him alleging that he was not the proper leaseholder.  Mr. Taylor sent copies of his rent checks to Defendants via certified mail, but they claimed that they did not receive his correspondence.  Mr. Taylor continued to be harassed by Defendants for eight months and was required to appear in housing court on multiple occasions. It was not until on or about April 2006 -- after Mr. Wiener was contacted by a reporter from the *New York Daily News* and a story appeared in that paper covering Mr. Taylor's situation -- that Defendants sent Mr. Taylor a letter informing him that Defendants were dropping their case.  To date, Mr. Taylor has not received any formal apology or compensation from Defendants.

**Dianne Trummer**

129.    Plaintiff Diane Trummer moved into a rent-stabilized apartment in a building presently owned by Defendants in or about February 2004, only to be subjected to multiple inconveniences and overcharged without adequate explanation and without regard to her needs and rights.  When Ms. Trummer moved into the apartment in February 2004, Defendants charged Ms. Trummer $1275 in rent.  Soon after moving into her apartment, Ms. Trummer became suspicious of the amount of rent she was being charged in light of the minimal improvements made to her apartment and the amounts certain other tenants were paying in rent. Ms. Trummer immediately requested the initial apartment registration for her apartment from Defendants.  Although Defendants promised to send her the requested document, they failed to do so.  After obtaining the rental history of her apartment from DHCR, Ms. Trummer learned that her apartment was previously rent-controlled, with the last tenant of record paying $497.53 in rent.  On or about June 24, 2004, Ms. Trummer filed a complaint for overcharge with DHCR. As a result of Defendants' failure to submit the initial apartment registration form to Ms.

Trummer or to DHCR as requested on February 9, 2005, Ms. Trummer's rent overcharge case was processed by DHCR as a fair market rent appeal.

130.    By letters dated September 29, 2004 and October 5, 2004, Defendants sent DHCR their objections to Ms. Trummer's complaint on the grounds that the increased rent resulted from $24,000 in alleged improvements that were performed on the apartment and that Ms. Trummer's fair market rent appeal should be barred by a 90-day statute of limitations applicable to fair market rent appeals where a tenant is mailed a certified copy of his or her initial apartment registration.  Ultimately, DHCR denied Ms. Trummer's fair market rent appeal because DHCR's rent registration database showed a higher rent for a neighboring apartment in Defendants' building.  However, upon information and belief, Defendants unlawfully increased the rent for Ms. Trummer's apartment based on fraudulent receipts and alleged renovations, including improper charges in the amount of approximately $11,000 in labor costs from their own super, which were not examined by DHCR in the fair market appeal proceeding.  Upon information and belief, the comparable apartment used to establish the fair market value of Ms. Trummer's apartment was fraudulently and artificially inflated by Defendants.

131.    Further, four months after moving in, on or about June 20, 2004, there was a fire in a neighboring apartment that required her to vacate her apartment.  Defendants never informed Ms. Trummer when she could move back into her apartment; when she finally did, she discovered that her kitchen was made twenty-feet smaller.  Defendants then petitioned to restore the rent, which had been reduced because of the fire, and set January 1, 2005 as the date when the apartment was allegedly habitable so that Defendants could collect back rent.  Defendants, however, never provided any evidence of habitability.

**Andres Mares-Muro**

132.    Plaintiff Andres Mares-Muro moved into a rent-stabilized apartment in a building then owned by Baruch Singer on or about September 15, 2003, signing a two-year lease at that time for $1,400 per month.  Defendants acquired the building complex in August 2005.  According to the Department of Housing Preservation & Development website, the building currently has 151 open housing maintenance code violations, several dating back more than a decade.  Of those open violations, 105 are classed as "hazardous," and no fewer than 20 of them are classed as "immediately hazardous."

133.    On or about July 19, 2005, Mr. Mares-Muro went to DHCR and requested the rental history for his apartment, where he discovered that the rent charged had nearly doubled between 2000 and 2001, from $648 per month to $1,275 per month.  Mr. Mares-Muro filed a complaint for rent overcharge with DHCR on or about July 27, 2005.  Because of a four-year regulatory limitation on the ability to contest a rent increase, however, Mr. Mares-Muro was unable to challenge the rent overcharges for his apartment.

134.    The Defendants, as a sophisticated entity and business person, know or should have known that many of the rents for apartments in buildings that it acquired were so inflated as to be illegal, based on unsupported and fraudulent rent increases.  The Defendants also know or should know, based on Mr. Singer's reputation and prior business practices, that it was not reasonable to rely on the accuracy of Mr. Singer's records.  The Defendants are also aware or should be aware of the four-year regulatory limitation on a tenant's ability to contest a rent increase, and they take unfair and deliberate advantage of this limitation so that they can unjustly enrich themselves from the unsupported and fraudulent rent overcharges that they assume as a result of their apartment building acquisitions.

**Kim Powell**

135.    Plaintiff Kim Powell has lived with her mother at 706 Riverside Drive since the 1970s.  Ms. Powell pays the rent and has succession rights to the lease.  In the late 1998 or 1999, the Defendants sent Ms. Powell a letter asking her to agree that their acceptance of her check for the rent was not an acknowledgement of her succession rights – an attempt to trick her into surrendering the legal rights she had.

136.    Around the same time, after the Defendants had failed to make necessary repairs in the apartment, Ms. Powell was forced to file an action in housing court requiring that the repairs be made.  After she won that action, even though the rent was paid in full, the Defendants commenced an eviction proceeding against Ms. Powell and her mother, falsely claiming that unpaid rent was due.  Ms. Powell was forced expend time and resources combating that improper suit.

137.    As stated above, Ms. Powell has been active in her community as a leader of Plaintiff BRUSH.  The Defendants have therefore targeted her and her mother for harassment and intimidation.  The most recent example is the surveillance device the Defendants installed directly in front of her apartment door around the time this lawsuit was filed (*see* paragraphs 81-87 above).

**BRUSH**

138.    In addition to the direct harm suffered by the Defendants' tenants, BRUSH has also been harmed.  The Defendants' actions have required BRUSH to focus the overwhelming majority of its time and resources on dealing with the Defendants, and therefore it has been unable to devote resources to its educational and advocacy activities in connection with tenants' rights and in championing access to affordable housing.

139.    The Defendants' scheme extends to other tenants besides the Individual Plaintiffs. The Defendants have caused similar harm to others, several examples of which are described below for illustrative purposes.

**Mark Gordon**

140.    Mark Gordon has expended more than $10,000 of his own money over three years on litigation against Defendants challenging rent overcharges they imposed on him based on charges of individual apartment improvements ("IAIs") allegedly made to his unit prior to his tenancy. Defendants later acknowledged that such charges were not appropriate. On or about July 1, 2001, Mr. Gordon moved into a rent-stabilized, two-bedroom apartment in a building presently owned by Defendants. At that time, Defendants charged Mr. Gordon a "preferential" rent of $1,900 a month. However, Defendants identified the "legal" rent on Mr. Gordon's lease as $2,100 and represented to Mr. Gordon that they could have charged as much as $2,100 based on renovations they had undertaken in the unit. Further, based on the amount of "legal rent," Defendants claimed on the lease that the unit was de-regulated.

141.    Suspicious of the basis for rent he was charged, Mr. Gordon requested a rental history for his apartment from DHCR. Mr. Gordon learned that his apartment's last registered rent was only $426.53 in 1998 for the last listed tenant before Mr. Gordon's legal rent amount of $2100. Based on the rental history of the apartment, Mr. Gordon determined that any alleged improvements or renovations would have had to amount to over $55,000 to justify the increased rent that Defendants charged him. After further investigation, Mr. Gordon learned that the rent increase was based upon, among other things, double-billed labor charges for the installation of kitchen cabinets, the cost of replacing electrical wiring that appeared not to have been done, and the alleged installation of five toilets in a two-bathroom apartment. In light of Defendants

fraudulent rent overcharge, Mr. Gordon withheld rent and commenced an action against Defendants in New York Supreme Court on or about July 31, 2002.

142.    Mr. Gordon received a "Three Day Notice" from Pinnacle dated August 13, 2002 demanding $4000 of back rent. That notice was false because it was based on unlawfully inflated rent amounts. On or about August 27, 2002, Horing Welikson & Rosen, P.C., on behalf of Defendants, instituted a non-payment proceeding against Mr. Gordon. Only after Mr. Gordon spent three years and more than $10,000 in legal fees to challenge the propriety of the alleged renovation charges -- causing him great emotional and financial distress, inconveniences, uncertainty, and disruption in his daily life -- did Defendants finally agree to resolve the case by lowering his rent and re-classifying his apartment as rent stabilized. Although Mr. Gordon is barred by a Settlement Agreement from joining as a Plaintiff in this action, his story is illustrative of the types of the harassing and unlawful tactics in which Defendants are engaged and constitutes evidence of Defendants' pervasive and ongoing scheme directed at multiple victims.

**Myrtle D. Butler**

143.    On information and belief, Defendants also engage in a pattern and practice of intentionally inflating the Maximum Base Rent ("MBR") of their rent-controlled units, many of which are occupied by senior citizens who are unfamiliar with the rent-regulation laws and thus lack the knowledge to challenge Landlord Defendants' calculations. Myrtle Butler, a long-time rent-controlled tenant in a building presently owned by Defendants, is a prime example of an unwitting victim of this unethical and illegal practice. Ms. Butler has maintained continuous residence in a two-bedroom apartment since 1970, when she first moved in with her then-husband, the late Henry Butler.

144.    Every other year, owners are entitled a statutory increase in the Maximum Base Rent ("MBR") for their rent-controlled apartments. The increase is calculated by the owner on a DHCR form to be submitted to the DHCR and the tenant; the form requires the owner to multiply the most recent approved MBR by a standard increase factor provided by DHCR, which varies depending on when the prior MBR increase was granted.

145.    With regard to Ms. Butler's apartment, for the 2006-2007 period, Defendants were entitled to a statutory increase in the MBR as described above. However, Defendants did not use the multiplier based on Ms. Butler's apartment's most recent MBR increase, which was granted in the 2004-2005 period. Instead, Defendants hand wrote onto the form the rent as of 1974-1975 and used a much larger corresponding multiplier to calculate the MBR, resulting in an MBR amount that is almost $180.00 more per month than if the correct figures had been used. The form is signed by "Joel Wiener, an "owner, officer or agent" of Defendants, and was submitted to DHCR with an affirmation "under penalties provided by law, that the computations and statements made on this form, are true and correct" to the best knowledge of the affiant.

146.    By inflating the MBR of rent-controlled apartments like Ms. Butler's, Defendants open the door to collecting and charging higher rents. Ms. Butler was only able to discover Defendants' misrepresentation as to the date of her apartment's last approved MBR increase (and the computation of her current, 2006-2007 MBR based on that amount) with the assistance of a representative from her tenants' association. Since the discovery of this misrepresentation, other rent-controlled tenants, both in Ms. Butler's building and others owned by Defendants, also have identified similar misrepresentations in their respective 2006-2007 MBR increase forms.

## CLASS ALLEGATIONS

**A.**     **Class Definition**

147.     The Individual Plaintiffs bring this action on their own behalf and, pursuant to Fed. R. Civ. P. 23(b)(1)(A), (b)(2) and (b)(3), as a class action on behalf of a class of persons defined as:

148.     All persons who, at any time from July 11, 2004 to the date of certification, leased an apartment directly or indirectly owned by Pinnacle or Joel Weiner in the City of New York. This class seeks certification of claims for declaratory and injunctive relief, and for damages pursuant to 18 U.S.C. § 1962(d) and New York General Business Law § 349(h).

**B.**     **Rule 23(a) - Typicality**

149.     The named Individual Plaintiffs and the members of the class each and all have tangible and legally protectible interests at stake in this action.

150.     The claims of the named class representatives and the absent class members have a common origin and share a common basis. Their claims originate from the same illegal, fraudulent, and deceptive practices of the Defendants, and the Defendants act in the same way toward the Individual Plaintiffs and the members of the class. Each named Individual Plaintiff has been the victim of one or more of the following illegal practices at the hands of the Defendants: intentionally misrepresenting the rent stabilized status of apartments to new tenants; intentionally misrepresenting the legal rent chargeable for the unit; intentionally misrepresenting of the nature and cost of improvements done to justify rent increases; intentionally misrepresenting the amount of rent that is due; intentionally sending baseless eviction notices fraudulently alleging rent due; intentionally instituting baseless court proceedings fraudulently alleging rent due; and fraudulently challenging tenants' legal succession rights.

151.    The proposed class representatives state claims for which relief can be granted that are typical of the claims of absent class members.  If brought and prosecuted individually, the claims of each class member would necessarily require proof of the same material and substantive facts, rely on the same remedial theories, and seek the same relief.

152.    The claims and remedial theories pursued by the named class representatives are sufficiently aligned with the interests of absent class members to ensure that the universal claims of the class will be prosecuted with diligence and care by the Individual Plaintiffs as representatives of the class.

**C.**    **Rule 23(a) - Numerosity**

153.    The members of the class are so numerous that joinder of all members is impracticable.  Defendants own or control over 400 buildings in New York City, containing more than 21,000 apartments.  On information and belief, the Defendants' illegal actions are widespread throughout their properties.  The class is ascertainable from records maintained by the Defendants.

**D.**    **Rule 23(a) - Commonality**

154.    The questions of law and fact common to the class include, among other things:

(a)    whether the Defendants have engaged in mail and wire fraud;

(b)    whether the Defendants have engaged in a pattern of racketeering activity;

(c)    whether the Pinnacle Enterprise identified herein is an enterprise within the meaning of 18 U.S.C. § 1961(4);

(d)    whether the Defendants conducted or participated in the affairs of the Pinnacle Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

46

(e)    whether the Defendants' overt or predicate acts in violation of 18 U.S.C. § 1962(c) proximately caused injury to the Individual Plaintiffs' and class members' business or property;

(f)    whether the Defendants act or refuse to act on grounds generally applicable to the Individual Plaintiffs and the class members;

(g)    whether the Defendants have established a practice or policy of misrepresenting tenants' rent stabilization status or of failing to notify tenants that their apartments are rent stabilized;

(h)    whether the Defendants have established a practice or policy of misrepresenting the prior rent charged on apartments they own;

(i)    whether the Defendants have established a practice or policy of misrepresenting the legal rent chargeable on apartments they own;

(j)    whether the Defendants have established a practice or policy of claiming tenants owe additional rent when they do not;

(k)    whether the Defendants have established a practice or policy of demanding rent that has already been paid;

(l)    whether the Defendants have established a practice or policy of demanding rent that has been lawfully withheld;

(m)    whether the Defendants have established a practice or policy of refusing to accept rent payments that have been properly tendered;

(n)    whether the Defendants have established a practice or policy of sending eviction notices when there is no proper basis for an eviction;

(o)    whether the Defendants have established a practice or policy of instituting eviction proceedings against tenants when there is no proper basis for an eviction;

(p)    whether the Defendants have established a practice or policy of misrepresenting tenants' succession rights;

(q)    whether the Defendants have established a practice or policy of harassing tenants to induce them to vacate their apartments;

(r)    whether the Defendants have established a practice or policy of failing to make necessary repairs until taken to court by tenants;

(s)    whether the Defendants have established a practice or policy of eavesdropping on tenants.

**E.    <u>Rule 23(a) – Adequate Representation</u>**

155.    The named Individual Plaintiffs are willing and prepared to serve the Court and the proposed class in a representative capacity with all of the obligations and duties material thereto.  The Individual Plaintiffs will fairly and adequately protect the interest of the class and have no interests adverse to, or that directly and irrevocably conflict with, the interests of the other class members.

156.    The self-interests of the proposed class representatives are co-extensive with, and not antagonistic to, those of the absent class members.  The proposed class representatives will undertake to protect the interests of the absent class members.

157.    The named Individual Plaintiffs have engaged the services of the counsel indicated below.  Those counsel are experienced in complex litigation, will adequately prosecute this action, and will assert, protect, and otherwise well represent the proposed class representatives and the absent class members.

**F.**     **Rule 23(b)(1)**

158.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for the Defendants toward the class members.

**G.**     **Rule 23(b)(2)**

159.    The Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

**H.**     **Rule 23(b)(3)**

160.    The questions of law and fact common to members of the class predominate over any questions affecting only individual members.

161.    A class action is superior to other available methods for the fair and efficient adjudication of the controversies herein because:

(a)     individual claims by class members are impractical as the costs of pursuing them far exceed what any one individual plaintiff or class member has at stake;

(b)     though some potential class members are, or have been, engaged in litigation with at least one of the Defendants or their affiliates, the baselessness of the Defendants' claims against them is part of the Defendants' scheme to impose costs on and to harass the class members as a means of illegally driving up their rents or of inducing them to vacate their apartments;

(c)     individual members of the proposed class have no interest in prosecuting and controlling separate actions;

(d)    it is desirable to concentrate litigation of the claims asserted herein in a single forum;

(e)    the proposed class action is manageable.

## COUNT I

### VIOLATION OF NEW YORK
### CONSUMER PROTECTION ACT ("NYCPA")

162.    Plaintiffs incorporate and restate the allegations of paragraphs 1 through 158 as if fully set forth herein.

163.    Defendants have engaged and continue to engage in deceptive consumer-oriented acts and practices by subjecting rent-subsidized tenants, including Plaintiffs and those on whose behalf BRUSH advocates, to demands of rents above those permitted under law based upon its representations of alleged renovations of individual units and major capital improvements not made or insufficient to justify the dramatic rent increases charged, for the purposes of illegal commercial gain.

164.    Defendants have engaged and continue to engage in deceptive consumer-oriented acts and practices filing eviction notices against rent-regulated tenants, including those on whose behalf BRUSH advocates, and making demands for rents already paid or lawfully withheld, and seeking unreasonable evidence of succession rights from lawful tenants, for the purposes of harassment and unfair and illegal commercial gain.

165.    Defendants' deceptive consumer-oriented acts and practices are misleading to a reasonable consumer in a material way.

166.    Plaintiffs and other of Defendants' tenants, including those on whose behalf BRUSH advocates, have suffered injury as a result of Defendants' deceptive consumer-oriented

acts and practices in the form of overpayment in rent, unlawful eviction, lost wages, severe

emotional distress, transportation and child care expenses, shoddy repairs and/or failure to make

reasonable repairs, and endless hours of aggravation and anxiety in housing court.

167.    Defendants' deceptive consumer-oriented acts and practices have a broad impact

on consumers at large and cause injury and harm to the public interest.

168.    Defendants' practices, acts, communications, and representations violate the New

York Consumer Protection Act, New York General Business Law § 349, because they constitute

deceptive acts or practices in the conduct of business, trade, and commerce, and/or in the

furnishing of services.

## COUNT II

### VIOLATION OF THE FEDERAL RACKETEER
### INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")

169.    Plaintiffs incorporate and restate the allegations of paragraphs 1 through 165 as if

fully set forth herein.

170.    Defendants Pinnacle and Wiener are "persons" as defined under 18 U.S.C.

§ 1961(3).

171.    Beginning in 2002, Pinnacle, Wiener, SecureWatch 24, Praedium, and at least the

LLCs identified in paragraphs 23 through 31 above, constituted an enterprise associated-in-fact

(the "Pinnacle Enterprise") within the meaning of 18 U.S.C. § 1961.  At all material times the

Pinnacle Enterprise operated for the purpose of investing in, owning, managing, and operating

residential properties, collecting rents, and converting rental apartment buildings into

condominium and cooperative units.

172.    At all material times, the Pinnacle Enterprise was separate and apart from the

pattern of racketeering activity in which it was engaged.

173.    At all material times, the Pinnacle Enterprise affected interstate commerce in that it used the U.S. mails and the interstate wires to conduct its business.

174.    Beginning in as early as 2002, Defendants Pinnacle and Wiener conducted the affairs of the Pinnacle Enterprise through a pattern of racketeering activity.  They are key decisionmakers for the Pinnacle Enterprise and implement its strategies, including predicate acts of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

175.    On numerous occasions, Defendants used the U.S. mails and the interstate wires to perpetrate their fraudulent scheme, acted with the knowledge that the use of the mails and interstate wires would follow in the ordinary course of business and could reasonably foresee such use of the mails and interstate wires.  Such mailings have also included, but are not limited to, notices to pay rent in amounts greater than the amount actually due, lease renewal forms providing for rents in excess of the legally chargeable amounts and checks mailed to tenants, for example Plaintiffs Marjorie and Theodore Charron, in less than the amounts the Defendants are obligated to pay them.

176.    Defendants' use of the U.S. mails and interstate wires included communications among Pinnacle, Praedium, SecureWatch 24, and Wiener, and communications between Defendants and various tenants, regulatory agencies and officials; all in furtherance of Defendants' fraudulent scheme.

177.    Defendants' fraudulent scheme and pattern of racketeering activity is ongoing, and has been directed at other victims besides the plaintiffs named herein, such as additional tenants in Pinnacle-controlled buildings that have been targeted by Defendants.

178.    As a proximate result of the fraudulent conduct perpetrated by Defendants, Plaintiffs have suffered and will continue to suffer damages, including:

a.      Plaintiffs have been harmed and will continue to be harmed by the excessive amount of rent they have paid directly to Pinnacle.

b.      Plaintiffs have been harmed and will continue to be harmed by the unlawful evictions Defendants have perpetrated and the fraudulent eviction proceedings Defendants have initiated.

c.      Plaintiffs have been harmed and will continue to be harmed by the diminution in value of their leasehold interests in their apartments.

d.      Plaintiffs have been harmed and will continue to be harmed by incurring lost wages for time spent defending fraudulent eviction claims and responding to fraudulent succession rights claims.

e.      Plaintiffs have been harmed and will continue to be harmed by incurring child-care expenses and unnecessary transportation expenses in defending fraudulent eviction claims.

f.      Plaintiffs have been harmed and will continue to be harmed by the diminution in value of their leasehold interests in their apartments.

WHEREFORE, Plaintiffs request judgment in the form of:

(a)     declaratory relief, declaring as follows:

     (1)    that Defendants' actions and practices of seeking to collect rent in amounts above what is permitted under the law, based on alleged individual apartment improvements or major capital improvements not actually made or in excess of those actually made, violate the New York Consumer Protection Act;

     (2)    that Defendants' actions and practices of refusing to make necessary and reasonable repairs or to address housing maintenance code violations as required by law, and then moving to evict tenants who have lawfully withheld rent based on Pinnacle's failure to make the repairs or address the code violations violate the New York Consumer Protection Act;

     (3)    that Defendants' actions and practices of commencing unfounded eviction actions in housing court to demand rent that has already been paid violate the New York Consumer Protection Act;

     (4)    that Defendants' actions and practices of commencing unfounded proceedings to challenge a tenant's succession rights or harassing and intimidating tenants by demanding an unduly burdensome, unjustified, and intrusive amount of evidence regarding a tenant's succession rights violate the New York Consumer Protection Act;

     (5)    that Defendants' repeated practice of ignoring, delaying compliance, and/or failing to comply with housing court orders and rulings from the DHCR violate the New York Consumer Protection Act; and

  (6)  that Defendants' operation of the Pinnacle Enterprise through a pattern of racketeering activity violates the Racketeer Influenced and Corrupt Organizations Act;

 (b)  injunctive relief, in the form of a preliminary and permanent injunction restraining Defendants, their agents, employees, successors, and all others acting in concert or conjunction with them, from continuing practices declared unlawful pursuant to paragraph (a) above, and

 (c) directing Defendants to implement Court-approved procedures designed to avoid such unlawful practices in the future, including but not limited to the appointment of an independent monitor, who shall oversee and ensure the lawful operation of buildings and management of tenant relations in buildings owned by Defendants and assist in the resolution of disputes between Defendants and their tenants; and the auditing and accounting of rents demanded by Defendants and disgorgement of any rent overcharges;

 (d)  an award of compensatory, statutory, and punitive damages pursuant to New York General Business Law § 349(h);

 (e)  revocation of rent increases and disgorgement of Defendants' unjust gains and profits;

 (f)  an award of attorneys' fees and costs pursuant to New York General Business Law § 349(h);

 (g)  all damages caused by Defendants' violations of 18 U.S.C. § 1962(c) including treble damages;

 (h)  attorneys' fees and costs;

 (i)  pre- and post-judgment interest to the extent permitted by law; and

 (j)  such other and further relief as this Court deems equitable and just.

PLAINTIFFS DEMAND A TRIAL BY JURY

Dated:  September 14, 2007

Respectfully submitted,

BUYERS AND RENTERS UNITED TO SAVE
HARLEM, MARJORIE and THEODORE
CHARRON, KAREN FLANNAGAN,
ANDRES MARES-MURO, TRACEY
MOORE, RAYMOND ANDREW STAHL-
DAVID, RUSSELL TAYLOR, DIANE
TRUMMER, and KIM POWELL

By: _____

Richard F. Levy (RL-9825)
Ronald M. Daignault (RD-2672)
Katya Jestin (KJ-6047)
Susan J. Kohlmann (SK-1855)
Chinh Q. Le (CL-9036)
Carletta F. Higginson (CH-6491)
Elizabeth Valentina (EV-4345)
JENNER & BLOCK LLP
919 Third Avenue, 37th Floor
New York, NY  10022-3908
(212) 891-1600
(212) 891-1699 facsimile

*Of counsel:*

C. Steven Tomashefsky
Andrew A. Jacobson
JENNER & BLOCK LLP
330 North Wabash Avenue
Chicago, IL  60611
(312) 222-9350
(312) 587-0484 facsimile