**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| BUYERS AND RENTERS UNITED TO SAVE HARLEM; and | ) ) ) | |
| MARJORIE and THEODORE CHARRON; ANTHONY CASASNOVAS; KAREN FLANNAGAN; ANDRES MARES-MURO; TRACEY MOORE; RAYMOND ANDREW STAHL-DAVID; RUSSELL TAYLOR; DIANE TRUMMER, and KIM POWELL, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) | **PLAINTIFFS' RICO STATEMENT** No. 07 CIV 6316 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| PINNACLE GROUP NY LLC; PINNACLE GROUP, LLC; and JOEL WIENER, | ) ) ) | |
| Defendants. | ) ) | |

Plaintiffs, Buyers and Renters United to Save Harlem ("BRUSH") and Marjorie and Theodore Charron, Anthony Casasnovas, Karen Flannagan, Andres Mares-Muro, Tracey Moore, Raymond Andrew Stahl-David, Russell Taylor, Diane Trummer, and Kim Powell, individually and on behalf of all others similarly situated (the "Individual Plaintiffs," and collectively with BRUSH, the "Plaintiffs"), by their attorneys, respectfully submit this RICO Case Statement pursuant to the Court's RICO Case Standing Order dated September 21, 2007.

This RICO Statement is based upon the information currently available to Plaintiffs. Given the nature of Defendants' fraud and other wrongdoing, additional information is in the control of the defendants and of certain third parties and unavailable to Plaintiffs, absent discovery. This is because Defendant Pinnacle Group NY LLC ("Pinnacle"), and other members of the enterprise alleged in the first amended complaint, are non-public entities that conceal and

obscure their conduct behind literally hundreds of subsidiary or affiliated entities. Further, additional relevant and discoverable information is in the possession of the New York County District Attorney and the New York State Attorney General, both of whom have conducted and are continuing to conduct investigations into criminal or otherwise unlawful conduct by Pinnacle or are exercising active supervisory oversight to prevent further criminal or otherwise unlawful activity of the types alleged in the First Amended Complaint. Plaintiffs reserve the right to amend this RICO Statement as information is learned through discovery, responses to Freedom of Information Law requests, or otherwise.

**1.      State whether the alleged unlawful conduct is in violation of 18 U.S.C. §§ 1962(a), (b), (c), and/or (d).**

The First Amended Class Action Complaint alleges unlawful conduct in violation of 18 U.S.C. § 1962(c).

**2.      List each defendant and state the alleged misconduct and basis of liability of each defendant.**

a.      Pinnacle Group NY LLC ("Pinnacle")

Pinnacle is the flagship entity for the real estate interests held or managed by Joel Wiener and his family. Pinnacle is a member of numerous LLCs, each of which directly owns one of some 400 apartment buildings in the City of New York (the "Landlord LLCs"). In most cases, Pinnacle or a Pinnacle affiliate is a managing member of the Landlord LLCs, though there may also be other managing members, including The Praedium Group LLC ("Praedium") or its principals and affiliates. Pinnacle, together with certain of its affiliates or subsidiaries, is responsible for the day-to-day management of the apartment buildings on behalf of the Landlord LLCs, including negotiating leases, collecting rent, performing repairs, and hiring building staff. In addition, through multi-layered subsidiary or affiliate relationships, Pinnacle has joined with

Praedium (through its own multi-layered affiliates or subsidiaries) to serve as "Sponsor" of at least 19 pending condominium conversion offering plans involving apartment buildings in New York City whose rent-regulated tenants are subject to the illegal conduct alleged in the amended complaint ("Sponsor Entities"). The precise legal relationships among Pinnacle and its affiliates are complex, many-layered, and not a matter of public record. The Plaintiffs expect to flesh out those relationships more fully through discovery. Pinnacle uses the "d/b/a" name "Pinnacle Group" for its activities, even if they are not directly conducted by Pinnacle Group NY LLC.

Pinnacle is part of an association-in-fact also comprising Joel Wiener, Praedium, Praedium's principals and subsidiaries, the several hundred Landlord LLCs, and SecureWatch 24, a security and surveillance firm of which Joel Wiener is a principal (collectively, the "Pinnacle Enterprise"). Pinnacle has participated in the operation and management of the affairs of the Pinnacle Enterprise through a pattern of racketeering activity, including acts of mail fraud, transport of funds taken by fraud, and extortion. Many tenants of the Landlord LLCs occupy rent-stabilized or rent-controlled apartments. Pinnacle's goal is to obtain rents from those tenants that exceed the amounts permitted by applicable rent stabilization and rent control laws and to cause tenants to vacate their apartments so as to make them available for lucrative condominium conversion. To achieve that goal, Pinnacle, among other things:

> (1)    misrepresents to tenants the prior rental history of their apartments, which forms the basis on which the current rent is permitted to be calculated;

> (2)    misrepresents the cost or value of repairs or capital improvements, a portion of which can be added to the base rent;

> (3)    misrepresents to tenants that their rental payments are delinquent, sending them eviction notices and commencing eviction proceedings when the rent is not delinquent or has been lawfully withheld because of Pinnacle's failure to make required repairs or because the rent has been determined by DHCR to be improperly inflated;

(4)     misrepresents to tenants their succession rights under their leases, which provide certain co-tenants or relatives with the right to take over the lease of a rent-subsidized or rent-controlled apartment without the rent switching over to market rates;

(5)     requires tenants who are entitled to succession rights to sign agreements providing they are not entitled to succession rights as a condition of continued occupancy; and

(6)     requires tenants to pay rents in excess of the legally permitted amounts under threat of eviction if they do not.

The harm to the Plaintiffs resulting from those misrepresentations is accomplished in part through the use of the United States Mail.  Such mailings have included notices to pay rent in amounts greater than the amount actually due, lease renewal forms providing for rents in excess of legally chargeable amounts, eviction notices and mailings relating to eviction proceedings.

The harm to the Plaintiffs resulting from Pinnacle's misrepresentations and acts of extortion consists of their paying higher rents than is permitted by law, their being forced to waive their legal succession rights, their being charged for repairs that have not been made or that have been shoddily made, their being compelled to expend money, time, and other resources in opposing Pinnacle's fraudulent eviction efforts, and their being forced to vacate rent-regulated apartments to make them available for rental at market rates or for condominium conversion.

       b.     Joel Wiener ("Wiener")

Wiener is a principal of Pinnacle and is one of the persons who manages and directs its affairs.  Although he is Pinnacle's chief decisonmaker and directs its overall strategy, that strategy is subject to input from other members of the Pinnacle Enterprise, including Praedium and its principals.  Wiener is also a principal of SecureWatch 24, which provides security and surveillance services to landlords in New York City, including the Landlord LLCs.  Wiener's precise status and legal role in Pinnacle, SecureWatch 24, and the Landlord LLCs is complex

and not a matter of public record.  Plaintiffs expect to flesh out Wiener's multiple roles more fully through discovery.

Wiener is a part of the Pinnacle Enterprise.  His role in the Pinnacle Enterprise consists not only of managing and directing Pinnacle's affairs but also of his role, in an individual capacity, as a principal of SecureWatch 24 and his role, in an individual capacity, as a principal or member of the Landlord LLCs and Sponsor Entities.  Wiener participates in the operation and management of the Pinnacle Enterprise through his participation in the management of Pinnacle's tenant-related business activities of the individual Landlord LLCs and Sponsor Entities, as detailed more fully in subsection (a) above.  Wiener further participates in the operation and management of the Pinnacle Enterprise through his participation in the management of SecureWatch 24's surveillance activities, which include harassment and intimidation of tenants through actual or feigned eavesdropping.

In addition, Wiener participates in the operation and management of the Pinnacle Enterprise through his role as a member and principal of the Landlord LLCs and Sponsor Entities.  Apart from the rent overcharges and other harms described above in subsection (a), many of the Landlord LLCs have sponsored or are currently sponsoring the conversion of rental apartments to condominiums or cooperatives.  That strategy is an effort by the Landlord LLCs' members to turn over their investments in the buildings at a significant profit.  But because most of the conversions are done pursuant to a "non-eviction" plan, the investors cannot achieve a return on their investment unless a current tenant either (1) buys the unit he or she occupies or (2) vacates the unit, allowing it to be sold to a third party.  Where tenants are not interested in buying or vacating voluntarily, the rent overcharges, extortion, and harassment directed by Wiener and others in the Pinnacle Enterprise are intended not only to obtain excessive rents, but

also to accelerate the emptying-out of apartments, enabling them to be sold. These practices involve deliberate steps taken by the Pinnacle Enterprise, directed and managed by Wiener and the other participants in the structure discussed in more detail in section 5.b. below. Those steps include, for example, the charging of unlawfully inflated rents not supported by requisite repairs or other improvements; failure to make necessary repairs to rent-regulated units; burdensome harassment of the rent-regulated tenant through requests for documentation that is not in fact required and threats of eviction if the improper rents are not paid; and frivolous housing court proceedings to intimidate the tenant so that she will vacate the unit. The pressure exerted on these tenants by Wiener and the Pinnacle Enterprise, including the intimidation and extortion described in the amended complaint, is ongoing and threatens additional harm unless it is stopped.

      c.     <u>Pinnacle Group, LLC</u>

As noted above in subsections (a) and (b), the status and relationships among Pinnacle and its affiliates are complex, many-layered, and not a matter of public record. Further, Pinnacle and its affiliates use the "d/b/a" name "Pinnacle Group" in communications with tenants and the public. Although the name "Pinnacle Group, LLC" has appeared in certain documents and press reports relating to Wiener and Pinnacle, counsel for Pinnacle and Wiener has represented that there is no actual legal entity called "Pinnacle Group, LLC." The Plaintiffs therefore will not assert any separate claims against Pinnacle Group, LLC, subject to discovery that may provide a basis for liability of such an entity.

    **3.**    **List the alleged victims and state how each victim was allegedly injured.**

      a.     <u>Buyers and Renters United to Save Harlem ("BRUSH")</u>

Plaintiff BRUSH is a not-for-profit, tenant-run association formed under the laws of the State of New York for the purposes of educating tenants in the West Harlem and Northern

Manhattan communities about their rights and of advocating for improving the West Harlem and Northern Manhattan communities. The Landlord LLCs own many buildings in those communities, containing a large number of low-income tenants who occupy rent-stabilized or rent-controlled apartments. Because of its prominence in the community, BRUSH has become a focal point for tenant grievances against Pinnacle.

BRUSH suffered and continues to suffer injury to its business as a result of Defendants' racketeering activity and violations of the RICO statute because the overwhelming impact of Pinnacle's RICO violations has forced BRUSH to divert its resources away from its core activities and to focus instead upon advocating on behalf of tenants who are being harmed by Pinnacle through frivolous or threatened litigation, threatened eviction, rent overcharges, and harassment by Defendants. BRUSH's ability to educate, represent, and organize tenants on other matters and with respect to other landlords is thus significantly impaired. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (perceptible impairment of a housing organization's ability to provide services it was intended to provide constitutes injury in fact for purposes of standing); *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 904-05 (2d Cir. 1993) (same).

      b.     <u>Marjorie and Theodore Charron</u>

Individual plaintiffs Marjorie and Ted Charron are also victims of Defendants' racketeering activity and violations of the RICO statute. The Charrons were never notified by the Defendants, as required by law, that the apartment was rent-stabilized when their lease began in 2001. The Charrons have suffered and continue to suffer injury by paying and having paid rent payments in excess of the amount permissible by law. The Charrons have been further harmed by Defendants by being forced to participate in frivolous court proceedings calculated to maximize the burden on their time and their expenses. During such proceedings, Defendants submitted fraudulent receipts to DHCR for "renovations" to justify a fraudulent rent overcharge.

These receipts included, among other things, 160 light bulbs, 75 pounds of grout, 130 gallons of paint, a $198 nail gun, a $424 drain cleaning device, and various other items listed as installed but not used. Defendants also fraudulently submitted to DHCR other costs for maintenance work which are illegal to pass on from a landlord to a tenant under relevant rent-regulation laws. Despite ultimately acknowledging, after three separate litigations, that they made "mistakes" that resulted in the Charrons being overcharged by more than $10,000, Defendants still have not repaid the Charrons. Moreover, when the Charrons attempted to withhold rent based on the credit they should have received as a result of past overcharges, they received a "Thirty Day Notice to Debtor" dated April 26, 2006, and a "Three Day Notice" from Pinnacle dated April 26, 2006. Facing Defendants' threats of eviction, the Charrons have been forced to continue to pay the unlawfully inflated rent amount for fear of possible eviction.

      c.    <u>Anthony Casasnovas</u>

Individual plaintiff Anthony Casasnovas is also a victim of Defendants' racketeering activity and violations of the RICO statute. Casasnovas suffered and continues to suffer injury by paying and having paid rent payments in excess of the amount permissible by law. Casasnovas has been forced to pay rent increases based on non-existent or falsely inflated renovations. The rental history for Casasnovas' unit reflected that Defendants would have had to have made more than $40,000 in renovations to his apartment to justify the increases leading to his monthly rent amount. After Casasnovas called the overcharge to the attention of Defendants, Casasnovas was subjected to Defendants' wrongfully filed eviction proceedings. Casasnovas was further harmed by Defendants' efforts to prolong the proceedings in a manner intended to maximize the burden on Casasnovas' time and his expenses. After withholding rent from Defendants, as was Casasnovas' right, Defendants served demand notices, such as a "Three Day Notice to Debtor" in 2006, demanding withheld rent based on the same unlawfully inflated rent

amounts. Casasnovas was required to make more than three court appearances, for which he has had to miss days of work. Casasnovas was never notified by Defendants, as required by law, that his apartment was rent-stabilized when his lease began.

        d.    <u>Karen Flannagan</u>

Individual plaintiff Karen Flannagan is also a victim of Defendants' racketeering activity and violations of the RICO statute. Flannagan suffered injury as a result of Defendants' attempts to force her to surrender her lawful occupancy in a rent-stabilized apartment including by having to appear in court repeatedly and without basis, respond to Defendants' frivolous notices, and expend time, money, and effort demonstrating she is a lawful tenant in her apartment. Defendants' harassment of Flannagan was designed to induce her to vacate the apartment. In a response to the first of Defendants' requests for proof that she was the "primary tenant" and lawful successor, Flannagan mailed to Defendants on May 13, 2004 the requested evidence and documentation, including jury duty notices, driver's license, bank account statements, utility bills and letters from her daughter's school. Nevertheless, Defendants sent additional letters dated January 10, 2005 and January 13, 2005 stating that they would not accept her checks for rent because she was not the "primary tenant" on the lease and returning seven personal checks from her. Defendants made additional demands that culminated in the issuance of a "Ten Days Notice to Quit Licensee" dated January 19, 2005. In 2005, Flannagan had holdover proceedings instituted against her by Defendants and as a result Flannagan was required to appear in housing court no fewer than 10 times over a two-year period. On or about April 26, 2006, Defendants abruptly and without explanation dropped their case.

        e.    <u>Andres Mares-Muro</u>

Individual plaintiff Andres Mares-Muro is also a victim of Defendants' racketeering activity and violations of the RICO statute. Mares-Muro suffered and continues to suffer injury

by paying and having paid rent payments in excess of the amount permissible by law. Mares-Muro has been further harmed by Defendants' concealment of information regarding his apartment's rental history that they knew or should have known would have allowed him to obtain a judgment of rent overcharge from DHCR. In September 2003, Mares-Muro signed a lease to occupy a rent-stabilized apartment in a building initially owned by Baruch Singer but subsequently acquired by Defendants. Several years later, Mares-Muro obtained a rental history for his apartment and learned that the rent charged had nearly doubled between 2000 and 2001, from $648 per month to $1,275 per month. Mares-Muro filed a complaint for rent overcharge with DHCR for this blatant violation of the rent regulation laws, but was time barred from recovering any overcharged rent.

        f.     <u>Tracey Moore</u>

Individual plaintiff Tracey Moore is also a victim of Defendants' racketeering activity and violations of the RICO statute. Moore suffered and continues to suffer injury by paying and having paid rent payments in excess of the amount permissible by law. Moore has been further harmed by having to pay for rent increases based on non-existent or falsely inflated renovations. Moreover, Moore has been subjected to demands for rent in amounts higher than that which Defendants have acknowledged is appropriate, requiring Moore to appear in court on several occasions to defend against claims for rent arrears that she had already paid or that should have been credited. Moore received a "Thirty Day Notice to Debtor" from Defendants on May 15, 2006, and a "Three Day Notice to Debtor" from Defendants also dated May 15, 2006, both seeking to collect rent arrears totaling $3,158.44. Those notices were false and misrepresented the amount of back rent due because they were based on unlawfully inflated rent amounts. Notwithstanding Moore's subsequent payment of the inflated amount, Moore was forced by Defendants to appear in housing court in June 2006, at which time the action against her was

dismissed. Shortly thereafter, Moore discovered that she was being overcharged for rent and initiated a rent overcharge claim against Defendants. DHCR documentation established that the previous occupant of Moore's apartment paid $464 per month in rent. As a result, Defendants acknowledged to DHCR, in a letter dated October 17, 2006, that they had overcharged Moore based on "items claimed earlier in the 1/40th calculation [that] should not be included in said calculation." Moore subsequently received from Defendants back-to-back rent statements in different amounts, including amounts both higher and lower than the correct rent Defendants had acknowledged in their letter to DHCR. Moreover, Moore received from Defendants a rent renewal application in or about January 2007 that contained a calculation of the new rent based on the original, overcharged rent figure.

g.    Raymond Andrew Stahl-David

Individual plaintiff Raymond Andrew Stahl-David is also a victim of Defendants' racketeering activity and violations of the RICO statute. Stahl-David suffered and continues to suffer injury by paying and having paid rent payments in excess of the amount permissible by law. Stahl-David signed a lease for $1850 per month in September 2005. In August 2006, upon learning that a prior tenant in the same unit had paid $976 per month in rent two years prior to his tenancy, Stahl-David filed a rent overcharge claim with DHCR. In addition, Stahl-David obtained documents from Defendants suggesting that they had installed appliances, such as a dishwasher, that his apartment in fact does not have. On July 20, 2007, Stahl-David received from DHCR an "Order Finding Rent Overcharge," which held in his favor that "the legal regulated rent is established as of September 1, 2005 in the amount of $534.29," not the $1,850 the Defendants had fraudulently demanded. Further, the Order directed Defendants to roll back the rent to the legal regulated rent and to offer Stahl-David a lease renewal based on that rate. After receiving the DHCR Order, Stahl-David tendered rent to Defendants in the reduced amount

established by the Order.  Defendants refused to deposit Stahl-David's payment and instead submitted a new bill fraudulently stating that he is in arrears and putting him in fear of further eviction proceedings.  In addition, rather than complying with the DHCR Order, Defendants mailed Stahl-David a renewal lease that called for rent payments based on the amount invalidated by the Order.  Stahl-David was fraudulently forced by Defendants to sign an earlier lease for the apartment that indicated that the apartment was free from rent regulation, even though it was in fact rent-stabilized.  Indeed, the lease Stahl-David were asked to sign contained a rider requiring them to agree that "the apartment is not subject to any form of rent regulation." A subsequent lease renewal application indicated that their apartment was subject to the rent stabilization statutory rent increase amount.

      h.    <u>Russell Taylor</u>

Individual plaintiff Russell Taylor is also a victim of Defendants' racketeering activity and violations of the RICO statute.  Taylor suffered and continues to suffer injury as a result of Defendants' attempts to force him to surrender his lawful occupancy in a rent-regulated apartment, including Defendants' baseless court filings, which have required him repeatedly and without basis to appear in court, respond to frivolous notices, and expend time, money, and effort to demonstrate that he is a lawful tenant in his apartment.  After purchasing the building in which Taylor resided, Defendants began subjecting Taylor to repeated harassment for almost a year in an effort to remove him from his rent-stabilized apartment.  Taylor has lived in the same apartment since 2000, when he first moved in with the apartment's leaseholder at that time. Before selling the building to Pinnacle, Taylor's then-landlord, Baruch Singer, agreed to add Taylor's name to the lease as tenant of record.  Taylor continued to reside in the apartment and pay rent for three years.  After the building was acquired by Defendants in or about September 2005, they immediately moved to evict Taylor, falsely claiming that he owed approximately

$3,000 in back rent.  Taylor received, via first class mail, a "Three Day Notice to Pay Rent" dated September 7, 2005 from Defendants.  Taylor was required to appear in housing court and successfully proved that he had in fact paid in full, and no rent was due.  On or about September 19, 2005, Taylor received another notice from Defendants, initiating an eviction proceeding against him alleging that he was not the proper leaseholder.  Taylor sent copies of his rent checks to Defendants via certified mail, but they claimed that they did not receive his correspondence.  Taylor continued to be harassed by Defendants for eight months, required him to appear in housing court on multiple occasions.

   i. <u>Diane Trummer</u>

   Individual plaintiff Diane Trummer is also a victim of Defendants' racketeering activity and violations of the RICO statute.  Trummer suffered and continues to suffer injury by paying and having paid rent payments in excess of the amount permissible by law.  Trummer moved into a rent-stabilized apartment in a building owned by Defendants in or about February 2004, only to be subjected to harassment and overcharged without explanation.  When Trummer moved into the apartment in February 2004, Defendants charged Trummer $1275 in rent.  After obtaining the rental history of her apartment from DHCR, Trummer learned that her apartment was previously rent-controlled, with the last tenant of record paying $497.53 in rent.  In June 2004, Trummer filed a complaint for overcharge with DHCR.  As a result of Defendants' failure to submit the initial apartment registration form to Ms. Trummer or to DHCR as requested on February 9, 2005, Ms. Trummer's rent overcharge case was processed by DHCR as a fair market rent appeal.  By letters dated September 29, 2004 and October 5, 2004, Defendants sent DHCR their objections to Trummer's complaint on the grounds that the increased rent resulted from $24,000 in alleged improvements that were performed on the apartment and that Trummer's fair market rent appeal should be barred by the statute of limitations.  Upon information and belief,

Defendants unlawfully increased the rent for Trummer's apartment based on fraudulent receipts and alleged renovations, including improper charges in the amount of approximately $11,000 in labor costs from their own super.    Additionally, on or about June 20, 2004 there was a fire in a neighboring apartment that required her to vacate her apartment.  Defendants never informed Trummer when she could move back into her apartment; when she finally did, she discovered that her kitchen was made twenty feet smaller.  Defendants then petitioned to restore the rent, which had been reduced because of the fire, and set January 1, 2005 as the date when the apartment was allegedly habitable so that Defendants could collect back rent.  Defendants, however, never provided any notice or evidence of habitability.

     j.    <u>Kim Powell</u>

Individual plaintiff Kim Powell is also a victim of Defendants' racketeering activity and violations of the RICO statute.  Powell suffered and continues to suffer injury by having to appear in court, respond to Defendants' frivolous notices, and expend time, money, and effort to demonstrate that she is a lawful tenant in her apartment.  Powell has lived with her mother in the building in which she current resides since the 1970s.  Powell pays the rent and has succession rights to the lease.  In late 1998 or 1999, Powell received from Defendants a letter asking her to agree that their acceptance of her check for the rent was not an acknowledgement of her succession rights – an attempt to deceive her into surrendering the legal rights she had.  Around the same time, after the Defendants had failed to make necessary repairs in the apartment, Powell was forced to file an action in housing court requiring that the repairs be made.  After she won that action, even though the rent was paid in full, the Defendants commenced an eviction proceeding against Powell and her mother, falsely claiming that unpaid rent was due.  Powell was forced to expend time and resources to combat that improper suit successfully.  Powell has

also been subjected to harassment and video surveillance by Defendants for her involvement with tenant organizing activities.

k.    <u>Additional victims</u>

Members of the proposed Plaintiff class are also victims of Defendants' racketeering activity and violations of the RICO statute. The named class representatives and the absent class members have common injuries. Class members have suffered injury by Defendants in the form of payment of rents in excess of the amounts permissible by law. Class members have suffered further harm from Defendants' efforts to force them to surrender their lawful occupancy in rent-regulated units, including by having to appear in court, repeatedly and without basis, to respond to Defendants' frivolous notices, and expend time, money, and effort demonstrating they are lawful tenants in their apartments. The class member injuries originate from the same illegal, fraudulent, and deceptive practices of the Defendants.

**4.    Describe in detail the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim. A description of the pattern of racketeering shall include the following information:**

        **a.    List the alleged predicate acts and the specific statutes that were allegedly violated;**

Pinnacle and Wiener have violated 18 U.S.C. § 1341 by utilizing or causing the use of the United States postal service in furtherance of the fraudulent scheme. Examples of such mailings are listed below.

Pinnacle and Wiener have also violated 18 U.S.C. § 1951 by extorting from tenants money or valuable property not lawfully due them in the form of inflated rents by threatening tenants with eviction from their homes if they fail to pay the inflated sums demanded. As evidenced by the allegations relating to Theodore and Marjorie Charron, for example, described *supra* at 3.b., Defendants engage in the extortion of money due to certain tenants by threatening

15

or actually initiating litigation if the tenants attempt to withhold rent based on a DHCR or housing court ruling, refuse to pay rents found to be unlawfully inflated, or move to collect overcharged amounts to which the tenants are legally entitled.[1]

Plaintiffs further believe that income fraudulently obtained from tenants by the Pinnacle Enterprise is transmitted, in part, to Praedium's investors outside of New York State, and to mortgage lenders outside New York State, in violation of the National Stolen Property Act, 18 U.S.C. § 2314, which prohibits the interstate transmission or transportation of funds known to be "taken by fraud." Because information about these interstate payments is solely within the control of defendants and certain third parties, Plaintiffs expect discovery will show evidence of these transmissions by the Pinnacle Enterprise.

The predicate acts constituting violations of these statutes are described below in response to 4.b.

> **b.     If the RICO claim is based on the predicate offenses of wire fraud, or fraud in the sale securities, the "circumstances of fraud or mistake shall be stated in particularity;"**

Defendants have engaged in a scheme whereby Pinnacle fraudulently inflates the rents of its rent-regulated apartments, intentionally fails to make needed repairs, initiates baseless

---

[1] In keeping with such practices, shortly after the filing of the original Complaint in this lawsuit, a Pinnacle attorney approached Plaintiff Anthony Casasnovas at a separate housing court hearing, offering to settle that housing court matter on very attractive terms, including a substantial cash payment, provided that Casasnovas withdraw as a plaintiff in this matter. At that time, Casasnovas was accompanied by counsel who did not represent Casasnovas with respect to this lawsuit, nor did Pinnacle's attorney have authorization to communicate with Casasnovas with respect to this lawsuit. Indeed, Pinnacle knew that Casasnovas was being represented by separate counsel in this matter. Puzzled by Pinnacle's abrupt about-face and its demand that Casasnovas agree on the spot to withdraw as a plaintiff from this action, Casasnovas was able to obtain a temporary postponement of his housing court hearing. That day, Casasnovas' counsel in this lawsuit informed Pinnacle's counsel that its approach to Casasnovas about this lawsuit violated the ethical rules governing lawyers' conduct. When confronted with the inappropriate demand and unauthorized communications with Casasnovas, Pinnacle dropped its insistence that Casasnovas withdraw from this action as a condition of resolving his overcharge dispute with Pinnacle.

eviction and holdover housing court proceedings against its tenants, and groundlessly harasses and forces tenants out from rent-regulated housing units. Specifically, as set forth in detail in the Amended Complaint, Defendants pattern and practice of tenant harassment includes: (i) seeking to collect rent in amounts that are not permitted under the law based on misrepresentations as to individual apartment improvements or major capital improvements that have not been made; (ii) failing to timely make necessary and reasonable repairs, to address housing maintenance code violations, or to provide essential, required services and then threatening and taking action to evict tenants who have reasonably and legally withheld rent because of such illegal conduct; (iii) commencing unfounded eviction actions based on misrepresentations that rent has not been paid; (iv) commencing unfounded proceedings to challenge  tenants' succession rights and harassing and intimidating tenants based on misrepresentations as to the amount and type of evidence needed to establish a tenant's succession rights; (v) unjustifiably refusing to accept tenants' rent checks and then misrepresenting that rent has not been paid, as a basis for commencing fraudulent eviction actions or other proceedings challenging succession rights; (vi) directing, encouraging and allowing the superintendents of its buildings to, among other things, harass tenants by making unacceptable and shoddy repairs or making false promises to conduct repairs; scheduling appointments that the superintendents do not attend; issuing false notices and documents regarding tenants' activities or conduct; and ignoring tenants' complaints and acting in a hostile and retaliatory manner to tenants who have made complaints; (vii) failing to offer tenants lease renewals, or lease renewals on proper terms; (viii) failing to comply with orders issued by the New York Department of Housing and Community Renewal requiring Pinnacle to pay monetary awards to tenants for rent overcharges and rent reductions; (ix) misrepresenting that it is entitled to collect original rents that have been reduced in accordance with Department

of Housing and Community Renewal orders, knowing that the housing violations giving rise to the rent reductions have not been resolved; (x) refusing to respond to and ignoring tenants' inquiries and requests for documents relating to rental histories, rent increases based on individual apartment improvements and major capital improvements, and lease renewals, all with the purpose of preventing tenants from discovering that the rent being charged is excessive; and (xi) altering documents relating to rental histories as a means of misrepresenting the amount of rent it is entitled to collect; and (xii) undertaking actual or feigned eavesdropping directed against tenants who object to Defendants' unlawful conduct.

These actions serve the Pinnacle Enterprise's goals of obtaining rents in amounts higher than what is legally permissible, avoiding the expense of necessary and legally required repairs, and ultimately eliminating rent-regulated units in its buildings without regard for the lawfulness of the tactics used. The Pinnacle Enterprise is thus able to turn what Pinnacle and its investment partner perceive to be "underperforming" assets into higher value assets through inflated rents, building sales, or condominium conversions -- all at the expense of existing tenants.

In furtherance of their scheme and in connection with their fraudulent practices, Defendants have employed the U.S. mails as part of an ongoing scheme to increase rents unlawfully, to receive illegal rents, and ultimately to free their properties from New York's rent control and rent stabilization requirements. Defendants submitted to Plaintiffs and class members inflated rent statements based on nonexistent turnover or fictional renovations, submitted demand letters and collection notices demanding payment of inflated rents on pain of court proceedings and ejectment, and made statements denying falsely that tenants were lawful lessees or successors. Through these mailings and misstatements, Defendants pressured, threatened, and harassed Plaintiffs and class members in furtherance of their efforts to increase

turnover and free properties from rent control and rent stabilization.    Examples of such correspondence are contained in the chart below:

| DATE | FROM | TO | DESCRIPTION |
|------|------|-----|-------------|
| 5/15/2003 | 706 Realty Co. LLC | Marjorie Charron | Letter crediting Charron's account $895.98 for past rent overcharges which was below the amount owed to Charron, and misrepresenting the rent to be paid to be $1786.94, which was higher than permitted by law.  Rent increases were based on nonexistent renovations. * |
| 4/26/2006 | Donna Fabrizio, 706 Realty Co. LLC | Theodore & Marjorie Charron | Three Day Notice demanding $2,801.68 based on unlawfully inflated rent amounts due to nonexistent renovations. |
| 1/11/2007 | 706 Realty Co. LLC | Theodore & Marjorie Charron | Renewal Lease form setting one year rent at $2016.92 based on unlawfully inflated rent amounts.  Rent increases were based on nonexistent renovations.* |
| 2/14/2006 | 3657 Realty Co. LLC | Anthony Casasnovas & Vero Gonzalez | Lease Renewal Form setting rent at $1900/month, above legally permissible rent. Rent increases were without justification in renovation or turnover. * |
| 7/24/2006 | 3657 Realty Co., LLC | Anthony Casasnovas & Veronica Gonzalez | 30-day Notice and 3-day Notice demanding $4400 based on unlawfully inflated rent amounts.  Rent increases were without justification in renovation or turnover. * |
| 1/10/2005 | Vahida, Pinnacle Group | Stanley Flannagan | Letter returning 6 personal checks as not from the primary tenant.  On May 13, 2004, Karen Flannagan mailed extensive documentation regarding her status as lawful tenant to Vahida Pinnacle Group.  At time of mailing, Pinnacle thus had in its possession information showing Karen Flannagan to be the lawful tenant. |
| 1/13/2005 | Vahida, Pinnacle Group | Stanley Flannagan | Letter returning check #1556, as not from the primary tenant. Flannagan mailed extensive documentation regarding her status as lawful tenant on 5/13/04, prior to this mailing.  At time of mailing, Pinnacle in possession of information showing Flannagan to be the lawful tenant. |
| 1/19/2005 | Donna Fabrizio, 706 Realty Co. LLC | Karen A. Flannagan | Ten Days Notice to Quit to Licensee founded on baseless claim that Flannagan was not a lawful successor.  On May 13, 2004, Flannagan mailed extensive documentation of her status as a lawful tenant.  At time of the Ten Days Notice, Pinnacle thus possessed information showing Flannagan to be the lawful tenant. * |

| | | | |
|---|---|---|---|
| 2/28/2005 | Vahida, Pinnacle Group | Stanley Flannagan | Letter returning check #1573, as Pinnacle has begun a holdover proceeding against Flannagan. On May 13, 2004, Flannagan mailed extensive documentation of her status as a lawful tenant. At time of this letter, Pinnacle thus possessed information showing Flannagan to be the lawful tenant. |
| 4/26/2005 | 635 Riverside LLC | Andres Mares-Muro & Maria Vides | Renewal Lease Form showing security deposit paid at $0 when Mares-Muro had existing security deposit.  635 Riverside LLC in possession of security deposit at time of mailing. * |
| 8/29/2005 | Pinnacle Singer Condo Mezzanine LLC | Andres Mares-Muro | Summary of Rent showing new security deposit of $1400 when in fact additional deposit was held.  Pinnacle Singer Condo Mezzanine LLC in possession of security deposit at time of mailing. * |
| 11/17/2005 | 635 Riverside LLC | Andres Mares-Muro ("To whom it may concern") | Letter informing Mares-Muro that it has no security deposit on file.  Letter asks tenant to submit proof of security deposit (none on file). Mares had submitted security deposit prior year.* |
| 4/13/2006 | 635 Riverside Drive NY LLC | DHCR re: Mares-Muro | Letter stating that the Mares-Muro's rent is correct and is not an overcharge. Providing data on turnover increases and renewal increases contrary to that known by Mares. |
| 6/27/2007 | 635 Riverside LLC | Andres Mares-Muro & Maria Vides | Renewal Lease Form setting rent at $1491, above amount permissible by law.  Rent increases were without justification in renovation or turnover. |
| 9/15/05 - 9/15/07 | 635 Riverside LLC | Andres Mares-Muro & Maria Vides | Rental Receipts for 635-11F based on unlawfully enhanced rent amounts.  Rent increases were without justification in renovation or turnover. * |
| 9/21/2006 | Donna Fabrizio, 706 Realty Co. LLC | Tracey Moore | Three Day Notice and Affidavit of Conspicuous Service demanding $3007.98, an amount above the legally permissible rent. |
| 10/17/2006 | 509 Realty Co LLC | DHCR re: Tracey Moore | Letter stating that the Moore rent is correct and is not an overcharge.  Providing data on renovations leading to an increase of rent from $464.09 to $1400 per month, which the letter concedes was erroneous.  Annexing to letter changes in rents and credits. |
| 10/17/2006 | 509 Realty Co LLC | DHCR re: Tracey Moore | Letter stating that the Moore rent is correct and is not an overcharge.  Letter provides additional documents attempting to explain overcharges |

| | | | and credits. |
|---|---|---|---|
| 8/17/2006 | Donna Fabrizio, 516 Realty NY LLC | Zachary Roberts & Hadley Hoyte (co-tenants of Stahl-David) | Three Day Notice demanding $4350 based on unlawfully inflated rent amounts. Rent amounts based on nonexistent renovations or turnover. * |
| 8/17/2006 | 516 Realty NY LLC | Zachary Roberts (co-tenant of Stahl-David) | Thirty Day Notice to Debtor demanding $4350 based on unlawfully inflated rent amounts. Rent amounts based on nonexistent renovations or turnover. * |
| 2006 | 516 Realty NY LLC | Re: Zachary Roberts (co-tenant of Stahl-David) | Rental Receipts reflecting unlawfully inflated rents. Rent amounts based on nonexistent renovations. * |
| 2/1/2004 | Equity Management | Saidah Nash (co-tenant of Russell Taylor) | Rental Statement in the amount of $4,214.56, above the amount legally permissible. * |
| 3/1/2004 | Equity Management | Saidah Nash (co-tenant of Russell Taylor) | Rental Statement in the amount of $4,244.20, above the amount legally permissible. * |
| 9/7/2005 | Pinnacle Hamilton LLC | Saidah Nash (co-tenant of Russell Taylor) | Three Day Notice to Pay $2,018.94, above the legally permissible amount. * |
| 9/7/2005 | Green & Cohen, PC | Saidah Nash (co-tenant of Russell Taylor) | Letter from firm retained to collect debt on behalf of Pinnacle Hamilton. Amount sought is $2,018.94, an amount in excess of the legally permissible rent. * |
| 1/20/2005 | 680 Realty Co. LLC | Diane Trummer | Rent Statement crediting Trummer $4136.12 when correct amount was $4219. |
| 1/23/2005 | 680 Realty Co. | Diane Trummer | Unsigned Apartment Lease, $1275/year, above the legally permissible rent. Rent increases were without justification in renovation or turnover. |
| 3/24/2005 | 680 Realty Co. LLC | Diane Trummer | Letter setting rent at $1275 per year, above the legally permissible rent. Rent increases were without justification in renovation or turnover. |
| 9/5/2006 | Rasim Toskic, 680 Riverside Realty Co, LLC | DHCR re: Trummer | Letter stating without basis that building was completely habitable as of January 2005, attaching incident report, seeking restoration of rent effective Jan. 2005. |

*Plaintiffs expect through discovery to confirm the circumstances surrounding the mailing or other transmission of these communications.

In addition to these communications that are in Plaintiffs' possession, on information and belief, Defendants and others within the Pinnacle Enterprise regularly correspond with each other by mail and/or wire in furtherance of the scheme. Because information about these

communications are solely within the control of Defendants and certain third parties, Plaintiffs expect to seek and obtain in discovery evidence of the additional use of mailings and wires by the Pinnacle Enterprise.

### c. Describe how the predicate acts form a "pattern of racketeering activity;"

The predicate acts form a "pattern of racketeering" because they are all part of an unlawful plan, beginning no later than early 2003 and continuing through the current date, to evade the stringent requirements of rent regulation, to collect rents in excess of amounts permitted by law, and to force tenants to surrender their lawful occupancy in rent-regulated apartments.

The predicate acts progressed in a logical fashion, starting with the fraudulent misstatement of an apartment's rental history and the legal maximum rent, which is based on the prior rent. The next step is sending the tenant a lease at a rent that exceeds the maximum permitted by rent stabilization or rent control laws. Another step is sending tenants statements that misrepresent the cost or value of improvements or repairs, which the landlord is permitted to recapture by raising the rent. Overstating those costs is followed by sending tenants rent invoices fraudulently overstating the permissible rent increase. When tenants fail to pay the unlawfully excessive rents, Pinnacle and Wiener institute baseless eviction proceedings, misrepresenting that rent is overdue.

Variations on the pattern include refusing to accept rent checks mailed by tenants who are entitled to succession rights under leases in rent-stabilized or rent-controlled apartments, misrepresenting to them that they are not entitled to succession rights, and then initiating baseless eviction proceedings misrepresenting that the rent has not been paid.

This pattern of virtually identical acts has been directed at dozens, if not hundreds, of tenants in buildings owned or controlled by the Pinnacle Enterprise. They have been occurring regularly for several years and continue to occur, reflecting the threat of continuing wrongful activity directed at both the Plaintiffs and other victims.

> **d.    State whether the alleged predicate acts relate to each other as part of a common plan. If so, describe.**

The predicate acts are related to each other, and are not isolated events. They are all part of a common plan to increase profits by evading the stringent requirements of rent regulation and, where possible, induce tenants to vacate their rent-regulated units to allow additional rent increases or conversions. Each of the predicate acts is related to that plan, by seeking to:

> (1)    obtain rents and other money in excess of the amounts permitted by law;

> (2)    evict rent-regulated tenants so that apartments can be rented to new tenants at market rates or sold as condominiums or co-ops;

> (3)    force tenants to "voluntarily" vacate their rent-regulated apartments so that the apartments can be rented to new tenants at market rates or sold as condominiums or co-ops; and

> (4)    block existing occupants or relatives from exercising their right to succeed the current tenant under a rent regulated lease.

The predicate acts are effected through the same administrative personnel at Pinnacle and are all directed at similar victims: tenants whose apartments are subject to rent regulation and whose lease payments are therefore below market.

> **5.    Describe in detail the alleged enterprise for each RICO claim. A description of the enterprise shall include the following information:**

> **a.    State the names of the individuals, partnerships, corporations, associations, or other legal entities that allegedly constitute the enterprise;**

The Pinnacle Enterprise consists of several known entities and some 400 Landlord LLCs, the Sponsor Entities, and others whose names are unknown to the Plaintiffs at present but will be

obtained through discovery. That said, the currently-known members of the Pinnacle Enterprise include:

1.  Pinnacle Group NY LLC

2.  Joel Wiener

3.  The Praedium Group LLC

4.  A. Floyd Lattin

5.  Russell L. Appel

6.  Frank P. Patafio

7.  SecureWatch 24

8.  706 Realty Company, LLC

9.  3657 Realty Company, LLC

10. 635 Riverside Drive LLC, a/k/a 635 Riverside LLC, a/k/a 635 Riverside Drive NY LLC

11. 509 Realty Co., LLC

12. 516 Realty NY LLC

13. Pinnacle Hamilton LLC

14. 680 Realty Co. LLC a/k/a 680 Riverside Realty Co. LLC

15. 63-67 W. 107th Street NY LLC

16. 725 Realty Co. LLC

17. 634 W. 135th Street LLC

18. 894 Riverside NY Associates LLC

19. NYC Residential Manager LLC

20. Pinnacle Holding Company LLC

21. Kaben RSD LLC

###### b.    Describe the structure, purpose, function and course of conduct of the enterprise;

The purpose of the Pinnacle Enterprise is to own, manage, collect rents from, and sell apartment buildings. It does so through the following structure: the Pinnacle Enterprise is an association-in-fact among several LLCs and individuals who act on behalf of their LLC and in their individual capacities. At the top of the Pinnacle Enterprise's structure is Joel Wiener, who has responsibility for directing the Enterprise's overall course of conduct. Wiener does this in consultation with Enterprise members Pinnacle and Praedium (and individuals acting on those members' behalf), who thus are either part of the top structure of the enterprise, or form an intermediate layer. The Landlord LLCs, and individuals acting on behalf of the LLCs with respect to tenant relations (such as building "supers" and others), together with SecureWatch 24 and its agents, comprise the lower structure of the Pinnacle Enterprise. As described in the response to Question 6, the Pinnacle Enterprise has a continuing ongoing association-in-fact for the common purpose of owning, managing and selling of apartments, and it exists to pursue those common goals through other, sometimes legitimate, conduct apart from the predicate fraudulent acts committed against Plaintiffs.

Praedium partners with Pinnacle to purchase apartment buildings, mostly in substandard condition and located in neighborhoods where many residents have low incomes. Praedium has apparently provided some of the funding, while Pinnacle has provided management and operational oversight. The apartment buildings are purchased by a single-purpose Landlord LLC created by Praedium and Pinnacle for the deal. Each Landlord LLC is owned by one or more layers of intermediate LLCs under the control and direction of Pinnacle and Praedium through their principals, Joel Wiener of Pinnacle and A. Floyd Lattin, Russell L. Appel, and Frank P. Patafio of Praedium, each of whom is a managing member of one or more of the intermediate

25

LLCs.  SecureWatch 24, of which Wiener is also a principal, provides surveillance and security for the buildings owned by the Pinnacle Enterprise.

The Pinnacle Enterprise is engaged in a course of conduct to profit from the buildings it owns by collecting rents and selling apartments for amounts greater than it has invested.  Once a building has been acquired,  Pinnacle is responsible for negotiating leases, billing for and collecting rent, hiring and supervising building staff (e.g., "supers"), making repairs, supervising capital improvements, sending delinquency and eviction notices, and commencing eviction proceedings.

To the extent apartments in the buildings are not rent-regulated, it is likely that the Pinnacle Enterprise's course of conduct toward those tenants and apartments is similar to the course of conduct undertaken by most landlords and condominium/co-op converters.  But to the extent apartments in the buildings are rent-regulated, Pinnacle and Wiener have conducted the Pinnacle Enterprise's affairs through the pattern of racketeering activity described above.

> **c.**    **State whether any defendants are employees, officers or directors of the alleged enterprise;**

No defendant is an employee, officer, or director of the Pinnacle Enterprise.

Defendant Joel Wiener is, however, an employee, officer or director of one or members of the Pinnacle Enterprise, including Pinnacle and some or possibly all of the Landlord LLCs.

> **d.**    **State whether any defendants are associated with the alleged enterprise; and**

Defendant Pinnacle is associated with, participates in, and is one of the entities that control the affairs of the Pinnacle Enterprise.

Defendant Joel Wiener is associated with, participates in, and is one of the persons who control the affairs of the Pinnacle Enterprise.

As stated above in Section 2(c), at the present time, without discovery but based on counsel's representation, it is unknown whether Defendant Pinnacle Group, LLC currently exists or is associated with the Pinnacle Enterprise.

> **e.    State whether you are alleging that the defendants are individuals or entities separate from the alleged enterprise, or that the defendants are the enterprise itself, or members of the enterprise.**

Defendants participate in and are members of the Pinnacle Enterprise, but they also have an existence separate and distinct from it.  As already stated, the Pinnacle Enterprise is an association-in-fact that also includes Praedium, Lattin, Appel, Patafio, SecureWatch 24, and the Landlord LLCs.

> **6.    Describe the alleged relationship between the activities of the enterprise and how the pattern of racketeering activity differs from the usual and daily activities of the enterprise, if at all.**

As stated above in Section 5(b), the usual and daily activities of the Pinnacle Enterprise are to acquire, own, manage, and sell apartment buildings for profit.  Some of that activity is a legitimate business undertaking, at least where the Pinnacle Enterprise is obtaining profits that meet its goals by renting and selling at market rates.  In those cases, tenants are charged the correct rents, repairs are properly made, and eviction proceedings are commenced only when the tenant has actually defaulted.

The pattern of racketeering activity differs from that activity, as explained above, by seeking to extract illegal profits from tenants who occupy rent-regulated apartments in the Enterprise's buildings (in any given building, some apartments may be regulated and some not). (Approximately 85 percent of the Pinnacle Enterprise's buildings are believed to be rent regulated.)

**7.    Describe the effect of the activities of the enterprise on interstate or foreign commerce.**

The Pinnacle Enterprise effects interstate commerce in several ways. First, the Pinnacle Enterprise has used the U.S. Mail, among other means of communication, to send communications of various types to Plaintiffs in furtherance of the fraudulent scheme alleged. Those communications, and the manner in which each furthered the fraudulent scheme alleged, are described in section 4.b.

In addition, the Pinnacle Enterprise has caused numerous mailings misrepresenting tenants' rent obligations to be sent to tenants who are members of the Plaintiff class set forth in the Amended Complaint, including out-of-state mailings. For example:

| DATE | FROM | TO | DESCRIPTION |
|------|------|-----|-------------|
| 1/3/2006 | Pinnacle Hamilton LLC | Lisa Adams | Letter stating lease deemed signed for a two-year period |
| 6/6/2005 | Donna Fabrizio, Anita Terrace Realty LLC | Marsha Agata | Ten Day Notice to Cure |
| 6/24/2005 | Donna Fabrizio, Anita Terrace Owners Corp. | Marsha Agata | Ten Days Notice of Termination |
| 8/8/2005 | Donna Fabrizio, Anita Terrace Realty LLC | Marsha Agata | Ten Day Notice to Cure |
| 8/26/2005 | Donna Fabrizio, Anita Terrace Realty LLC | Marsha Agata | Ten Days Notice of Termination |
| 8/13/2004 | Nader Ohebshalom, JIJI Holdings LLC | Alease Britton | Thirty Day Notice of Termination. This notice also states: "Additional copies sent by regular and certified mail to Alease Britton at 7 Berkeley Place, Montclair, NJ 07042." |
| 11/16/2005 | Donna Fabrizio, 527 Realty NY LLC | Alease Britton | Thirty Day Notice of Termination. This notice also states: "Additional copies sent by regular and certified mail to Alease Britton at 7 Berkeley Place, Montclair, NJ 07042." |
| 12/7/2005 | Daisy, 527 Realty NY LLC | Alease Britton | Letter returning check, after commencement of holdover proceedings against Ms. Britton* |
| 2/28/2006 | Donna Fabrizio, The Pinnacle Group | Carol Brutus | Letter re: inspection of bedroom floor |
| 8/2006 | Yim Ng, The Pinnacle Group | Gordon Kenney | Letter returning check, after commencement of holdover proceedings against Mr. Kenney* |
| 3/6/2006 | Donna Fabrizio, 635 Riverside | Maria Rosario | Three Day Notice* |

| | Dr. NY LLC | | |
|---|---|---|---|
| 5/30/2006 | 835 Riverside Realty Co. | Bernice Star | Calculation of retroactive charges for fuel increase. |
| Unknown | 835 Realty Co., LLC | Bernice Star | Calculation of retroactive charges for 2004-2005 MBR/MCR increase* |
| 3/15/2006 | 635 Riverside Dr. | Jean Tremont | Renewal Lease Form* |

*Plaintiffs expect through discovery to confirm the circumstances surrounding the mailing or other transmission of these communications.

Evidence of additional mailings is within the Defendants' possession and control. The Plaintiffs and putative class members are not sophisticated record-keepers and do not have in their possession everything that was mailed to them. Through discovery, Plaintiffs expect to obtain additional mailings by the Pinnacle Enterprise and will seek to amend the Complaint, if necessary and appropriate, to incorporate such information.

Second, the rents paid to Pinnacle affect interstate commerce because the apartment buildings owned by the Landlord LLCs are mortgaged to foreign banks. For example, "Red Herring" offering statements for condominium or co-op conversions of buildings owned by the Landlord LLCs and managed by Pinnacle state that mortgages for those buildings are currently held and collected by Wells Fargo Bank, N.A., which is headquartered in San Francisco, California and chartered in South Dakota, and by Deutsche Bank Mortgage Capital, LLC, a Delaware corporation controlled by a German bank that describes itself as "one of the largest foreign-based employers in New York." http://www.db.com/usa/. Accordingly, portions of the proceeds obtained by the Pinnacle Enterprise from rent overcharges and other acts in furtherance of the fraud scheme are transmitted across state lines outside of New York State to make payments on those mortgages. Those non-local banks (and likely others of which Plaintiffs are not yet aware, as they have not been able to review all of the Pinnacle Enterprise's "Red Herrings") possess mortgage liens and, no doubt, assignments of rents that direct the rents

collected to the non-local banks.  To date, Plaintiffs have obtained the following information
about buildings in which Plaintiffs or putative class members reside:

1.      807 Riverside Drive (Wells Fargo)

2.      690 Riverside Drive (Wells Fargo)

3.      635 Riverside Drive (Deutsche Bank)

4.      700 Riverside Drive (Wells Fargo)

5.      680 Riverside Drive (Wells Fargo)

6.      835 Riverside Drive (Wells Fargo)

7.      668 Riverside Drive (Wells Fargo)

8.      706 Riverside Drive (Wells Fargo)

9.      725 Riverside Drive (Wells Fargo)

10.     894 Riverside Drive (Deutsche Bank)

11.     634 West 135th St. (Deutsche Bank)

15.     660 Riverside Drive (Wells Fargo)

16.     801 Riverside Drive (Wells Fargo)

17.     5 West 101st St. (Deutsche Bank)

18.     15 West 107th St. (Deutsche Bank)

19.     627 West 113th St. (Deutsche Bank)

Plaintiffs expect to obtain more information about those and the 390-odd other buildings owned
or controlled by the Pinnacle Enterprise in discovery.

        The payment of these mortgages with income derived from the Pinnacle Enterprise's
fraudulent activities, as well as the Defendants' contractual relationships with out-of-state
lenders securing financing for their ownership of the buildings at issue, directly constitutes and

affects interstate commerce. *McLain v. Real Estate Bd.*, 444 U.S. 232, 246 (1980); *see also De Falco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001) (finding effect on interstate commerce where intrastate activity resulted in a plaintiff breaking a contract with an out-of-state company); *United States v. Barton*, 647 F.2d 224, 234 (2d Cir. 1981) (finding effect on interstate commerce where a car blown up by defendants was insured by an out-of-state insurance carrier that would have to pay the claim).

Third, Praedium which has funded Pinnacle Group's activities -- including the fraudulent "value enhancement" activities alleged in the Amended Complaint -- is itself funded in whole or in part by investors based outside New York State which, in turn, receive portions of the income derived from the fraudulent activities of the Pinnacle Enterprise. On its website, Praedium explains:

> Praedium was formed in 1991 with an international investment bank as its sole investor . . . . In 2000, Cadim, a Montreal-based real estate advisor and portfolio manager, became a major shareholder of The Praedium Group. Cadim is a division of the Caisse de depot et placement du Quebec and a member of the Real Estate Group of the Caisse.

http://www.praediumgroup.com/about.php   The Caisse de dépôt et placement du Québec "conducts its operations mainly from its business office in Montréal and its head office in Québec City."   http://www.cdpcapital.com/Profile/Histoire.aspx.   Accordingly, income fraudulently obtained from tenants by the Pinnacle Enterprise through rent overcharges is transmitted, in part, to Praedium's owners in Canada. The Pinnacle Enterprise's reliance upon, and enrichment of, Praedium's out-of-state investors affects interstate commerce. *United States v. Robertson*, 514 U.S. 669, 671 (1995); *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 173 n.12 (2d Cir. 2004); *Haggiag v. Brown*, 728 F. Supp. 286, 295 (S.D.N.Y. 1990); *Khaimi v. Schonberger*, 664 F. Supp. 54, 60 (E.D.N.Y. 1987). As discovery commences,

Plaintiffs expect to learn much more about the flow of capital to and from New York based on the Pinnacle Enterprise's activities.[2]

Fourth, the Pinnacle Enterprise's practices of rent overcharges and tenant harassment are intended to speed up the conversion of rent-stabilized and rent-controlled apartments into condominiums, co-ops, or rental units at significantly higher rents. It is likely that some of the tenants who are forced out of their apartments will travel out of state to find cheaper housing. Conversely, it is likely that the Pinnacle Enterprise will market those units to potential buyers and renters in the metropolitan New York area, including Connecticut and New Jersey. That strategy affects interstate commerce by influencing housing rental and purchasing decisions by residents of other states and by inducing movement of New York State residents to other states. Intrastate activity that encourages or discourages interstate travel affects interstate commerce. *United States v. Farrish*, 122 F.3d 146, 149 (2d Cir. 1997). Plaintiffs expect to obtain in discovery evidence detailing the Pinnacle Enterprise's marketing strategy and the fates of tenants whom the Defendants' frauds and harassment have caused to vacate Pinnacle Enterprise buildings.

For RICO purposes, the effect on interstate commerce need only be "minimal." *De Falco*, 244 F.3d at 309; *see also Barton*, 647 F.2d at 233 (noting that "[i]n determining what connections with interstate commerce must be proven . . . to establish a violation of § 1962, the courts have ruled that the impact need not be great"). The effect upon interstate commerce need not be pled with particularity. *Godlewska v. Human Dev. Ass'n, Inc.*, No. 03-33985, 2005 U.S. Dist. LEXIS 36998, at *28-29 (E.D.N.Y. July 18, 2005). Moreover, if the enterprise engages in

---

[2]    As noted, when Plaintiffs obtain through discovery specific instances of fund transfers to and from the Pinnacle Enterprise, they will have grounds to add as RICO predicate acts violations of the National Stolen Property Act, 18 U.S.C. § 2314, which prohibits the interstate transmission or transportation of funds known to be "taken by fraud."

use of the U.S. Mail, courts have found a sufficient effect on interstate commerce irrespective of whether the communications at issue crossed state lines. *See, e.g.*, *Ideal Steel Supply Corp. v. Anza*, 373 F.3d 251, 265 (2d Cir. 2004) ("There is no requirement that mail travel interstate for its sender to violate § 1341."), *rev'd on other grounds*, 126 S. Ct. 1991 (2006); *Brooke v. Schlesinger*, 898 F. Supp. 1076, 1082-84 (S.D.N.Y. 1995) (same). The activities alleged here more than meet that standard.

**8.    If the complaint alleges a violation of 18 U.S.C. § 1962(a), provide the following information:**

> **a.    State who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt;**

Not Applicable.

> **b.    Describe the use or investment of such income.**

Not Applicable.

**9.    If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe the acquisition or maintenance of any interest in or control of the alleged enterprise.**

Not Applicable.

**10.    If the complaint alleges a violation of 18 U.S.C. § 1962(c), provide the following information:**

> **a.    State who is employed by or associated with the enterprise;**

Pinnacle, Wiener, Praedium, Lattin, Appel, Patafio, the Landlord LLCs and SecureWatch 24 are associated with the Pinnacle Enterprise.

> **b.    State whether the same entity is both the liable "person" and the "enterprise" under § 1962(c).**

While Defendants Pinnacle and Wiener are liable "persons" that participate in and are members of the enterprise, they have an existence separate and distinct from the larger enterprise, and as such are not both the "person" and the "enterprise" under § 1962(c).

**11.    If the complaint alleges a violation of 18 U.S.C. § 1962(d), describe the alleged conspiracy.**

Not Applicable.

**12.    Describe the alleged injury to business or property.**

The injuries of the organizational, individual, and proposed class Plaintiffs are described in detail in section 3, above.  In summary, Plaintiffs and proposed class members have suffered injury to business or property by having to pay rent in excess of the amount permissible by law; by having to pay thousands of dollars (without interest or treble damages) in rent overcharges and/or rent increases based on non-existent or inflated renovations; and by having to hire and pay for lawyers to defend themselves in frivolous court proceedings or compensate for lost wages or child care expenses to address Defendants' harassment.  Organizational plaintiff BRUSH has also been forced to divert its resources from its day-to-day activities and mission to focus instead upon advocating for rent-regulated tenants who have been subjected to frivolous litigation, threatened litigation, and harassment by Defendants; as a result, its ability to educate, represent, and organize tenants on other matters has been severely impaired.

**13.    Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.**

Defendants' fraudulent activities have directly injured the Plaintiffs and the proposed Plaintiff class members by requiring them to pay unlawfully inflated rents, and for attorneys' fees, lost wages, and expenses incurred for child-care and transportation to address frivolous housing court lawsuits.  For those class members who were actually forced out of their apartments by Defendants' activities and without legal basis, the direct injuries suffered are also significant.  These harms and injuries are a direct result of, and would not have been sustained but for, Defendants' pattern and practice of fraudulently inflating rents, intentionally failing to

make repairs, initiating baseless eviction and holdover housing proceedings, and otherwise harassing tenants to induce them to vacate their rent-regulated units.

**14.    Provide any additional information that you feel would be helpful to the Court in trying the RICO claim.**

This lawsuit was brought after years of tenant grievances in buildings managed by Pinnacle for the Pinnacle Enterprise. Published sources state that, as soon as the Landlord LLCs acquired the Pinnacle Enterprise's portfolio of properties, Pinnacle commenced eviction proceedings against one-quarter of the tenants. On-line sources maintained by the New York Department of Housing Preservation and Development show that, at present, buildings owned by the Pinnacle Enterprise have hundreds of long-unremedied building code violations deemed hazardous or extremely hazardous. Several public officials have expressed serious concern about Pinnacle's practices toward its rent-regulated tenants and the New York County District Attorney and the New York State Attorney General have conducted and are continuing to conduct investigations into criminal or otherwise unlawful conduct by Pinnacle or are exercising active supervisory oversight to prevent further criminal or otherwise unlawful activity of the type alleged in the amended complaint.

The sheer volume of the violations, and their consistent pattern over several years, takes this case out of housing court and into civil RICO. This case is not about random overcharges or claims that could be properly vindicated purely under state law. It is about a scheme to defraud hundreds or thousands of low-income tenants by tricking them into paying more than they should and by driving them out if they fight back. As an old song goes, "Some rob you with a gun, some with a fountain pen." Pinnacle and Wiener do it with the U.S. mails.

Dated:  September 28, 2007

Respectfully submitted,

BUYERS AND RENTERS UNITED TO SAVE
HARLEM, MARJORIE and THEODORE
CHARRON, KAREN FLANNAGAN,
ANDRES MARES-MURO, TRACEY
MOORE, RAYMOND ANDREW STAHL-
DAVID, RUSSELL TAYLOR, DIANE
TRUMMER, and KIM POWELL

By: _____

    Richard F. Levy
    Jeremy M. Creelan
    Chinh Q. Le
    Carletta F. Higginson
    JENNER & BLOCK LLP
    919 Third Avenue, 37th Floor
    New York, NY  10022-3908
    (212) 891-1600
    (212) 891-1699 facsimile

*Of counsel:*

    C. Steven Tomashefsky
    Andrew A. Jacobson
    JENNER & BLOCK LLP
    330 North Wabash Avenue
    Chicago, IL  60611
    (312) 222-9350
    (312) 587-0484 facsimile

## <u>CERTIFICATE OF SERVICE</u>

I, Richard F. Levy, an attorney, hereby certify that on this 28th day of September, 2007 I caused true and correct cop of the foregoing ***Plaintiffs' Rico Statement*** to be served on the following individuals by regular U.S. mail:

Mitchell A. Karlan
Gibson, Dunn & Cruther LLP
200 Park Avenue
New York, New York 10166-0193


                                            s/ Richard F. Levy
                                            Richard F. Levy