# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| BUYERS AND RENTERS UNITED TO SAVE HARLEM; and | ) ) ) | PLAINTIFFS DEMAND TRIAL BY JURY |
| MARJORIE and THEODORE CHARRON; ANTHONY CASASNOVAS; KAREN FLANNAGAN; ANDRES MARES-MURO; TRACEY MOORE; RAYMOND ANDREW STAHL-DAVID; RUSSELL TAYLOR; DIANE TRUMMER, and KIM POWELL, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) | **SECOND AMENDED CLASS ACTION COMPLAINT**_____<br><br>No. 07 CIV 6316 (CM) |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| PINNACLE GROUP NY LLC and JOEL WIENER, | ) ) ) | |
| Defendants. | ) ) | |

Plaintiffs Buyers and Renters United to Save Harlem ("BRUSH") and Marjorie and

Theodore Charron, Anthony Casasnovas, Karen Flannagan, Andres Mares-Muro, Tracey Moore,

Raymond Andrew Stahl-David, Russell Taylor, Diane Trummer, and Kim Powell, individually

and on behalf of all others similarly situated (the "Individual Plaintiffs," and collectively with

BRUSH, the "Plaintiffs"), by their attorneys, for their complaint against Defendants Pinnacle

Group NY LLC ("Pinnacle") and Joel Wiener ("Wiener"), state as follows:

## INTRODUCTION

1.      The Plaintiffs bring this lawsuit to redress and to end the illegal, fraudulent, and

harassing practices employed by Pinnacle and Wiener against the tenants of over 400 apartment

buildings in the City of New York.  Pinnacle and Wiener have pursued a scheme designed to

inflate rents over and above the amounts they are legally permitted to charge under New York's

rent-control and rent-stabilization laws and to force tenants to vacate apartments so that rents can be raised or the units sold as condominiums or co-ops.  That  ongoing scheme has been and is being accomplished through, among other things, a pattern of fraudulent conduct, including misrepresenting the legally chargeable rent; misrepresenting the status and cost of repair work; misrepresenting and refusing to acknowledge tenants' succession rights under their leases; misrepresenting tenants' rent payment status; filing meritless eviction suits that misrepresent the tenants' rent payment status; providing false information to government agencies, including the New York Attorney General and the New York County District Attorney; extortion; and harassment, including eavesdropping and surveillance.

2.      The Defendants' scheme is intended to intimidate tenants and to create a climate of fear among tenants and to discourage and prevent them from challenging the Defendants' illegal actions, all in a blatant attempt to circumvent the carefully balanced New York rent regulation process at the expense of tenants who lack the resources to oppose the Defendants' tactics on their own.  The scheme's purpose is to increase profits by (a) illegally raising the rent on rent-regulated apartments and (b) illegally emptying rent-regulated apartments in buildings that Pinnacle, Wiener, and other members of their enterprise desire to convert to condominiums or co-ops.

3.      Pinnacle, Wiener, and their associates have been accumulating residential apartment buildings in New York City for many years.  In late 2005, Pinnacle and Wiener, in partnership with The Praedium Group LLC ("Praedium") and its affiliates, reportedly bought 104 buildings in Manhattan from infamous slumlord Baruch Singer for $500 million, though it appears Singer may have retained an interest in a least some of those buildings.  Pinnacle and Wiener direct and control a large enterprise consisting of individuals, corporations, LLCs, and

partnerships that directly or indirectly hold legal title to or manage apartment buildings in New York City under the "Pinnacle Group" umbrella name.  In addition, entities within the enterprise that is  directed or controlled by Pinnacle and Wiener are in the business of converting rental apartment units to condominium or cooperative ownership.

4.      Also among the entities in which Wiener has an interest is SecureWatch 24, which is in the business of providing residential electronic surveillance.  SecureWatch 24 shares the Pinnacle Group's office suite.  It operates digital video and audio surveillance devices in buildings owned by LLCs and other entities within the enterprise described above and more fully below.  Those surveillance devices are connected via the Internet, telephone lines, or other wires through a "hub" system to a central observation point so that activities in the buildings can be observed on a real-time basis.  SecureWatch 24 employs off-duty and former law-enforcement officers to conduct additional surveillance.  Though some of SecureWatch 24's activities serve legitimate purposes, it is used by the Defendants to conduct improper surveillance and to intimidate tenants.

5.      Pinnacle's and Wiener's acquisitions of interests in apartment New York buildings were largely funded by Praedium, a massive real estate investment firm that boasts over $6 billion in nationwide real estate investments made through various Praedium-controlled funds.  Praedium, and its principals individually, are involved with Pinnacle and Wiener in the ownership of apartment buildings through multi-layered LLCs and partnerships.

6.      Praedium's website (www.praediumgroup.com) describes Praedium as a "real estate investor focusing on underperforming and undervalued assets."  Praedium acknowledges that its investment strategy is to join with "local operators and investment partners," such as Pinnacle and Wiener, to identify and acquire "middle market" properties.  Praedium describes its

real-estate "value enhancement program" as including "aggressively manag[ing] the current tenant/leasing base," making only "strategic capital improvements," and "asset repositioning." In their efforts to achieve those investment goals, Pinnacle and Wiener have pioneered a relentless attack on affordable housing through a concerted effort to increase rents over the legal limit, replace tenants holding existing rent-regulated leases with tenants subject to higher, "market rate" leases, and empty out rent-regulated apartments so that they can be sold as condominium or co-op units at a significant profit. Left unchecked, the Defendants' unlawful conduct will force countless more tenants from their long-time homes and accelerate the demise of affordable housing in New York City.

## NATURE OF THE ACTION

7.      Defendants Pinnacle and Joel Wiener engage in reckless and intentional systematic acts and business practices of demanding and collecting rents in amounts beyond those permitted under the law, including but not limited to New York's Rent Stabilization Laws and Rent Stabilization Code. Defendants' conduct also violates the New York Consumer Protection Act ("NYCPA"), N.Y. General Business Law § 349, *et seq.* In addition, Defendants' ongoing pattern of fraudulent practices violates the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

8.      The Defendants' unlawful acts are part of an overall pattern and practice of fraudulent management and extortion, all directed at the goal of illegally increasing regulated rents or evicting tenants entitled to rent regulation. The pattern includes:

>     (a)      collecting or threatening to collect rent in amounts that are not permitted under the law based on misrepresentations as to an apartment's historical rent, on which the regulated rent is based;

(b)      collecting or threatening to collect rent in amounts that are not permitted under the law based on misrepresentations as to the cost and status of repairs and capital improvements;

(c)      failing to make timely and necessary repairs, to address housing maintenance code violations, and to provide essential, required services and then threatening eviction proceedings against tenants who have legally withheld rent because of such illegal conduct, misrepresenting that rent is due and owing;

(d)      commencing unfounded eviction actions based on misrepresentations that rent is due and owing when it is not;

(e)      commencing unfounded proceedings to challenge tenants' succession rights and harassing and intimidating tenants based on misrepresentations as to the amount and type of evidence needed to establish a tenant's succession rights;

(f)      unjustifiably refusing to accept tenants' rent checks and then misrepresenting that rent has not been paid, as a basis for commencing fraudulent eviction actions or other proceedings challenging succession rights;

(g)      directing, encouraging and allowing the superintendents of its buildings to, among other things, harass tenants by making unacceptable and shoddy repairs or making false promises to conduct repairs; scheduling appointments that the superintendents do not attend; issuing false notices and documents regarding tenants' activities or conduct; and ignoring tenants' complaints and acting in a hostile and retaliatory manner to tenants who have made complaints;

(h)      failing to comply with orders issued by the New York Department of Housing and Community Renewal ("DHCR") requiring Pinnacle to pay monetary awards to tenants for rent overcharges and rent reductions, and misrepresenting that it is entitled to collect original rents that have been reduced in accordance with DHCR orders, knowing that the housing violations giving rise to the rent reductions have not been resolved;

(i)      refusing to respond to and ignoring tenants' inquiries and requests for documents relating to rental histories, rent increases based on individual apartment improvements and major capital improvements, and lease renewals, all with the purpose of preventing tenants from discovering that the rent being charged is excessive;

(j)      altering documents relating to rental histories as a means of misrepresenting the amount of rent it is entitled to collect; and

(k)      providing false and misleading information to Forensic Investigative Associates ("FIA"), a firm retained to collect information pursuant to an agreements between Pinnacle and (i) the New York Attorney General and (ii) the New York County District Attorney.

9.     In connection with their fraudulent practices, Defendants have employed the U.S. mails and extortion as part of their ongoing scheme to increase rents unlawfully, to receive illegal rents, and ultimately to free their properties from New York's rent control and rent stabilization requirements.  Defendants' pattern of racketeering activity and unlawful tactics has injured countless tenants, deprived them of their lawful property interests in their apartments and forced them to pay money to which Defendants are not entitled.

10.     Plaintiffs seek a judgment from this Court, as set forth below, providing (a) declaratory relief; (b) injunctive relief; (c) appointment of an independent monitor to oversee  the lawful operation and management of rent-regulated buildings owned by Defendants and assist in the resolution of disputes between Defendants and their tenants;  (d) an audit and accounting of rents demanded by Defendants and disgorgement of any rent overcharges; (e) compensatory, statutory, and punitive damages; (f) reasonable attorneys' fees and costs; and (g) any other relief as this Court deems appropriate.

## **PARTIES**

11.     Plaintiff BRUSH is a not-for-profit association formed under the laws of the State of New York for the purposes of educating tenants in the West Harlem and Northern Manhattan communities about their rights and of advocating for the betterment of the West Harlem and Northern Manhattan communities.  BRUSH is an advocate for, and represents the interests of, tenants in those areas, a large number of whom occupy rent-regulated apartments in buildings owned by Defendants.  BRUSH also organizes tenants and helps them to defend against harassment and unlawful acts by landlords and acts as an umbrella organization for local tenant groups and associations.

12.     Plaintiffs Marjorie and Ted Charron are residents of New York City, citizens of the State of New York, and lawful tenants of a rent-stabilized apartment at 706 Riverside Drive, New York, New York, a building owned by Defendants and others through 706 Realty Company, LLC.

13.     Plaintiff Anthony Casasnovas is a resident of New York City, a citizen of the State of New York, and a lawful tenant of a rent-stabilized apartment at 3657 Broadway, New York, New York, a building owned by Defendants and others through 3657 Realty Company, LLC.

14.     Plaintiff Karen Flannagan is a resident of New York City, a citizen of the State of New York, and a lawful tenant of a rent-controlled apartment at 706 Riverside Drive, New York, New York, a building owned by Defendants and others through 706 Realty Company, LLC.

15.     Plaintiff Andres Mares-Muro is a resident of New York City and the State of New York, and a lawful tenant of a rent-stabilized apartment at 635 Riverside Drive, New York, New York, a building owned by Defendants and others through 635 Riverside Drive LLC, a/k/a 635 Riverside LLC, a/k/a 635 Riverside Drive NY LLC.

16.     Plaintiff Tracey Moore is a resident of New York City and the State of New York, and a lawful tenant of a rent-stabilized apartment at 509 West 155 Street, New York, New York, a building owned by Defendants and others through 509 Realty Co., LLC.

17.     Plaintiff Raymond Andrew Stahl-David is a resident of New York City, a citizen of the State of New York, and a lawful tenant of a rent-stabilized apartment at 516 West 143 Street, New York, New York, a building owned by Defendants and others through 516 Realty NY LLC.

18.    Plaintiff Russell Taylor is a resident of New York City, a citizen of the State of New York, and a lawful tenant of a rent-stabilized apartment at 75 St. Nicholas Place, New York, New York, a building owned by Defendants and others through Pinnacle Hamilton LLC.

19.    Plaintiff Diane Trummer is a resident of New York City, a citizen of the State of New York, and a lawful tenant of a rent-stabilized apartment at 680 Riverside Drive, New York, New York, a building owned by Defendants and others through 680 Realty Co. LLC, a/k/a 680 Riverside Realty Co. LLC.

20.    Plaintiff Kim Powell is a resident of New York City, a citizen of the State of New York, and a lawful tenant of a rent-stabilized apartment at 706 Riverside Drive, New York, New York, a building owned by Defendants and others through 706 Realty Company, LLC.

21.    Defendant Pinnacle is a limited liability corporation organized and existing under the laws of the State of New York, having its principal place of business in New York.  Directly and indirectly, Pinnacle holds interests in affiliated LLCs, corporations, or partnerships, such as the LLCs listed in paragraphs 12-20 above, that own some 400 apartment buildings in New York City.  Pinnacle operates its businesses under the "d/b/a" umbrella name "The Pinnacle Group."

22.    Defendant Joel Wiener is a citizen of the State of New York, with his principal residence in Woodmere, New York.  Mr. Wiener is the founder, Chief Executive Officer, and an investor in, and owner of, Pinnacle and in various of its affiliates.  Mr. Wiener directs and manages the Pinnacle Group's affairs.

## JURISDICTION AND VENUE

23.    This Court has jurisdiction of this action pursuant to 18 U.S.C. § 1962 and 28 U.S.C. § 1331.

24.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

25.     Venue is proper in this Court under 28 U.S.C. § 1391(a) because all Plaintiffs and at least one Defendant reside in this judicial district, and a substantial part of the events, acts, or omissions giving rise to the claims occurred in this judicial district.

## THE APPLICABLE STATUTORY AND REGULATORY ENVIRONMENT

### A.     New York Rent-Regulation Laws

26.     The Rent Stabilization Laws ("RSL"), and the Rent Stabilization Code ("RSC") issued by the New York State DHCR, limit the rent that landlords can charge and circumscribe the manner in which landlords can raise rents, recover the cost of improvements, terminate tenancies, or commence other proceedings against tenants.  The rent regulations include several fundamental concepts that the Defendants have violated through their scheme, including the following:

### Legal Rent

27.     The rent that a landlord can charge for a regulated unit is based on an initial legal rent that is subject to various adjustments.  The initial legal rent is based on the rent the previous tenant had paid.  The landlord is required to give new rent-regulated tenants an accurate account of the prior tenant's rent.  Rents can be increased  above the initial legal rent only pursuant to certain regulatory guidelines and percentages.

### Additional Rent For MCIs and IAIs

28.     Landlords of rent-stabilized apartments may be entitled to a rent increase where they have performed certain kinds of improvements either for individual apartments, known as

Individual Apartment Improvements ("IAIs"), or building-wide, known as Major Capital Improvements ("MCIs").

29.     Landlords who undertake an IAI may be entitled to a rent increase equal to 1/40th of the costs of improvements per month, including installation costs but not finance charges. Landlords can make improvements in an occupied apartment only upon written consent of the tenants in possession; no written consent is required for vacant housing accommodations.  If tenants in possession do not want the improvements that the landlord offers, then no additional charge can be added to the tenant's rent.  When a tenant timely challenges any claimed IAIs, landlords of rent-regulated apartment buildings must demonstrate that the cost of the improvements is supported by adequate documentation.

30.     Landlords who undertake an MCI for a residential apartment building subject to rent-regulation laws may be permitted to adjust the rent of rent-regulated apartments in the building based on the actual, verified cost of the improvements, as submitted to DHCR by the landlord within two years of the improvement having been made.  The rent increase to which the landlord may be entitled equals 1/60th of the cost, including installation but excluding finance charges, divided by the number of rooms in the building, charged per apartment based on the number of rooms.  To be eligible for a rent adjustment an MCI must be, among other things, a new installation for the operation, preservation, and maintenance of the building that directly or indirectly benefits all tenants and is deemed depreciable under the Internal Revenue Code.  If DHCR approves the application, it also establishes the amount of the rent adjustment for the MCI.

**Renewal and Vacancy Leases**

31.     Upon expiration of any lease after initial legal rents are established, landlords of occupied rent-stabilized apartments must offer existing tenants the option of a one- or two-year renewal lease in which they are permitted to charge a statutory rent increase per annum, as established by the Rent Guidelines Board ("RGB") each year.  Landlords of rent-stabilized apartments that become vacant or of rent-controlled apartments that become rent-stabilized upon vacancy, must offer new tenants one- or two-year leases and are permitted to charge the first tenants of such apartments the statutory rent increase that the RGB may set per annum, plus twenty percent.

32.     For all rent-regulated apartments, "an owner shall furnish to each tenant signing a vacancy or renewal lease, a rider in a form promulgated or approved by the DHCR, in larger type than the lease, describing the rights and duties of the owners and tenants as provided under the RSL. . . .  For vacancy leases, such rider shall in addition also include a notice of the prior legal regulated rent, if any, which was in effect immediately prior to the vacancy, an explanation of how the rental amount provided for in the vacancy lease has been computed above the amount shown in the most recent annual registration statement, and a statement that any increase above the amount set forth in such registration statement is in accordance with the adjustments permitted by the Rent Guidelines Board and [the RSC]."  RSC § 2522.5 (c)(1).

**Succession Rights**

33.     Any "family member" of a rent-regulated tenant, including persons with  certain familial-like ties, may have the right to a renewal lease and/or protection from eviction when the tenant dies or permanently leaves the apartment, provided that the family member has resided with the tenant as a primary resident in the apartment for at least two years immediately prior to

11

the death of, or permanent departure from the apartment of, the prior tenant (one year for senior

citizens).  The family member may also have the right to a renewal lease or protection from

eviction if she/he resided with the tenant from the inception of the tenancy or from the

commencement of the relationship.

34.    The term "family member" is defined as a husband, wife, son, daughter, stepson,

stepdaughter, father, mother, stepfather, stepmother, brother, sister, grandfather, grandmother,

grandson, granddaughter, father-in-law, mother-in-law, son-in-law, or daughter-in-law of the

tenant.  It also includes any other person(s) residing with the tenant in the apartment as a primary

resident, who can prove emotional or financial commitment and interdependence between such

person and the tenant.

**Landlords' Obligations -- and the Consequences
If Landlords Do Not Meet Them**

35.    Landlords of rent-stabilized apartments must maintain all essential services

provided by the RSC, known as required services, which may include but are not limited to

reasonable repairs, decorating and maintenance, the furnishing of light, heat, hot and cold water,

elevator services, janitorial services, and removal of refuse.  In addition, landlords must provide

certain building-wide services, known as ancillary services, which may include garage facilities,

laundry facilities, recreational facilities, and security, for which owners are not permitted to

charge additional payments (except for security).  Failure to maintain required services may

entitle tenants to a reduction of the legal regulated rent.

36.    Landlords are prohibited from harassing tenants of rent-regulated apartments for

any reason; it is unlawful for "any owner or any person acting on his or her behalf, directly or

indirectly, to engage in any course of conduct (including but not limited to interruption or

discontinuance of required services, or unwarranted or baseless court proceedings) which interferes with, disturbs, or is intended to interfere with or disturb, the privacy, comfort, peace, repose or quiet enjoyment of the tenant in his or her use or occupancy of the housing accommodation, or intended to cause the tenant to vacate such housing accommodation or waive any right afforded under [the RSC]." RSC § 2525.5; *see also* RSL § 26-516.  It is also unlawful for any person to remove or attempt to remove a tenant because the tenant has taken or proposes to take any action authorized or required by the RSL, RSC, or any order of the DHCR.

37.    The RSC provides that "[a]ny owner who is found by DHCR . . . to have collected any rent or other consideration in excess of the legal regulated rent shall be ordered to pay the tenant a penalty equal to three times the amount of such excess," unless "the owner establishes by a preponderance of the evidence that the overcharge was not willful," in which case the penalty shall equal the amount of overcharge plus interest from the date of the first overcharge. RSC § 2526.1.

38.    DHCR also has the authority to impose civil penalties against landlords of housing accommodations who knowingly violate the laws and regulations by charging illegal rents or harassing tenants.  In addition to any other penalties, it may impose a civil penalty up to $250.00 for each knowing violation of the RSL or RSC.  If DHCR finds a landlord "to have harassed a tenant to obtain a vacancy of a housing accommodation, the DHCR may impose . . . a penalty in the amount of up to $1,000.00 for a first such offense and up to $2,500 for each subsequent offense or for a violation consisting of conduct directed at the tenants of more than one housing accommodation."  RSC § 2526.2(b) & (c); *see also* RSL § 26-516(c)(1) & (2).

39.     Any landlord found to have overcharged a tenant may be assessed and ordered to pay the reasonable costs and attorneys' fees of the proceeding and interest from the date of the overcharge.

40.     As is described more fully below, the Defendants have implemented a scheme to avoid the rent limitations imposed by law, through misrepresenting the initial legal rent, misrepresenting the cost of IAIs and MCIs, misrepresenting tenants' succession rights, misrepresenting the impact of judgments by the DHCR requiring payment of rent overcharges and damages, extortion, and other means.

**B.      Unlawful Deceptive Practices**

41.     The New York Consumer Protection Act (the "NYCPA"), NY General Business Law § 349, prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state."  Defendants' conduct, as described herein, violates the NYCPA.

**C.      Pattern of Racketeering Activity**

42.     The Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), makes it "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  Defendants' unlawful scheme conducted through the pattern of racketeering activity described more fully herein violates RICO.

**THE DEFENDANTS' UNLAWFUL ACTIVITIES**

**A.      THE PINNACLE ENTERPRISE**

14

43.     Pinnacle and its partners and associates own or co-own, manage, and operate numerous properties throughout New York City, including residential properties in which tenants on whose behalf BRUSH advocates live.

44.     Wiener, as a founder, investor, owner, and Chief Executive Officer of Pinnacle, has principal authority and responsibility for overseeing Pinnacle's operations.

45.     Pinnacle typically holds title to property, manages, operates, and does business as separate "LLCs" under the names of each building it owns, but generally does not disclose to tenants the precise ownership structure of the landlord LLC.  That information is not generally available to the public but is partially disclosed from time to time in "red herrings" and offering memoranda prepared for the conversion of Pinnacle apartment buildings to condominium or co-op ownership.

46.     For example, according to a "red herring" for the condominium conversion of the apartment building at 635 Riverside Drive , the landlord is an entity called 635 Riverside Drive NY LLC ("635 LLC"), whose address is the same as Pinnacle's.  The sole member of  635 LLC is PMM Associates LLC ("PMM"), whose sole member is 58 Manhattan Associates LLC ("58 Manhattan").  The addresses of PMM and 58 Manhattan are the same as Praedium's.  58 Manhattan has three members:   Manhattan Valley Fund, L.P. ("Manhattan Valley"); P VI-B Manhattan Equity LLC ("Manhattan Equity"); and Pinnacle Holding Company XXV LLC ("Pinnacle XXV").  The principals of Manhattan Valley and Manhattan Equity are A. Floyd Lattin, Russell L. Appel, and Frank P. Patafio, who are all principals of Praedium.  The principal of Pinnacle XXV is Defendants Joel Wiener.  Other buildings where the individual Plaintiffs and class members reside have similar ownership structures.

47.    Pinnacle, Wiener, SecureWatch 24, Praedium, Lattin, Appel, Patafio, and at least the LLCs identified in paragraphs 12 through 20 form an enterprise that is an association-in-fact (the "Pinnacle Enterprise") for the purpose of acquiring New York City apartment buildings. The Pinnacle Enterprise purchases distressed properties, which usually contain a significant number of rent-regulated apartments.  For example, according to the "red herrings," the 635 Riverside Drive building contains 66 apartments, of which 60 are rent-stabilized or rent-controlled, and the 680 Riverside Drive building contains 25 apartments, of which 21 are rent-stabilized or rent-controlled.   The "red herring" for the 660 Riverside Drive building, also acquired by the Pinnacle Enterprise, lists 54 apartments, of which 43 are rent-stabilized and 4 are "luxury decontrolled."

48.    The Pinnacle Enterprise employs a strategy of increasing the value of its investments.  As noted above, that involves what Praedium describes on its web site as "aggressively manag[ing] the current tenant/leasing base."  To do so, the Pinnacle Enterprise seeks to increase income by raising rents and to obtain a return on its investment by converting rental units to condominiums or co-ops and then selling them at a profit.

49.    Rent-regulated tenants present a problem for implementing that strategy.  First, their rent cannot readily be increased without breaking the law.  Second, they typically cannot afford to buy their apartments in a condominium or co-op conversion, and they cannot lawfully be forced to vacate their apartments for sale to others.  Indeed, the law generally requires landlords to offer renewal leases to rent-regulated tenants.

50.    To overcome those obstacles to increasing profits, the Defendants have conducted the Pinnacle Enterprise's affairs through a scheme involving a variety of illegal acts, all intended

to increase regulated rents beyond the legal limit and to drive rent-regulated tenants to vacate their apartments.  Those acts include the following:

**<u>Misrepresenting the Legal Rent</u>**

51.     The base from which a rent-regulated tenant's payments are calculated is the historical rent charged for a given apartment.  The Defendants have engaged in a pattern and practice of altering or misrepresenting the historical rent records provided to tenants to justify charging higher initial rents.

52.     The base rent can be increased by adding a percentage of the cost the landlord has spent on individual apartment improvements or major capital improvements.  The Defendants have engaged in a pattern and practice of misrepresenting the cost of those improvements to justify increasing rents.  In addition, the Defendants have engaged in a pattern and practice of charging tenants for improvements that have not actually been made at all and thus cannot form a basis for increasing the base rent.

**<u>Commencing Baseless Eviction Proceedings</u>**

53.     The Defendants have engaged in a pattern and practice of commencing eviction proceedings for which there is no proper basis, as a strategy for evicting tenants or of harassing them so that they will not seek to renew their leases.  In many cases, the tenants cannot afford a lawyer and must appear *pro se* or seek to obtain a lawyer who will represent them for free.  In addition, appearing in court to oppose the baseless eviction proceedings requires tenants repeatedly to take time off from their jobs, which they can ill afford and which in some cases causes them to lose wages they can hardly afford to lose.  In some cases, tenants are unable to

take time off work or to obtain child care and are forced to miss scheduled hearing dates, placing them at risk of losing by default even though the Defendants' complaint is baseless.

54.     The Defendants' eviction program is aggressive.  According to newspaper reports, they have sued as many as *one quarter* the tenants since they acquired their ownership interests in the apartment buildings residents have been involved in housing court actions initiated by or against Defendants.

55.     The Defendants' tactics in filing eviction proceedings involve a pattern and practice of claiming that rent is overdue when it is not.  For example, the Defendants have a history of failing to make necessary repairs in a timely manner, including the failure to remedy dangerous and serious housing code violations.  The City of New York Department of Housing Preservation & Development ("HPD") maintains a website at http://www.nyc.gov/html/hpd/html/pr/violation.shtml, which provides a listing of all of the open violations of the New York City's Housing Maintenance Code and the State's Multiple Dwelling Law for all residential buildings in New York City.  HPD classes violations into three classes:  A ("non-hazardous"), B ("hazardous"), and C ("immediately hazardous").  Depending on the seriousness of a violation, HPD establishes different time periods within which it must be corrected.  For example, a Class C violation is to be remedied within 24 hours.  The HPD website also indicates when an owner has not certified that the violation was corrected within the specified time period.  Moreover, the website indicates when a violation constitutes a "rent impairing violation," which if not promptly corrected, becomes a fire hazard or serious threat to the life, health, or safety of the occupants thereof.

56.     An examination of the HPD website for the buildings in which the individual Plaintiffs reside shows scores of long uncorrected violations, including multiple outstanding

"rent impairing violations" and numerous uncorrected Class C violations, which are deemed "immediately hazardous" by HPD and include such serious violations as "inadequate fire exits, rodents, lead-based paint, lack of heat, hot water, electricity, or gas."  Many of these Class C violations have not been addressed for years, despite the fact that HPD requires an owner to correct all Class C violations within 24 hours.

57.    In such cases, tenants have the right to withhold rent until the repairs are made. But rather than make the repairs, the Defendants have adopted a pattern and practice of filing eviction proceedings misrepresenting that rent that was due had not been paid.

58.    The Defendants have engaged in a pattern and practice of refusing to cash or accept rent payments from rent-regulated tenants based on the misrepresentation that the payors are not persons who have succession rights to the apartment, when in fact they do.  So although the rent has been paid in such cases, the Defendants have engaged in a pattern and practice of filing eviction proceedings misrepresenting that the rent as not been paid.

**<u>Extortion</u>**

59.    Before commencing an eviction proceeding, a landlord typically must send a tenant a "30-Day Notice" and a "3-Day Notice" notifying the tenant of the rent due and providing an opportunity to cure the default before eviction proceedings are commenced.  The Defendants have engaged in a pattern and practice of sending those notices when no rent is actually overdue, for example because the tenant is entitled to withhold rent when necessary repairs have not been performed or because the tenant has obtained a Housing Court judgment that the Defendants have overcharged rent but the overcharge has not been repaid.

60.    The Defendants count on the tenants' concern about losing their homes and about the difficulty of finding another affordable apartment.  The Defendants further count on tenants'

concern that they will be blacklisted by other landlords when they are taken to court, as is examined more fully below.  As a result of the Defendants' threatening notices, tenants are put in the position of having to pay what they do not owe in order to protect themselves against baseless eviction proceedings.

**Blocking Succession Rights**

61.    As noted above, the applicable rent regulations and laws require landlords to provide regulated rents to family members and other cohabitants of a tenant who succeed to the original tenant's lease.  That has the effect of extending rent regulation in apartments that the Defendants prefer to empty out and convert to market-rate units or condominiums and co-ops. To prevent that from happening, the Defendants engage in a pattern and practice of refusing to recognize, or placing barriers in the way of obtaining, proper succession rights.  To facilitate that pattern and practice, the Defendants misrepresent to tenants the amount and nature of evidence required to confirm their succession rights to the unit they occupy and in which they have resided often times for many years.

**B.    THE CLIMATE OF FEAR AND INTIMIDATION**

62.    A common tactic used by the Defendants to further their scheme is to employ tactics aimed at making tenants afraid to exercise their legal rights or to object to the Defendants; conduct.  By keeping tenants in fear of reprisals directly from the Defendants or of other adverse consequences, the Defendants have been able to chill the tenants' exercise of their rights.  The Defendants' tactics take several forms.

**Blacklisting**

63.    For example, the Defendants know that one consequence for any tenant objecting to mistreatment or exercising his or her rights is the potential for that tenant to be "blacklisted" in connection with efforts to find future rental housing.  "Blacklisting" is a practice where commercial tenant screening bureaus purchase electronic housing court case data from the Office of Court Administration, use this data to prepare so-called "tenant screening reports" based on that data, and then sell such reports to prospective landlords.

64.    The Defendants know or should know that these tenant screening reports are derived from housing court data that is known to be and inaccurate and incomplete, and thus result in landlords regularly denying housing to blameless individuals.

65.    On information and belief, Defendants threaten or actually initiate housing court actions against their tenants with the knowledge that the tenants may be further harmed, regardless of whether they prevail in housing court, by their inability subsequently to obtain future alternative rental housing as a result of their involvement in a prior housing court action and the blacklisting practice.

66.    On information and belief, the Defendants obtain rent in amounts beyond that to which they are legally entitled by threatening their tenants with the initiation of housing court actions, knowing that tenants are afraid that merely being named in any legal action, regardless of its merits, will likely result in blacklisting.

67.    On information and belief, the Defendants refuse or fail to make necessary and needed repairs in tenants' buildings and apartments knowing that tenants are afraid to initiate housing court actions to enforce their rights or to undertake self-help measures, such as withholding of rent, for fear of being blacklisted.

68.     The Defendants use the existence of blacklisting as part of their overall effort to intimidate tenants and create a climate of fear and thus to stifle tenant opposition to the Defendants' unlawful conduct.

**Surveillance and Eavesdropping**

69.     As part of its campaign to intimidate those who oppose their unlawful aims, the Defendants, through SecureWatch 24, have initiated unauthorized surveillance and eavesdropping on prominent tenant leaders.

70.     For example, the President of BRUSH, Kim Powell, resides in an apartment on the seventh floor of a Pinnacle-owned building located at 706 Riverside Drive.  The Defendants know that Ms. Powell is a leader of BRUSH and an advocate of tenants' rights because, in the months preceding the filing of Plaintiffs' original Complaint, Wiener and other Pinnacle representatives met on several occasions with Ms. Powell and other BRUSH representatives and have openly but falsely claimed that Ms. Powell has improperly incited tenants to complain about Pinnacle.

71.     During the week of July 10, 2007, at about the same time BRUSH and others sued Pinnacle and Wiener, a device was installed approximately three feet opposite Ms. Powell's apartment door.  The installation was carried out by agents of SecureWatch 24, a security company owned or controlled by Pinnacle or Wiener.

72.     The device consisted of an electrical junction box with a hole drilled into the faceplate.  The hole in the device pointed directly at Ms. Powell's apartment.  Wiring leading from the junction box to the basement of the building appeared to be connected to surveillance hub facilities maintained by SecureWatch 24.  There were no other similar devices installed on any other floor of the 706 Riverside Drive building.

73.     Inside the junction box, at the Defendants' direction, the SecureWatch 24 employee placed a surveillance device to record Ms. Powell's activities, conversations, or other private matters; or, alternatively, at the Defendants' direction, the SecureWatch 24 gave the impression of having installed a surveillance device, intended by the Defendants to intimidate Ms. Powell and other tenants by making them believe that they were targeted for surveillance and eavesdropping.

74.     On August 10, 2007, counsel for BRUSH sent a letter (dated August 9, 2007) to Pinnacle's attorneys raising concerns over the possible surveillance and eavesdropping and requesting an explanation of the nature and purposes of the device.  The letter also requested that representatives of the Plaintiffs be permitted to inspect the device, and it also notified Defendants of their duty to preserve evidence relating to any surveillance and eavesdropping.  Neither the Defendants nor their attorneys ever responded to the letter.

75.     But just a few hours after the letter was transmitted, a representative of SecureWatch 24 arrived at 706 Riverside Drive, opened the junction box, removed and pocketed something from inside it, and replaced the faceplate of the box with a new one that did not have a hole through which surveillance could be conducted.  Photographs of the junction box as installed and after the device was removed are attached hereto as Exhibits A and B.

**Attempts to Buy Silence**

76.     Consistent with their ongoing efforts to stifle opposition, the Defendants also have attempted to "buy-off" tenants whose opposition to their misconduct has become a public-relations liability to them.

77.     For example, as set forth below, plaintiff Anthony Casasnovas has been engaged in a protracted dispute with Pinnacle relating to Pinnacle's ongoing rent overcharges for his

23

apartment.  Consisted with the Defendants' usual tactics, Mr. Casasnovas was not able to make

any significant progress in resolving his dispute with Pinnacle – until he became a plaintiff in

this lawsuit.  Previously, the Defendants had refused to provide any information to Mr.

Casasnovas justifying the amount of rent they sought to charge in connection with a renewal

lease and had instead commenced baseless eviction proceedings against him.

78.     On July 18, 2007, shortly after the filing of Plaintiffs' original Complaint in this

lawsuit, a Pinnacle attorney approached Mr. Casasnovas at a separate housing court hearing.

Pinnacle's attorney in that matter offered to settle the housing court matter on very attractive

terms, including a substantial cash payment, provided that Mr. Casasnovas withdraw as a

plaintiff in this separate litigation.  At that time, Mr. Casasnovas was accompanied by counsel

who only represented him in the housing court action.  That counsel did not represent Mr.

Casasnovas with respect to this lawsuit, nor did Pinnacle's attorney have authorization to

communicate with Mr. Casasnovas with respect to this lawsuit. Indeed, Pinnacle knew that Mr.

Casasnovas was being represented by separate counsel in this matter.

79.     Puzzled by Pinnacle's abrupt about-face and its demand that Mr. Casasnovas

agree on the spot to withdraw as a plaintiff from this action, Mr. Casasnovas was able to obtain a

temporary postponement of his housing court hearing.  That day, Mr. Casasnovas' counsel in this

lawsuit informed Pinnacle's counsel that its approach to Mr. Casasnovas about this lawsuit

violated the ethical rules governing lawyers' conduct.  When confronted with the inappropriate

demand and unauthorized communications with Mr. Casasnovas,  Pinnacle dropped its insistence

that Mr. Casasnovas withdraw from this action as a condition of resolving Mr. Casasnovas'

overcharge dispute with Pinnacle.

80.     Similarly, Pinnacle has attempted to silence Plaintiffs Marjorie and Theodore Charron.  The original Complaint in this lawsuit alleged that the Defendants owed the Charrons over $24,000 in rent overcharges (before adding interest and trebling as provided by law) dating back to June 2001, based on the legal rents established in a DHCR proceeding (*see* paragraphs 93-94 below).  Shortly after that Complaint was filed, Pinnacle mailed the Charrons checks for less than the amount owed, with no explanation and with their names misspelled.  The Charrons requested an explanation.  Pinnacle then mailed them a new check, with their names properly spelled, but with release language providing that, by cashing the check they would give up all of their claims against Pinnacle, including their claims in this lawsuit.  Because the amount of the new check was less than the amount the Charrons are owed and the damages they have suffered, they have rejected it.

81.     Another example of the Defendants' to buy silence only after this lawsuit was filed is their treatment of Ms. Georgia Wright, a 74-year-old lady who lives alone in the Dunbar Apartments at 211 W. 149th Street.  Early in 2007, an electrical fire in the basement of the building or in a wall spread to Ms. Wright's first-floor apartment.  As a result, her apartment was rendered uninhabitable by smoke, water damage and debris, and Ms. Wright, who did not have sufficient money to rent another apartment, was forced for a time to move to a public shelter.  Pinnacle, the landlord, did not make any effort to repair the damage caused by the fire.  On July 12, 2007, the day this lawsuit was filed, there was considerable television coverage of Ms. Wright's burned out apartment, and an interview with Mrs. Wright, and the New York City Public Advocate, Betsy Gotbaum and the Manhattan Borough President Scott Stringer.  Within days Pinnacle agreed to move Ms. Wright temporarily to another nearby apartment, and to repair her fire-damaged apartment.

82.     In sum, the Defendants are aware of their tenants' vulnerabilities and have intentionally and unlawfully taken advantage of their tenants' situations, with the objective of realizing their business goal, namely overcharging tenants, collecting illegal rents, and ultimately deregulating rent-regulated apartments in order to increase rents and to convert properties to cooperatives or condominiums.

## C.     SUBVERTING GOVERNMENTAL OVERSIGHT

83.     On December 10, 2006, the York State Attorney General entered into an agreement with Pinnacle (the "Attorney General Agreement") following significant expressions of concern over Pinnacle's rent charges.  By its terms, the Attorney General Agreement attempted to address the question whether Pinnacle  and its affiliates "have been or are engaged in wrongful practices or illegal acts concerning certain rent-stabilized properties and apartments owned or managed directly or indirectly by Pinnacle Group NY, LLC and/or its current or former affiliates and subsidiaries (collectively, 'Pinnacle') with respect to computation of rent increases for vacated apartments based upon the cost of improvements to those properties and apartments during the four-year period between December 15, 2002 and December 15, 2006."

84.     To accomplish that, the Attorney General Agreement required Pinnacle to retain Forensic Investigative Associates ("FIA") to "audit all rents set by Pinnacle for the four-year period between December 15, 2002 and December 15, 2006 for each rent-stabilized apartment owned or managed by Pinnacle which was vacated within that four-year period."

85.     In purported compliance with the Attorney General Agreement, during the period at least from May to September 2007, Pinnacle provided FIA with information about the costs it claims to have incurred for apartment renovations and the allocation of those costs to rent increases on the affected apartments.

86.     Much of the information provided by Pinnacle to FIA was known by Pinnacle executives to be false.  The false information was provided under the direct supervision of Defendant Joel Wiener, his sons-in-law Barry Landy and Adam Kaplan, senior Pinnacle executive Harry Hirsch, and Perrie Agoch, Pinnacle's Controller.

87.     The information provided to FIA purported to provide assurance that  costs incurred in apartment renovation, as evidenced by vendor invoices, were incurred for work on the particular apartment on which Pinnacle raised the rent in light of the renovation costs.  But in fact the costs Pinnacle attributed to work on particular apartments was not done on them.  Instead, to make any audits difficult in many cases, Pinnacle intentionally kept records of total costs paid for materials and services but no records that would enable it to assign costs to specific apartments.  To make the reports to FIA, Landy, Kaplan and Hirsch, acting on Wiener's instructions, directed building superintendents to assign costs to specific apartments on a random basis, without verifying that the materials and services described in the invoices were actually provided to the specific apartment. on Pinnacle's list.   That process apparently explains why tenants have been charged rent increases based on improvements that have not actually been made in their apartments.

88.     Further, during the process of gathering information for FIA, Pinnacle employees advised management, and Controller Perrie Agoch in particular, that the percentages Pinnacle used in setting rent increases for 2007 were incorrect because Pinnacle was rounding up prior rents used in the computation, though the law requires landlords to round down.  Management ignored or rebuffed that information and refused to correct the amounts.

D.    **THE HARM SUFFERED BY THE NAMED PLAINTIFFS**

89.    The facts alleged below are illustrative examples of the harms that tenants have suffered at the Defendants' hands.

**BRUSH**

90.    BRUSH is a not-for-profit, tenant-run association whose purpose is to educate tenants in the West Harlem and Northern Manhattan communities about their rights and to advocate for the improvement of those communities.  The Pinnacle Enterprise has acquired many apartment buildings in those communities, which contain a large number of low-income tenants who occupy rent-regulated apartments.   Because of its prominence in the community, BRUSH has become a focal point for tenant grievances against the Defendants.

91.    BRUSH has suffered, and continues to suffer, injury to its business as a result of the Defendants' illegal activity.  The massive impact of the Defendants' scheme has forced BRUSH to divert its resources away from its core activities and to focus instead on helping tenants who are being harmed by the Defendants through frivolous or threatened litigation, threatened eviction, rent overcharges, and harassment.  BRUSH's ability to educate, represent, and organize tenants on other matters and to otherwise seek community improvement has been significantly impaired.

**Marjorie and Ted Charron**

92.    For several years, Plaintiffs Marjorie and Ted Charron have been embroiled in multiple lawsuits against Pinnacle to correct egregious illegal overcharges based on inflated individual apartment improvements -- overcharges which the Charrons continue to be forced to pay to this very day.  In or about June 2001, the Charrons moved into a rent-regulated apartment

in a building presently owned by Defendants.  By law, Defendants were required to notify the

Charrons that their apartment was rent-stabilized, but they failed to do so.  Defendants charged

the Charrons a "preferential" rent of $1,900 per month for their rent-stabilized, two-bedroom

apartment.  Defendants represented, however, that the "legal" rent on the Charrons' lease was

$2,500 and further represented to the Charrons that they could have charged as much as $2,500

based on approximately $20,000 of renovations Defendants had allegedly undertaken in the unit.

93.    When the Charrons investigated the alleged renovations that Defendants

purportedly made, they discovered that Defendants had submitted fraudulent receipts to DHCR

for "renovations" to justify a fraudulent rent overcharge.  These receipts included, among other

things, 160 light bulbs, 75 pounds of grout, 130 gallons of paint, a $198 nail gun, a $424 drain

cleaning device, and various other items listed as installed but not used.  In a further attempt to

justify the rent overcharge to the Charrons, Defendants fraudulently submitted to DHCR other

costs for maintenance work which cannot legally be passed on from a landlord to a tenant under

the relevant rent-regulation laws.  The Defendants causing the Charrons the need to file two

Article 78 Petitions and to defend against a third Article 78 Petition before the overcharge was

established.  In 2003, the DHCR found that the $1,900 monthly rent exceeded the $1,684.52

permitted by law and that the Charrons were entitled to a refund of $2,069.58 for the period

2001-2003.  Despite that ruling, on May 15, 2003 the Defendants caused the landlord, 706

Realty Co. LLC, to send the Charrons a letter fraudulently stating that the credit was only

$895.98 and that the proper rent was $1,786.94.    On February 6, 2006, the DHCR issued a new

ruling holding that the legal rent for the Charrons' apartment in 2003 was actually only

$1,337.09 and that the rent overcharge for 2001-2003 actually totaled $10,778.74.  On January

11, 2007, the Defendants caused the landlord to send the Charrons a lease renewal form that

misrepresented the rent as $2,016.92, based on the same overcharges the DHCR had found unlawful in 2003 and 2006.

94.    Based on the DHCR's rulings, the Defendants currently owe the Charrons more than $10,000 (before adding interest or trebling the damages as provided under the law) for rent overcharges for the period June 2001 to June 2003.  But the Defendants have failed to pay. When the Charrons attempted to withhold rent based on the credit they should have received as a result of past overcharges, the Defendants caused the landlord to send them a "Thirty Day Notice to Debtor" dated April 26, 2006, and a "Three Day Notice" dated April 26, 2006.  The aforementioned notices were false and the amounts stated therein were misrepresented because they were based on unlawfully inflated rent amounts.  Defendants subsequently filed a demand for rent, requiring the Charrons to appear in housing court.  Defendants intentionally and systematically and/or with reckless disregard submitted fraudulent documents to DHCR, other government agencies and to the court, to justify rent overcharges.  But based on DHCR's order with respect to the proper rent for the Charrons' apartment, Defendants also owe the Charrons approximately $14,000 (before adding interest or treble damages provided under the law) for the period June 2003 to present.

95.    Facing the Defendants' threats of eviction and baseless refusal to credit the refund, the Charrons have been forced to pay the unlawfully inflated rent amounts to this day rather than run the risk of being turned out on the street.  The Defendants have willfully threatened eviction and demanded unlawful rent amounts to extort from the Charrons rent in excess of what the law permits.

**Anthony Casasnovas**

96.　Despite multiple efforts over the course of over a year, Plaintiff Anthony Casasnovas was unable to get Defendants to provide information required by law regarding the alleged individual apartment improvements made prior to his tenancy, that purportedly provide the basis for a significant increase in the unit's legal rent. Rather than answer his questions, Defendants filed eviction proceedings against Mr. Casasnovas and used tactics calculated to prolong the proceedings in a manner intended to maximize the burden on Mr. Casasnovas' time and expense.

97.　In June 2005, Mr. Casasnovas and his friend, Veronica Gonzalez, moved into a two-bedroom rent-stabilized apartment in a building presently owned by Defendants. Defendants charged Mr. Casasnovas a "preferential" rent of $1,800 per month, although they identified the purported "legal" rent on Mr. Casasnovas' lease as $2,200. By law, Defendants were required to notify Mr. Casasnovas that his apartment was rent-stabilized, but failed to do so.

98.　On February 14, 2006, Defendants caused the landlord, 3657 Realty Co. LLC, to send Mr. Casasnovas a renewal lease form, which contained a typewritten amount of "new rent". This amount was crossed out by hand, however, and another amount, which reflected a $100.00 rental increase to his prior "preferential rent" of $1,800, along with the words "new preferential rent", was inserted in its place. Moreover, the "additional deposit required amount" was scratched out and a new amount was handwritten in instead. Mr. Casasnovas tried on multiple occasions to contact Defendants by phone and by mail to discuss the renewal lease and the new rental amounts. When he failed to hear back from Defendants, Mr. Casasnovas requested a rental history for his apartment from DHCR.

99.     Mr. Casasnovas learned that his apartment's registered rent was only $683 in 2002, but that year, when a new tenant moved in, Pinnacle nearly tripled the rent to $1,700. Based on the apartment's rental history, Mr. Casasnovas computed that Defendants would have had to have made more than $40,000 in renovations to his apartment to justify the increased rent that they charged, a virtual impossibility given the condition of the apartment. Unable to get any answers or even a response from Defendants, Mr. Casasnovas finally sent them a letter informing them that he would withhold rent until they justified the rent they were charging and provided documentation substantiating any alleged renovations which they conducted and filed a complaint with DHCR based on the overcharge in rent on or about May 25, 2006.

100.    Rather than providing a response to his letters, on July 24, 2006 the Defendants caused the landlord to send Mr. Casasnovas a "Thirty Day Notice to Debtor" and a "Three Day Notice to Debtor," both demanding $4,400 in back rent. The aforementioned notices were false and the amounts stated therein were misrepresented because they were based on unlawfully inflated rent amounts. The Defendants willfully sent the Three Day and Thirty Day notices and threatened eviction in an attempt to extort payments from Mr. Casasnovas in excess of what they were legally permitted to charge.

101.    Mr. Casasnovas immediately responded to the two notices, again explaining the overcharge and noting the overcharge complaint pending with the DHCR. The Defendants did not respond. Instead, on August 8, 2006, they caused their lawyers, Horing, Welikson & Rosen, P.C. ("Horing Welikson"), to serve Mr. Casasnovas with an action in Housing Court seeking to evict Mr. Casasnovas for non-payment of rent. Mr. Casasnovas asserted several defenses and a counterclaim against Defendants based on the rental overcharge. Each of Mr. Casasnovas' first three court appearances, for which he has had to miss days of work, resulted in adjournments

because Defendants' attorneys were not prepared and purportedly needed additional time to review Defendants' file.  It was not until June 2007 that Mr. Casasnovas received documents from Pinnacle.  The documents Mr. Casasnovas ultimately received did not justify the claimed rental increase and included invoices for costs not legally includable in the rent computation, along with invoices for work done other tenants' apartments.

102.     As described in paragraphs 77-79 above, on July 18, 2007, one week after the Complaint in this lawsuit was filed, Pinnacle suddenly changed its obstructionist tactics and offered Mr. Casasnovas a settlement that included a reduced rent rate and a lease renewal, along with payment of substantial treble damages provided Mr. Casasnovas withdrew as a plaintiff in this lawsuit.  After Mr. Casasnovas' counsel in this lawsuit confronted Pinnacle over its unethical conduct, Pinnacle agreed to settle without that condition.

103.     When Mr. Casasnovas' next rent payment became due, he called Pinnacle to confirm the amount to be paid.  Consistent with the Defendants' scheme, Pinnacle ignored the settlement, telling him that its records showed his rent payment was still in the pre-settlement amount.  To date Pinnacle has refused to provide him with a rent bill in the correct amount agreed in the settlement.

**Karen Flannagan**

104.     Despite having maintained continuous residence for nearly a decade in the same rent-controlled apartment in which she grew up, Plaintiff Karen Flannagan was repeatedly harassed by Defendants' demands -- stretching over the course of years and ending as abruptly as they began – to produce excessive and unduly burdensome documentation of her succession rights to the apartment upon the death of her mother.  In 1969, at the age of 16, Ms. Flannagan moved with her parents into a rent-controlled apartment presently in the Pinnacle Enterprise

33

portfolio.  After moving out at the age of 20, Ms. Flannagan returned to the apartment, where she

has maintained continuous residence with her daughter and her mother since 1997.

105.    Shortly after her mother's death in March 2004, Defendants stopped accepting

rent checks from Ms. Flannagan.  On or about May 11, 2004, Defendants sent Ms. Flannagan a

letter enclosing a check that she had drawn on her own account to pay rent because she was not

the "primary tenant" on the lease.  Ms. Flannagan immediately called Pinnacle and was told by a

representative that she must submit extensive evidence and documentation of her succession

rights.  Although the requests were excessive and unduly burdensome, on or about May 13, 2004

Ms. Flannagan dutifully mailed Defendants the requested evidence and documentation, including

jury duty notices, driver's license, bank account statements, utility bills and letters from her

daughter's school.  Defendants then cashed Ms. Flannagan's May 2004 and June 2004 rent

checks.

106.    Defendants subsequently continued to harass Ms. Flannagan.  On January 10,

2005,  "Pinnacle Group" sent her a letter (addressed to her late father, Stanley Flannagan)

returning six personal checks she had sent them for the rent., stating that they would not accept

her checks for rent because she was not the "primary tenant" on the lease, even though she had

already established her succession rights.   On January 13, 2005, "Pinnacle Group" sent her

another letter (again addressed to her late father) returning another rent check for the same

reason.  On January 19, 2005, the Defendants caused the landlord, 706 Realty Co. LLC, to serve

Ms. Flannagan with a "Ten Days Notice to Quit Licensee," which fraudulently alleged that she

was not a lawful successor tenant to her parents.

107.    Ms. Flannagan did not quit her apartment.  On February 17, 2005, the Defendants

caused their lawyers, Horing Welikson, to commence a baseless holdover proceeding against

Ms. Flannagan.  On February 28, 2005, "Pinnacle Group" sent Ms. Flannagan a letter (again addressed to her late father) returning a rent check she had sent.

108.    On May 26, 2005, Ms. Flannagan again provided the Defendants with the documents she had previously provided on May 13, 2004, establishing her succession rights. But the Defendants refused to dismiss their frivolous case and continued to harass against Ms. Flannagan, intending that she give in and vacate the apartment..  As a result of the legal actions Defendants commenced against her, Ms. Flannagan was required to appear in housing court no fewer than 10 times over a two-year period.  On April 26, 2006, Defendants abruptly dropped their case with no explanation or compensation for harassing her and wasting her time.

**Tracey Moore**

109.    For more than a year, Plaintiff Tracey Moore has been subjected to varying demands for rent in amounts higher than that which Defendants have acknowledged is appropriate, requiring her to appear in court on several occasions to defend against claims for rent arrears that she had already satisfied or that should have been offset by overcharges.  In July 2004, Ms. Moore signed a one-year lease to rent a two-bedroom, rent-stabilized apartment in a building presently owned by Defendants for $1,400 per month.  Ms. Moore has renewed her lease each year for the past two years at the statutory rent increase amounts.

110.    On May 15, 2006, the Defendants caused the landlord, 509 Realty Co. LLC, to send Ms. Moore a "Thirty Day Notice to Debtor" and a "Three Day Notice to Debtor," both fraudulently alleging rent arrearages totaling $3,158.44.  Those notices were false and misrepresented the amount of back rent due because they were based on unlawfully inflated rent amounts, which Ms. Moore did not realize at the time.  On May 25, 2006, the Defendants then commenced an eviction action against her.

111.    To avoid the harsh consequences of an eviction, Ms. Moore paid the inflated amount the Defendants had demanded.  Nevertheless, the Defendants forced her to appear in housing court in June 2006, at which time the action against her was dismissed.  The Defendants willfully sent the Three Day and Thirty Day notices and threatened eviction to extort payments from Ms. Moore in excess of what they were legally permitted to charge.

112.    Shortly thereafter, Ms. Moore obtained a rental history from the DHCR and discovered that the previous tenant of Ms. Moore's apartment had paid only $464 per month in rent.   She then initiated a rent overcharge claim with the DHCR.

113.    On September 21, 2006, the Defendants caused the landlord to send her another "Three Day Notice" fraudulently demanding payment of $3,007.98 in rent.  On October 6, 2006, the Defendants commenced another eviction action against Ms. Moore.  But on October 17, 2006, the landlord responded to Ms. Moore's DHCR overcharge claim by admitting it had overcharged her, inflating the rent based on the cost of repairs that "should not be included in said calculation."  The landlord offered to credit Ms. Moore almost $5000 in overcharged rent.

114.    Nevertheless, the Defendants did not drop the pending eviction proceeding.  At a subsequent Housing Court hearing, Ms. Moore presented the landlord's letter admitting the overcharge to a Horing Welikson attorney, who then requested two continuances over the next several months (requiring Ms. Moore to appear each time) to "review" the admission his client had already made.

115.    Meanwhile, Ms. Moore continued, through DHCR, to challenge some of the purported "improvement" costs added to her rent, such as charges for a new microwave, a new refrigerator, and various appliances or fixtures not actually installed.  Meanwhile, the Defendants sent Ms. Moore a lease renewal application in January 2007 that contains a fraudulent new rent

amount based on the original, overcharged rent figure.  In August 2007, the DHCR issued a

ruling in the rent overcharge case, finding a $5,000 overcharge and trebling the damages as

provided by law.  The Defendants have not credited her with that amount, nor have they

provided her with a lease in the correct amount.  At present, her only choice is to sign a lease

providing for an amount higher than she should be paying or refusing to sign, which is likely to

lead to additional efforts to terminate her tenancy.

### Raymond Andrew Stahl-David

116.    Not only did Defendants base the rent charged to Plaintiff Raymond Andrew

Stahl-David on alleged individual apartment improvements that appear to be inflated, they

fraudulently forced him to sign a lease for an apartment that purported to be free from rent

regulation, even though it was in fact rent-stabilized.  Mr. Stahl-David and his roommates moved

into a four-bedroom, rent-stabilized unit in September 2005, around the same time that the

building's ownership was transitioning from a prior owner to Defendants.  At that time, Mr.

Stahl-David and his roommates signed a one-year lease for $1,850 per month.  The Defendants

caused the landlord, 516 Realty NY LLC, to send Mr. Stahl-David numerous invoices for that

amount, which Mr. Stahl-David and his roommates paid.

117.    By law, Defendants were required to notify Mr. Stahl-David that their apartment

was rent-stabilized, but they failed to do so.  Indeed, the lease Mr. Stahl-David and his

roommates were asked to sign contained a fraudulent rider requiring them to agree that "the

apartment is not subject to any form of rent regulation."

118.    Mr. Stahl-David subsequently learned the unit was rent-stabilized, a fact that

Pinnacle itself confirmed when Mr. Stahl-David and his roommates received their lease renewal

application for the following year, which indicated that their apartment was subject to the rent stabilization statutory rent increase amount.

119.    In August 2006, upon learning that a prior tenant in the same unit had paid $976 per month in rent for the two years prior to Mr. Stahl-David's his tenancy, he filed a rent overcharge claim with DHCR.  In addition, Mr. Stahl-David obtained a document from Pinnacle purporting to justify a rent increase based on the installation of appliances, at least one of which, a dishwasher, was never in fact installed.

120.    Mr. Stahl-David fell behind in his rent payments, and on August 17, 2006, the Defendants caused the landlord to send him a "Three-Day Notice" and a "Thirty-Day Notice," both demanding payment of $4,350, an amount that was fraudulently inflated.  On August 24, 206, the Defendants caused the landlord to commence an eviction proceeding.  Rather than face eviction, Mr. Stahl-David paid the full amount claimed, including the fraudulent overcharge. The Defendants willfully sent the Three Day and Thirty Day notices and threatened eviction to extort payments from Mr. Stahl-David in excess of what they were legally permitted to charge.

121.    On July 20, 2007, Mr. Stahl-David received from DHCR an "Order Finding Rent Overcharge," holding in his favor that "the legal regulated rent is established as of September 1, 2005 in the amount of $534.29," not the $1,850 the Defendants had fraudulently demanded. Further, the Order directed Pinnacle to roll back the rent to the legal regulated rent and to offer Mr. Stahl-David a lease renewal based on that rate.

122.    After receiving the DHCR Order, Mr. Stahl-David tendered rent to Pinnacle in the amount established by the Order.  Consistent with its scheme, Pinnacle refused to deposit Mr. Stahl-David's payment and instead sent him a rent bill fraudulently stating that he was is in arrears, putting him in fear of further eviction proceedings.

123.    In addition, rather than complying with the DHCR Order, on August 20, 2007 the Defendants caused the landlord to send Mr. Stahl-David a lease renewal form that called for rent payments in the amount invalidated by the Order.   Mr. Stahl-David did not sign that lease and, instead, sent monthly rent checks in the amount established by the DHCR ruling, which the Defendants directed the landlord not to cash.  As a result, the landlord sent him statements continuing to show him as being in arrears when he was not.  In mid-October 2007, after the First Amended Complaint in this case was filed, the Defendants finally caused the landlord to send Mr. Stahl-Davis a lease in the proper rental amount, but they still have not repaid the amount of the past overcharges.

**Russell Taylor**

124.    Almost immediately after the Pinnacle Enterprise acquired the building in which Plaintiff Russell Taylor resided, the Defendants began subjecting him to repeated harassment for almost a year in an effort to remove him from a rent-stabilized apartment.  Mr. Taylor has lived in the same apartment since 2000, when he first moved in with his friend, Saidah Nash, the apartment's leaseholder at that time.  After Ms. Nash moved out one year later, Mr. Taylor asked his then-landlord, Baruch Singer (from whom the Pinnacle Enterprise acquired the building), that his name be added as the tenant of record.  Mr. Singer's agents agreed to do so.  Mr. Taylor continued to reside in the apartment and pay rent for three years.

125.    After the building was acquired by the Pinnacle Enterprise in or about September 2005, the Defendants immediately moved to evict Mr. Taylor, falsely claiming that he owed approximately $3,000 in back rent.  On September 7, 2005, the Defendants caused the landlord, Pinnacle Hamilton LLC, to send Mr. Taylor (addressed to Ms. Nash) a "Three Day Notice to Pay Rent."  The same day, the Defendants caused their lawyers, Green & Cohen, PC, to send Mr.

Taylor (addressed to Ms. Nash) a debt-collection letter.  Both the Three Day Notice and the collection letter fraudulently alleged that $2,018.94 was overdue.

126.    On or about September 19, 2005, the Defendants caused the landlord to initiate an eviction proceeding against Mr. Taylor, alleging that he was not the proper leaseholder.  Mr. Taylor sent copies of his rent checks to Defendants via certified mail, but they claimed that they did not receive his correspondence.

127.    Mr. Taylor continued to be harassed by Defendants for eight months and was required to appear in housing court on multiple occasions.  It was not until on or about April 2006 -- after Mr. Wiener was contacted by a reporter from the *New York Daily News* and a story appeared in that paper covering Mr. Taylor's situation – that the Defendants caused the landlord to dropping the case.  To date, Mr. Taylor has not received any compensation from Defendants for harassing him and wasting his time.

**Dianne Trummer**

128.    Plaintiff Diane Trummer moved into a rent-stabilized apartment in a building presently owned by Defendants in February 2004, only to be subjected to multiple inconveniences and overcharges.  When Ms. Trummer moved into the apartment in February 2004, the rent was $1,275.  Soon after moving into her apartment, Ms. Trummer became suspicious of the amount of rent she was being charged in light of the minimal improvements made to her apartment and the amounts certain other tenants were paying in rent.  Ms. Trummer immediately requested the initial apartment registration for her apartment from Defendants. Although Defendants promised to send her the requested document, they failed to do so.  After obtaining the rental history of her apartment from DHCR, Ms. Trummer learned that her apartment was previously rent-controlled, with the last tenant of record paying $497.53 in rent.

On or about June 24, 2004, Ms. Trummer filed a complaint for overcharge with DHCR.  As a result of Defendants' failure to submit the initial apartment registration form to Ms. Trummer or to DHCR as requested on February 9, 2005, Ms. Trummer's rent overcharge case was processed by DHCR as a fair market rent appeal.

129.    By letters dated September 29, 2004 and October 5, 2004, Defendants sent DHCR their objections to Ms. Trummer's complaint on the grounds that the increased rent resulted from $24,000 in alleged improvements that were performed on the apartment and that Ms. Trummer's fair market rent appeal should be barred by a 90-day statute of limitations applicable to fair market rent appeals where a tenant is mailed a certified copy of his or her initial apartment registration.  Ultimately, DHCR denied Ms. Trummer's fair market rent appeal because DHCR's rent registration database showed a higher rent for a neighboring apartment in Defendants' building.  However, upon information and belief, Defendants unlawfully increased the rent for Ms. Trummer's apartment based on fraudulent receipts and alleged renovations, including improper charges in the amount of approximately $11,000 in labor costs from their own super, which were not examined by DHCR in the fair market appeal proceeding.  Upon information and belief, the rent on the comparable apartment used to establish the fair market value of Ms. Trummer's apartment was also fraudulently and artificially inflated by Defendants.

130.    Further, four months after moving in, on or about June 20, 2004, there was a fire in a neighboring apartment that required her to vacate her apartment.  Ms. Trummer was legally vacated from her apartment by HPD on July 1, 2004 and DHCR issued an order allowing Ms, Trummer to pay $1.00 for rent until DHCR ordered her rent restored.  Defendants never informed Ms. Trummer when she could move back into her apartment.  On November 10 2004, during a visit to the apartment to check on its status, she discovered that her kitchen had been

made 20 feet smaller.  On March 24, 2005, the Defendants caused the landlord, 680 Realty Co.

LLC, to send Ms. Trummer a letter stating that, because the kitchen had been reduced in size, the

rent would not be increased from $1,275.  But that amount was still far above the $497.53 that

the prior tenant had paid and was not justified by any subsequent improvements.

131.    On September 5, 2006, Defendants caused the landlord to petition the DHCR to

restore the rent, which had been reduced because of the fire, and to establish January 1, 2005 as

the date when the apartment was allegedly habitable so that Defendants could collect the restored

rent retroactively as of that date.  The Defendants' petition fraudulently stated that the building

was completely habitable as of January 2005 and that all tenants had resumed occupancy at that

time.

132.    Ms. Trummer did not move back in January 2005.  Indeed, because her apartment

was near where the had fire started and had suffered extensive damage, she was not able to move

back into the apartment until November 2005, as Pinnacle well knew.  But Ms. Trummer was

forced to spend time and resources challenging Pinnacle's fraudulent assessment of back rent

against her.  Only after she expended those resources did Pinnacle eventually agree with Ms.

Trummer and Ms. Trummer paid back rent from January 1, 2006.

**Andres Mares-Muro**

133.    Plaintiff Andres Mares-Muro moved into a rent-stabilized apartment in a building

then owned by Baruch Singer on or about September 15, 2003, signing a two-year lease at that

time for $1,400 per month.  The Pinnacle Enterprise acquired the building complex in August

2005.  According to the Department of Housing Preservation & Development website, the

building currently has 151 open housing maintenance code violations, several dating back more

than a decade. Of those open violations, 105 are classed as "hazardous," and no fewer than 20 of them are classed as "immediately hazardous."

134.    On April 26, 2005, the Defendants caused the landlord, 635 Riverside LLC, to send Mr. Mares-Muro a lease renewal form at a rent of $1,400 per month. The lease misrepresented his security deposit as $0, even though Mr. Mares-Muro had deposited $1,400. Not wanting to risk eviction for not having a lease, Mr. Mares-Muro signed the lease, noting that he did so under protest "because the owner failed to include my security deposit."

135.    On July 19, 2005, Mr. Mares-Muro went to DHCR and requested the rental history for his apartment. He discovered that the rent charged had nearly doubled between 2000 and 2001, from $648 per month to $1,275 per month. On July 27, 2005, Mr. Mares-Muro filed a complaint for rent overcharge with DHCR. Because of a four-year regulatory limitation on the ability to contest a rent increase, however, Mr. Mares-Muro was unable to challenge the rent overcharges for his apartment.

136.    On August 29, 2005, the Defendants caused Pinnacle Singer Condo Mezzanine LLC to send Mr. Mares-Muro a letter stating that it was the apartment building's new owner. That letter also failed to acknowledge that Mr. Mares-Muro had paid a $1,400 security deposit. A few months later, on November 17, 2005, the Defendants caused 635 Riverside Drive LLC to send Mr. Mares-Muro a letter stating that it was the apartment building's new owner and that there was no security deposit.

137.    On April 13, 2006, the Defendants caused the landlord, 635 Riverside Drive LLC, to submit to DHCR rental history figures purporting to substantiate a rent of $1,491 per month. On June 27, 2007, the Defendants caused the landlord to send Mr. Mares-Muro a lease renewal

form at a rent of $1,535.73 per month, based on that fraudulently inflated figure. Rather than

face eviction for not having a lease, Mr. Mares-Muro signed it.

138.    The Defendants are sophisticated in real-estate matters and knew or should have

known that rental histories provided when the Pinnacle Enterprise acquired the building from

Baruch Singer were unreliable. Based on Singer's shady reputation and prior business practices,

it was not reasonable to assume Mr. Singer's records reflected legal rents on which they could

rely without further investigation. Had they investigated, they would have discovered that

Singer's records reflected fraudulently inflated amounts. The Defendants are also aware or

should be aware of the four-year regulatory limitation on a tenant's ability to contest a rent

increase, and they take unfair and deliberate advantage of this limitation so that they can unjustly

enrich themselves from the unsupported and fraudulent rent overcharges that they assume as a

result of their apartment building acquisitions.

**Kim Powell**

139.    Plaintiff Kim Powell has lived with her mother at 706 Riverside Drive since the

1970s. Ms. Powell pays the rent and has succession rights to the lease. In the late 1998 or 1999,

the Defendants sent Ms. Powell a letter asking her to agree that their acceptance of her check for

the rent was not an acknowledgement of her succession rights – an attempt to trick her into

surrendering the legal rights she had.

140.    Around the same time, after the Defendants had failed to make necessary repairs

in the apartment, Ms. Powell was forced to file an action in housing court requiring that the

repairs be made. After she won that action, even though the rent was paid in full, the Defendants

commenced an eviction proceeding against Ms. Powell and her mother, falsely claiming that

unpaid rent was due.  Ms. Powell was forced expend time and resources combating that improper suit.

141.    Ms. Powell has been active in her community as a leader of Plaintiff BRUSH. The Defendants have therefore targeted her and her mother for harassment and intimidation.  The most recent example is the surveillance device the Defendants installed directly in front of her apartment door around the time this lawsuit was filed (*see* paragraphs 69-75 above).

**Other Tenants Harmed by the Defendants' Scheme**

142.    The Defendants' scheme extends to other tenants besides the Individual Plaintiffs. The Defendants have caused similar harm to others, several examples of which are described below for illustrative purposes.

**Mark Gordon**

143.    Mark Gordon has expended more than $10,000 of his own money over three years on litigation against Defendants challenging rent overcharges they imposed on him based on charges of individual apartment improvements ("IAIs") allegedly made to his unit prior to his tenancy.  Defendants later acknowledged that such charges were not appropriate.  On or about July 1, 2001, Mr. Gordon moved into a rent-stabilized, two-bedroom apartment in a building presently owned by Defendants.  At that time, Defendants charged Mr. Gordon a "preferential" rent of $1,900 a month.  However, Defendants identified the "legal" rent on Mr. Gordon's lease as $2,100 and represented to Mr. Gordon that they could have charged as much as $2,100 based on renovations they had undertaken in the unit.  Further, based on the amount of "legal rent," Defendants claimed on the lease that the unit was de-regulated.

144.    Suspicious of the basis for rent he was charged, Mr. Gordon requested a rental history for his apartment from DHCR.  Mr. Gordon learned that his apartment's last registered rent was only $426.53 in 1998 for the last listed tenant before Mr. Gordon's legal rent amount of $2100.  Based on the rental history of the apartment, Mr. Gordon determined that any alleged improvements or renovations would have had to amount to over $55,000 to justify the increased rent that Defendants charged him.  After further investigation, Mr. Gordon learned that the rent increase was based upon, among other things, double-billed labor charges for the installation of kitchen cabinets, the cost of replacing electrical wiring that appeared not to have been done, and the alleged installation of five toilets in a two-bathroom apartment.  In light of Defendants' fraudulent rent overcharge, Mr. Gordon withheld rent and commenced an action against Defendants in New York Supreme Court on or about July 31, 2002.

145.    Mr. Gordon received a "Three Day Notice" from Pinnacle dated August 13, 2002 demanding $4000 of back rent.  That notice was false because it was based on unlawfully inflated rent amounts.  On or about August 27, 2002, Horing Welikson & Rosen, P.C., on behalf of Defendants, instituted a non-payment proceeding against Mr. Gordon.  Only after Mr. Gordon spent three years and more than $10,000 in legal fees to challenge the propriety of the alleged renovation charges -- causing him great emotional and financial distress, inconveniences, uncertainty, and disruption in his daily life -- did Defendants finally agree to resolve the case by lowering his rent and re-classifying his apartment as rent stabilized.  Although Mr. Gordon is barred by a Settlement Agreement from joining as a Plaintiff in this action, his story is illustrative of the types of the harassing and unlawful tactics in which Defendants are engaged and constitutes evidence of Defendants' pervasive and ongoing scheme directed at multiple victims.

**Myrtle D. Butler**

146.    Ms. Butler has maintained continuous residence in a two-bedroom apartment since 1970, when she first moved in with her then-husband, the late Henry Butler.

147.    Every other year, owners are entitled a statutory increase in the Maximum Base Rent ("MBR") for their rent-controlled apartments.  The increase is calculated by the owner on a DHCR form to be submitted to the DHCR and the tenant; the form requires the owner to multiply the most recent approved MBR by a standard increase factor provided by DHCR, which varies depending on when the prior MBR increase was granted.

148.    With regard to Ms. Butler's apartment, for the 2006-2007 period, Defendants were entitled to a statutory increase in the MBR as described above.  However, Defendants did not use the multiplier based on Ms. Butler's apartment's most recent MBR increase, which was granted in the 2004-2005 period.  Instead, Defendants hand wrote onto the form the rent as of 1974-1975 and used a much larger corresponding multiplier to calculate the MBR, resulting in an MBR amount that is almost $180.00 more per month than if the correct figures had been used. The form was signed by Joel Wiener and was submitted to DHCR with an affirmation "under penalties provided by law, that the computations and statements made on this form, are true and correct" to the best knowledge of the affiant.

149.    By inflating the MBR of rent-controlled apartments like Ms. Butler's, Defendants open the door to collecting and charging higher rents.  Ms. Butler was only able to discover Defendants' misrepresentation as to the date of her apartment's last approved MBR increase (and the computation of her current, 2006-2007 MBR based on that amount) with the assistance of a representative from her tenants' association.  Since the discovery of this misrepresentation, other

rent-controlled tenants, both in Ms. Butler's building and others owned by Defendants, also have

identified similar misrepresentations in their respective 2006-2007 MBR increase forms.

## CLASS ALLEGATIONS

**A.    Class Definition**

150.    The Individual Plaintiffs bring this action on their own behalf and, pursuant to

Fed. R. Civ. P. 23(b)(1)(A), (b)(2) and (b)(3), as a class action on behalf of a class of persons

defined as:

151.    All persons who, at any time from July 11, 2004 to the date of certification, leased

an apartment in the City of New York directly or indirectly owned in whole or in part by the

Pinnacle  Enterprise. This class seeks certification of claims for declaratory and injunctive relief,

and for damages pursuant to 18 U.S.C. § 1962(d) and New York General Business Law § 349(h).

**B.    Rule 23(a) – Typicality**

152.    The named Individual Plaintiffs and the members of the class each and all have

tangible and legally protectible interests at stake in this action.

153.    The claims of the named class representatives and the absent class members have

a common origin and share a common basis.  Their claims originate from the same illegal,

fraudulent, and deceptive practices of the Defendants, and the Defendants act in the same way

toward the Individual Plaintiffs and the members of the class.  Each named Individual Plaintiff

has been the victim of one or more of the following illegal practices at the hands of the

Defendants:  intentionally misrepresenting the rent-regulated status of apartments to new tenants;

intentionally misrepresenting the legal rent chargeable for the unit; intentionally misrepresenting

of the nature and cost of improvements done to justify rent increases; intentionally

misrepresenting the amount of rent that is due; intentionally sending baseless eviction notices

fraudulently alleging rent due; intentionally instituting baseless court proceedings fraudulently

alleging rent due, fraudulently challenging tenants' legal succession rights; and extorting

excessive rent payments through meritless threats of foreclosure.

154.    The proposed class representatives state claims for which relief can be granted

that are typical of the claims of absent class members.  If brought and prosecuted individually,

the claims of each class member would necessarily require proof of the same material and

substantive facts, rely on the same remedial theories, and seek the same relief.

155.    The claims and remedial theories pursued by the named class representatives are

sufficiently aligned with the interests of absent class members to ensure that the universal claims

of the class will be prosecuted with diligence and care by the Individual Plaintiffs as

representatives of the class.

## C.    Rule 23(a) – Numerosity

156.    The members of the class are so numerous that joinder of all members is

impracticable.  The Pinnacle Enterprise owns or controls over 400 buildings in New York City,

containing more than 21,000 apartments.  Based on information available from "red herring"

filings submitted by the Pinnacle Enterprise, a large portion of those apartments is rent-regulated.

On information and belief, the Defendants' illegal actions are widespread throughout the

Pinnacle Enterprise's properties.  The class is ascertainable from records maintained by the

Defendants.

## D.    Rule 23(a) – Commonality

157.    The questions of law and fact common to the class include, among other things:

(a)      whether the Defendants have engaged in mail fraud, extortion, and transportation of stolen property;

(b)      whether the Defendants have engaged in a pattern of racketeering activity;

(c)      whether the Pinnacle Enterprise identified herein is an enterprise within the meaning of 18 U.S.C. § 1961(4);

(d)      whether the Defendants conducted or participated in the affairs of the Pinnacle Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

(e)      whether the Defendants' overt or predicate acts in violation of 18 U.S.C. § 1962(c) proximately caused injury to the Individual Plaintiffs' and class members' business or property;

(f)      whether the Defendants act or refuse to act on grounds generally applicable to the Individual Plaintiffs and the class members;

(g)      whether the Defendants have established a practice or policy of misrepresenting tenants' rent stabilization status or of failing to notify tenants that their apartments are rent stabilized;

(h)      whether the Defendants have established a practice or policy of misrepresenting the prior rent charged on apartments they own;

(i)      whether the Defendants have established a practice or policy of misrepresenting the legal rent chargeable on apartments they own;

(j)      whether the Defendants have established a practice or policy of claiming tenants owe additional rent when they do not;

(k)      whether the Defendants have established a practice or policy of demanding rent that has already been paid;

50

(l)    whether the Defendants have established a practice or policy of demanding rent that has been lawfully withheld;

(m)    whether the Defendants have established a practice or policy of refusing to accept rent payments that have been properly tendered;

(n)    whether the Defendants have established a practice or policy of sending eviction notices when there is no proper basis for an eviction;

(o)    whether the Defendants have established a practice or policy of instituting eviction proceedings against tenants when there is no proper basis for an eviction;

(p)    whether the Defendants have established a practice or policy of misrepresenting tenants' succession rights;

(q)    whether the Defendants have established a practice or policy of harassing tenants to induce them to vacate their apartments;

(r)    whether the Defendants have established a practice or policy of failing to make necessary repairs until taken to court by tenants;

(s)    whether the Defendants have established a practice or policy of eavesdropping on tenants.

**E.**    **Rule 23(a) – Adequate Representation**

158.    The named Individual Plaintiffs are willing and prepared to serve the Court and the proposed class in a representative capacity with all of the obligations and duties material thereto.  The Individual Plaintiffs will fairly and adequately protect the interest of the class and have no interests adverse to, or that directly and irrevocably conflict with, the interests of the other class members.

159.    The self-interests of the proposed class representatives are co-extensive with, and not antagonistic to, those of the absent class members.  The proposed class representatives will undertake to protect the interests of the absent class members.

160.    The named Individual Plaintiffs have engaged the services of the counsel indicated below.  Those counsel are experienced in complex litigation, will adequately prosecute this action, and will assert, protect, and otherwise well represent the proposed class representatives and the absent class members.

**F.**    **Rule 23(b)(1)**

161.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for the Defendants toward the class members.

**G.**    **Rule 23(b)(2)**

162.    The Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

**H.**    **Rule 23(b)(3)**

163.    The questions of law and fact common to members of the class predominate over any questions affecting only individual members.

164.    A class action is superior to other available methods for the fair and efficient adjudication of the controversies herein because:

(a)    individual claims by class members are impractical as the costs of pursuing them far exceed what any one individual plaintiff or class member has at stake;

(b)    though some potential class members are, or have been, engaged in litigation with at least one of the Defendants or their affiliates, the baselessness of the Defendants' claims against them is part of the Defendants' scheme to impose costs on and to harass the class members as a means of illegally driving up their rents or of inducing them to vacate their apartments;

(c)    individual members of the proposed class have no interest in prosecuting and controlling separate actions, and requiring them to do so would impose a significant burden of exactly the type the Defendants seek to impose on them;

(d)    it is desirable to concentrate litigation of the claims asserted herein in a single forum;

(e)    the proposed class action is manageable.


**COUNT I**

**VIOLATION OF NEW YORK
CONSUMER PROTECTION ACT ("NYCPA")**

165.    Plaintiffs incorporate and restate the allegations of paragraphs 1 through 164 as if fully set forth herein.

166.    Defendants have engaged and continue to engage in deceptive consumer-oriented acts and practices by subjecting rent-subsidized tenants, including Plaintiffs and those on whose behalf BRUSH advocates, to demands of rents above those permitted under law based upon its representations of alleged renovations of individual units and major capital improvements not

made or insufficient to justify the dramatic rent increases charged, for the purposes of illegal commercial gain. Detailed examples of such practices are set forth in paragraphs 90-149 above.

167.    Defendants have engaged and continue to engage in deceptive consumer-oriented acts and practices filing eviction notices against rent-regulated tenants, including those on whose behalf BRUSH advocates, and making demands for rents already paid or lawfully withheld, and seeking unreasonable evidence of succession rights from lawful tenants, for the purposes of harassment and unfair and illegal commercial gain. Detailed examples of such practices are set forth in paragraphs 90-149 above.

168.    Defendants' deceptive consumer-oriented acts and practices are misleading to a reasonable consumer in a material way.

169.    Plaintiffs and other of Defendants' tenants, including those on whose behalf BRUSH advocates, have suffered injury as a result of Defendants' deceptive consumer-oriented acts and practices, as described more fully in paragraphs 90-149 above, and including overpayment in rent, unlawful eviction, lost wages, severe emotional distress, transportation and child care expenses, shoddy repairs and/or failure to make reasonable repairs, and numerous hours of aggravation and anxiety in housing court.

170.    Defendants' deceptive consumer-oriented acts and practices have a broad impact on consumers at large and cause injury and harm to the public interest.

171.    Defendants' practices, acts, communications, and representations violate the New York Consumer Protection Act, New York General Business Law § 349, because they constitute deceptive acts or practices in the conduct of business, trade, and commerce, and/or in the furnishing of services.

## COUNT II

### VIOLATION OF THE FEDERAL RACKETEER
### INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")

172.    Plaintiffs incorporate and restate the allegations of paragraphs 1 through 171 as if fully set forth herein.

173.    Defendants Pinnacle and Wiener are "persons" as defined under 18 U.S.C. § 1961(3).

174.    The Pinnacle Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961 and consists of at least the following persons and entities:

Pinnacle Group NY LLC

Joel Wiener

Pinnacle Managing Co., LLC

The Praedium Group LLC

A. Floyd Lattin

Russell L. Appel

Frank P. Patafio

SecureWatch 24

706 Realty Company, LLC

3657 Realty Company, LLC

635 Riverside Drive LLC, a/k/a 635 Riverside LLC, a/k/a 635 Riverside Drive NY LLC

509 Realty Co., LLC

516 Realty NY LLC

Pinnacle Hamilton LLC

55

680 Realty Co. LLC, a/k/a 680 Riverside Realty Co. LLC

063-67 W. 107th Street NY LLC

725 Realty Co. LLC

634 W. 135th Street LLC

894 Riverside NY Associates LLC

NYC Residential Manager LLC

Pinnacle Holding Company LLC

Kaben RSD LLC

175.    At all material times the Pinnacle Enterprise has operated for the purpose of investing in, owning, managing, and operating residential properties, collecting rents, and converting rental apartment buildings into condominium and cooperative units.  The Pinnacle Enterprise has a discernable structure, at the top of which is Joel Wiener, who has responsibility for directing the Enterprise's overall course of conduct.  Wiener does that in consultation with other Enterprise members, including Lattin, Appel, and Patafio, who are associated with Praedium.  Pinnacle and Praedium function as umbrella entities through which the individuals may act.   A lower layer of the Enterprise consists of LLCs that hold title to the individual apartment buildings (the "Landlord LLCs").  There may be intermediate layers of ownership and control between the Landlord LLCs and Wiener, Lattin, Appel, and Patafio, as described by example in paragraph 46 above.

176.    Pinnacle is responsible for managing the Pinnacle Enterprise's day-to-day operations, including negotiating leases, billing for and collecting rent, hiring and supervising building staff (e.g., "supers"), making repairs, supervising capital improvements, sending delinquency and eviction notices, and commencing eviction proceedings.  At least some of those

functions are done through Pinnacle Managing Co., LLC "Pinnacle Managing"). SecureWatch 24 provides security services to the Pinnacle Enterprise, including the installation of security cameras that are connected to a central hub in SecureWatch 24's headquarters, allowing SecureWatch 24 personnel to observe activities in the buildings at all times. Pinnacle, Pinnacle Managing, and SecureWatch 24 are under Joel Wiener's direction and control.

177.    At all material times, the Pinnacle Enterprise was separate and apart from the pattern of racketeering activity in which the Defendants are engaged.

178.    At all material times, the Pinnacle Enterprise affected interstate commerce in several ways. The details of the Enterprise's activities are not matters of public record, and the Plaintiffs have as yet had no discovery to flesh them out. But the following impacts on interstate commerce are presently apparent..

(a)    First, the Pinnacle Enterprise has used the U.S. Mail, among other means of communication, to send communications of various types to Plaintiffs in furtherance of the fraudulent scheme described herein. Those communications include but are not limited to numerous mailings misrepresenting tenants' rent obligations, including out-of-state mailings in certain cases. For example:

| DATE | FROM | TO | DESCRIPTION |
|---|---|---|---|
| 1/3/2006 | Pinnacle Hamilton LLC | Lisa Adams | Letter stating lease deemed signed for a two-year period |
| 6/6/2005 | Donna Fabrizio, Anita Terrace Realty LLC | Marsha Agata | Ten Day Notice to Cure |
| 6/24/2005 | Donna Fabrizio, Anita Terrace Owners Corp. | Marsha Agata | Ten Days Notice of Termination |
| 8/8/2005 | Donna Fabrizio, Anita Terrace Realty LLC | Marsha Agata | Ten Day Notice to Cure |
| 8/26/2005 | Donna Fabrizio, Anita Terrace Realty LLC | Marsha Agata | Ten Days Notice of Termination |

| 8/13/2004 | Nader Ohebshalom, JIJI Holdings LLC | Alease Britton | Thirty Day Notice of Termination. This notice also states: "Additional copies sent by regular and certified mail to Alease Britton at 7 Berkeley Place, Montclair, NJ 07042." |
|---|---|---|---|
| 11/16/2005 | Donna Fabrizio, 527 Realty NY LLC | Alease Britton | Thirty Day Notice of Termination. This notice also states: "Additional copies sent by regular and certified mail to Alease Britton at 7 Berkeley Place, Montclair, NJ 07042." |
| 12/7/2005 | Daisy, 527 Realty NY LLC | Alease Britton | Letter returning check, after commencement of holdover proceedings against Ms. Britton* |
| 2/28/2006 | Donna Fabrizio, The Pinnacle Group | Carol Brutus | Letter re: inspection of bedroom floor |
| 8/2006 | Yim Ng, The Pinnacle Group | Gordon Kenney | Letter returning check, after commencement of holdover proceedings against Mr. Kenney* |
| 3/6/2006 | Donna Fabrizio, 635 Riverside Dr. NY LLC | Maria Rosario | Three Day Notice* |
| 5/30/2006 | 835 Riverside Realty Co. | Bernice Star | Calculation of retroactive charges for fuel increase. |
| Unknown | 835 Realty Co., LLC | Bernice Star | Calculation of retroactive charges for 2004-2005 MBR/MCR increase* |
| 3/15/2006 | 635 Riverside Dr. | Jean Tremont | Renewal Lease Form* |

*Plaintiffs expect through discovery to confirm the circumstances surrounding the mailing or other transmission of these communications.

      (b)     Second, the rents paid to Pinnacle affect interstate commerce because the apartment buildings owned by the Landlord LLCs are mortgaged to foreign banks. For example, "Red Herring" offering statements for condominium or co-op conversions of buildings owned by the Landlord LLCs and managed by Pinnacle state that mortgages for those buildings are currently held and collected by Wells Fargo Bank, N.A., which is headquartered in San Francisco, California and chartered in South Dakota, and by Deutsche Bank Mortgage Capital, LLC, a Delaware corporation controlled by a German bank that describes itself as "one of the largest foreign-based employers in New York."

(c)      Accordingly, portions of the proceeds obtained by the Pinnacle Enterprise from rent overcharges and other acts in furtherance of the Defendants' scheme are transmitted across state lines outside of New York State to make payments on those mortgages.   Those non-local banks (and likely others of which Plaintiffs are not yet aware, as they have not been able to review all of the Pinnacle Enterprise's "Red Herrings") possess mortgage liens and, no doubt, assignments of rents that direct the rents collected to the non-local banks.

(d)      To date, Plaintiffs have obtained the following information about the lenders on  buildings owned or controlled by the Pinnacle Enterprise in which Plaintiffs or putative class members reside:

807 Riverside Drive (Wells Fargo)

690 Riverside Drive (Wells Fargo)

635 Riverside Drive (Deutsche Bank)

700 Riverside Drive (Wells Fargo)

680 Riverside Drive (Wells Fargo)

835 Riverside Drive (Wells Fargo)

668 Riverside Drive (Wells Fargo)

706 Riverside Drive (Wells Fargo)

725 Riverside Drive (Wells Fargo)

894 Riverside Drive (Deutsche Bank)

634 West 135th St. (Deutsche Bank)

660 Riverside Drive (Wells Fargo)

801 Riverside Drive (Wells Fargo)

5 West 101st St. (Deutsche Bank)

15 West 107th St. (Deutsche Bank)

627 West 113th St. (Deutsche Bank)

The payment of these mortgages with income derived from the Defendants' scheme, as well as

the Pinnacle Enterprise's contractual relationships with out-of-state lenders securing financing

for their ownership of the buildings at issue, directly constitutes and affects interstate commerce.

(e)     Third, the Defendants' practices of rent overcharges and tenant harassment

are intended to speed up the Pinnacle Enterprise's conversion of rent-stabilized and rent-

controlled apartments into condominiums, co-ops, or rental units at significantly higher rents.

Some of the tenants who are forced out of their apartments will no doubt travel out of state to

find cheaper housing.  In addition, Defendants advertise and market the units they convert to

condominiums to out-of-state purchasers via the internet.  For example, at the time of this

writing, units controlled by the Pinnacle Enterprise at the following addresses are being marketed

nationwide on the website of the Corcoran Group:

660 Riverside Drive

690 Riverside Drive

706 Riverside Drive

801 Riverside Drive

Certain of the those buildings with currently listed condominium units contain the units in which

named plaintiffs reside, *e.g.*, 706 Riverside Drive (Kim Powell and Karen Flannagan), 690

Riverside Drive (Diane Trummer).

(f)     The Defendants' scheme to inflate rents and drive tenants out of their rent-

regulated units thus culminates in the listing of Pinnacle Enterprise units for purchase by out-of-

state buyers.  That strategy affects interstate commerce by influencing housing rental and

purchasing decisions by residents of other states and by inducing movement of New York State residents to other states.

(g)    Fourth, Praedium, which is a key player in the Pinnacle Enterprise, providing much of its funding, is itself funded in whole or in part by investors based outside New York State that, in turn, receive portions of the income derived from the Pinnacle Enterprise.  On its website, Praedium explains:

> Praedium was formed in 1991 with an international investment bank as its sole investor . . . .  In 2000, Cadim, a Montreal-based real estate advisor and portfolio manager, became a major shareholder of The Praedium Group.  Cadim is a division of the Caisse de depot et placement du Quebec and a member of the Real Estate Group of the Caisse.

http://www.praediumgroup.com/about.php.    The Caisse de dépôt et placement du Québec "conducts its operations mainly from its business office in Montréal and its head office in Québec City."    *See*  http://www.cdpcapital.com/Profile/Histoire.aspx.    Accordingly, income obtained from tenants by the Pinnacle Enterprise, including income fraudulently obtained through the Defendants' scheme, is transmitted, in part, to Praedium's owners in Canada.  The Pinnacle Enterprise's reliance upon, and enrichment of, Praedium's out-of-state investors affects interstate commerce.

179.    Beginning at least as early as 2002, Defendants Pinnacle and Wiener conducted the affairs of the Pinnacle Enterprise through a pattern of racketeering activity.  They are key decisionmakers for the Pinnacle Enterprise and implement its strategies, including predicate acts of mail fraud in violation of 18 U.S.C. § 1341, extortion in violation of 18 U.S.C. § 1951 and state law, and violation of the National Stolen Property Act, 18 U.S.C. § 2314.

180.    On numerous occasions, Defendants used the U.S. mails to perpetrate their fraudulent scheme, acted with the knowledge that the use of the mails would follow in the ordinary course of business and could reasonably foresee such use of the mails.  Such mailings

have also included, but are not limited to, notices to pay rent in amounts greater than the amount actually due, lease renewal forms providing for rents in excess of the legally chargeable amounts and checks mailed to tenants in less than the amounts the Defendants are obligated to pay them.

181.    Defendants' use of the U.S. mails included communications among Pinnacle, Praedium, SecureWatch 24, and Wiener, and communications between Defendants and various tenants, regulatory agencies and officials; all in furtherance of Defendants' fraudulent scheme. The Plaintiffs are not sophisticated about the elements of RICO and mail fraud and thus have not retained detailed records of mailings they have received or sent.  Plaintiffs expect to obtain more information on that subject in discovery.  But  based on information currently available to Plaintiffs, the following are specific examples of mailings involving predicate acts of mail fraud:

| DATE | FROM | TO | DESCRIPTION |
|---|---|---|---|
| 5/15/2003 | 706 Realty Co. LLC | Marjorie Charron | A 2003 DHCR ruling found that the $1900/month being charged by Defendants was in excess of the $1684.52 permissible by law, and that the Charrons were entitled to have the difference returned to them for overpayments reaching back to 2001 (overpayments DHCR calculated as $2069.58).  In this letter immediately following that ruling, however, Defendants stated that the credit was $895.98, and reduced the rent to $1786.94, again in excess of the lawful rent.* |
| 4/26/2006 | Donna Fabrizio, 706 Realty Co. LLC | Theodore & Marjorie Charron | Three Day Notice demanding $2,801.68.  When Charrons attempted to withhold rent based on the credit they should have received as a result of past overcharges, they received a Three Day notice based on rent amounts already found to be inflated by DHCR. |
| 4/26/2006 | Donna Fabrizio, 706 Realty Co. LLC | Theodore & Marjorie Charron | Thirty Day Notice demanding $2,801.68.  When Charrons attempted to withhold rent based on the credit they should have received as a result of past overcharges, they received a Thirty Day notice based on rent amounts already found to be inflated by DHCR. |
| 1/11/2007 | 706 Realty Co. LLC | Theodore & Marjorie Charron | Renewal Lease form setting one year rent at $2016.92 based on unlawfully inflated rent amounts.  Following the Charrons victory before the DHCR, Defendants refused to issue the |

| | | | |
|---|---|---|---|
| | | | award or credit Charrons' monthly rent, and have maintained the higher rent on threat of eviction.  Facing Defendants' threats of eviction, the Charrons have been forced to continue to pay the unlawfully inflated rent amount for fear of possible eviction.  That rent amount was set in a January 2007 lease at $2016.92 based on the same overcharges the DHCR found wrongful in 2003.* |
| 2/14/2006 | 3657 Realty Co. LLC | Anthony Casasnovas & Vero Gonzalez | Lease Renewal Form setting rent at $1900/month, above legally permissible rent.  In or about February 2006, Defendants sent Mr. Casasnovas a renewal lease form which contained a typewritten amount of "new rent." This amount was crossed out by hand, and a new rent of $1900 was written in, along with the words "new preferential rent."  As discovered subsequently by Casasnovas, the $1900 rent was far above what prior tenants had paid, and the rent increase was without justification in renovation or turnover. * |
| 7/24/2006 | 3657 Realty Co., LLC | Anthony Casasnovas & Veronica Gonzalez | 30-day Notice and 3-day Notice demanding $4400 based on unlawfully inflated rent amounts.  Casasnovas learned that his apartment's registered rent was only $683 in 2002, but that year, when a new tenant moved in, Pinnacle nearly tripled the rent to $1700. After Casasnovas sought documentation justifying increase and Defendants refused, Casasnovas withheld rent.  Defendants demands for $4400 were without justification in renovation or turnover.* |
| 1/10/2005 | Vahida, Pinnacle Group | Stanley Flannagan | Letter returning 6 personal checks as not from the primary tenant.  On May 13, 2004, Karen Flannagan mailed extensive documentation regarding her status as lawful tenant to Vahida Pinnacle Group.  At time of January 2005, mailing, Pinnacle had in its possession information showing Karen Flannagan to be the lawful tenant.  Regardless, Pinnacle refused to accept her lawful payments. |
| 1/13/2005 | Vahida, Pinnacle Group | Stanley Flannagan | Letter returning check #1556, as not from the primary tenant. Flannagan mailed extensive documentation regarding her status as lawful tenant on 5/13/04, prior to this mailing.  At time of January 2005 mailing, Pinnacle was in possession of information showing Flannagan to be the lawful tenant. |
| 1/19/2005 | Donna Fabrizio, 706 Realty Co. | Karen A. Flannagan | Ten Days Notice to Quit to Licensee founded on baseless claim that Flannagan was not a lawful successor.  On May 13, 2004, Flannagan mailed |

| | | | |
|---|---|---|---|
| | LLC | | extensive documentation of her status as a lawful tenant.  At time of the Ten Days Notice, Pinnacle possessed copious information showing Flannagan to be the lawful tenant.  The Notice was premised on the same baseless contention, already refuted by Flannagan, that she was not a lawful tenant.* |
| 2/28/2005 | Vahida, Pinnacle Group | Stanley Flannagan | Letter returning check #1573, as Pinnacle has begun a holdover proceeding against Flannagan. On May 13, 2004, Flannagan mailed extensive documentation of her status as a lawful tenant. At time of this letter, Pinnacle thus possessed information showing Flannagan to be the lawful tenant.  The holdover proceedings were premised on the baseless contention, refuted in May 13, 2004, that Flannagan was not a lawful tenant. |
| 4/26/2005 | 635 Riverside LLC | Andres Mares-Muro & Maria Vides | Renewal Lease Form showing security deposit paid at $0 when Mares-Muro had existing security deposit.  635 Riverside LLC was in possession of security deposit at time of mailing, however, the lease indicated that Mares-Muro had never paid the $1400.  Mares-Muro signed the renewal lease under protest, writing on the lease itself "I'm signing this lease under protest because the owner failed to include my security deposit." * |
| 8/29/2005 | Pinnacle Singer Condo Mezzanine LLC | Andres Mares-Muro | Summary of Rent showing new security deposit of $1400 when in fact additional deposit was held.  Pinnacle Singer Condo Mezzanine LLC was in possession of security deposit at time of mailing. Mailing failed to reflect that Mares-Muro had previously paid the security deposit. * |
| 11/17/2005 | 635 Riverside LLC | Andres Mares-Muro ("To whom it may concern") | Letter informing Mares-Muro that it has no security deposit on file.  Letter asks tenant to submit proof of security deposit (none on file). Mares had submitted security deposit in the prior year.* |
| 4/13/2006 | 635 Riverside Drive NY LLC | DHCR re: Mares-Muro | Letter to DHCR stating that the Mares-Muro's rent is correct and is not an overcharge.  The letter responded to Mares-Muro's overcharge allegation and submitted figures to support its contention that the appropriate rent was $1491/month.  The data on turnover increases and renewal increases was contrary to that known by Mares-Muro. |
| 6/27/2007 | 635 Riverside LLC | Andres Mares-Muro & Maria Vides | Renewal Lease Form setting rent at $1535.73, above amount permissible by law.  Rent increases were without justification in renovation or turnover, as DHCR documents |

| | | | |
|---|---|---|---|
| | | | reflected that the rent charged had nearly doubled between 2000 and 2001, from $648 per month to $1,275 per month. |
| 9/15/05 - 9/15/07 | 635 Riverside LLC | Andres Mares-Muro & Maria Vides | Rental Receipts for 635-11F based on unlawfully enhanced rent amounts.  Throughout the time that 635 Riverside Drive NY LLC and Pinnacle Singer Condo Mezzanine LLC were owners of the apartment in question, Mares-Muro has retained rental invoice statements reflecting the monthly rent the owners claimed was the lawful amount (see below).  Rent amounts and increases were without justification in renovation or turnover. * |
| 5/15/2006 | Donna Fabrizio, 509 Realty Co. LLC | Tracey Moore | Three Day Notice from 509 Realty Co. LLC seeking to collect rent arrears totaling $3,158.44.  Notice was false and misrepresented the amount of back rent due because they were based on unlawfully inflated rent amounts. |
| 5/15/2006 | 509 Realty Co. LLC | Tracey Moore | Thirty Day Notice from 509 Realty Co. LLC seeking to collect rent arrears totaling $3,158.44.  Notice was false and misrepresented the amount of back rent due because they were based on unlawfully inflated rent amounts. |
| 9/21/2006 | Donna Fabrizio, 706 Realty Co. LLC | Tracey Moore | Three Day Notice and Affidavit of Conspicuous Service demanding $3007.98.  DHCR documentation established that the previous occupant of Ms. Moore's apartment paid $464 per month in rent.  Nevertheless, the Three Day Notice, demanded $3007.98 on pain of eviction, computing the $3007.98 as $3005.32 as the rent due and adding a July balance due of $2.66.  Subsequently, however, as a result of the DHCR documentation, Defendants acknowledged to DHCR, in a letter dated October 17, 2006, that they had overcharged Ms. Moore. |
| 10/17/2006 | 509 Realty Co LLC | DHCR re: Tracey Moore | Letter stating that the current Moore rent is correct and is not an overcharge.  Providing data on renovations leading to an increase of rent from $464.09 to $1400 per month, which the letter concedes was erroneous.  Annexing to letter changes in rents and credits. |
| 8/17/2006 | Donna Fabrizio, 516 Realty NY LLC | Zachary Roberts & Hadley Hoyte (co-tenants of Stahl-David) | Three Day Notice demanding $4350 based on unlawfully inflated rent amounts. In August 2006, upon learning that a prior tenant in the same unit had paid $976 per month in rent two years prior to his tenancy, Mr. Stahl-David filed a rent overcharge claim with DHCR.  In addition, Mr. Stahl-David obtained documents from Pinnacle suggesting that it had installed appliances, such as a dishwasher, that his apartment in fact does not have.  The Three-Day Notice  demanded $4350 in order to remain in |

| | | | |
|---|---|---|---|
| | | | the apartment.* |
| 8/17/2006 | 516 Realty NY LLC | Zachary Roberts (co-tenant of Stahl-David) | Thirty Day Notice to Debtor demanding $4350 based on unlawfully inflated rent amounts. On the same day as the Three Day Notice, Pinnacle demanded the same $4350 in order to remain in the apartment. In August 2006, upon learning that a prior tenant in the same unit had paid $976 per month in rent two years prior to his tenancy, Mr. Stahl-David filed a rent overcharge claim with DHCR. In addition, Mr. Stahl-David obtained documents from Pinnacle suggesting that it had installed appliances, such as a dishwasher, that his apartment in fact does not have.* |
| 2006 | 516 Realty NY LLC | Re: Zachary Roberts (co-tenant of Stahl-David) | Rental Receipts reflecting unlawfully inflated rents. After Stahl-David discovered $976 per month in rent two years prior to his tenancy, Stahl-David continued to receive monthly invoice stubs issued by 516 Realty NY LLC for the $1850/month that 516 Realty NY LLC claimed was lawful.* |
| 6/27/2007 | 516 Realty NY LLC | Zachary Roberts & Hadley Hoyte (co-tenants of Stahl-David) | Lease stating that rent is $1,928.63/month, above the legally permissible rent. Rent was subsequently reduced by Pinnacle to $534/month, and Pinnacle by letter conceded that this reduction had no impact on DHCR proceedings being pursued by Stahl-David. |
| 9/7/2005 | Pinnacle Hamilton LLC | Saidah Nash (co-tenant of Russell Taylor) | Three Day Notice to Pay $2,018.94, above the legally permissible amount. Notice was based on baseless claim that Taylor had not paid his $917.87/month rent for September or August of 2005, and that he owed a balance for June 2005 of $183.20.* |
| 9/7/2005 | Green & Cohen, PC | Saidah Nash (co-tenant of Russell Taylor) | Letter from firm retained to collect debt on behalf of Pinnacle Hamilton. Amount sought was $2,018.94, an amount in excess of the legally permissible rent. Letter was predicated on baseless claim that Taylor had not paid his $917.87/month rent for September or August of 2005, and that he owed a balance for June 2005 of $183.20* |
| 1/20/2005 | 680 Realty Co. LLC | Diane Trummer | Rent Statement crediting Trummer $4136.12 when correct amount was $4219. Tenant was paying $1.00 to retain tenancy after fire in neighboring apartment caused her to vacate. Credit of $4219 was wrongfully reduced to $4136.12 after lease was deemed renewed by owner and increased. Owner was obligated to accept $1.00 until DHCR issued order, not increase rent. |

| | | | |
|---|---|---|---|
| 1/23/2005 | 680 Realty Co. | Diane Trummer | Unsigned Apartment Lease, $1275/year, above the legally permissible rent. After obtaining the rental history of her apartment from DHCR, Ms. Trummer learned that her apartment was previously rent-controlled, with the last tenant of record paying $497.53 in rent. Rent increases were without justification in renovation or turnover. |
| 3/24/2005 | 680 Realty Co. LLC | Diane Trummer | Letter setting rent at $1275 per year, above the legally permissible rent. After obtaining the rental history of her apartment from DHCR, Ms. Trummer learned that her apartment was previously rent-controlled, with the last tenant of record paying $497.53 in rent. Rent increases were without justification in renovation or turnover. |
| 9/5/2006 | Rasim Toskic, 680 Riverside Realty Co, LLC | DHCR re: Trummer | Letter stating without basis that building was completely habitable as of January 2005, attaching incident report, seeking restoration of rent effective Jan. 2005. Rasim Toskic declared to DHCR that tenants resumed occupancy as of January 2005, however Toskic provided no proof to support this claim. |

Non-named Plaintiff:

| | | | |
|---|---|---|---|
| 8/29/2005 | Pinnacle Singer Condo Mezzanine LLC | Cassandra Simmons | Letter stating that base rent is $1,709.25/month. Simmons had moved in at an initial rent of $1500/month; subsequently Simmons discovered that the previous tenant had paid $500/month. There were no justifications for the increase, and the $1,709.25/month figure was similarly inflated. |

182.    The Defendants' predicate acts of extortion or attempted extortion include:

(a)     threatening Plaintiff Theodore and Marjorie Charron with eviction and withholding rent overcharge payments to obtain rent payments in excess of those permitted by law, and obtaining such payments, as detailed more fully above in paragraphs 94-95;

(b)     threatening Plaintiff Andrew Stahl-David with eviction to obtain rent payments in excess of the amounts permitted by law, and obtaining such payments, as detailed more fully above in paragraphs 118-120;

(c)      threatening Plaintiff Anthony Casasnovas with eviction to obtain rent payments in excess of the amounts permitted by law, as detailed more fully above in paragraphs 98-100;

(d)      threatening Plaintiff Tracey Moore with eviction to obtain rent payments in excess of the amounts permitted by law, and obtaining such payments, as detailed more fully above in paragraphs 110-111.

183.    The Defendants' predicate acts of transporting stolen property arise from the fact that they sought and received payments from tenants, as detailed in paragraphs 90-149 above, that did not belong to them and that they had no right to receive.  At no time did the Defendants have a legitimate possessory right to rents in excess of those permitted by law.  Thus, the Defendants' exercise of possession and control over those funds was unauthorized and wrongful. The Defendants transmitted, or caused Landlord LLCs to transmit, such wrongfully obtained funds in amounts exceeding $5,000 in interstate commerce to, among others, Wells Fargo and Deutsche Bank in payment of mortgages on the individual apartment buildings.

184.    The Defendants' fraudulent scheme and pattern of racketeering activity is ongoing, and has been directed at other victims besides the plaintiffs named herein, including other tenants in buildings controlled by the Pinnacle Enterprise.

185.    As a proximate result of the Defendants' acts of mail fraud, extortion, and transporting stolen property, Plaintiffs have suffered and will continue to suffer damages, as more fully described above in paragraphs 90-141, and including:

(a)      Plaintiffs have been harmed and will continue to be harmed by the excessive amount of rent they have paid directly to Pinnacle.

(b)      Plaintiffs have been harmed and will continue to be harmed by the unlawful evictions Defendants have perpetrated and the fraudulent eviction proceedings Defendants have initiated.

(c)     Plaintiffs have been harmed and will continue to be harmed by the diminution in value of their leasehold interests in their apartments.

(d)     Plaintiffs have been harmed and will continue to be harmed by incurring lost wages for time spent defending fraudulent eviction claims and responding to fraudulent succession rights claims.

(e)     Plaintiffs have been harmed and will continue to be harmed by incurring child-care expenses and unnecessary transportation expenses in defending fraudulent eviction claims.

(f)     Plaintiffs have been harmed and will continue to be harmed by the diminution in value of their leasehold interests in their apartments.

WHEREFORE, Plaintiffs request judgment in the form of:

(a)     declaratory relief, declaring as follows:

(1)     that Defendants' actions and practices of seeking to collect rent in amounts above what is permitted under the law, based on alleged individual apartment improvements or major capital improvements not actually made or in excess of those actually made, violate the New York Consumer Protection Act;

(2)     that Defendants' actions and practices of refusing to make necessary and reasonable repairs or to address housing maintenance code violations as required by law, and then moving to evict tenants who have lawfully withheld rent based on Pinnacle's failure to make the repairs or address the code violations violate the New York Consumer Protection Act;

(3)    that Defendants' actions and practices of commencing unfounded eviction actions in housing court to demand rent that has already been paid violate the New York Consumer Protection Act;

(4)    that Defendants' actions and practices of commencing unfounded proceedings to challenge a tenant's succession rights or harassing and intimidating tenants by demanding an unduly burdensome, unjustified, and intrusive amount of evidence regarding a tenant's succession rights violate the New York Consumer Protection Act;

(5)    that Defendants' repeated practice of ignoring, delaying compliance, and/or failing to comply with housing court orders and rulings from the DHCR violate the New York Consumer Protection Act; and

(6)    that Defendants' operation of the Pinnacle Enterprise through a pattern of racketeering activity violates the Racketeer Influenced and Corrupt Organizations Act;

(b)    injunctive relief, in the form of a preliminary and permanent injunction restraining Defendants, their agents, employees, successors, and all others acting in concert or conjunction with them, from continuing practices declared unlawful pursuant to paragraph (a) above, and

(c)    an Order directing Defendants to implement Court-approved procedures designed to avoid such unlawful practices in the future, including but not limited to the appointment of an independent monitor, who shall oversee and ensure the lawful operation of buildings and management of tenant relations in buildings owned by Defendants and assist in the resolution of disputes between Defendants and their tenants; and the auditing and accounting of rents demanded by Defendants and disgorgement of any rent overcharges;

(d)  an award of compensatory, statutory, and punitive damages pursuant to New York General Business Law § 349(h);

(e)  revocation of rent increases and disgorgement of Defendants' unjust gains and profits;

(f)  an award of attorneys' fees and costs pursuant to New York General Business Law § 349(h);

(g)  all damages caused by Defendants' violations of 18 U.S.C. § 1962(c) including treble damages;

(h)  attorneys' fees and costs as provided by 18 U.S.C. § 1964(c);

(i)  pre- and post-judgment interest to the extent permitted by law; and

(j)  such other and further relief as this Court deems equitable and just.

PLAINTIFFS DEMAND A TRIAL BY JURY


Dated:  October 15, 2007

Respectfully submitted,

BUYERS AND RENTERS UNITED TO SAVE HARLEM, MARJORIE and THEODORE CHARRON, KAREN FLANNAGAN, ANDRES MARES-MURO, TRACEY MOORE, RAYMOND ANDREW STAHL-DAVID, RUSSELL TAYLOR, DIANE TRUMMER, and KIM POWELL


By: _____s/Richard F. Levy_____

Richard F. Levy
Jeremy M. Creelan
Chinh Q. Le
Carletta F. Higginson
JENNER & BLOCK LLP
919 Third Avenue, 37th Floor
New York, NY  10022-3908
(212) 891-1600
(212) 891-1699 facsimile

*Of counsel:*

C. Steven Tomashefsky
Andrew A. Jacobson
JENNER & BLOCK LLP
330 North Wabash Avenue
Chicago, IL  60611
(312) 222-9350
(312) 587-0484 facsimile