UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BUYERS AND RENTERS UNITED TO SAVE HARLEM;
and

MARJORIE and THEODORE CHARRON; ANTHONY
CASANOVAS; KAREN FLANNAGAN; ANDRES
MARES-MURO; TRACEY MOORE; RAYMOND-
ANDREW STAHL-DAVID; RUSSELL TAYLOR; DIANE
TRUMMER, and KIM POWELL, on behalf of themselves
and all others similarly situated,

     Plaintiffs,

     v.

PINNACLE GROUP NY LLC and JOEL WIENER,

     Defendants.

No. 1:07-cv-06316-CM

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**PROPOSED MEMORANDUM OF LAW OF *AMICUS CURIAE*
RENT STABILIZATION ASSOCIATION OF NEW YORK CITY
<u>IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>**

VIVIAN SHEVITZ

Vivian Shevitz, Attorney at Law
46 Truesdale Lake Drive
South Salem, New York 10590
Telephone: (914) 763-2122
Facsimile: (914) 763-2322
vivian@shevitzlaw.com

*Attorney for Amicus Curiae*
*Rent Stabilization Association of New York City*

November 15, 2007

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................- 1 -

INTEREST OF THE RENT STABILIZATION ASSOCIATION ...........................- 2 -

STATEMENT OF THE CASE...............................................................................- 3 -

ARGUMENT.........................................................................................................- 3 -

I.  New York State and City Laws Provide Comprehensive
    Protections for Tenants ............................................................................- 3 -

    1.  Rent Regulations................................................................- 4 -

        A.  Rent Control..........................................................- 4 -

        B.  Rent Stabilization..................................................- 5 -

    2.  Rent Increases and Disputes ...............................................- 6 -

    3.  Quality and Habitability Regulations...................................- 7 -

    4.  Landlords' Rights and Obligations.......................................- 8 -

    5.  Cooperative and Condominium Conversions ......................- 10 -

II. Defendants' Conduct, Even as Alleged, Falls Within or Above the
    Norm ..................................................................................................- 10 -

    1.  The Condition of Plaintiffs' Buildings Is Generally
        Exemplary........................................................................- 10 -

    2.  Defendants, Even on the Pleadings, Are Not Unusually
        Litigious ..........................................................................- 12 -

III. The Relief Requested Would Serve Only To Substitute the Federal
     Courts for the Comprehensive Regulatory Scheme Already in
     Place...................................................................................................- 14 -

CONCLUSION.....................................................................................................- 17 -

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Roberts v. Tishman Speyer Props.,*
  No. 100956/07, N.Y.L.J. Sept. 29, 2007 (N.Y. 2007) .................................................. 2

*Rosario v. Diagonal Realty, LLC,*
  No. 402448/04, 2007 WL 2086604 (N.Y. 2007) ....................................................... 2

*Myers v. Frankel,*
  No. 00-06058, 2001 WL 34692066 (2d Dep't 2001) ................................................. 2

*Pultz v. Economakis,*
  No. 1149105/04, 40 A.D.3d 24 (1st Dep't. 2007) ...................................................... 2

**Statutes**

N.Y. Gen. Bus. Law § 352 (McKinney 1996) .......................................................... 10

N.Y. Pub. Hous. Law § 14(4) (McKinney Supp. 2007) ............................................ 4

N.Y. Real Prop. Acts. Law § 770 (McKinney 2006) ................................................ 9

N.Y. Real Prop. Acts. Law § 778 (McKinney 2006) ................................................ 10

N.Y. Real Prop. Law § 235-b (McKinney 2006) ...................................................... 3

N.Y.C. Admin. Code § 26-511 (McKinney 2007) .................................................... 9

N.Y.C. Admin. Code § 26-512 (McKinney 2007) .................................................... 5

N.Y.C. Admin. Code § 26-516 (McKinney 2007) .................................................... 9

N.Y.C. Admin. Code § 26-521 (McKinney 2007) .................................................... 9

N.Y.C. Local Law No. 29 (2007) ...................................................................... 8, 11

**Other Authorities**

4 Eugene J. Morris et al., *New York Practice Guide: Real Estate* § 26 (2007) ..................... 4-6, 9

Civil Court of the City of New York, *Caseload Activity Report for 2006* (Feb. 1, 2007) ........... 13

Housing Here and Now, *Hazardous Homes: How NYC Fails its Tenants* (Nov. 2005) ............. 11

Joe Lamport, *Anti-Tenants Suits by the Housing Authority*, Gotham Gazette (Aug. 26, 2004) ................................................................................................................. 13

NYC Rent Guidelines Board, *2007 Housing Supply Report* (June 5, 2007) ................................. 3

NYU Furman Center for Real Estate and Urban Policy, *The State of NYC's Housing and Neighborhoods* (2004) ......................................................................................... 11

TABLE OF AUTHORITIES
(continued)

Page(s)

Timothy Williams, *In Suit Against Landlord, Tenants Make Unusual Accusation:
Racketeering,* N.Y. Times (July 12, 2007) ............................................................ 12

**Rules**

9 N.Y.C.R.R. § 2104.2 (2007) ...................................................................... 4

9 N.Y.C.R.R. § 2104.6 (2007) ...................................................................... 5

9 N.Y.C.R.R. § 2204.2 (2007) ...................................................................... 4

9 N.Y.C.R.R. § 2204.6 (2007) ...................................................................... 5

9 N.Y.C.R.R. § 2503.5 (2007) ...................................................................... 5

9 N.Y.C.R.R. § 2522.3 (2007) ...................................................................5-6

9 N.Y.C.R.R. § 2522.4 (2007) ...................................................................... 4

9 N.Y.C.R.R. § 2522.6 (2007) ...................................................................... 7

9 N.Y.C.R.R. § 2522.8 (2007) ...................................................................... 6

9 N.Y.C.R.R. § 2523.1 (2007) ...................................................................... 5

9 N.Y.C.R.R. § 2523.5 (2007) ...................................................................... 5

9 N.Y.C.R.R. § 2524.1 (2007) ...................................................................... 8

9 N.Y.C.R.R. § 2524.3 (2007) ...................................................................... 8

9 N.Y.C.R.R. § 2525.5 (2007) ...................................................................... 9

9 N.Y.C.R.R. § 2526.1 (2007) ...................................................................... 7

9 N.Y.C.R.R. § 2531.2 (2007) ...................................................................... 5

9 N.Y.C.R.R. §§ 2101.1-2102.3 (2007) ........................................................ 4

9 N.Y.C.R.R. §§ 2202.1-2202.13 (2007) ...................................................... 4

*Amicus Curiae* Rent Stabilization Association of New York City ("RSA") respectfully requests that this Court grant Defendants' Motion to Dismiss the Second Amended Complaint (the "Complaint") for the reasons set forth below.

### PRELIMINARY STATEMENT

The RSA is the largest residential real estate industry association in the City of New York, representing approximately 25,000 residential rental property owners and agents. These owners and agents, in turn, own or manage some one million residential units throughout the City. The RSA's members range from owners of one small building to large multi-family complexes, cooperatives and condominiums. The RSA urges this Court to grant Defendants' Motion to Dismiss for the following reasons:

*First,* the New York City rental market is governed by a comprehensive statutory and regulatory system that is fully capable of providing the relief that Plaintiffs request. Indeed, Plaintiffs have already obtained relief under this system.

*Second,* Plaintiffs' depictions of Defendants as lawbreaking landlords, or as "slumlords," are hollow and baseless. Publicly available statistical comparisons demonstrate that even if the accusations against Defendants were true, Defendants' conduct would fall within or above the norm in New York's rental market.

*Third,* the remedies that Plaintiffs request—RICO damages and federal receivership for Defendants' alleged holdings—would subvert the comprehensive enforcement system already in place, shifting control of that system from New York's city and state governments to the federal judiciary. Granting Plaintiffs the relief they seek would also open the floodgates to similar suits against thousands of New York City landlords.

## INTEREST OF THE RENT STABILIZATION ASSOCIATION

The RSA is actively involved in every aspect of residential real estate regulation in New York City. It represents rental housing owners on an institutional level before such administrative agencies as the New York State Division of Housing and Community Renewal ("DHCR") and the New York City Department of Housing Preservation and Development ("HPD"). The RSA assists members and non-members who subscribe to its rent registration service, and processes the annual registrations of hundreds of thousands of rent stabilized apartments with the DHCR. It frequently advocates on behalf of property owners before other administrative and legislative bodies as well, such as the New York State Legislature, the New York City Council, and the New York City Rent Guidelines Board.

The RSA is also actively involved with residential real estate issues on a judicial level. The RSA monitors decisions of the City's Housing Courts on an ongoing basis and reports to members. The RSA, through its participation on the Housing Court Advisory Council and the New York Bar Association Housing Court Committee and Judiciary Committee, assists in the evaluation of prospective Housing Court judge appointments and reappointments. The RSA also operates Owners' Assistance Centers in Brooklyn's and the Bronx's Housing Courts to help building owners deal with the complexities of the landlord/tenant system. The RSA has appeared as an *amicus* in numerous housing-related cases. *See Rosario v. Diagonal Realty, LLC*, No. 402448/04, 2007 WL 2086604 (N.Y. 2007); *Roberts v. Tishman Speyer Props.*, No. 100956/07, N.Y.L.J. Sept. 29, 2007 (N.Y. 2007); *Pultz v. Economakis*, No. 1149105/04, 40 A.D.3d 24, 830 N.Y.S.2d 101 (1st Dep't. 2007); *Myers v. Frankel*, No. 00-06058, 2001 WL 34692066 (2d Dep't 2001).

These qualifications put the RSA in a unique position to brief this Court on some of the myriad nuances of New York City's residential real estate scheme that the RSA believes bear

- 2 -

heavily on the disposition of this case.  Specifically, the RSA respectfully wishes to provide some context for the allegations raised in the Complaint, for such allegations read very differently when placed next to the backdrop of New York's massive regulatory framework.  The RSA urges this Court to grant Defendants' Motion to Dismiss within this context.

### STATEMENT OF THE CASE

The RSA adopts and incorporates by reference the Statement of Facts set forth in Defendants' opening brief.

### ARGUMENT

I.    **New York State and City Laws Provide Comprehensive Protections for Tenants**

New York City's nearly 2.1 million rental apartment units are governed by a massive and comprehensive regulatory system, which exists primarily to protect tenants.  Fully two-thirds of New York City's rental units are subject to rental regulation of some type.  Over half of the 2.1 million units are subject to rent control or stabilization.  *See* NYC Rent Guidelines Board, *2007 Housing Supply Report* 1 (June 5, 2007).  And every rental unit in New York City is subject to the implied warranty of habitability set forth at N.Y. Real Prop. Law § 235-b (McKinney 2006), and to various habitability statutes administered by the HPD.

New York City provides numerous resources to guide tenants through this complex regulatory structure.  The DHCR, which promulgates rent regulations, provides a specialized administrative forum in which tenants may bring complaints related to rent overcharge and harassment by landlords without the necessity of retaining counsel.  The DHCR's website also offers extensive information on tenants' rights, including numerous plain-language fact sheets.  *See* DHCR, *Home Page*, *at* http://www.dhcr.state.ny.us/ (2007).  The HPD's website is similarly user-friendly, providing extensive information about tenants' rights in laymen's terms, and offering a 311 hotline, open 24 hours a day, 7 days a week, through which tenants may raise

complaints. *See* HPD, *HPD Online, at* http://www.nyc.gov/html/hpd/html/pr/violation.shtml (2007).

Pinnacle and its affiliates are alleged to manage 21,000 rental units in New York City, the vast majority of which are subject to rent controls or stabilization.

### 1.    Rent Regulations

#### A.    Rent Control

New York City's "rent control" rules apply to rental residences that were completed or converted to residential use before February 1, 1947, and which have been continuously occupied by a tenant or the tenant's legal successor since July 1, 1971.  4 Eugene J. Morris et al., *New York Practice Guide: Real Estate* § 26.02[1][a] (2007).  Rent control creates a "statutory tenancy," in which a tenant's maximum rent is frozen at certain restrictive levels and can only be raised with administrative or court approval, in accordance with stringent guidelines.  9 N.Y.C.R.R. §§ 2101.1-2102.3, 2202.1-2202.13.  The ability of a landlord to evict a rent controlled tenant is sharply limited.  *Id.* §§ 2104.2, 2204.2.

Because rent control (and to a certain extent, rent stabilization) creates rents far below those in the open market, there is great incentive to keep regulated units "in the family."  New York City law grants succession rights to rent controlled and rent stabilized units under certain, relatively liberal, conditions.  Eligible persons include 1) "family" members, defined as spouses, children, stepchildren, parents, stepparents, grandparents, grandchildren, parents-in law and children-in-law; and 2) other, unrelated "person[s] . . . who can prove emotional and financial commitment and interdependence," as evidenced by sharing of family expenses, intermingling of finances, and formalizing of legal obligations.  N.Y. Pub. Hous. Law § 14(4) (McKinney Supp. 2007); Morris et al., *supra*, § 26.04[8].

Succession rights are available to eligible persons only if they have lived with the tenant as a primary residence for at least two years, or for at least one year where the putative successor is a senior citizen or a disabled person. 9 N.Y.C.R.R. §§ 2104.6(d)(1); 2204.6(d)(1); 2503.5(d)(1), (2); 2523.5(b)(1), (2). To preserve these rights, the current tenant must notify the landlord of facts regarding any person who may become entitled to succession rights. If the tenant fails to do so, the putative successor will have the burden of proving a right to succession after the tenant vacates. *Id.*

### B. Rent Stabilization

Rent stabilization applies to units in buildings built between February 1, 1947 and January 1, 1974 that have six or more dwelling units, and to certain buildings built after January 1, 1974 that receive certain tax benefits. Rent controlled units become subject to rent stabilization once vacated. Morris et al., *supra*, § 26.03[2][a]. Like rent control, rent stabilization restricts the grounds upon which a tenant may be evicted, and regulates the rate at which a unit's rent may increase over its "initial regulated rent." There are no income requirements for residence in a rent-stabilized apartment, except that when the apartment's stabilized rent is above $2,000, and its tenants have earned $175,000 or more for two calendar years, the unit becomes de-stabilized and market rent may be charged. 9 N.Y.C.R.R. § 2531.2.

The initial regulated rent for a rent stabilized unit is set at the amount of rent of the unit's prior lease, unless the prior lease was subject to rent control and the rent-controlled tenant has vacated the unit. N.Y.C. Admin. Code § 26-512(1), (3) (McKinney 2007). When a rent-controlled tenant vacates, the new rent becomes whatever is "agreed to by the landlord and the tenant." *Id.* § 26-512(2). This becomes the unit's "initial regulated rent," and is registered as such with the City, subject to the tenant's right to file a "Fair Market Rent Appeal" ("FMRA") within ninety days of lease signing. 9 N.Y.C.R.R. §§ 2522.3, 2523.1.

### 2.    Rent Increases and Disputes

FMRAs are adjudicated by the DHCR. The determination of a unit's "fair market rent" is more an art than a science. In making these determinations, DHCR adjudicators are instructed to weigh numerous considerations, including guidelines promulgated annually by New York's Rent Guidelines Board, prevailing neighborhood rents, the rental history of the unit in question for the past four years, and the rents of "comparable" units in the same building. *Id.* § 2522.3(e). The resulting "fair market rent" is, by necessity, the product of a somewhat subjective process.

Landlords may legitimately raise a stabilized unit's rent from the "initial regulated rent" for only a limited number of reasons. A landlord is permitted to raise rent at renewal, capped at a percentage set annually by the Rent Guidelines Board. In 2007, a 3.5% increase was allowed for one-year rent-stabilized leases, and a 5% increase for two-year rent-stabilized leases. Rent Guidelines Board, *Summary of Guidelines Adopted on June 26, 2007*, *available at* http://www.housingnyc.com/downloads/guidelines/Guidelines2007.pdf (2007). After vacancy by a previous rent-stabilized tenant, rent may be raised up to 20%. 9 N.Y.C.R.R. § 2522.8(1). Improvements made to the unit with the tenant's consent, or during vacancy, may increase the monthly rent by an amount equal to 1/40th the total cost of the improvements. *Id.* § 2522.4(a). Major capital improvements made to the building as a whole may raise the monthly rent in each unit by 1/84th of the total costs, capped at a 6% increase per year. *Id.* § 2522.4(4). Plaintiffs may challenge the validity of improvement-related rent increases in court. *Id.* § 2522.4.

The complexities inherent in setting rent increases frequently prompt disputes between tenants and landlords. New York City provides two forums with concurrent jurisdiction to handle such disputes: an administrative forum, the DHCR, and a legal forum, the New York City Civil Court, Housing Part ("Housing Court"). A tenant therefore has its choice of forum in which to file a "rent overcharge" complaint. *See* Morris et al., *supra*, § 26.04[1][a]. As with

FMRAs, although certain guidelines are provided, there is no strict calculus for the determination of a rent overcharge complaint. 9 N.Y.C.R.R. §§ 2526.1, 2522.6. When a landlord's overcharge is deemed "willful," the tenant may be awarded treble damages. Morris et al., *supra*, § 26.04[1][a].

DHCR decisions may be appealed through a "Petition for Administrative Review." Further review is available through an Article 78 petition. *See* Morris et al., *supra*, at 26.05[9][d]. Housing Court decisions may be appealed to the Appellate Term of the Supreme Court. *See* New York City Civil Court, Housing Part, *Appeals, available at* http://www.courts.state.ny.us/courts/nyc/housing/appeals2.shtml (2007).

### 3. Quality and Habitability Regulations

New York City also extensively regulates the quality and habitability of all of its rental units. The Department of Housing Preservation and Development ("HPD") monitors and enforces compliance with the City's Housing Maintenance Code and New York State's Multiple Dwelling Law, cataloging tenant complaints and contacting landlords to ensure that complaints are addressed.

The HPD divides maintenance problems into three categories of violations, *see* HPD, *Online Glossary, at* http://www.nyc.gov/html/hpd/html/pr/hpd-online-glossary.shtml (2007):

- Class A:  Non-hazardous conditions, such as a minor leak or chipped paint. A landlord has 90 days to correct the problem.

- Class B:  Hazardous conditions, such as inadequate security in public areas or vermin. A landlord has 30 days to correct the problem.

- Class C:  Immediately hazardous conditions, such as lack of heat or hot water, rodents, or lead paint. A landlord has 24 hours to correct the problem.

If a landlord fails to correct a Class C violation in a timely manner, the HPD may make the necessary repairs through its Emergency Repair Program ("ERP"). The cost of the repairs is

then secured by a tax lien against the property. A tenant may also sue the landlord for any unremedied HPD violation in Housing Court. *See* HPD, *Emergency Repair Program*, *at* http://www.nyc.gov/html/hpd/html/tenants/erp.shtml (2007).

The HPD also has its own litigation arm, which may sue landlords with chronic or egregious histories of HPD violations. *See* HPD, *Housing Litigation Division*, *at* http://www.nyc.gov/html/hpd/html/about/housing-litigation-div.shtml (2007). In addition, New York City recently enacted legislation permitting the HPD to assume administrative responsibilities for at least two hundred of New York's most distressed buildings annually. Under this legislation, a building is considered "distressed" if it has at least five Class B or C violations per dwelling unit. *See* N.Y.C. Local Law No. 29 (2007).

### 4.    Landlords' Rights and Obligations

A landlord's ability to evict a tenant from a rent controlled or stabilized unit is severely restricted, and eviction cannot occur without a court order. 9 N.Y.C.R.R. § 2524.1. Eviction is only permissible in cases of nonpayment of rent, holdover, nuisance (such as vandalism), illegal activity, or refusal to permit the landlord access to make necessary repairs. *Id.* § 2524.3. Under the law, a landlord has no recourse for nonpayment of rent other than to commence a nonpayment proceeding, which requires a notice of eviction. *Id.* A landlord has no recourse for other misconduct other than to file a holdover proceeding, which also requires a notice of eviction. *Id.*

A landlord seeking eviction must first give the tenant notice and the opportunity to cure: thirty days' notice to debtor and three days' notice of eviction when eviction is premised on nonpayment; seven days' notice for any other grounds. 9 N.Y.C.R.R. § 2524.3. If the tenant fails to cure, the landlord must file a "summary proceeding" in Housing Court. Only if Housing Court approves the summary proceeding petition may the tenant be evicted. This process can

take many months, during which time a tenant may live rent-free before exhausting the legal

process and being evicted.

Landlords are strictly prohibited from harassing tenants into vacating their units or paying

higher rents. New York state law defines harassment very broadly, as:

> *[A]ny* course of conduct (including but not limited to interruption
> or discontinuance of required services, or unwarranted or baseless
> court proceedings) which interferes with, or disturbs, or is intended
> to interfere with or disturb, the privacy, comfort, peace, repose, or
> quiet enjoyment of the tenant in his or her use or occupancy of the
> housing accommodation, or is intended to cause the tenant to
> vacate such housing accommodation or waive any right afforded
> under this Code.

*Id.* § 2525.5 (emphasis added).

The DHCR adjudicates harassment actions, imposing "strict penalties" where

appropriate. Morris et al., *supra*, § 26.04[9][b]. Landlords found guilty of harassment are barred

from applying for or collecting rent increases until the DHCR determines that the harassment has

stopped. N.Y.C. Admin. Code § 26-511. Landlords are also fined up to $1000 for first-time

offenses, and up to $5,000 for each subsequent offense. *Id.* § 26-516(c)(2). In 2011, the fine for

subsequent offenses will increase to $25,000. *Id.* § 26-516(c)(3). Criminal penalties are also

available against landlords found to have committed an unlawful eviction. *Id.* § 26-521.

New York law also permits the City Commissioner or one-third of the tenants in any

building to bring a "special proceeding" to wrest control of the building from a landlord who

violates its obligations. A special proceeding may be brought if a building has numerous HPD

violations, or if the owner has engaged in a "course of conduct" of "harassment, illegal eviction,

continued deprivation or services or other acts dangerous to life, health or safety." *See* N.Y. Real

Prop. Acts Law § 770 (McKinney Supp. 2007). If the plaintiffs in a special proceeding prevail,

the building is placed under the control of a special administrator, called a "7-A Administrator."
*Id.* § 778.

### 5.    Cooperative and Condominium Conversions

Tenants are also afforded strong protections when their buildings become the subject of

proposed cooperative condominium conversions.  No conversion may occur without the approval

of New York's Attorney General.  N.Y. Gen. Bus. Law § 352-e(a) (McKinney 1996).  The

Attorney General may not grant approval until after the receipt and review of extensive plan

details.  *Id.* § 352-e(b).  At the outset, a landlord wishing to initiate a conversion must commit to

one of two basic plans:  a "non-eviction" plan," which requires a minimum of 15% of the

building's units to be purchased for conversion, or an "eviction plan," which requires a minimum

of 51% of the building's units to be purchased for conversion.  *Id.* § 352-eeee(b), (c).  A landlord

is prohibited from harassing tenants into purchasing or vacating their units.  *Id.* § 352-eeee(f)(4).

The Attorney General may enforce this anti-harassment provision by obtaining a restraining

order against the landlord, or, if appropriate, withdrawing approval for the conversion plan.  *Id.*

## II.    Defendants' Conduct, Even as Alleged, Falls Within or Above the Norm

Plaintiffs offer numerous anecdotes and statistics about the units allegedly run by

Defendants, presumably in an attempt to depict Defendants as bad landlords.  But in fact, these

items, even if true, instead paint the opposite picture.  The buildings Defendants are alleged to

operate have fewer housing violations and less litigation than even the average New York City

buildings, placing them in stark contrast to buildings run by so-called "slumlords."

### 1.    The Condition of Plaintiffs' Buildings is Generally Exemplary

Plaintiffs allege that their buildings contain "scores of long uncorrected [HPD]

violations." (Compl. ¶ 56.)  They accuse Defendants of "failing to make timely and necessary

repairs . . . [and] to address housing maintenance code violations." (Compl. ¶ 8(c).) The condition of Plaintiffs' buildings, however, is generally exemplary.

A landlord's overall compliance with HPD regulations is typically evaluated by examining violations per unit. In the Bronx, the average number of HPD violations across all rental units is 1.4; in Brooklyn and Manhattan, the number is 1.0. NYU Furman Center for Real Estate and Urban Policy, *The State of NYC's Housing and Neighborhoods*, 185 (2004). The HPD defines landlords with 3 or more B and C violations per unit as "unsatisfactory." Housing Here and Now, *Hazardous Homes: How NYC Fails its Tenants* 6 (Nov. 2005). The HPD targets for its "Alternative Enforcement Program" landlords with 5 or more B and C violations per unit. N.Y.C. Local Law No. 29 (2007).

Under this metric, the buildings in which the individual Plaintiffs live compare extremely favorably. The HPD's online violation search tool reveals that, as of October 2007, of the seven buildings described in the complaint, five have *well under one* HPD violation per unit:

- 706 Riverside Drive, in which Plaintiffs Ted and Marjorie Charron and Karen Flannagan reside, and in which Margaret Powell (Plaintiff Kim Powell's mother) resides, has only **0.64** B and C violations per unit. When A violations are included, there are only 0.86 violations per unit.

- 3657 Broadway, in which Plaintiff Anthony Casasnovas resides, has only **0.25** B and C violations per unit. When A violations are included, there are only 0.35 violations per unit.

- 509 W. 155th St., in which Plaintiff Tracey Moore resides, has only **0.42** B and C violations per unit. When A violations are included, there are only 0.53 violations per unit.

- 680 Riverside Drive, in which Plaintiff Diane Trummer resides, has only **0.48** B and C violations per unit. When A violations are included, there are only 1.32 violations per unit.

- 75 St. Nicholas Place, in which Plaintiff Russell Taylor resides, has only **0.58** B and C violations per unit. When A violations are included, there are only 0.83 violations per unit.

The violation averages in the remaining buildings in which Plaintiff tenants reside do not even approach the HPD definition of "unsatisfactory":

- 516 W. 143rd St., in which Plaintiff Raymond Andrew Stahl-David resides, has 1.65 B and C violations per unit. When A violations are included, there are 2.07 violations per unit.

- 635 Riverside Drive, in which Plaintiff Mares-Muro resides, has 1.19 B and C violations per unit. When A violations are included, there are 1.4 violations per unit.

These numbers must further be placed in context. Until late 2005, both 516 W. 143rd Street and 635 Riverside Drive were owned by other management that severely mismanaged the properties. In February 2006, around the time the buildings changed hands, 516 W. 143rd Street had 3.52 violations per unit, and 635 Riverside Drive had 3.79. Given this previous state of disrepair, the current numbers represent remarkable progress.

### 2. Defendants, Even on the Pleadings, Are Not Unusually Litigious

Plaintiffs also allege that, "[a]ccording to newspaper reports, [defendants] have sued as many as one quarter [of] the tenants since they acquired their ownership interests." (Compl. ¶ 54.) But this assertion misinterprets the reports (which are in turn based on dubious data). The newspaper articles do not say that a quarter of the tenants were sued. Rather, they state that 5,000 nonpayment notices were sent over the course of a twenty-nine month period, and that Defendants allegedly own 21,000 units. *See, e.g.,* Timothy Williams, *In Suit Against Landlord, Tenants Make Unusual Accusation: Racketeering,* N.Y. Times (July 12, 2007).

Furthermore, throughout the rental market, certain tenants repeatedly and unjustifiably fail to pay rent. Therefore, the 5,000 nonpayment proceedings allegedly initiated would almost certainly not have been brought against 5,000 unique tenants, but rather against a much smaller subset of chronic offenders. Moreover, these numbers must be placed in context. 5,000 nonpayment proceedings brought over 29 months works out to approximately 172 nonpayment

proceedings per month. This means that in any given month, on the facts Plaintiffs allege, only 0.82% of Defendants' units are subject to a nonpayment proceeding.

Indeed, the numbers Plaintiffs allege fall well below the norm in the industry. By way of comparison, the New York City Housing Authority (the "NYCHA"), a quasi-city landlord that provides affordable housing for low and middle income tenants, administers over 178,000 rental units. *See* NYCHA, Fact Sheet, *at* http://www.nyc.gov/html/nycha/html/about/factsheet.shtml (2007). As a government-related agency, it has no economic incentive whatsoever for tenants to vacate or pay additional rent. Nevertheless, the NYCHA routinely brings a large proportion of suits in relation to its number of units administered—a startling 116,761 cases in 2003. Joe Lamport, *Anti-Tenant Suits by the Housing Authority*, Gotham Gazette (Aug. 26, 2004). Its monthly rate of nonpayment proceedings is therefore about 7.8%.

Defendants compare favorably even if one accepts Plaintiffs' fundamentally flawed assumption that each alleged nonpayment suit was brought against a unique tenant. 5,000 suits over 29 months yields an average of 2068 suits per year, or suits against 9.9% of the tenants annually. The comparable annual figure for the NYCHA is 65.5%. And the comparable annual figure for the New York City rental market as a whole (in 2006, 268,493 nonpayment proceedings were initiated in a rental market of 2.1 million units) is 12.8%. *See* Civil Court of the City of New York, *Caseload Activity Report for 2006* (Feb. 1, 2007). Plaintiffs' assertion that Defendants have brought nonpayment suits as part of a scheme to defraud (Compl. ¶ 8) is therefore ludicrous. Nonpayment suits are a landlord's sole means to compel payment of rent arrears. And as these numbers reveal, even on Plaintiffs' version of the facts, Defendants pursue this option far less often than other New York landlords.

Plaintiffs further accuse Defendants of attempting to "buy silence" (Compl. ¶¶ 76-82) by settling, rather than litigating, tenant actions. This is nonsense. Settlement is strongly encouraged in both Housing Court and DHCR adjudications, and virtually every landlord takes the opportunity to settle when available. For example, in 2006, of the 268,493 nonpayment proceedings filed in Housing Court, only 4,115 resulted in a judgment. *See 2006 Caseload Activity Report, supra.* Indeed, the most heavily staffed Part of Housing Court is the Resolution Part, where "landlord and tenant can discuss their differences before a Judge or Court Attorney to see if an agreement can be reached to settle the dispute." *See* Housing Court, *Resolution Part, at* http://www.courts.state.ny.us/courts/nyc/housing/resolutionpart.shtml (2007). Indeed, if all 268,493 nonpayment proceedings brought were to result in a trial, the already-burdened Housing Part would effectively be forced to shut down.

**III.    The Relief Requested Would Serve Only To Substitute the Federal Courts for the Comprehensive Regulatory Scheme Already In Place**

The landlord/tenant issues presented in the instant case are not unique, particularly with respect to New York City's one million rent-regulated apartments. Every landlord has tenants who fall behind in rent payments. Every landlord has tenants who claim to be entitled to succession rights. Every landlord has tenants who desire repairs. Every landlord has tenants who believe they are paying too much.

As discussed in detail above, New York City and State have enacted a wide and comprehensive system of laws and regulations to address these issues. A network of judicial, regulatory, and administrative bodies have the specific expertise and the institutional knowledge (as well as the express jurisdiction) to resolve whatever disputes may arise—and they do so every day. Furthermore, thanks to the efforts of these bodies, the vast majority of disputes result in fair settlements, to the mutual benefit of tenant and landlord.

Plaintiffs in the instant action attempt not only to void the state court and agency determinations in their own cases, but to supersede the entire system. In their prayer for relief, Plaintiffs request that the Court enter:

> An Order directing Defendants to implement Court-approved procedures designed to avoid such unlawful practices in the future, including but not limited to the appointment of an independent monitor, who shall oversee and ensure the lawful operation of buildings and management of tenant relations in buildings owned by Defendants and assist in the resolution of disputes between Defendants and their tenants; and the auditing and accounting of rents demanded by Defendants and disgorgement of any rent overcharges.

(Compl. at 70.)

In essence, Plaintiffs request that this Court substitute its judgment for that of the regulatory and judicial system of New York, and place 21,000 of New York's rental units in federal receivership.

If this Court concludes that the commonplace landlord/tenant issues that form the backbone of this case merit federal intervention, and decides to displace the comprehensive regulatory and judicial apparatus already in place, this Court will be heading down an extremely slippery slope. There are over 2.1 million rental apartments in New York City alone, one million of which are rent controlled or rent stabilized. Nearly 300,000 cases are brought before the Housing Courts each year. Acquiescing to Plaintiffs' attempt to bypass the system would set a dangerous precedent, inviting all the problems that may arise in these 2.1 million landlord/tenant relationships to appear on the federal docket.

This Court should forcefully reject Plaintiffs' suggestion that the federal courts, through a perversion of the RICO statute, should entertain collateral attacks on final decisions rendered by competent state and local tribunals. It should dismiss as absurd the notion that voluntary settlements, approved in each case by a competent state or local tribunal, could be construed as

- 15 -

"buying off" tenants. And it should discard out of hand the assertion that a landlord's proper pursuit of state remedies, whether by filing a legitimate nonpayment or holdover proceeding, or by opposing a non-meritorious suit, could constitute a RICO predicate act.

The RSA therefore respectfully submits that this Court should dismiss this action, in recognition that all necessary relief can be (and indeed, has been) provided by the state and city laws and regulations that comprehensively govern these matters.

## **CONCLUSION**

For all the reasons set forth above, the Rent Stabilization Association respectfully

requests that this Court grant Defendants' Motion to Dismiss the Complaint.

Dated:    New York, New York
          November 15, 2007

                                    Respectfully submitted,

                                    VIVIAN SHEVITZ


                                    By:    /s Vivian Shevitz_____
                                          Vivian Shevitz (VS-6943)

                                    Attorney at Law
                                    46 Truesdale Lake Drive
                                    South Salem, New York 10590
                                    Telephone:  (914) 763-2122
                                    Facsimile:  (914) 763-2322
                                    vivian@shevitzlaw.com
                                    *Attorney for Amicus Curiae*
                                    *Rent Stabilization Association of New York City*


Of Counsel:

        Mitchell Posilkin
        THE RENT STABILIZATION
        ASSOCIATION OF NEW YORK
        CITY