IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

—————————————————————————
)
BUYERS AND RENTERS UNITED                  )
TO SAVE HARLEM et al.,                     )
                                           )        No. 1:07-cv-6316-CM
                        Plaintiffs,        )
                                           )
          v.                               )
                                           )
PINNACLE GROUP NY LLC and                  )
JOEL WIENER,                               )
                                           )
                        Defendants.        )
—————————————————————————)

## PLAINTIFFS' MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

JENNER & BLOCK LLP
919 Third Avenue
37th Floor
New York, New York  10022-3908
Telephone:    (212) 891-1600
Facsimile:    (212) 891-1699

*Attorneys for Plaintiffs*

*Of counsel:*
JENNER & BLOCK LLP
330 North Wabash Avenue
Chicago, Illinois 60611
Telephone:    (312) 222-9350
Facsimile:    (312) 527-0484

December 17, 2007

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ......................................................................................... 1

    Wiener, Pinnacle, and the Pinnacle Enterprise ..................................................... 1

    The individual named Plaintiffs ............................................................................ 4

    BRUSH .................................................................................................................... 9

ARGUMENT .............................................................................................................. 9

I.      Defendants Have Argued Themselves out of a Rule 12(b)(6) Motion and into a Summary Judgment Motion ................................................................... 10

II.    The Plaintiffs Have Properly Pleaded a RICO Claim ........................................ 12

    A.    The Complaint Properly Alleges Mail Fraud ........................................... 12

        (1)    The Complaint Does Not "Clump." ............................................... 12

        (2)    The Complaint Alleges Fraudulent Intent ...................................... 14

        (3)    The Complaint Alleges the Use of the Mails ................................. 17

        (4)    The Complaint Alleges Reliance. .................................................. 17

    B.    The Complaint Properly Alleges Extortion. ............................................. 18

    C.    The Complaint Properly Alleges Violations of the National Stolen Property Act ("NSPA") ........................................................................... 19

    E.    The Complaint Properly Alleges the Existence of an Enterprise. ............ 22

        (1)    The Pinnacle Enterprise Is Distinct from the Defendant Persons. 22

            (a)    Pinnacle and Wiener are Distinct from the Other Members of the Enterprise. ............................................................. 22

            (b)    Praedium is a Proper Member of the Enterprise. .............. 24

        (2)    The Complaint Properly Alleges That The Enterprise Has a Hierarchy and Organization. ........................................................ 26

    F.    The Complaint Properly Alleges an Injury to Business or Property. ....... 27

G. The Complaint Properly Alleges Causation. ............................................. 29

H. RICO Permits Private Parties to Obtain Equitable Relief. ...................... 29

III. The Plaintiffs Have Standing to Assert RICO Claims. ........................................... 30

A. The Individual Plaintiffs' Claims Are Not Barred by *Res Judicata*. ........ 30

B. BRUSH Has Standing. ............................................................................... 32

IV. The Complaint States a Claim Under the NYCPA. ................................................. 33

A. The Landlord-Tenant Relationship Falls within the NYCPA. .................. 33

B. The Plaintiffs' Claims Are Not Time-Barred. .......................................... 34

C. Plaintiffs' Injuries Are Cognizable under the NYCPA. ............................ 34

CONCLUSION ....................................................................................................................... 35

# TABLE OF AUTHORITIES

## FEDERAL CASES

*ATSI Commc'ns, Inc. v. The Sharr Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) .........................................10

*Amaker v. Weiner*, 179 F.3d 48 (2d Cir. 1999)............................................................................10, 12

*American Special Risk Insurance Co. v. Greyhound Dial Corp.*, No. 90-2066, 1996 WL 551659 (S.D.N.Y. Sept. 26, 1996)................................................................................................23

*Ames Associates v. ABS Partners Real Estate LLC*, No. 06-928, 2007 WL 984009 (S.D.N.Y. Mar. 30, 2007)...............................................................................................................................25

*In re Ann Taylor Stores Sec. Litigation*, 807 F. Supp. 990 (S.D.N.Y. 1992) .....................................16

*Beauford v. Helmsley*, 865 F.2d 1386 (2d Cir. 1989), *vacated for further reconsideration, Helmsley v. Beauford*, 492 U.S. 914 (1989) ....................................................................................20

*Beauford v. Helmsley*, 893 F.2d 1433 (2d Cir. 1989), *cert denied, Helmsley v. Beauford*, 493 U.S. 992 (1989).............................................................................................................................21

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) .................................................................10

*Brooke v. Schlesinger*, 898 F. Supp. 1076 (S.D.N.Y. 1995)..............................................................13

*Cedric Kushner Promotions Ltd. v. King*, 533 U.S. 158 (2001).........................................................23

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002)...........................................................11

*Connolly v. Havens*, 763 F. Supp. 6 (S.D.N.Y. 1991) .......................................................................13

*Cosmas v. Hassett*, 886 F.2d 8 (2d Cir. 1989) .................................................................................12

*Davidson v. Capuano*, 792 F.2d 275 (2d Cir. 1986).........................................................................31

*DeFalco v. Bernas*, 244 F.3d 286 (2d Cir. 2001) .............................................................................20

*DiVittorio v. Equidyne*, 822 F.2d 1242 (2d Cir. 1987) .....................................................................13

*Enzo Biochem, Inc. v. Johnson & Johnson*, No. 87-6125, 1992 U.S. Dist. LEXIS 15723 (S.D.N.Y. Oct. 15, 1992) ..............................................................................................................16

*Erickson v. Pardus*, 127 S. Ct. 2197 (2007) .....................................................................................9

*Feeley v. Whitman Corp.*, 65 F. Supp. 2d 164 (S.D.N.Y. 1999) ...........................................17

*First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004)....................26

*First Interregional Advisors Corp. v. Wolff*, 956 F. Supp. 480 (S.D.N.Y. 1997)...............................14

*Fonte v. Board of Managers of Cont'l Towers Condominium*, 848 F.2d 24 (2d Cir. 1988)...............11

*Friedl v. City of New York*, 210 F.3d 79 (2d Cir. 2000) ..........................................................11, 12

*Gant v. Wallingford Board of Education*, 69 F.3d 669 (2d Cir. 1995).............................................16

*Geraci v. Women's Alliance, Inc.*, 436 F. Supp. 2d 1022 (D.N.D. 2006)....................................27, 28

*Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150 (2d Cir. 2006).........................10

*Goldman v. Belden*, 754 F.2d 1059 (2d Cir. 1985)................................................................10, 14, 15

*Gristede's Foods, Inc. v. Unkechauge Nation*, No. 06-1260, 2007 U.S. Dist. LEXIS 87562 (E.D.N.Y. Nov. 28, 2007)............................................................................................34

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ......................................................28, 32, 33

*Howe v. Reader's Digest Association*, 686 F. Supp. 461 (S.D.N.Y. 1988) ........................................28

*Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004) .................................................................17

*Libertad v. Welch*, 53 F.3d 428 (1st Cir. 1995) ..........................................................................27, 28

*Manhattan Telecomms. Corp. v. DialAmerica Marketing, Inc.*, 156 F. Supp. 2d 376 (S.D.N.Y. 2001).........................................................................................................24

*McLaughlin v. Anderson*, 962 F.2d 187 (2d Cir. 1992).................................................................18

*Metromedia Co. v. Fugazy*, 983 F.2d 350 (2d Cir. 1992), *overruled in part on other grounds as noted in Yung v. Lee*, 432 F.3d 142, 147-48 (2d Cir. 2005)......................................17

*Mills v. Polar*, 12 F.3d 1170 (2d Cir. 1993) (6 defendants) ..............................................................13

*Monahan v. New York City Department of Corrections*, 214 F.3d 275 (2d Cir. 2000)......................31

*Moses v. Martin*, 360 F. Supp. 2d 533 (S.D.N.Y. 2004) .................................................................23

*Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239 (S.D.N.Y. 2002), *rev'd in part on other grounds*, 322 F.3d 130 (2d Cir. 2003) ...................................................................29, 30

*National Organization for Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393 (2003) ...................................................................................29, 30

*Oak Beverages, Inc. v. TOMRA of Mass., L.L.C.*, 96 F. Supp. 2d 336 (S.D.N.Y. 2000) .............31, 32

*P.M.F. Services, Inc. v. Grady*, 681 F. Supp. 549 (N.D. Ill. 1988) ....................................................20

*In re Parmalat Sec. Litigation*, 479 F. Supp. 2d 332 (S.D.N.Y. 2007) ..............................................23

*Perlman v. Zell*, 938 F. Supp. 1327 (N.D. Ill. 1996) ........................................................................20

*Powers v. British Vita, P.L.C.*, 57 F.3d 176 (2d Cir. 1995)..........................................................14, 16

*Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898 (2d Cir. 1993).........................................28, 33

*Religious Technology Center v. Wollersheim*, 796 F.2d 1076 (9th Cir. 1986).............................29, 30

*Reves v. Ernst & Young*, 507 U.S. 170 (1993)...................................................................................25

*Robinson v. Block*, 869 F.2d 202 (3d Cir. 1989)...............................................................................28

*Rodonich v. House Wreckers Union, Local 95*, 627 F. Supp. 176 (S.D.N.Y. 1985) ..........................27

*Schmuck v. United States*, 489 U.S. 705 (1989) ...............................................................................17

*Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256 (2d Cir. 1995)......................................22, 23

*Standardbred Owners Association v. Roosevelt Raceway Associates*, 985 F.2d 102 (2d Cir. 1993) .........................................................................................................................................29

*Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158 (2d Cir. 1993)........................................27

*In re Sumitomo Copper Litigation*, 995 F. Supp. 451 (S.D.N.Y. 1998) .............................................14

*Three Crown Ltd. Partnership v. Caxton Corp.*, 817 F. Supp. 1033 (S.D.N.Y. 1993) (18 defendants)...............................................................................................................................13

*Travesio v. Gutman*, No. 94-5756, 1995 U.S. Dist. LEXIS 17804 (E.D.N.Y. Nov. 16, 1995) ............................................................................................33, 34, 35

*Trustees of Plumbers & Pipefitters National Pension Fund v. Transworld Mechanical, Inc.*, 886 F. Supp. 1134 (S.D.N.Y. 1995)..............................................................................26, 27

*Turkish v. Kasenetz*, 27 F.3d 23 (2d Cir. 1994) ...............................................................................15

*U.S. Fire Insurance Co. v. United Limousine Serv.*, 303 F. Supp. 2d 432 (S.D.N.Y. 2004)...............15

*United States v. Anderson*, 626 F.2d 1358 (8th Cir. 1980) ................................................26

*United States v. Bortnovsky*, 879  F.2d 30 (2d Cir. 1989) ..........................................13, 14

*United States v. Salerno*, 868 F.2d 524 (2d Cir. 1989) .......................................................19

*United States v. Turkette*, 452 U.S. 576 (1981) ....................................................25, 26, 27

*VanDenBroeck v. CommonPoint Mortgage Co.*, 22 F. Supp. 2d 677 (W.D. Mich. 1998)...............24

*Zito v. Leasecomm Corp.*, No. 02-8074, 2004 WL 2211650 (S.D.N.Y. Sept. 30, 2004) .............28, 29

## STATE CASES

*Blanchette v. School Committee*, 692 N.E.2d 21 (Mass. 1998) ..........................................32

*Meyerson v. Prime Realty Services, LLC*, 796 N.Y.S.2d 828 (N.Y. Sup. Ct. 2005) ...................33, 34

## FEDERAL STATUTES

18 U.S.C. § 1951(b)(2) .........................................................................................19

18 U.S.C. § 1964(a) ........................................................................................29, 30

Fed. R. Civ. P. 8(a) ..................................................................................18, 20, 26

Fed. R. Civ. P. 9(b) ........................................................................................12, 20

## STATE STATUTES

N.Y. Gen. Bus. Law § 352-eeee(b)-(c) ...........................................................15

Plaintiffs respectfully submit this memorandum in opposition to the motion to dismiss of Defendants Pinnacle Group NY LLC ("Pinnacle") and Joel Wiener.

## INTRODUCTION

The motion to dismiss should be denied for three reasons:

*First*, the motion is so heavily laced with matters outside the pleadings that it should be converted to a motion for summary judgment. The Second Circuit has held that conversion is required where there is even a "legitimate possibility" that the court relied on outside material in deciding a 12(b)(6) motion. Neither the Plaintiffs nor this Court should be required to sort out the movants' hodge-podge.

*Second*, the Complaint properly pleads a RICO claim. Defendants attack the claim on every possible ground, but their attacks rely extensively on matters outside the pleadings -- and ignore and distort what the factually detailed Complaint actually says.

*Third,* the Complaint properly pleads a New York Consumer Practices Act claim.

## STATEMENT OF FACTS

### Wiener, Pinnacle, and the Pinnacle Enterprise

Defendants Joel Wiener and Pinnacle direct the affairs of an enterprise that owns or controls some 21,000 apartments in 400 buildings in New York City, many of which are rent regulated. (Compl. ¶¶ 3, 156) (all citations to "Compl." are to the Second Amended Complaint.) Unwilling to see their profits limited by the laws governing rent control and rent stabilization, Wiener and Pinnacle have systematically cheated and strong-armed the tenants through a scheme of fraud and extortion. (*Id*. ¶¶ 1, 2, 8.) Though their actions have attracted the concern of both the New York Attorney General and the New York County District Attorney, Defendants have subverted governmental oversight by providing false information to those agencies. (*Id*. ¶¶ 83-

88.)  Wiener, his sons-in-law, and senior Pinnacle executives have taken a direct role in directing and supervising that fraudulent activity.  (*Id*.  ¶ 86.)

The Pinnacle Enterprise is a complex web of companies and persons.  While its full scope is as yet unknown, at a minimum it consists of:

- Several companies directly controlled by Wiener and his family, including Pinnacle, Pinnacle Managing Co., LLC, and SecureWatch 24;

- The Praedium Group LLC, a real-estate investment firm whose self-described strategy is increasing the value of its investments by "aggressively manag[ing] the current tenant/leasing base";

- Numerous LLCs, each of which holds title to a particular apartment building and is jointly owned by intermediate LLCs or partnerships among Wiener and various Praedium principals, including A. Floyd Lattin, Russell L. Appel, and Frank P. Patafio.

(Compl.  ¶¶  45-48;  174-75.)    Praedium is not simply a lender to Pinnacle as argued by Defendants; it is an integral participant in the enterprise of owning and profiting from apartment buildings.  (*Id*. ¶ 6.)

Wiener personally directs Pinnacle's affairs and "has principal authority and responsibility for overseeing Pinnacle's operations."  (*Id*. ¶¶ 22, 44, 176.) Pinnacle  is responsible for managing the Pinnacle Enterprise's day-to-day operations, including "negotiating leases, billing for and collecting rent, hiring and supervising building staff (*e.g*., 'supers'), making repairs, supervising capital improvements, sending delinquency and eviction notices, and commencing eviction proceedings."  (*Id*. ¶ 176.)  Wiener also directs and controls SecureWatch 24, which provides surveillance services to the Pinnacle Enterprise.  (*Id*. ¶¶ 4, 176.)

Wiener and, at his direction, Pinnacle, have systematically operated the Pinnacle Enterprise to evade the limits of rent regulation by overcharging tenants in numerous impermissible ways.  (*Id*. ¶ 8.)  Examples include:

(a)     **<u>Misrepresenting the legal base rent rate</u>** by engaging in a pattern and practice of altering or misrepresenting historical rent records, which form the base on which any legally permitted increases must be computed.  (*Id.* ¶¶ 27, 51, 92, 99, 112, 119, 128, 144, 148.) In at least one case of which the Plaintiffs are currently aware, the inflated rent calculation was signed by Wiener himself.  (*Id.* ¶ 148.)  Pinnacle has also failed to inform new tenants that the apartments they have rented are rent-regulated, as is required by law.  (*Id.* ¶¶ 97, 117.)

(b)     **<u>Misrepresenting the cost of repairs and improvements</u>** used to calculate rent increases.  (*Id.* ¶¶ 28-30, 52, 93, 99, 119, 129, 144.)  In some cases, the work was not done at all. In others, the work was done on other tenants' apartments. (*Id.* ¶¶ 93, 101, 115, 119, 144.)   Indeed, Wiener has personally instructed Pinnacle personnel to allocate repair costs to apartments on an arbitrary basis, without verifying that the materials and services were actually provided to particular apartments.  (*Id.* ¶ 87.)  That is entirely inconsistent with his claim (Def. Mem. at 12) that "mistakes are bound to happen."

(c)     **<u>Misrepresenting tenants' entitlement to succession rights</u>** that enable them to continue under rent regulation after the former tenant dies or must leave.  (Compl. ¶ 61.) Pinnacle has refused to accept rent checks from tenants legally entitled succession rights at their predecessors' rates, and has misrepresented the amount and type of information required to establish succession rights, thus forcing tenants to expend unjustified time and resources to establish their succession rights.  (*Id.* ¶ 105-08, 125-27.)

(d)     **<u>Commencing baseless eviction proceedings</u>**, a strategy of claiming rent is overdue when it is not.  (Compl. ¶ 55.)  Wiener and Pinnacle have pursued an aggressive eviction program, filing suit against one quarter of the Pinnacle Enterprise's tenants in the last several years.  (*Id.* ¶ 54.)   The purpose of that strategy is to empty the units, enabling the Pinnacle Enterprise to re-rent them at higher rates or to sell them as condominiums or co-ops.

(*Id.* ¶ 53.)  Even if they are ultimately successful in stopping the evictions, tenants are forced to take off time from work, to obtain child care, and in some cases to lose wages in order to combat the baseless suits.  (*Id.* ¶¶ 53, 107-08, 110-11, 113-14, 126-27, 140, 145.)

(e)      **Extortion**, a strategy for harassing tenants so they will pay more than they owe or decline to renew their leases, which enables the Pinnacle Enterprise to re-rent apartments at higher rates.  (*Id.* ¶¶ 2, 59-60.)  Pinnacle has sent rent bills in inflated amounts and has refused to credit refunds owed to tenants, forcing tenants to pay more than they owe to avoid the risk of being turned out into the street, and has sent tenants renewal leases in inflated amounts, forcing them to sign rather than face eviction for not having a lease.  (*Id.* ¶ 95, 111, 120, 137.)

**The individual named Plaintiffs**

Each of the individual Plaintiffs is a tenant in an apartment building owned by members of the Pinnacle Enterprise and each has been subjected to one or more of the fraudulent or extortionate acts described above. (Compl. ¶¶ 12-20.)  Though Defendants seek to undermine the Complaint's credibility – hardly a proper basis for a Rule 12(b)(6) motion – by questioning why there are only nine individual Plaintiffs (Def. Mem. at 1), the Complaint is pleaded as a class action, and these Plaintiffs represent the scope of the wrongs committed pursuant to Defendants' scheme.  (Compl. ¶ 153.)  For example:

(a)      **Marjorie and Ted Charron.**  The Housing Court found that Pinnacle inflated the Charrons' rent by nearly $1,200 per month, falsely claiming it had done renovations on their apartment, including the alleged costs of 160 light bulbs, 75 pounds of grout, 130 gallons of paint, a $198 nail gun, and a $424 drain-cleaning device, and yet Pinnacle continues to withhold over $24,000 in rent refunds (before interest and penalties).  (*Id.* ¶ 93, 94.)  On January 11, 2007, Pinnacle sent the Charrons a lease renewal agreement providing for a legally impermissible rent and has threatened eviction proceedings if the Charrons did not pay that amount.  (*Id.* ¶¶ 93, 95.)

4

Rather than risk eviction, the Charrons have paid the inflated rent amount, though they have not received payment of the overcharges. (*Id.* ¶ 95.) Defendants argue (Def. Mem. at 29) that Pinnacle recently offered to pay the Charrons part of the overcharge (an improper assertion outside the pleadings, belonging in an answer, not a 12(b)(6) motion), but they neglect to mention that the offer was conditioned on their releasing all claims against Defendants, including their claims in this case. (Welikson Decl. Ex. D at 3-4.) The Charrons rejected the offer.

(b)    **Anthony Casasnovas.**    When Mr. Casasnovas's lease came up for renewal, Pinnacle increased Mr. Casasnovas' rent but refused to explain the increase. (Compl. ¶¶ 97, 98.) He then learned that the rent demanded was nearly triple the amount charged in 2002, but under applicable rent regulations, the only way to account for that increase would have been over $40,000 in renovations, which the apartment's condition did not reflect. (*Id.* ¶ 99) Mr. Casasnovas filed a housing court complaint seeking a refund of rent overcharges. Pinnacle responded by filing an eviction action. (*Id.* ¶ 100.) After delaying almost a year, Pinnacle produced documents that did not substantiate the renovation costs. (*Id.* ¶ 101.) Then, one week after the complaint in this case was filed, Pinnacle offered to settle the eviction case by reducing Mr. Casasnovas' rent and paying substantial damages provided he agree to withdraw as a plaintiff in this lawsuit. (*Id.* ¶ 102.) That offer was made by Pinnacle's counsel directly to Mr. Casasnovas even though he was represented by counsel in this case. (*Id.* ¶ 78.) Only after Pinnacle's counsel was confronted with his unethical behavior did Pinnacle agree to withdraw that condition. (*Id.* ¶ 102.) Nevertheless, Pinnacle continues to bill Mr. Casasnovas in the pre-settlement amount, creating a strong risk of future eviction proceedings. (*Id.* ¶ 103.)

(c)    **Karen Flannagan.**    Ms. Flannagan was entitled to succession rights after her mother, the original tenant, died. (*Id.* ¶ 105.) She continued paying the rent, but Pinnacle returned her checks and told her it would not accept payment from her unless she provided

excessive and unduly burdensome documentation of her succession rights. (*Id.*) She did so, and Pinnacle then cashed two of her rent checks but still filed an eviction proceeding against her. (*Id.* ¶ 105-06.) Although Ms. Flannagan again provided Pinnacle with documentation of her succession rights, Pinnacle refused to drop its baseless suit, requiring her to appear in housing court no fewer than 10 times. (*Id.* ¶ 108.) In April 2006, Pinnacle abruptly dismissed its suit without explanation or compensation. (*Id.*)

(d)     **Tracey Moore.** Ms. Moore was initially charged – and paid – a rent in excess of the amount permitted by law, and when she fell behind in her rent payments, Pinnacle commenced an eviction proceeding, claiming an illegally inflated amount was overdue. She paid the inflated amounts to avoid eviction but then learned that her rent exceeded the amount paid by the prior tenant by $1,000 per month, a legally impermissible increase. (*Id.* ¶ 109-112.) She initiated an overcharge claim, but Pinnacle commenced another eviction proceeding based on claimed arrearages that were not in fact due. (*Id.* ¶ 113.) Later, Pinnacle admitted the rental amount was incorrect and that Ms. Moore was due a refund, but it refused to dismiss the eviction suit and claimed repairs and improvements that were not actually made. (*Id.* ¶¶ 113-15.) In August 2007, the housing court determined that Ms. Moore had been overcharged by $5,000, but Pinnacle has thus far refused to pay or credit her with that amount and the statutory penalty. (*Id.* ¶ 115.) Further, Pinnacle sent Ms. Moore a lease renewal in the inflated amount, which she has refused to sign, putting her at risk of further eviction actions. (*Id.*)

(e)     **Raymond Stahl-David.** When Mr. Stahl-David leased his apartment, Pinnacle fraudulently required him to acknowledge that the apartment was not rent stabilized. (Compl. ¶ 116.) Mr. Stahl-David eventually discovered that the prior tenant had paid only half the rent he was charged. (*Id.* ¶ 119.) When he asked Pinnacle to justify the drastic increase, it fraudulently claimed it had installed new appliances after the prior tenant had vacated, though it

had not done so. (*Id*.) Mr. Stahl-David fell behind in his rent payments, and eviction proceedings were started. Rather than face eviction, Mr. Stahl-David paid the full amount claimed. (*Id*. ¶ 120.) In July 2007, the Housing Court established his legal rent as less than one third of the amount Pinnacle had charged. (*Id*. ¶ 121.) Mr. Stahl-David tendered rent to Pinnacle in that amount, but Pinnacle refused to deposit his check and sent him a rent bill stating he was in arrears and a lease renewal form calling for payment of the previously invalidated rate. (*Id*. ¶ 122, 123.) Though he continued to send rent checks in the amount established by the court, Pinnacle refused to cash them, and it refused to pay the amount that had been overcharged. (*Id*.) Not until the First Amended Complaint was filed in this case did Pinnacle cause the landlord to furnish a lease in the correct amount. (*Id*.) Defendants assert (Def. Mem at 6, *citing* Welikson Decl. ¶16) that the overcharges were made because Pinnacle "was unable to respond because the prior landlord did not provide it with rental records for the unit," but that is simply an untested assertion outside the pleadings that has no place in a Rule 12(b)(6) motion. Defendants also assert that, after the Second Amended Complaint was filed in this case, they settled Mr. Stahl-David's overcharge claim, but they neglect to mention that the settlement agreement's release provision, drafted by Pinnacle's lawyer, expressly exempts the claims asserted in this case from the release. *See* Welikson Decl. Ex. L ¶ 4.

(f)    **Russell Taylor.**   Pinnacle moved to evict Mr. Taylor, fraudulently claiming he was not a proper leaseholder, and requiring Mr. Taylor to appear in housing court on numerous occasions without Pinnacle ever acknowledging his right to tenancy. (Compl. ¶¶ 124-27.) Only after the *New York Daily News* ran a story about Mr. Taylor's situation did Pinnacle drop the eviction case. (*Id*.) To date, Mr. Taylor has received no compensation for the waste of his time and resources. (*Id*.)

(g)    **Dianne Trummer.**  Ms. Trummer initially rented her apartment at the rate of
$1,275 per month but then learned that the previous tenant had paid only $497.53.  (Compl. ¶
128.)   When she filed a complaint to recover rent overcharges, and Pinnacle responded that the
increased rent resulted from various repairs and improvements, which included $11,000 in labor
costs for the building super and other fraudulent expenses.  (*Id*. ¶ 129.)   Ms. Trummer's
complaint was denied because a neighboring apartment's rent was even higher, but that rent also
was inflated, and Ms. Trummer did not have the opportunity to present data on the overcharged
repair costs.  (*Id*.)  Four months after Ms. Trummer moved in, there was a fire in a neighboring
apartment that damaged hers, requiring her to vacate in July 2004.  (*Id*. ¶ 130.)   Though Ms.
Trummer was required to pay only nominal rent while her apartment was uninhabitable, Pinnacle
fraudulently claimed the unit had become habitable by January 1, 2005 and sought to restore the
full rent as of that date.  (*Id*. ¶ 131.)   In fact, the apartment was not habitable until November
2005, as Pinnacle well knew.  (*Id*. ¶ 132.)   Pinnacle's fraud required Ms. Trummer to expend
time and resources challenging Pinnacle's rent claim.  (*Id*.)

(h)    **Andres Mares-Muro.**  When the Pinnacle Enterprise acquired his building,
Pinnacle sent Mr. Mares-Muro a fraudulent rental history purporting to substantiate a legal rent
of $1,491 per month, then on June 27, 2007, Pinnacle caused the landlord to send him a lease
renewal form at a monthly rent of $1,535.73.  Rather than face eviction, Mr. Mares-Muro signed
it. (Compl. ¶ 137.)  The representation to Mr. Mares-Muro that the legal rent for his apartment
was $1,535.73 was knowingly fraudulent or in reckless disregard of the truth.  (*Id*.)

(i)    **Kim Powell.**  Ms. Powell has lived with her mother for over 30 years.  She pays
the rent and has succession rights under the lease.  (*Id*. ¶ 139.)  In the late 1990s, she filed a
housing court action to require Pinnacle to make necessary repairs to the apartment.  (*Id*. ¶ 140.)
After she won that action, Pinnacle filed a retaliatory eviction suit against her and her mother,

falsely claiming rent was due when, in fact, the rent was paid up in full.  (*Id*.)  Ms. Powell was forced to expend time and resources to oppose that improper suit.  (*Id*.)  More recently, Ms. Powell has been active as a community leader through BRUSH.  Pinnacle and Wiener therefore targeted her and her mother for harassment and intimidation.  Shortly after this suit was filed, Wiener and Pinnacle caused SecureWatch 24 to install a spy camera directly in front of her apartment door so that they could eavesdrop on her comings and goings.  (*Id*. ¶¶ 70-73, 141.)  Only after Plaintiffs' counsel wrote a letter demanding that the surveillance camera be removed was it taken away.  (*Id*. ¶¶ 74-75.)

## BRUSH

BRUSH is a not-for-profit corporation formed under the laws of New York for the purposes of educating tenants in the West Harlem and Northern Manhattan communities about their rights and of advocating for the betterment of those communities.  (Compl. ¶ 11; though the Complaint refers to BRUSH as an "association," it is incorporated, as the public record shows; *see* the New York Department of State's web site at www.dos.state.ny.us.)  BRUSH acts as an umbrella organization for local tenant groups and advocates the interests of rent-regulated tenants, and has become a focal point for tenant grievances against Pinnacle and Wiener. (Compl. ¶¶ 11, 90.)  The massive impact of Defendants' scheme has forced BRUSH to divert its resources away from its core activities and to focus instead on providing direct assistance to tenants who are being victimized by Defendants' actions.  (*Id*. ¶ 91.)  BRUSH's ability to seek community improvement in other areas has been significantly impaired as its resources have become concentrated on dealing with the Pinnacle Enterprise.  (*Id*.)

## ARGUMENT

When ruling on a motion to dismiss, "a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (*per*

*curiam*) (citing *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)).  Though *Twombly* has introduced a "flexible 'plausibility standard'" into motions to dismiss, *ATSI Commc'ns, Inc. v. The Sharr Fund, Ltd.*, 493 F.3d 87, 98 n.2 (2d Cir. 2007), that does not mean a court should weigh competing fact allegations and determine which is more credible.  As the Supreme Court observed in *Twombly*, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts [alleged] is improbable, and 'that a recovery is very remote and unlikely.'"  127 S. Ct. at 1965 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

## I.   Defendants Have Argued Themselves out of a Rule 12(b)(6) Motion and into a Summary Judgment Motion.

Defendants flout the principles governing Rule 12(b)(6) motions in an effort to argue the facts by (1) submitting factual allegations (some sworn in the Welikson Declaration and some just argued in their brief); (2) attaching documents (more than 20 attached to the Welikson Declaration); and (3) mischaracterizing what the Complaint does allege.  The motion to dismiss should therefore either be denied or converted to a summary judgment motion, to be resolved after the plaintiffs have had the opportunity to take discovery, as is required by Rule 12(d).  Conversion to a motion for summary judgment if the matters are not excluded is "mandatory," *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985), and is "strictly enforce[d]." *Amaker v. Weiner*, 179 F.3d 48, 50 (2d Cir. 1999).

Thus, a court cannot rely on matters outside the complaint to "controvert[]" the complaint's allegations.  *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006).  Nor can a court rely on matters outside the complaint that "'make[] a connection not established by the complaint alone' or contain[] an 'unexplained reference' that 'raises the possibility that it improperly relied on matters outside the pleading in granting the defendant's

Rule 12(b) motion.'" *Friedl v. City of New York*, 210 F.3d 79, 84 (2d Cir. 2000) (quoting *Fonte v. Bd. of Managers of Cont'l Towers Condominium*, 848 F.2d 24, 25 (2d Cir. 1988)).

Here, Defendants have larded their brief with excuses and defenses that, they must know, have no place at this stage of the proceedings. Examples of that improper procedure include:

- The entire Welikson Declaration, which purports to challenge the facts alleged in the Complaint (Welikson Decl. ¶¶ 3-5);

- More than 20 exhibits attached to the Welikson Declaration;

- Allegations in Defendants' Memorandum of Law purporting to challenge the facts alleged in the Complaint, including:

  - Def. Mem. at 5-7 (numerous factual contentions regarding housing proceedings undertaken by individual Plaintiffs, citing Welikson Declaration *17 times*);

  - Def. Mem. at 12 ("The nature of defendants' alleged business . . . gives rise to a strong inference that any misstatements defendants may have made were innocent errors.");

  - Def. Mem. at 4 ("Defendants have no contractual or legal relationships with plaintiffs.");

  - Def. Mem. at 12 ("Clerks may print rent notices for the wrong amount, names may be misspelled on checks, nonpayment proceedings may automatically be started for failure to pay rent.");

  - Def. Mem at 18 ("[T]here is no threat of continued illegal activity with respect to these conversions . . . .");

  - Def. Mem. at 19 ("[D]efendants would have little incentive to harass tenants in condominium conversions into eviction.").

To be sure, there is a limited exception to the conversion rule. Courts may consider documents not attached to a complaint that (1) the plaintiffs have seen *and* (2) are "integral" to the claims alleged in the complaint and on which the complaint "heavily" relies. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Both requirements must be met; "mere notice or possession is not enough." *Id.*

Here, the Plaintiffs obviously did not rely on the terms and effect of the (yet-unwritten) Welikson Declaration, nor on the terms and effect of 20-odd exhibits attached to the Welikson Declaration.    And they did not rely on Defendants' myriad excuses, recited in their Memorandum of Law, including, for example, that their business is plagued with "innocent errors."  (Def. Mem. at 12.)   The limited exception for *documents* that were *integral* to the complaint cannot be twisted to permit consideration of those and many other alleged excuses and affirmative defenses here.

This Court therefore should exclude those matters.  But where, as here, the movant has chosen to lace its brief so thoroughly with matters outside the Complaint, the difficulty in separating what can and what cannot be considered itself requires treating the motion as one for summary judgment or to simply deny Defendants' motion and require them to file an answer.  This Court should not be required to sift through a brief, putting on and taking off blinders as it goes.  The Second Circuit has held that conversion is required where there is even a "legitimate possibility" that the court relied on outside material.  *Amaker*, 179 F.3d at 50; *Friedl*, 210 F.3d at 83.   Converting the motion into one for summary judgment can create no hardship for Defendants.  They know the rules and have consciously chosen to flout them.

II.    **The Plaintiffs Have Properly Pleaded a RICO Claim.**

    A.    **The Complaint Properly Alleges Mail Fraud.**

        (1)    **The Complaint Does Not "Clump."**

The purpose of heightened pleading under Fed. R. Civ. P. 9(b) is to provide a defendant with enough information to fairly mount a defense.  *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989).  Pinnacle and Wiener claim (Def. Mem. at 9) that the Complaint does not inform them of their specific roles in the fraudulent scheme because it says that "Defendants" committed certain acts instead of saying "who among the Defendants performed such acts."  But here there are only

the two defendants, and the word "Defendants" can mean only one thing: Pinnacle *and* Wiener. Each case the Defendants cite  involved many defendants, making the word "defendants" potentially ambiguous.  *See Mills v. Polar*, 12 F.3d 1170 (2d Cir. 1993) (6 defendants); *DiVittorio v. Equidyne*, 822 F.2d 1242 (2d Cir. 1987) (15 defendants); *Connolly v. Havens*, 763 F. Supp. 6 (S.D.N.Y. 1991) (8 defendants); *Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F. Supp. 1033 (S.D.N.Y. 1993) (18 defendants).

Defendants next argue that, by using the term "Defendants," the Complaint intends to impose liability on Wiener only under a theory of *respondeat superior.*  (Def. Mem. at 10.)  But that is not Plaintiffs' theory.  The Complaint specifically alleges the many ways in which Wiener personally participated in the racketeering activity.  (*See, e.g*., Compl. ¶¶ 1-3, 7-9, 44-46, 50-68, 85-88, 92-149, 175, 176 178-181; *see also* RICO Stmt. at 2-6.), and so discussion of  vicarious liability is irrelevant.

Finally, Defendants argue that the Complaint's allegations that Wiener "caused" the use of the mails are "wholly conclusory."  (Def. Mem. at 10, citing *Kades v. Organic Inc*, No. 00-3671, 2003 WL 470331 (S.D.N.Y. Feb. 24, 2003).)  But in *Kades*, the court found the mailing allegations to be conclusory because the complaint lacked any facts "concerning the use of the mail . . . to transmit any communications to any identifiable individual."  *Kades*, 2003 WL 470331 at *9.  That infirmity is not present here.  (*See* Compl. ¶¶ 92-149, detailing numerous mailings and their recipients; *id*. ¶181, detailing more than 30 specific instances of use of the mails involving the parties to this case.)

The mail fraud statute does not require the defendant personally to place a letter in the mailbox.  *Brooke v. Schlesinger*, 898 F. Supp. 1076, 1086 (S.D.N.Y. 1995).  A person causes mailings to be made if he directs employees to engage in fraudulent actions, *id.*, or if his fraudulent scheme makes the mailings reasonably foreseeable. *United States v. Bortnovsky*, 879

13

F.2d 30, 36 (2d Cir. 1989).  Here, Pinnacle and Wiener "pioneered" the fraudulent scheme to evade rent regulation (Compl. ¶ 6), and as controlling members of the Pinnacle Enterprise, they "implement" its strategies.  (Compl. ¶ 179; RICO Stmt. at 25.)  Given the nature of their scheme, it was foreseeable that the mails would be used to send lease renewals (Compl. ¶¶ 93, 98, 123, 134, 137), rent demands (Compl. ¶¶ 93, 116, 122), and eviction notices (Compl. ¶¶ 94, 100, 106, 110, 113, 120, 125), as well as to submit fraudulent documents to government agencies (Compl. ¶¶ 87, 93-94, 129, 137) and to coordinate the efforts of Pinnacle Enterprise members.  (Compl. ¶¶ 181; RICO Stmt. at 21-22.)

The Complaint also alleges that both Defendants used the mails to coordinate efforts in furtherance of their scheme.  (Compl. ¶ 181; RICO Stmt. at 21-22.)  Those allegations need not be pleaded with particularity because the details of these mailings are presently in the sole knowledge of Defendants, *First Interregional Advisors Corp. v. Wolff*, 956 F. Supp. 480, 485 (S.D.N.Y. 1997), and because the mailings themselves are not alleged to contain fraudulent misrepresentations.  *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998) (when non-fraudulent mailings are alleged, only the fraudulent scheme must be pleaded in detail).  Thus, the allegations that Defendants "caused" the use of the mails are well supported.

### (2)    The Complaint Alleges Fraudulent Intent.

Defendants argue a failure to plead fraudulent intent ("scienter"), but they fail to mention the tests used in the Second Circuit for inferring intent.  The first test looks for allegations of a motive and opportunity to commit fraud, while the second looks for allegations of conscious behavior indicating intent.  *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 184 (2d Cir. 1995).  A complaint may survive by satisfying either test, and unlike the other elements of mail fraud, intent may be pleaded generally via circumstantial evidence.  *Goldman v. Belden*, 754 F.2d 1059, 1070 (2d Cir. 1985).  Here, the Complaint satisfies both tests.

14

*Motive and opportunity.* Motive often involves the potential for economic benefit. *See, e.g., Turkish v. Kasenetz*, 27 F.3d 23, 28 (2d Cir. 1994) (desire to avoid repayment of loans was adequate motive); *Goldman*, 754 F.2d at 1070 (reversing district court's dismissal on scienter grounds when defendants stood to gain financially from fraud); *U.S. Fire Ins. Co. v. United Limousine Serv.*, 303 F. Supp. 2d 432, 444-45 (S.D.N.Y. 2004) (intent satisfied when complaint alleged motive to collect excessive insurance premiums). Opportunity involves being in a position that allows the defendant to carry out his plan. *See, e.g.,Turkish*, 27 F.3d at 28 (reversing district court's dismissal when defendant's controlling interest in business provided opportunity).

Here, both Defendants stand to benefit from their fraudulent scheme by receiving inflated rent payments and profits from the eventual sale of condominiums. (Compl. ¶¶ 2, 8, 49, 50; RICO Stmt. at 18.) Similarly, as controlling members of the Pinnacle Enterprise and co-owners of the apartment buildings in question, Defendants are in a position to carry out their plans. They negotiate leases, send rent bills, determine when to file eviction suits, and arrange condominium conversions. (*See, e.g.*, Compl. ¶¶ 3, 5, 21, 22, 43-47, 175, 176; RICO Stmt. at 2-6, 25.)

Defendants try to downplay the role of condominium conversions by suggesting (Def. Mem at 19) that they need not drive tenants out under a "non-eviction" conversion plan and could simply do an "eviction" plan instead. That is an impermissible factual argument at this pleading stage which ignores, among other things, the fact that eviction plans are difficult to implement, requiring, among other things, that 51% of the current tenants agree to buy their apartments, while a non-eviction plan can proceed with only a 15% buy-in. *See* N.Y. Gen. Bus. Law § 352-eeee(b)-(c).

15

*Conscious behavior.*  The Complaint also satisfies the conscious behavior test, which looks for strong circumstantial evidence that a defendant acted in bad faith.  *See, e.g., Powers v. British Vita, P.L.C.*, 57 F.3d 176, 185-86 (2d Cir. 1995) (defendant went back on his word at the first opportunity); *In re Ann Taylor Stores Sec. Litig.*, 807 F. Supp. 990, 1006-07 (S.D.N.Y. 1992) (defendant contradicted its earlier press release); *Enzo Biochem, Inc. v. Johnson & Johnson*, No. 87-6125, 1992 U.S. Dist. LEXIS 15723, at *37-38 (S.D.N.Y. Oct. 15, 1992) (defendant repeatedly failed to cooperate with plaintiff).

Defendants' behavior here reveals their bad faith.  Examples of this are crossing out portions of lease renewals and adding inflated rent amounts by hand (Compl. ¶ 98), continuing to charge inflated rent even after DHCR rulings to the contrary (*id.* ¶¶ 93-94, 122), failing to honor a settlement agreement (*id.* ¶¶ 102-103), repeatedly failing to return overpayments (*id.* ¶¶ 94-95, 115), allowing illegal treatment of tenants to continue until public attention is called (*id.* ¶ 127), sending eviction notices to tenants who have been adjudged not to owe rent (*id.* ¶¶ 123), randomly assigning repair costs to un-repaired apartments (*id.* ¶¶ 99, 113, 129 ), and failing to maintain records that would reveal improper the cost allocations.  (*Id.* ¶ 87.)

Defendants argue (Def. Mem. at 12) that their behavior only indicates legitimate disputes between them and the tenants and that the misrepresentations might be honest mistakes.  But those speculations must be rejected now, because the facts as pleaded must be accepted as true, with all reasonable inferences being drawn in Plaintiffs' favor.  *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995).  Further, the Complaint specifically alleges, among other things, that Wiener, his sons-in-law and named senior executives of Pinnacle expressly directed their staff to misrepresent the facts of repair costs and rent escalations in their reports to the Attorney General and the District Attorney.  (Compl. ¶¶ 86-88.)  That leaves no room for giving them the benefit of the doubt.

Finally, the cases on which Defendants rely simply hold that facially nonsensical RICO claims should be dismissed and the RICO claims here are certainly not that.

### (3)    The Complaint Alleges the Use of the Mails.

Defendants next argue (Def. Mem. at 13) that because the RICO Statement labels a list of mailings as "correspondence" (RICO Stmt. at 19), while the Complaint labels the list as "mailings" (Compl. ¶ 181), this Court should regard the alleged mailings as "dubious." That argument fails at the outset given that all doubts must be resolved in the Plaintiffs' favor. Moreover, there is no fatal inconsistency between the words "correspondence" and "mailings."

Finally, the Complaint (¶ 181) lists 31 specific mailings in furtherance of Defendants' scheme – by date, sender, recipient, and content.  That is more than sufficient.

### (4)    The Complaint Alleges Reliance.

Reliance is not an element of mail fraud, but the Second Circuit uses it as a marker for damages causation.  *Metromedia Co. v. Fugazy*, 983 F.2d 350, 368 (2d Cir. 1992) (reliance indicates injury to business or property), *overruled in part on other grounds as noted in Yung v. Lee*, 432 F.3d 142, 147-48 (2d Cir. 2005); *Feeley v. Whitman Corp.*, 65 F. Supp. 2d 164, 174 (S.D.N.Y. 1999) (reliance has no place as an element of mail fraud, but it should be discussed under causation).

The mail fraud statute does not require the mailing to contain any fraudulent misrepresentation and has been interpreted by the Supreme Court to mean that innocent or routine mailings can trigger liability.  *Schmuck v. United States*, 489 U.S. 705, 715 (1989).  The fraudulent misrepresentations can be made outside of any mailings so long as the mailings are "incidental to an essential part of the fraudulent scheme."  *Schmuck*, 489 U.S. at 711; *see also Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004) (holding that for mail-fraud purposes, detrimental reliance occurred when the defendants made false promises that induced the

plaintiffs to enter into contracts and that reliance on the contents of later mailings made pursuant to the contracts need not be shown).  Thus, it is not necessary that the Complaint allege Plaintiffs' reliance on anything contained in a mailing.

That said, the Complaint does allege reliance on the contents of mailings.  Ms. Moore received letters demanding inflated rent amounts, and she paid those amounts, not realizing they were fraudulent.  (Compl. ¶ 110.)  Defendants even concede (Def. Mem. at 15) that she was "duped into making overpayments."  Mr. Stahl-David paid inflated rent amounts in response to invoices requesting such payments, and only later did he learn of the fraud.  (Compl. ¶ 116.)

Further, before signing their leases, several Plaintiffs were fraudulently told that the rental rates were the "legal" rates when they were, in fact, inflated.  (Compl. ¶¶ 92, 97, 109, 116, 128, 134.)  It is reasonable to infer that if they had been told the truth, they would have refused to sign the leases.  The later mailings were mostly Pinnacle's attempts to enforce those leases.  Even though Plaintiffs' reliance occurred before the mailings, those later mailings are still causally connected to the harm suffered by Plaintiffs because they were a necessary precursor to the eviction proceedings that *forced* many Plaintiffs to lose wages and spend money on litigation.  (*See* Compl. ¶¶ 53, 101, 107, 110, 120, 126 (baseless eviction proceedings caused harm); *see also id.* ¶ 59 (under New York law, a landlord cannot initiate eviction proceedings without first sending notices and rent demands to the tenant).)

### B.    The Complaint Properly Alleges Extortion.

Defendants incorrectly argue (Def. Mem. at 14) that extortion must be pleaded "with particularity."  To the contrary, allegations of extortion are read under the plain notice pleading standard of Fed. R. Civ. P. 8(a).  *McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir. 1992).  The Complaint meets that standard.

Extortion occurs when a person voluntarily parts with his property in response to threats of force, violence, or fear. 18 U.S.C. § 1951(b)(2). Defendants argue (Def. Mem. at 14) that none of the Plaintiffs voluntarily parted with their property, but the Complaint states otherwise. Over the course of four years, the Charrons, Mr. Stahl-David, and Mr. Mares-Muro all paid inflated rent amounts in response to eviction threats. (Compl. ¶¶ 95, 120, 134.)

Threats of economic harm are sufficient to trigger extortion. *United States v. Salerno*, 868 F.2d 524, 531 (2d Cir. 1989). Defendants argue (Def. Mem. at 15) that threatening eviction is an exception to that rule, citing *Goldberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 97-8779, 1998 WL 50200, at *5 (S.D.N.Y. Feb. 9, 1998), for the proposition that threatening legal proceedings in an attempt to gain money is not extortion. But in *Merrill Lynch*, the court held there was no extortion because the defendant had threatened to sue to obtain property in which – as the plaintiff conceded – the defendant had a property right. *Id.* at *6. Here, however, Defendants had no legal right to obtain rents in excess of the regulated rate or to evict any Plaintiff for failing to pay the illegal amounts.

Moreover, the threat of eviction proceedings is unlike the threat of other litigation because it carries a real threat of economic harm even if the tenant prevails. As Pinnacle and Wiener know, the existence of eviction proceedings places tenants on blacklists, and blacklisted tenants have difficulty in finding housing. (Compl. ¶¶ 63-68.) Therefore, the threats of eviction proceedings were tantamount to threats of having the Plaintiffs blacklisted, another factor not present in *Merrill Lynch*. The Complaint therefore states predicate acts of extortion.

### C.    The Complaint Properly Alleges Violations of the National Stolen Property Act ("NSPA").

Defendants argue (Def. Mem. at 16) that NSPA claims must be pleaded "with the specificity required by Rule 9(b)," but that is far from settled law. The Second Circuit has not

addressed the issue.  Receipt and transportation of stolen property is not fraud, and thus Rule

9(b) has no place in the pleading.  *P.M.F. Servs., Inc. v. Grady*, 681 F. Supp. 549, 554 (N.D. Ill.

1988).  To be sure, when the property is alleged to have been procured by fraud, then the

underlying fraud should be pleaded with specificity, but nothing in the nature of the offense

requires its other elements – the transportation in interstate commerce or the property's value –

to be pleaded pursuant to Rule 9(b).  *Perlman v. Zell*, 938 F. Supp. 1327, 1348 (N.D. Ill. 1996).

Here, as already shown, the Complaint pleads the specifics of the fraud.  The Complaint

further alleges transportation and describes its transportation to Canada.  (Compl. ¶ 178(g).)

Defendants claim the Complaint must say more about the transportation, but Rule 8(a) applies to

that element of the offense, and the Complaint suffices under that standard.

### D.    The Complaint Properly Alleges a Pattern of Racketeering.

The Complaint alleges both open- and closed-ended patterns of racketeering, though

Defendants only attack open-ended continuity.  (Def. Mem at 17.)  That attack lacks merit.

An open-ended pattern exists when the predicate acts are part of an entity's regular way

of doing business, *or* if the nature of the acts implies a threat of continued criminal activity.

*DeFalco v. Bernas*, 244 F.3d 286, 323 (2d Cir. 2001).  Both approaches apply here.

A continuous threat of criminal activity has been found when a defendant's actions

indicate he will continue his criminal behavior regardless of what the plaintiff does.  *DeFalco v.

Bernas*, 244 F.3d 286, 324 (2d Cir. 2001).  Additionally, a continuous threat is present where

acts of mail fraud are made in pursuit of an ongoing plan.  *Beauford v. Helmsley*, 865 F.2d 1386,

1392 (2d Cir. 1989) (en banc) (finding a continued threat of mail fraud in connection with the

sale of condominiums where the defendant's plan to sell condominiums had not been

completed), *vacated for further reconsideration, Helmsley v. Beauford*, 492 U.S. 914 (1989),

*adhered to on remand, Beauford v. Helmsley*, 893 F.2d 1433 (2d Cir. 1989), *cert denied,*

*Helmsley v. Beauford*, 493 U.S. 992 (1989).

A pattern of collecting inflated rents is inherently indefinite, since rent payments are continuous and when one tenant leaves another usually takes his place.  Moreover, Defendants' behavior raises a strong inference that they intend to continue their behavior regardless of what the Plaintiffs do.  (*See, e.g.*, Compl. ¶¶ 93-95, 115, 122-123 (continuing to seek and withhold overpayments despite DHCR orders to the contrary); *id*. ¶ 103 (refusing to honor settlement agreement); *id*. ¶¶ 106-107 (denying status as primary tenant after receiving comprehensive evidence to the contrary); *id*. ¶¶ 113-114 (commencing eviction proceedings after admitting no rent was owed).)  The threat of continuity is made more potent because, here, as in *Beauford*, the Pinnacle Enterprise has not completed its conversion plans.

Defendants also argue (Def. Mem. at 18) that, because there are only nine individual named Plaintiffs, the fraudulent scheme cannot hope to empty entire buildings. That does not address the continuing threat of collecting inflated rents.  But in any event the Complaint alleges that others have been affected by Defendants' acts.  (Compl. ¶¶ 142-149.)  Further, a Complaint does not need to present hundreds of plaintiffs to credibly allege a pervasive scheme.  That would, of course, be highly impractical and unmanageable.  Instead, the Complaint is pleaded as a class action and alleges that Defendants' scheme is "widespread" throughout the Pinnacle Enterprise's properties.  (Compl. ¶ 156.)  At the pleading stage, that is sufficient.

Defendants next argue (Def. Mem. at 18) that there can be no threat of continued criminal activity because the New York Attorney General oversees condominium conversions.  But the presence of government oversight has never been construed as a guaranty against wrongful acts.  If that were so, the existence of the S.E.C. would require the dismissal of every securities fraud claim and the existence of the F.D.A. would require the dismissal of every claim of injury or

death resulting from prescription drugs.  Nor can government oversight function if the regulated party submits false information.  Here, Pinnacle, under Wiener's direct supervision, submitted false information to the Attorney General and the District Attorney.  (Compl. ¶¶ 83-88.)

Finally, Defendants argue (Def. Mem. at 18) that the predicate acts cannot constitute a regular means of doing business because the rents paid by the previous tenants were not inflated.  But the Complaint does *not* allege that the prior tenants' rent was not inflated.  It merely alleges that *Defendants*' rents represented illegal increases over the prior rent.  The prior rents may well have been inflated, and Defendants, as the moving parties, are not entitled to an inference that they weren't.

Defendants do not argue that the Complaint fails to allege a closed-ended pattern of racketeering, so that issue need not be addressed here.

### E.     The Complaint Properly Alleges the Existence of an Enterprise.

#### (1)     The Pinnacle Enterprise Is Distinct from the Defendant Persons.

Defendants argue (Def. Mem. at 19-22) that the Complaint fails to plead an enterprise distinct from the "persons" sued as defendants.  They assert that (a) the "Pinnacle-related" members of the enterprise must be considered a single entity for enterprise purposes, and (b) Praedium and its officers are not proper members of the enterprise.  Both arguments fail.

#### (a)     Pinnacle and Wiener are Distinct from the Other Members of the Enterprise.

Defendants' argument initially proceeds from the incorrect premise that SecureWatch 24 and the numerous LLCs that hold title to the apartment buildings are Pinnacle subsidiaries or affiliates.  The Complaint does not allege that SecureWatch 24 is a Pinnacle subsidiary.  Rather, it alleges that Wiener "has an interest" in SecureWatch 24, which provides surveillance services to the Pinnacle Enterprise and other customers.  (Compl. ¶ 4.)  That does not make it either a subsidiary or even an affiliate of Pinnacle.  *See Securitron Magnalock Corp. v. Schnabolk*, 65

F.3d 256, 263-64 (2d Cir. 1995) ("[E]ven if [defendant] owned 100% of the shares of each corporation, the corporations would be separately existing legal entities capable of constituting an association-in-fact enterprise.")

As for the LLCs, the Complaint alleges that they are jointly owned though a web of intermediary entities by persons associated with both Pinnacle and Praedium.  (Compl. ¶ 46.) Again, that does not make them either subsidiaries or affiliates of Pinnacle any more than they are subsidiaries or affiliates of Praedium.  Thus, as with SecureWatch 24, Pinnacle and the LLCs are not identical with the Pinnacle Enterprise, because corporations in similar, but distinct, lines of business that are under the same ownership structure do not share an identity for RICO enterprise purposes.  *Securitron*, 65 F.3d at 263-64; *American Special Risk Ins. Co. v. Greyhound Dial Corp.*, No. 90-2066, 1996 WL 551659, at *83 (S.D.N.Y. Sept. 26, 1996).

Wiener is also distinct from the Pinnacle Enterprise.  The Pinnacle Enterprise is an association of entities with which Wiener has a variety of relationships, including, many LLCs of which he is only part owner.  But even assuming for argument's sake that he were an employee or sole owner of the entire enterprise, he would still be distinct from it under RICO.  As the Supreme Court held in *Cedric Kushner Promotions Ltd. v. King*, 533 U.S. 158, 163 (2001), "corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status."  Thus, the CEO/owner of a corporation can be sued as the "person" who conducts the affairs of the corporation/enterprise, even if his actions are within the scope of his employment.  *Id*. at 165-66; *accord Moses v. Martin*, 360 F. Supp. 2d 533, 546 (S.D.N.Y. 2004).

The cases cited by Defendants are inapposite because they involve enterprises that are alleged to be alter egos of the RICO person.  *See, e.g., In re Parmalat Sec. Litig.*, 479 F. Supp. 2d 332, 346-47 (S.D.N.Y. 2007) (holding that inclusion of "dummy entities" in an enterprise was

not sufficient to make the enterprise distinct). Here, in contrast, members of the enterprise, such as SecureWatch 24 and the LLCs, are alleged to be genuine entities that have distinct businesses.

### (b)    Praedium is a Proper Member of the Enterprise.

The Complaint alleges that Praedium and certain of its individual officers are members of the Pinnacle Enterprise, further distinguishing Wiener and Pinnacle from the Enterprise, but Defendants argue (Def. Mem. at 21) that Praedium and its officers cannot be part of the Pinnacle Enterprise because Praedium is simply a source of funding to Pinnacle. That assertion contradicts the Complaint, which alleges that Praedium and its officers have taken ownership interests in the LLCs. (Compl. ¶ 46.) So Praedium is not merely a banker lending money to Pinnacle; it is a joint owner, with Pinnacle and Wiener, of buildings within the Pinnacle Enterprise, all of which are managed for the Enterprise's benefit by Pinnacle. That is quite different from the enterprises alleged in the cases on which Defendants rely. For example, in *Manhattan Telecomms. Corp. v. DialAmerica Mktg., Inc.*, 156 F. Supp. 2d 376, 384 (S.D.N.Y. 2001), the court held that the alleged enterprise consisted simply of "any vendor and its customers" that had no joint business. Similarly, in *VanDenBroeck v. CommonPoint Mortgage Co.*, 22 F. Supp. 2d 677, 682 (W.D. Mich. 1998), the court held that an alleged enterprise consisting of a mortgage lender and various entities to which it sold loans was "a typical business relationship in which two or more parties rely upon each other to achieve separate, but dependent economic benefits." Here, however, the economic benefit of owning the buildings is joint: as co-owners, Praedium and Pinnacle both make a share of the rents received from tenants and the proceeds received from condominium sales. They benefit in the same way from the Enterprise's successes and they suffer in the same way from the Enterprise's failures. Moreover, they are locked into the relationship by virtue of the joint ownership.

Defendants next argue (Def. Mem. at 21) that Praedium cannot be a member of the Enterprise because the Complaint does not allege that it has a "role in the alleged course of fraudulent or illegal conduct." But there is no requirement that all members of an enterprise be involved in wrongful activities. Rather, the Complaint need only allege that the members of an enterprise are "associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981) (emphasis added). Indeed, the enterprise itself can be entirely innocent. *Id.* at 580-81.

Nor is it correct that, as Defendants argue (Def. Mem. at 21), the Complaint must allege that Praedium was involved in the "operation, management, or internal affairs" of the enterprise. That is the test for holding a defendant liable as a RICO person, not the test for membership in an enterprise. *See Reves v. Ernst & Young*, 507 U.S. 170, 178-79 (1993). Nevertheless, the Complaint alleges that Praedium and Pinnacle are partners in $500 million dollars worth of buildings (Compl. ¶ 3) and that Praedium's corporate strategy is a "value enhancement program" that includes "aggressively manag[ing] the current tenant/leasing base," "asset repositioning," and making only "strategic capital improvements." (*Id.* ¶¶ 6, 48.) Further, Praedium and its officers participate in the condominium conversion offerings. (*Id.* ¶¶ 45-48.) That is fully consistent with the goals and strategies Pinnacle has used in controlling the enterprise's affairs.

*Ames Assocs. v. ABS Partners Real Estate LLC*, No. 06-928, 2007 WL 984009 (S.D.N.Y. Mar. 30, 2007), on which Defendants rely (Def. Mem. at 22-23) is again inapposite. There, the court found no enterprise because the alleged member had performed "no function in the alleged enterprise" and was not alleged to have "any alleged ongoing conduct in the alleged enterprise." 2007 WL 984009 at *5. Here, Praedium has taken a role in the Enterprise's affairs by, among other things, funding the enterprise's acquisitions, maintaining an ownership interest in the properties, and setting forth the enterprise's investment strategy.

25

Pinnacle and Wiener do not share an identity with Praedium, and Praedium is a continuing member of the Pinnacle Enterprise. Therefore, the Complaint sufficiently pleads an enterprise that is distinct from the RICO "persons."

### (2)    The Complaint Properly Alleges That The Enterprise Has a Hierarchy and Organization.

To plead an enterprise, plaintiffs need only allege that the members of the enterprise "associated together for a common purpose of engaging in a course of conduct." *Turkette*, 452 U.S. at 583. The Second Circuit has recognized that "an enterprise may be found where there is simply a 'discrete economic association existing separately from the racketeering activity.'" *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) (quoting *United States v. Anderson*, 626 F.2d 1358, 1372 (8th Cir. 1980)). At this stage, the Complaint need only provide the Court with a "clear and concise statement of the enterprise" consistent with Fed. R. Civ. P. 8. *Trustees of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1145 (S.D.N.Y. 1995).

The Complaint alleges an association-in-fact enterprise comprised of numerous individuals and entities that exists for the purpose of owning, operating, and managing residential properties. (Compl. ¶¶ 3-6, 174-176.) The Pinnacle Enterprise "has a discernable structure, at the top of which is Joel Wiener, who has responsibility for directing the Enterprise's overall course of conduct." (Compl. ¶ 175.) Wiener directs the enterprise in consultation with individual members, including Lattin, Appel, and Patafio. (*Id.*) The LLCs comprise the lower layer of the enterprise, and that there may be intermediate layers of ownership and control, as outlined in detail in the complaint. (*Id.*)

Moreover, the Pinnacle Enterprise is alleged to function as a continuing unit and each member of the enterprise is alleged to associate together for the purpose of owning, operating,

managing, and selling the jointly-owned residential properties.   (Compl. ¶¶ 3-6, 174-176.) Pinnacle is responsible for the day-to-day operations of the enterprise; Praedium has funded the acquisition of the apartment buildings; the LLCs hold title to the individual apartment buildings; and SecureWatch 24 provides security services (including eavesdropping).  (*Id.*)

Defendants ignore those allegations.   Instead, they argue that each member of the enterprise must have some "role in the alleged course of fraudulent or illegal conduct."   As explained above, RICO does not require that the members of the enterprise participate in the racketeering activity; the term "enterprise" has long been held to encompass entirely legitimate entities. *Turkette*, 452 U.S. at 580-81.

Plaintiffs have sufficiently provided the Court with a "clear and concise statement of the enterprise."   No more is required of them at this stage in the proceedings.  *Transworld Mech.*, 886 F. Supp. at 1145.

### F.      The Complaint Properly Alleges an Injury to Business or Property.

Defendants argue (Def. Mem. at 24) that any injury the Plaintiffs may have suffered has already been remedied.   That again ignores the Complaint's allegations.   While some of the Plaintiffs' overcharges have been refunded (or have been ordered to be refunded, though payment has yet to be made), many have not.  (*See, e.g.,* Compl. ¶¶ 95, 110, 116, 185.)

Defendants next argue (Def. Mem. at 24) that the Plaintiffs' injuries are *de minimis* and thus not cognizable under RICO.  Defendants do concede (*id.*) that Plaintiffs have alleged losses from inflated rent, transportation costs, lost wages, child-care expenses, and attorneys' fees. Those expenses constitute injuries to business or property under RICO.  *See Libertad v. Welch*, 53 F.3d 428, 437 n.4 (1st Cir. 1995) (lost wages and travel expenses); *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1167 (2d Cir. 1993) (attorneys' fees); *Geraci v. Women's*

*Alliance, Inc.*, 436 F. Supp. 2d 1022, 1039 (D.N.D. 2006) (child care expenses); *Rodonich v. House Wreckers Union, Local 95*, 627 F. Supp. 176, 179-80 (S.D.N.Y. 1985) (lost wages).

There is no bright line for *de minimis* damages. Defendants rely on *dicta* from a single case, *Howe v. Reader's Digest Ass'n*, 686 F. Supp. 461 (S.D.N.Y. 1988), but that case does not support Defendants' argument because it was decided on summary judgment, where discovery showed that the plaintiff made a *single* long-distance telephone call and suffered *no* injury because he incurred no cost in making the call. *Howe*, 686 F. Supp. at 465-66.

More recent cases in this District, hold that a plaintiff need only allege *some* injury at the pleading stage. *See, e.g., Zito v. Leasecomm Corp.*, No. 02-8074, 2004 WL 2211650, at *24 (S.D.N.Y. Sept. 30, 2004) (plaintiffs alleged some injury; the severity of the injury "presents factual issues not properly addressed on a motion to dismiss"); *GI-Holdings, Inc. v. Baron & Budd*, No. 01-0216, 2003 WL 193502, at *11 (S.D.N.Y. Jan. 29, 2003) (plaintiff satisfied pleading burden by alleging *de minimis* injury).

Next, Defendants argue (Def. Mem. at 25) that BRUSH did not suffer an injury. While BRUSH is not a tenant, Defendants' actions have forced BRUSH to divert significant resources from its core community mission. (Compl. ¶ 91.) Diversion of an organization's resources is an injury to its business or property. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993); *Robinson v. Block*, 869 F.2d 202, 207, 210 n.9 (3d Cir. 1989).

Defendants' citation to *Libertad v. Welch*, 53 F.3d 428, 437 (1st Cir. 1995) is unavailing because in that case there was no evidence about "any injury sustained by the group, such as expended resources." Here, in contrast, the Complaint specifically alleges that BRUSH was injured by diverting resources to combat Defendants' fraudulent practices. The Complaint

alleges that BRUSH has suffered an injury to its business; nothing more is required at this stage in the proceedings. *Zito*, 2004 WL 2211650, at *24.

Finally, Defendants argue (Def. Mem. at 26) that BRUSH's injury is too indirect. But proximate cause is established where the defendants' conduct is a "substantial factor in the sequence of responsible causation." *Standardbred Owners Ass'n v. Roosevelt Raceway Assocs.*, 985 F.2d 102, 104 (2d Cir. 1993). BRUSH diverted its resources as a direct result of Defendants' fraudulent conduct. Thus, the Complaint pleads proximate cause.

### G.    The Complaint Properly Alleges Causation.

Defendants arguments (Def. Mem. at 26-27) that Plaintiffs do not allege reasonable reliance on the alleged mail fraud or the requisite elements of extortion have been addressed above, *see supra* at sections II.A & II.B, and the argument that the NSPA requires that a plaintiff be injured by the interstate transportation of funds has also been addressed. *See supra* at II.C.

### H.    RICO Permits Private Parties to Obtain Equitable Relief.

The Defendants concede (Def. Mem. at 27) that there is a circuit split as to whether private plaintiffs can obtain equitable relief under RICO and that Second Circuit has not yet decided the issue. The Seventh Circuit, in *National Organization for Women, Inc. v. Scheidler*, 267 F.3d 687, 695-700 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393 (2003), held that private RICO plaintiffs can obtain equitable relief. The Ninth Circuit, in *Religious Technology Center v. Wollersheim*, 796 F.2d 1076, 1081-89 (9th Cir. 1986), held they cannot. In *Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239, 243-44 (S.D.N.Y. 2002), *rev'd in part on other grounds*, 322 F.3d 130 (2d Cir. 2003), the court considered both *Scheidler* and *Wollersheim* and concluded that RICO does permit private parties to obtain equitable relief.

*Scheidler* observed that 18 U.S.C. § 1964(a) "spells out a non-exclusive list of the remedies district courts are empowered to provide" in civil RICO actions. 267 F.3d at 697. That

list includes equitable relief. RICO §§ 1964(b) and (c) then "describe two types of plaintiffs, the government and private plaintiffs, and spell out additional remedies specific to each type . . . ." *Id.* at 698. Therefore, "the only logical conclusion is that Congress intended the general remedies explicitly granted in § 1964(a) to be available to all plaintiffs." *Id.*

The Ninth Circuit focused on legislative history rather than the statute itself. It initially concluded that reading § 1964(c) to provide private litigants with remedies *additional* to those provided in § 1964(a) found "some support" in the legislative history. *Wollersheim*, 796 F.2d at 1085. But it regarded two failed congressional attempts to add explicit authority for private injunctive relief as dispositive evidence against allowing it. *Id.* at 1085-86. *Scheidler* considered that same legislative history but noted that, since *Wollersheim* was decided, the Supreme Court has rejected the probative value of failed legislative proposals in interpreting statutes.

The Supreme Court granted certiorari in *Scheidler* in part to resolve the circuit split, but did not reach the question, reversing on other grounds. 537 U.S. at 411. Yet the *Motorola Credit* court did canvass the arguments pro and con, and agreed with *Scheidler* and held that the Ninth Circuit's reading of the legislative history in *Wollersheim* was "far too narrow and wooden." 202 F. Supp. 2d at 244. Notably, the court in *Motorola Credit* granted the plaintiffs a preliminary injunction. *Id.* at 248. On appeal, the Second Circuit vacated and remanded, finding that the plaintiffs' RICO claims were unripe, but it did not vacate the preliminary injunction or cast doubt on the District Court's authority to grant one. *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 132 (2d Cir. 2003).

Absent a definitive ruling from the Second Circuit, this Court should also reject *Wollersheim* and hold that the Plaintiffs' claims for equitable relief must stand.

## III. **The Plaintiffs Have Standing to Assert RICO Claims.**

### A. **The Individual Plaintiffs' Claims Are Not Barred by *Res Judicata*.**

Defendants cast a *res judicata* argument as a "standing" argument because granting of claim preclusion normally requires consideration of matters outside the Complaint, including the scope of what was previously litigated. Here, however, the Court can reject the *res judicata* argument without considering matters outside the pleadings, because the courts in the prior litigation did *not* have jurisdiction to consider the RICO and other claims made here.

*Res judicata* "makes a final, valid judgment conclusive on the parties, and those in privity with them, as to all matters, fact and law, [that] were or should have been adjudicated in the proceeding." *Oak Beverages, Inc. v. TOMRA of Mass., L.L.C.*, 96 F. Supp. 2d 336, 351 (S.D.N.Y. 2000) (quotation omitted). A party asserting *res judicata* bears the burden of showing that "the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 285 (2d Cir. 2000). Where the initial forum "did not have the power to award the full measure of relief sought in the later litigation," *res judicata* does not apply. *Davidson v. Capuano*, 792 F.2d 275, 278 (2d Cir. 1986).

Here, the prior courts here were courts of limited jurisdiction that had no power to hear RICO or fraud claims. Housing Court is "devoted to actions and proceedings involving the enforcement of *state and local laws* for the establishment and maintenance of housing standards." NYC Civ. Ct. Act § 110(a) (emphasis added). The DHCR can hear only "an application or complaint for *adjustment of rent, or for other relief provided by the [Rent Stabilization Law] or this Code*." 9 N.Y. Codes R. & Regs. § 2527.1 (emphasis added); *see also* 1-3 WEINSTEIN, KORN & MILLER CPLR MANUAL § 3.02[a] ("All of the courts in the New York State court system are courts of limited jurisdiction, except for the New York Supreme Court."). DHCR and housing court proceedings thus cannot bar RICO claims because those courts had no power to hear them.

*Oak Beverages* provides Defendants with no support. There, the plaintiff sued in a court of general jurisdiction, where RICO claims could have been brought. *Oak Beverages*, 96 F. Supp. 2d at 351.

Nor did any of the Plaintiffs release their RICO claims. The Charrons refused checks that would have required them to release all of their claims. (Welikson Decl. ¶ 8.) Mr. Stahl-David's settlement, drafted by Mr. Welikson, explicitly stated it did not constitute a release of his civil RICO claim. (Welikson Decl. Ex. L ¶ 4.) Nor could Plaintiffs in the other settlements release civil RICO claims that could not have been brought in the limited-jurisdiction housing courts.

In sum, Plaintiffs are not attempting two bites at the same apple. They seek damages they could not recover in the prior actions, which were limited only to rent. They do not seek in this lawsuit any amounts they recovered in Housing Court or the DHCR. Rather, they seek "single bites from two separate apples as [they] look[] to enforce two different sets of rights in the respective forums that are available to [them]. Nothing in the preclusion doctrine prevents this." *Blanchette v. School Comm.*, 692 N.E.2d 21, 26 (Mass. 1998).

## B.    **BRUSH Has Standing.**

Defendants' attack on BRUSH argues that it cannot invoke "associational standing" on behalf of its members. (Def. Mem. at 30-32.) But BRUSH is not a membership organization and does not seek standing as a representative of any members. Rather, BRUSH has standing to bring claims on its own behalf because it has been directly injured by Defendants' actions, an argument Defendants do not address.

The Supreme Court addressed this exact issue in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). There, the plaintiff was "'a nonprofit corporation organized under the laws of the State of Virginia' whose purpose was 'to make equal opportunity in housing a reality in the Richmond Metropolitan Area.'" *Id.*, 455 U.S. at 368 (quoting the complaint). The complaint

further alleged that the defendant landlord's racial steering practices "had frustrated the organization's counseling and referral services, with a consequent drain on resources." *Id*. at 369. Holding that the complaint should not have been dismissed, the Court stated:

> If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and-moderate-income homeseekers, there can be no question that the organization has suffered an injury in fact. Such concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resources – constitutes far more than simply a setback to the organization's abstract social interests. . . . [I]t was improper for the District Court to dismiss for lack of standing claims of the organization in its own right.

*Id*. at 379. Similarly, in *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898 (2d Cir. 1993), the court upheld a fair housing organization's standing to sue a landlord, where the complaint alleged that the defendant landlord's racially discriminatory advertising had forced the organization to "devote significant resources to identify and counteract" the defendants' advertising practices to the detriment of its "efforts to [obtain] equal access to housing through counseling and other referral services." *Id*., 6 F.3d at 905 (interpolation by the court).

That is precisely what BRUSH alleges here. (Compl. ¶¶ 90-91.) It therefore has standing in its own right to sue for injuries to itself caused by Defendants' wrongful actions.

## IV.  The Complaint States a Claim Under the NYCPA.

### A.  The Landlord-Tenant Relationship Falls within the NYCPA.

Defendants contend (Def. Mem. at 33) that the Complaint fails to state a cause of action under the NYCPA because the landlord-tenant relationship is not "consumer oriented." But they cite no cases to support that argument, and the courts have rejected it. In *Travesio v. Gutman*, 1995 U.S. Dist. LEXIS 17804 at *7 (E.D.N.Y. Nov. 16, 1995), the court held that "New York courts, interpreting consumer protection statutes, do give tenants private rights of action against their landlords" under the NYCPA. *See also Meyerson v. Prime Realty Servs., LLC*, 7 Misc. 3d 911, 917-18, 796 N.Y.S. 2d 828, 854-55 (N.Y. Sup. Ct. 2005) (plaintiff-tenant stated a cause of

action against her landlord under the NYCPA over improper lease renewal provisions).    Here, as in *Travesio* and *Meyerson*, the allegations involve pervasive and systemic deceptive acts and practices that impact a substantial number of rent-regulated apartment buildings owned by defendants.  (Compl. ¶¶ 1-3, 8, 21, 51-61.)  The cases on which Defendants rely do not.  Indeed, their only citation having anything to do with the landlord-tenant relationship is a "*but see*" reference to *Travesio*, (Def. Mem. at 33), which, as is noted above, comes out the other way. Plaintiffs thus have stated a claim under the NYCPA.

**B.      The Plaintiffs' Claims Are Not Time-Barred.**

Defendants appear to seek dismissal of the entire Complaint, based on the NYCPA's three-year statute of limitations, because some of their deceptions occurred in 2004 or earlier. (Def. Mem. at 34-35.)  But under New York law, a claimant's cause of action accrues upon injury by the deceptive act or practice, *i.e.*, "when all of the factual circumstances necessary to establish a right of action have occurred, so that the plaintiff would be entitled to relief." *Gristede's Foods, Inc. v. Unkechauge Nation*, No. 06-1260, 2007 U.S. Dist. LEXIS 87562, at *34-35 (E.D.N.Y. Nov. 28, 2007).  Here, many of the original deceptions were concealed when made, and were not discovered until later.    Further, the deceptions were continuing. Accordingly, while a plaintiff cannot not assert NYCPA claims that matured more than three years before a complaint is filed, claims maturing, or based on conduct occurring, within the three-year period should not be dismissed.  *Gristede's*, 2007 US. Dist LEXIS, at *36.

Thus, even assuming that some alleged fraudulent acts took place and were discovered outside the limitations period, that cannot provide a basis for dismissing the entire Complaint. At most, it would be a ground for limiting the extent of damages.  *Id.*  Determining the scope of that limitation, if any, requires fact development not relevant at this stage of the proceedings.

**C.      Plaintiffs' Injuries Are Cognizable under the NYCPA.**

Finally, Defendants seem to argue that because (1) the Complaint alleges that Pinnacle has sued more than one quarter of its 21,000 tenants but does not name a tenant who has been evicted (Def. Mem at 2), and (2) because the Complaint alleges a pattern of harassment but "defendants and defendants' alleged affiliates have never been subject to a DHCR determination of harassment." (Welikson Decl ¶ 4), the Complaint must be dismissed. The impropriety of raising this on a 12(b)(6) motion aside, those arguments miss the point. In *Travieso v. Gutman*, No. 94-5756, 1995 U.S. Dist. LEXIS 17804 (E.D.N.Y. Nov. 16, 1995), the Court refused to dismiss a claim based on violations of the Fair Debt Practices Collection Act because the underlying issues are quickly resolved in Housing Court, holding that plaintiffs there "wish to be protected from false rent bills, baseless summary petitions, and unlawful charges, not from the quick judicial resolution of the disputes in Housing Court." *Id*. at *11. The same is true here.

## CONCLUSION

Defendants' motion to dismiss -- and its improper demand that any dismissal be with prejudice -- should be denied.

Respectfully submitted,

JENNER & BLOCK LLP
By:    s/Richard F. Levy
      Richard F. Levy (RL-9825)
      Jeremy M. Creelan
      Chinh Q. Le
      Carletta F. Higginson
      Luke P. McLoughlin
      919 Third Avenue, 37th Floor
      New York, New York  10022-3908
      Telephone:    (212) 891-1600
      Facsimile:    (212) 891-1699
      *Attorneys for Plaintiffs*

Of Counsel:
C. Steven Tomashefsky
Andrew A. Jacobson
Andrew F. Merrick
Brian J. Wilson
JENNER & BLOCK LLP
330 N. Wabash Avenue
Chicago, Illinois 60611
Telephone:    (312) 222-9350
Facsimile:    (312) 527-0484

## <u>CERTIFICATE OF SERVICE</u>

I, Richard F. Levy, an attorney, hereby certify that on this 18th day of December, 2007 I caused a true and correct copy of the foregoing ***Plaintiffs' Memorandum In Opposition to Defendants' Motion to Dismiss*** to be served on the following individuals by regular U.S. mail:

Mitchell A. Karlan
Gibson, Dunn & Cruther LLP
200 Park Avenue
New York, New York 10166-0193


s/ Richard F. Levy
Richard F. Levy

14125.1