UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9/5/08

BUYERS AND RENTERS UNITED TO SAVE
HARLEM; and

MARJORIE and THEODORE CHARRON;
ANTHONY CASASNOVAS; KAREN FLANNAGAN;
ANDRES MARES-MURO; TRACEY MOORE;
RAYMOND-ANDREW STAHL-DAVID;
RUSSELL TAYLOR; DIANE TRUMMER; and
KIM POWELL, on behalf of themselves and all
others similarly situated,

                        Plaintiffs,

        -against-                                       07 Civ. 6316 (CM)

PINNACLE GROUP NY LLC and JOEL WIENER,

                        Defendants.

_____x

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

McMahon, J.:

Plaintiffs allege that defendants Pinnacle and Joel Wiener (collectively, the "defendants")

have violated the RICO statute and the New York Consumer Protection Act ("NYCPA") by

demanding and collecting rents in amounts beyond those permitted under New York State law,

with the goal of illegally increasing regulating rents and/or evicting tenants entitled to rent

regulation. Plaintiffs seek a judgment from this Court providing (a) injunctive relief, (b)

declaratory relief, (c) appointment of an independent monitor to oversee lawful operation and

-1-

management of rent-regulated buildings owned by defendants and assist in the resolution of disputes between defendants and their tenants, (d) an audit and accounting of rents demanded by defendants and disgorgement of any rent overcharges, (e) compensatory, statutory, and punitive damages, and (f) reasonable attorneys' fees and costs. Defendants have moved to dismiss the Second Amended Complaint ("SAC"), arguing that (1) BRUSH lacks standing to bring a RICO claim, (2) plaintiffs have failed to adequately plead their RICO claim, and (3) plaintiffs have failed to adequately plead their NYCPA claim. For the following reasons, plaintiff BRUSH is dismissed for lack of standing. The remainder of defendants' motion is denied.

## BACKGROUND

The following well-pleaded facts are presumed true.

### 1.    The parties

Plaintiff Buyers and Renters United to Save Harlem ("BRUSH") is a not-for-profit association formed under the laws of New York for the purposes of educating tenants in the West Harlem and Northern Manhattan communities about their rights and of advocating for the betterment of these communities. BRUSH is an advocate for and represents the interests of, tenants in those areas, a large number of whom occupy rent-regulated apartments in buildings owned by defendants. BRUSH also organizes tenants and helps them to defend against harassment and unlawful acts by landlords and serves as an umbrella organization for local tenant groups and associations.

Plaintiffs Marjorie and Ted Charron are residents of New York City, and lawful tenants of a rent-stabilized apartment at 706 Riverside Drive, New York, New York, a building owned by Defendants and others through 706 Realty Company, LLC.

-2-

Plaintiff Anthony Casasnovas is a resident of New York City, and a lawful tenant of a rent-stabilized apartment at 3657 Broadway, New York, New York, a building owned by Defendants and others through 3657 Realty Company, LLC.

Plaintiff Karen Flannagan is a resident of New York City, and a lawful tenant of a rent-stabilized apartment at 706 Riverside Drive, New York, New York, a building owned by Defendants and others through 706 Realty Company, LLC.

Plaintiff Andres Mares-Muro is a resident of New York City, and a lawful tenant of a rent-stabilized apartment at 635 Riverside Drive, New York, New York, a building owned by Defendants and others through 635 Realty Company, LLC, a/k/a 635 Riverside LLC, a/k/a 635 Riverside Drive NY LLC.

Plaintiff Tracey Moore is a resident of New York City, and a lawful tenant of a rent-stabilized apartment at 509 West 155th Street, New York, New York, a building owned by Defendants and others through 509 Realty Co., LLC.

Plaintiff Raymond Andrew Stahl-David is a resident of New York City, and a lawful tenant of a rent-stabilized apartment at 516 West 143rd Street, New York, New York, a building owned by Defendants and others through 516 Realty NY LLC.

Plaintiff Russell Taylor is a resident of New York City, and a lawful tenant of a rent-stabilized apartment at 75 St. Nicholas Place, New York, New York, a building owned by Defendants and others through Pinnacle Hamilton LLC.

Plaintiff Diane Trummer is a resident of New York City, and a lawful tenant of a rent-stabilized apartment at 680 Riverside Drive, New York, New York, a building owned by Defendants and others through 680 Realty Co. LLC, a/k/a 680 Riverside Realty Co. LLC.

-3-

Plaintiff Kim Powell is a resident of New York City, and a lawful tenant of a rent-stabilized apartment at 706 Riverside Drive, New York, New York, a building owned by Defendants and others through 706 Realty Company, LLC.

Defendant Pinnacle Group NY LLC ("Pinnacle") is a limited liability company organized under the laws of the State of New York, with its principal place of business in New York. Directly and indirectly, Pinnacle holds interests in affiliated LLCs, corporations, or partnerships, such as those named above, that own some 400 apartment buildings in New York City. Pinnacle operates its businesses under the "d/b/a" umbrella name "The Pinnacle Group."

Defendant Joel Wiener is the founder, Chief Executive Office, and an investor in, and owner of, Pinnacle and various of its affiliates. He directs and manages the Pinnacle Group's affairs. (SAC ¶ 22.) Pinnacle, Pinnacle Managing (an LLC affiliated with Pinnacle) and SecureWatch 24 are under his direction and control. (SAC ¶ 176.) He is a resident of New York.

## 2.    The alleged unlawful activities

### A.    The so-called "Pinnacle Enterprise"

Pinnacle and its partners and associates own or co-own, manage and operate numerous properties throughout New York City, including residential properties in which the individual plaintiffs live. Wiener, as a founder, investor, owner and CEO of Pinnacle, has principal authority and responsibility for overseeing Pinnacle's operations.

Pinnacle's and Wiener's acquisitions of interest in New York apartment buildings were largely funded by The Praedium Group LLC ("Praedium"), a massive real estate investment firm that boasts over $6 billion in nationwide real estate investments made though various Praedium-

controlled funds. (SAC ¶ 5.) According to Praedium's website, Praedium "aggressively manages the current tenant/leasing base," making only "strategic improvements," and "asset repositioning." (SAC ¶ 6.) Praedium, and its principals individually, as explained below, own interests in Pinnacle apartment buildings through multi-layered LLCs and partnerships. (SAC ¶ 5.)

Pinnacle typically holds title to property, manages, operates and does business as separate "LLCs" under the name of each building it owns, but generally does not disclose to tenants the precise ownership structure of the landlord LLC. (SAC ¶ 45.) For example, for the apartment building at 635 Riverside Drive, the landlord is an entity called 635 Riverside Drive NY LLC ("635 LLC"), whose address is the same as Pinnacle's. The sole member of 635 LLC is PMM Associates LLC ("PMM"), whole sole member is 58 Manhattan Associates LLC ("58 Manhattan"). (Id. ¶ 46.) The address of PMM and 58 Manhattan are the same as Praedium's. 58 Manhattan has three members: Manhattan Valley Fund, L.P. ("Manhattan Valley"); P VI-B Manhattan Equity LLC ("Manhattan Equity") and Pinnacle Holding Company XXV LLC (Pinnacle XXV"). (Id.) The principals of Manhattan Valley and Manhattan Equity are A. Floyd Lattin, Russell L. Appel, and Frank P. Patafio, who are all principals of Praedium. (Id.) The principal of Pinnacle XXV is defendant Joel Wiener. (Id.) Other buildings where the individual plaintiffs and putative class members reside have similar ownership structures. (Id.)

In this case, the "persons" allegedly liable for the substantive RICO violations are listed in the Amended Complaint as defendants Joel Wiener and Pinnacle Group NY LLC. (SAC ¶ 173.) The "enterprise" is defined as an association-in-fact enterprise–which plaintiffs call the "Pinnacle Enterprise"– consisting of the following entities: Pinnacle Group NY LLC; Joel

-5-

Wiener; Pinnacle Managing Co., LLC; The Praedium Group LLC; A. Floyd Lattin; Russell L. Appel; Frank P. Patafio; SecureWatch 24; 706 Realty Company, LLC; 3657 Realty Company, LLC; 635 Riverside Drive LLC, a/k/a 635 Riverside LLC, a/k/a 635 Riverside Drive NY LLC; 509 Realty Co., LLC; 516 Realty NY LLC; Pinnacle Hamilton LLC; 680 Realty Co. LLC, a/k/a 680 Riverside Realty Co. LLC; 063-67 W. 107th Street NY LLC; 725 Realty Co. LLC; 634 W. 135th Street LLC; 894 Riverside NY Associates LLC; NYC Residential Manager LLC; Pinnacle Holding Company LLC; Kaben RSD LLC. (SAC ¶ 174)

Plaintiffs allege that the "Pinnacle Enterprise" has operated for the purpose of investing in, owning, managing, and operating residential properties, collecting rents, and converting rental apartment buildings into condominium and cooperative units. (SAC ¶ 175.) The SAC alleges that Joel Wiener is at the top of this structure, and is responsible for "directing the Enterprise's overall course of conduct." (Id.) He allegedly does so "in consultation with other Enterprise members, including Lattin, Appel, and Patafio, who are associated with Praedium." (Id.) Pinnacle and Praedium allegedly function as "umbrella entities through which the individuals may act." (Id.) The lower layer of the "Enterprise" consists of the LLCs that hold title to the individual apartment buildings (the "Landlord LLCs"). As explained in the previous paragraph, there also seem to be intermediate layers of ownership and control between the Landlord LLCs, Wiener, Lattin, Appel, and Patafio. (See SAC ¶ 46.)

Pinnacle is allegedly responsible for managing the Pinnacle Enterprise's day-to-day operations, including negotiating leases, billing for and collecting rent, hiring and supervising building staff, making repairs, supervising capital improvements, sending delinquency and eviction notices, and commencing eviction proceedings. (SAC ¶ 176.) Some of these functions

are done through Pinnacle Managing Co., LLC ("Pinnacle Managing"). (Id.) SecureWatch 24

provides security services to the Pinnacle Enterprise, including the installation of security

cameras that are connected to a central hub in SecureWatch 24's headquarters, allowing

SecureWatch 24 personnel to observe activities in the buildings at all times. (Id.) Pinnacle,

Pinnacle Managing, and SecureWatch 24 are all alleged to be under Joel Wiener's direction and

control. (Id.)

**B.    The alleged scheme**

Plaintiffs allege that defendants have pursued an illegal scheme designed to increase

profits by (a) illegally raising the rent on rent-regulated apartments and (b) illegally forcing

tenants to vacate rent-regulated apartments so that rents can be raised or the units sold as

condominiums or co-ops. The scheme is "intended to intimidate tenants and to create a climate of

fear among tenants and to discourage and prevent them from challenging the Defendants' illegal

actions...." (SAC ¶ 2.) The defendants' alleged illegal acts include, *inter alia*:

    (a)    collecting or threatening to collect rent in amounts that are not permitted under the
law based on misrepresentations as to an apartment's historical rent, on which the
regulated rent is based;

    (b)    collecting or threatening to collect rent in amounts that are not permitted under the
law based on misrepresentations as to the cost and status of repairs and capital
improvements;

    (c)    commencing baseless eviction proceedings based on misrepresentations that rent
that was due had not been paid;

    (d)    sending tenants eviction notices when no rent is actually overdue, for example

-7-

because the tenant is entitled to withhold rent because certain necessary repairs had not been performed;

(e)     creating a climate of fear and intimidation aimed at making tenants afraid to exercise their legal rights or to object to defendants' conduct by (1) using the existence of "blacklisting,"[1] (2) initiating unauthorized surveillance and eavesdropping on prominent tenant leaders through SecureWatch 24, a residential electronic surveillance company owned or controlled by the defendants, and (3) attempting to "buy-off" tenants whose oppose defendants' alleged misconduct.

For example, Plaintiffs Marjorie and Ted Charron allege that defendants failed to notify them that their apartment was rent-stabilized when they first moved in. Defendants charged the Charrons a "preferential" rent of $1,900 per month for their apartment, but represented that the "legal" rent on the lease was $2,500 and that they could have charged as much as $2,500 based on the approximate $20,000 of renovations defendants had allegedly undertaken in the unit. When the Charrons investigated the alleged renovations that defendants purportedly made, they discovered that defendants had submitted fraudulent receipts to the New York DHCR for "renovations" to justify a fraudulent rent overcharge. The Charrons filed several Article 78 petitions to establish the overcharge, and the DHCR found that the rent was only $1,337.09 and that the rent overcharge totaled $10,778.74. However, the defendants have failed to credit the Charrons this money. When the Charrons attempted to withhold rent based on the credit they

---

[1] "Blacklisting" is a practice where commercial tenant screening bureaus purchase electronic housing court case data from the Office of Court Administration use this data to prepare so-called "tenant screening reports" based on that data, and then sell such reports to prospective landlords.

should have received, the defendants caused the landlord to send them eviction notices, dated 26, 2006. Defendants subsequently filed a demand for rent in housing court. The Charrons have continued to pay the unlawfully inflated rent amounts out of fear of being evicted.

When plaintiff Anthony Casasnovas' lease came up for renewal, Pinnacle increased his rent, but refused to explain the increase. He then learned that his unit was rent stabilized, and that he was being overcharged. Mr. Casasnovas subsequently sent defendants a letter informing them that he would withhold rent until they justified the rent they were charging and provided documentation substantiating any alleged renovation that they conducted. He also filed a complaint with DHCR based on the overcharge in rent. In response, "defendants caused the landlord to send" Mr. Casasnovas eviction notices, demanding $4,400 in back rent. Defendants also filed an action in housing court seeking to evict Mr. Casasnovas. Mr. Casasnovas and Pinnacle settled the lawsuit, but Pinnacle has yet to provide him with a rent bill in the correct amount agreed upon in the settlement.

Mr. Stahl-David also subsequently learned that the unit he leased from Pinnacle was rent-stabilized and filed a rent overcharge claim with the DHCR. After he fell behind in rent payment, the defendants caused the landlord to send him eviction notices. The defendants also commenced an eviction proceeding. Rather than face eviction, Mr. Stahl-David paid the full amount claimed. Several months later, Mr. Stahl-David received a favorable ruling from the DHCR, finding an overcharge. After receiving the order, Mr. Stahl-David tendered rent to Pinnacle in the amount established by the Order. Defendants refused to deposit his payments and sent him a rent bill stating that he was in arrears. Finally, the defendants caused the landlord to send Mr. Stahl-David a lease reflecting the proper rental amount.

Plaintiff Tracey Moore also claims that defendants threatened to evict her after she failed to pay her rent on time. However, there is no allegation that Ms. Moore was willfully withholding rent based on a belief that she was being overcharged. Indeed, the SAC admits that, at the time, she did not know the rent was unlawfully inflated. (SAC ¶ 110.) She subsequently obtained a rental history from the DHCR and discovered that she was in fact being overcharged. She filed a rent overcharge claim with the DHCR. Several months later, defendants commenced another eviction proceeding against Ms. Moore, presumably because she missed more rent payments. Ms. Moore ultimately received a favorable ruling from the DHCR, finding a $5000 overcharge and trebling the damages. The defendants have not credited her with that amount or provided her with a lease reflecting the correct rental price.

Defendants mailed eviction notices to and commenced eviction proceedings against plaintiff Russell Taylor, based on failure to pay rent. Mr. Taylor sent copies of his rent checks to defendants via certified mail. Defendants dropped the case eight months later.

Plaintiff Karen Flannagan claims that defendants threatened to evict her based upon a dispute over succession rights. In 1969, Ms. Flannagan moved with her parents into a rent-controlled apartment owned by a Pinnacle-affiliated entity. Four years later she moved out. In 1997, she moved back in and maintained a continuous residence with her daughter and mother. After her mother died, defendants stopped accepting her rent checks, claiming that she was not the "primary tenant" on the lease. Defendants requested extensive evidence of her succession rights. Defendants then caused the landlord to serve Ms. Flannagan with a "Ten Days Notice to Quit Licensee," which alleged that she was not a lawful successor tenant to her parents. When Ms. Flannagan did not quit her apartment, defendants commenced a holdover proceeding against

her. In April 2006, defendants dropped the case.

Defendants commenced eviction proceedings against plaintiff Kim Powell, claiming that unpaid rent was due. Ms. Powell, however, claims that her rent was paid in full. Ms. Powell also claims that defendants installed a security device in front of her apartment door around the time this lawsuit was filed in an effort to harass and intimidate her.

Defendants did not threaten plaintiff Andres Mares-Muro with eviction, but claimed that he had never paid a security deposit. Defendants caused the landlord to send him a lease renewal so stating. Andres Mares-Muro also believed that his rent was unlawfully inflated, but because of a four-year regulatory limitation on the ability to contest a rent increase, he was unable to challenge the rent overcharges for his apartment.

Defendants also did not threaten plaintiff Diane Trummer with eviction, but she was forced to vacate her apartment after a fire broke out in a neighboring unit on June 20, 2004. The DHCR issued an order allowing Ms. Trummer to pay $1 for rent until DHCR ordered the rent restored. On September 5, 2006, defendants caused the landlord to petition the DHCR to restore the rent, and to establish January 1, 2005 as the date when the apartment was allegedly habitable. Ms. Trummer, however, was not able to move unto the apartment until November 2005. Finally, Pinnacle agreed, and Ms. Trummer's rent was restored on January 1, 2006.

The SAC alleges that by virtue of the aforementioned conduct, defendants have committed mail fraud in violation of 18 U.S.C. § 1341, extortion in violation of § 1951 and state law, and violated the National Stolen Property Act ("NSPA"), 18 U.S.C. § 2314.

**3.    Procedural History**

Plaintiffs filed their complaint on July 11, 2007. The Amended Complaint was filed on

September 14, 2007, and the RICO Statement was filed on September 28, 2007. The Second

Amended Complaint ("SAC") was filed on October 24, 2007. In Claim I of the SAC, plaintiff

pleads a violation of the New York Consumer Protection Act. Count II pleads a RICO claim

under 18 U.S.C. § 1962(c). Defendants now move to dismiss the complaint.

## DISCUSSION

## I.    Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a

complaint that fails to state a claim upon which relief can be granted. The standard of review on

a motion to dismiss is heavily weighted in favor of the plaintiff. "In ruling on a motion to

dismiss for failure to state a claim upon which relief may be granted, the court is required to

accept the material facts alleged in the complaint as true." Frasier v. General Elec. Co., 930 F.2d

1004, 1007 (2d Cir. 1991). The court is also required to read a complaint generously, drawing all

reasonable inferences from its allegations in favor of the plaintiff. California Motor Transp. Co.

v. Trucking Unlimited, 404 U.S. 508, 515 (1972).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007) (internal

quotation marks, citations, and alterations omitted). Indeed, a plaintiff must assert "enough facts

to state a claim to relief that is plausible on its face." Id. at 1974. This "plausibility standard" is

a flexible one, "oblig[ing] a pleader to amplify a claim with some factual allegations in those

contexts where such amplification is needed to render the claim *plausible*." Iqbal v. Hasty, 490

-12-

F.3d 143, 157-58 (2d Cir. 2007).

## II.     RICO claim

The RICO statute, 18 U.S.C. § 1961 *et seq.,* makes it "unlawful for any person employed

by or associated with any enterprise ... to conduct or participate ... in the conduct of such

enterprise's affairs" through the commission of two or more statutorily defined crimes– which

RICO calls "a pattern of racketeering activity." See § 1962(c); Cedric Kushner Promotions, Ltd.

v. King, 533 U.S. 158, 160, 121 S.Ct. 2087, 2089 (2001). The defendants argue that plaintiffs

fail to allege a violation of the RICO statute because the Second Amended Complaint (1) fails to

allege a pattern of racketeering activity, (2) fails to allege an "enterprise," (3) fails to allege an

injury to "business or property" and (4) fails to plead causation. Defendants also argue that

BRUSH has no standing to bring a RICO claim.[2]

### A.     BRUSH has no standing

Plaintiffs concede that BRUSH does not seek standing as a representative of any

members. (Pl. Opp. p. 32.) Instead, plaintiffs assert that BRUSH has standing to bring claims on

its own behalf because it has been directly injured by defendants' actions. The only injury,

however, that BRUSH alleges is that defendants' scheme has frustrated BRUSH's efforts to

advocate for and organize tenants who occupy rent-regulated apartments in West Harlem and

Northern Manhattan communities. This may give BRUSH constitutional standing; however,

RICO poses a much higher standing requirement. RICO injury requires injury to "business or

property," and does not encompass activity that merely "conflicts with the group's mission and

---

[2]Defendants' argument that the individual plaintiffs lack standing is completely without
merit.

renders their objectives more difficult to achieve." Libertad v. Welch, 53 F.3d 428, 437 (1st Cir. 1995). Given plaintiffs' rejection of associational standing, BRUSH fails to establish RICO injury, and therefore does not have standing to bring a RICO claim.

## B. RICO Pattern

To survive Defendants' motion to dismiss the RICO count of the SAC alleging a violation of 18 U.S.C. § 1962(c), Plaintiffs must have alleged that they were injured by Defendants' conduct of an enterprise through a pattern of racketeering activity. First Capital Asset Management, Inc. v. Satinwood, Inc., 385 F.3d 159, 178 (2d Cir. 2004); Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir.1999). For these purposes, a "pattern of racketeering activity" consists of "at least two [predicate] acts of racketeering activity" committed in a ten-year period, 18 U.S.C. § 1961(5), which "'amount to or pose a threat of continued criminal activity.' " Id. (quoting Cofacredit, *supra*, 187 F.3d at 242 (quoting H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)).

The SAC identifies the following predicate acts: mail fraud in violation of 18 U.S.C. § 1341, extortion in violation of § 1951 and state law, and violation of the National Stolen Property Act ("NSPA"), 18 U.S.C. § 2314. At least two predicate acts of mail fraud are pleaded with sufficient particularity to survive a motion to dismiss.

To establish mail fraud as a RICO predicate act, a plaintiff must demonstrate that defendants knowingly or intentionally participated in a "scheme to defraud" using the U.S. mails "in furtherance of the scheme." S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp., 84 F.3d 629, 633 (2d Cir. 1996). In addition, pursuant to Rule 9(b), the complaint must allege the content of the fraudulent communication, who made and received the communication, where and when it

-14-

took place, and describe why the information transmitted was fraudulent. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir. 1993). Finally, the complaint must "provide some minimal factual basis" that gives rise to a strong inference of fraudulent intent. Powers v. British Vita, P.L.C., 57 F.3d 176, 184 (2d Cir. 1995).

The SAC details more than 30 specific instances of defendants'[3] use of the U.S. mail to send communications of various types to plaintiffs– e.g., lease renewal forms, ten day notices of termination; thirty day notices of termination. (*See* SAC ¶ 181.) The SAC alleges that these mailings were intended to speed up the Pinnacle Enterprise's conversion of rent-stabilized and rent-controlled apartments into condominiums, co-ops, or rental units at significantly higher rents. Plaintiffs also allege that defendants used the mails to coordinate efforts in furtherance of their scheme (SAC ¶ 181.) Because the mailings sent between the members of the Pinnacle Enterprise are not alleged to contain fraudulent misrepresentations, those allegations need not be pleaded with particularity. In re Sumitomo Copper Litig., 995 F. Supp. 451, 456 (S.D.N.Y. 1998) (when non-fraudulent mailings are alleged, only the fraudulent scheme must be pleaded in detail).

Plaintiffs admit that the landlord LLCs, not defendants, actually sent the various communications to the plaintiffs. However, the mail fraud statute does not require that the defendant personally place a letter in the mailbox. Brooke v. Schlesignger, 898 F. Supp. 1076, 1086 (S.D.N.Y. 1995). A person causes mailings to be made if he directs employees to engage in

---

[3]Defendants argue that the SAC runs afoul of Rule 9(b) by failing to specify who among the two defendants committed which alleged bad acts. This argument barely passes the straight face test. There are only two defendants: Wiener and Pinnacle. Wiener is the founder, investor, owner and CEO of Pinnacle, and has principal authority and responsibility for overseeing Pinnacle's operations.

fraudulent actions, id., or if his fraudulent scheme makes the mailings reasonably foreseeable. United States v. Bortnovsky, 879 F.2d 30, 36 (2d Cir. 1989). Plaintiffs have alleged that, given the nature of defendants' scheme, it was foreseeable that the mails would be used to send lease renewals, rent demands, and evictions notices.

Plaintiffs have also alleged the requisite "specific intent to defraud." United States v. Gole, 158 F.3d 166, 167 (2d Cir. 1998). The Second Circuit uses two tests for inferring intent. The first test looks for allegations of a motive and opportunity to commit fraud, while the second looks for allegations of conscious behavior indicating intent. Powers, *supra*, 57 F.3d at 184. A complaint may survive by alleging facts that satisfy either test. Unlike other elements of mail fraud, these facts may be pleaded generally via circumstantial evidence. Goldman v. Belden, 754 F.2d 1059, 1070 (2d Cir. 1985). The SAC satisfies both tests.

Motive often involves the potential for economic benefit. See, e.g., Turkish v. Kasenetz, 27 F.3d 23, 28 (2d Cir. 1994); Goldman, *supra*, 754 F.2d at 1070; U.S. Fire Ins. Co. v. United Limousine Serv., 303 F. Supp. 2d 432, 444-45 (S.D.N.Y. 2004). Opportunity involves being in a position that allows the defendant to carry out his plan. See, e.g., Turkish, *supra*, 27 F.3d at 28.

Here both defendants stand to benefit financially from their fraudulent scheme by receiving inflated rent payments and profits from the increased rents and the conversion of rental buildings to owner-occupied condominium apartments. Similarly, as controlling members of the alleged Pinnacle Enterprise and co-owners of the apartment buildings in question, defendants are in a position to carry out their plans. They negotiate leases, send rent bills, determine when to file eviction suits, and arrange condominium conversion.

The SAC also satisfies the conscious behavior test, which looks for strong circumstantial

-16-

evidence that a defendant acted in bad faith. See, e.g., Powers, *supra*, 57 F.3d at 185-86; In re Ann Taylor Stores Sec. Litig., 807 F. Supp. 990, 1006-07 (S.D.N.Y. 1992). The allegations point to numerous examples of defendants' bad faith– e.g., continuing to charge inflated rent even after DHCR ruling to the contrary (SAC ¶¶ 93-94, 122), failing to honor a settlement agreement (SAC ¶¶ 102-03), and repeatedly failing to return overpayments (SAC ¶¶ 94-95, 115). Defendants argue that their behavior only indicates legitimate disputes between them and the tenants. However, drawing all reasonable inferences in plaintiffs' favor, these allegations are sufficient to survive a motion to dismiss.

Finally, plaintiffs have adequately pleaded causation by alleging that certain plaintiffs relied on defendants' misrepresentations. See Bridge v. Phoenix Bond & Indem. Co., 128 S.Ct. 2131, 2139, 2143 (2008) (a RICO plaintiff who alleges injury by reason of mail fraud must show that someone relied on the misrepresentations and that plaintiffs' injury was a foreseeable result). For example, the SAC alleges that defendants caused Ms. Moore's landlord to send her a "Thirty Day Notice to Debtor" and "Three Day Notice to Debtor," both demanding unlawfully inflated rent amounts. (SAC ¶ 110.) She paid this amount, not realizing that she was being overcharged. (SAC ¶ 111.) In addition, the SAC alleges that before signing their leases, several plaintiffs were fraudulently told that the rental rates were the "legal rates" when they were, in fact, inflated. It is reasonable to infer that plaintiffs would have refused to sign these leases had they known the truth. The later mailings were mostly Pinnacle's attempts to enforce those leases. Even though plaintiffs' reliance occurred before the mailings, those later mailings are still causally connected to the harm suffered by plaintiffs, because they were a necessary precursor to the eviction proceedings that forced many plaintiffs to miss work and spend money on litigation.

## B.    RICO Enterprise

"'Enterprise' is defined to 'include[ ] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" Bankers Trust Co. v. Rhoades, 741 F.2d 511, 515 (2d Cir. 1984) (quoting 18 U.S.C. § 1961(4)). The Supreme Court has explained that a RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," the existence of which is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

The SAC adequately pleads an enterprise that is distinct from the RICO persons, and the hierarchy and organization of that enterprise.

### 1.    The "Pinnacle Enterprise" is distinct from the RICO persons

To establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a "person"; and (2) an "enterprise" that is not simply the same "person" referred to by a different name. Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161-62, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001).

In this case, the "person' allegedly liable for the substantive RICO violations are listed in the Amended Complaint as defendants Joel Wiener and Pinnacle Group NY LLC. (SAC ¶ 174.) The "enterprise" is defined as an association-in-fact enterprise–which plaintiffs call the "Pinnacle Enterprise"– consisting of the following entities: Pinnacle Group NY LLC; Joel Wiener; Pinnacle Managing Co., LLC; The Praedium Group LLC; A. Floyd Lattin; Russell L. Appel; Frank P. Patafio; SecureWatch 24; 706 Realty Company, LLC; 3657 Realty Company, LLC; 635

Riverside Drive LLC, a/k/a 635 Riverside LLC, a/k/a 635 Riverside Drive NY LLC; 509 Realty

Co., LLC; 516 Realty NY LLC; Pinnacle Hamilton LLC; 680 Realty Co. LLC, a/k/a 680

Riverside Realty Co. LLC; 063-67 W. 107th Street NY LLC; 725 Realty Co. LLC; 634 W. 135th

Street LLC; 894 Riverside NY Associates LLC; NYC Residential Manager LLC; Pinnacle

Holding Company LLC; Kaben RSD LLC. Thus, the "person" and the "enterprise" do not

completely overlap.

Defendants argue that SecureWatch 24 and the Landlord LLCs are Pinnacle affiliates and

should be considered part of the same Pinnacle entity for RICO enterprise purposes. See Discon,

Inc. v. NYNEX Corp., 93 F.3d 1055, 1064 (2d Cir. 1996), *rev'd on other grounds*, 525 U.S. 128,

119 S. Ct. 493, 142 L.Ed 2d 510 (1998) (the distinctness requirement is not met where the

'person' is a corporation and the 'enterprise' consists of the corporation associating with

subsidiaries "operat[ing] within a unified corporate structure."); see also In re Parmalat Sec.

Litig., 479 F. Supp. 2d 332, 346 (S.D.N.Y. 2007). However, the SAC does not allege that

SecureWatch 24 is a Pinnacle subsidiary. Rather, the SAC alleges that Wiener "has an interest"

in SecureWatch 24, which operates a distinct business of providing digital video and audio

surveillance devices in buildings owned by the Landlord LLCs and other entities within the

enterprise. (SAC ¶ 4) This does not even make it an affiliate of Pinnacle. Instead, it makes

SecureWatch 24 a distinct, active operating businesses. See Securitron Magnalock Corp. v.

Schnabolk, 65 F.3d 256, 263-64 (2d Cir. 1995) ("[E]ven if [defendant] owned 100% of the

shares of each corporation, the corporation would be separately legal entities capable of

constituting an association-in-fact enterprise.").

As for the LLCs, the SAC alleges that they are jointly owned through a web of

-19-

intermediary entities by persons associated with both Pinnacle and Praedium. (SAC ¶ 46.) Thus, as with SecureWatch 24, Pinnacle and the LLCs are not identical to the Pinnacle Enterprise, because corporations in similar, but distinct, lines of business that are under the same ownership structure do not share an identity for RICO enterprise purposes. Securitron, *supra*, 65 F.3d at 263-64.

Wiener is also distinct from the Pinnacle Enterprise. The Pinnacle Enterprise is an association of entities with which Wiener has a variety of relationships, including many LLCs of which he is only a part owner. But even assuming that he were the sole owner of the entire enterprise, he would still be distinct from it under RICO. See Cedric, *supra*, 533 U.S. at 163 ("[t]he corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different legal rights and responsibilities due to its different legal status," and "nothing in the statute ... requires more 'separateness' than that.").

Finally, the SAC alleges that Praedium and certain of its individual officers are members of the Pinnacle Enterprise, further distinguishing Wiener and Pinnacle from the Enterprise. Defendants argue that they cannot be part of the Pinnacle Enterprise because Praedium is simply a source of funding to Pinnacle. However, the SAC alleges that Praedium has taken a role in the Enterprise's affairs by, among other things, funding the enterprise's acquisitions, maintaining an ownership interest in the LLCs (making it a joint owner of certain Pinnacle buildings), and setting forth the enterprise's investment strategy. Assuming these allegations to be true (as I must on this motion), Praedium is not merely a banker lending money to Pinnacle. The relationship is much more involved. Whereas in the typical business relationship, two or more parties rely upon each other to achieve separate, but dependent economic benefits, *see*

-20-

VanDenBroeck v. CommonPoint Mortgage Co., 22 F. Supp. 2d 677, 682 (W.D. Mich. 1998),

here the economic benefit of owning the buildings is joint. As co-owners, Praedium and

Pinnacle both make a share of the rents received from tenants and the proceeds received from

condominium sales. They benefit in the same way from the Enterprise's successes and they

suffer in the same way from the Enterprise's failures. Moreover, they are allegedly locked into

the relationship by virtue of the joint ownership. Praedium may well be able to defeat liability on

the merits, but at this stage of the proceedings, it is sufficiently identified as a member of the

Enterprise.

### 2. Plaintiffs fail to allege the hierarchy and organization of the alleged enterprise

Plaintiffs have alleged "solid information regarding the hierarchy, organization and

activities of th[e] alleged association-in-fact enterprise, from which [the court] could fairly

conclude that its members functioned as a unit." Satinwood, *supra*, 385 F.3d at 174 (internal

quotations and citations omitted); see also United States v. Turkette, 452 U.S. 576, 583, 1010 S.

Ct. 2524, 2528-29 (1981).

Plaintiffs allege that Joel Wiener "directs the enterprise in consultations with individual

members, including Lattin, Appel, and Patafio"; LLCs comprise the lower layer of the so-called

enterprise, and suggest that there may be intermediate layers of ownership and control.

According to the SAC, the "purpose" of the alleged enterprise was investing, owning, managing,

and operating residential properties, collecting rents, and converting rental apartment buildings

into condominium and cooperative units.

Additionally, each member of the enterprise is alleged to associate together for the

-21-

purpose of investing, owning, managing, and operating residential properties, collecting rents,

and converting rental apartment buildings into condominium and cooperative units. Pinnacle

manages the buildings and is responsible for the day-to-day operations of the enterprise,

including negotiating leases, billing for and collecting rent, hiring and supervising building staff,

making repairs, supervising capital improvements, sending delinquency and eviction notices, and

commencing eviction proceedings. (SAC ¶ 176.) The SAC alleges that at least some of these

functions are done through Pinnacle Managing Co., LLC. (Id.) SecureWatch 24 provides

security services to the Pinnacle Enterprise, including the installation of security cameras that are

connected to a central hub in SecureWatch 24's headquarters, allowing SecureWatch 24

personnel to observe activities in the buildings at all times. (Id.) Additionally, Praedium funds

the buildings and maintains ownership in certain buildings and LLCs. Finally, the Landlord

LLCs hold title to the individual buildings. These allegations are sufficient to survive

defendants' motion.

## III.    Plaintiffs' State Law Claim

As the Court has jurisdiction over defendants based on the RICO statute, it exercises

supplementary jurisdiction as to the plaintiffs' New York Consumer Protection Act ("NYCPA")

claim.

The NYCPA prohibits "[d]eceptive acts or practices in the conduct of any business,

trade, or commerce." N.Y. Gen. Bus. Law § 349(a). The leading case on GBL § 349 is Oswego

Laborers' v. Marine Midland Bank, 85 N.Y.2d 20, 623 N.Y.S.2d 529 (1995). It sets out a 3-

factor test for determining consumer fraud: (1) a consumer oriented transaction; (2) deceptive

acts by the defendant; and (3) injury caused by such deceptive acts. 623 N.Y.S.2d at 532.

Here, the Individual Plaintiffs plead the elements necessary to state a claim under GBL §

349. Defendants argue that a landlord-tenant relation is contractual, not consumer oriented, and

therefore not subject to the consumer protection laws. However, New York courts, interpreting

consumer protection statutes, give tenants private rights of action against their landlords. See

Travieso v. Gutman, 1995 WL 704778, 7 (E.D.N.Y. 1995) (citing 23 Realty Asociates v.

Teigman, 624 N.Y.S.2d 155 (1st Dept.1995) (apartment dweller is consumer of housing, and

may assert New York City consumer protection law); Lozano v. Grunberg, 195 A.D.2d 308, 600

N.Y.S.2d 43 (1st Dept.1993) (deceptive dispossess notices for late rent payments violates GBL §

349); Frazier v. Priest, 534 N.Y.S.2d 846 (Jefferson Co.1988) (GBL § 349 applies to the

landlord-tenant relationship)).

Plaintiffs allege numerous acts of deception that caused plaintiffs to suffer injury. Some,

however, may be barred by the three year statute of limitations applicable to § 349 actions.

"Under New York law, a claimant's cause of action accrues upon injury by the deceptive act or

practice, *i.e.,* 'when all of the factual circumstances necessary to establish a right of action have

occurred, so that the plaintiff would be entitled to relief.'" Gristede's Foods, Inc. v. Unkechauge

Nation, 532 F. Supp. 2d 439, 452 (E.D.N.Y. 2007) (quoting Gaidon v. Guardian Life Ins. Co., 96

N.Y.2d 201, 209-10, 727 N.Y.S.2d 30, 750 N.E.2d 1078 (2001)). Thus, plaintiffs may not assert

any claims which accrued prior to July 11, 2004, three years before the complaint was filed.

## CONCLUSION

For the foregoing reasons, BRUSH has no standing to bring a RICO claim. The

remainder of defendants' motion is denied.

September 5, 2008

Colleen McMahon, U.S.D.J

BY ECF TO ALL COUNSEL