# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHARRON et al., ) | |
| ) | No. 1:07-cv-6316-CM |
| Plaintiffs, ) | (CM) (RLE) |
| ) | |
| v. ) | |
| ) | |
| PINNACLE GROUP NY LLC and ) | |
| JOEL WIENER, ) | |
| ) | |
| Defendants. ) | |

**SECOND SUPPLEMENTAL MEMORANDUM OF LAW IN RESPONSE TO OBJECTIONS TO THE SETTLEMENT AGREEMENT**

Richard F. Levy
Marisa K. Perry
Chavi Keeney Nana
Joshua H. Rubin
JENNER & BLOCK LLP
919 Third Avenue, 37th Floor
New York, NY  10022-3908
(212) 891-1600 telephone
(212) 891-1699 facsimile

*Class Counsel*

## **TABLE OF CONTENTS**

I.   Introduction ............................................................................................................... 2

II.  Responses to Remaining Objections ........................................................................ 3

    A.  Objection to Settlement Negotiations ............................................................... 5

    B.  Objection to the Notice Program ....................................................................... 6

    C.  Objections Related to the Amount of Monetary Relief Available or to the Recipients of the Monetary Relief ........................................................................ 7

    D.  Objections to the Exclusion of Pre-2004 and Prior Owner Rent Overcharge Claims ................................................................................................................. 8

    E.  Objections to the Scope of the Lease Audit ..................................................... 9

    F.  Objections that Repairs are not expressly included in the Settlement. ......... 11

    G.  Objections Regarding Oversight over Pinnacle ............................................. 11

    H.  Objections Regarding Major Capital Improvements (MCIs) ....................... 12

**CONCLUSION** ................................................................................................................ 13

**I.      INTRODUCTION**

On March 16, 2012, Class Counsel timely filed its Memorandum in Support of Motion for Final Approval of Settlement Agreement and in Response to Objections to the Settlement Agreement. (Dkt. 181, "Memorandum in Support.")  The Memorandum in Support responded to most objections received from Class Members through March 12, 2012.  On April 5, 2012, Class Counsel filed its Supplemental Memorandum in Response to Objections to the Settlement Agreement.  (Dkt. 192, "First Supplemental Memorandum.")  Hard copies of the objections, tabbed and indexed to the Memorandum in Support, were delivered to the Court on March 19, 2012 and April 6, 2012, respectively.

This Second Supplemental Memorandum responds to submissions received after the April 5, 2012 filing, either by the Court, or by Class Counsel through the Pinnacle post office box (the "Remaining Objections").  All of the issues raised in the Remaining Objections have previously been considered and rejected by this Court or have been fully addressed in Class Counsel's Memorandum in Support or the First Supplemental Memorandum responding to objections.  Neither the substance nor the scope of the Remaining Objections undermine Class Counsel's conviction that the Settlement is fair, reasonable, and adequate.

Now that all of the objection and opt-out periods have ended, the Court can fully assess the reaction of the class as a whole.  The final count of class member responses to the Settlement (those reported in Class Counsel's Memorandum in Support plus all other responses postmarked by April 27, 2012) is as follows:

- 56 letters supporting the Settlement;

- 118 objections to the settlement (64 do not state the basis for the objections;[1] 90 appear on identical forms, some of which were distributed and solicited by Class Representatives);[2]
- 141 Opt Outs;
- 131 requests to appear;
- 5 opt ins from Class Members who had previously opted out.

Fewer than 1% of the Class Members who received the Initial Notice, the Revised Notice and the Supplemental Notice[3] opted out of the lawsuit (only 1.1% of the Omitted Tenants opted out of the lawsuit), and an even smaller percentage of the class objected to the lawsuit (no objections were received from Omitted Tenants during the Supplemental Notice period). Accordingly, the reaction of the Class as a whole still supports final approval of the Settlement.

## II.   RESPONSES TO REMAINING OBJECTIONS

None of the Remaining Objections raises any new issues for the Court with respect to the fairness, reasonableness, or adequacy of the proposed Settlement. Because Class Counsel has previously addressed the objections either in written submissions to the Court, or during the oral presentation at the Fairness Hearing, this memorandum will only briefly summarize and respond to the seven recent submissions from class members that include objections to the Settlement.

On May 1, 2012, Class Counsel received ten submissions that had been sent directly to the Court following the Fairness Hearing. The submissions can be broken down as follows: (1) one submission from a non-class member (Gin) whose attempts to intervene in this action were

---

[1] Some objectors who originally submitted unspecified objections subsequently submitted specified objections and are no longer counted as "unspecified" objectors.
[2] Versions of some of the "form" objection letters and notices of appearance were circulated by the Class Representatives during the community meeting on October 5, 2011 and again at a community meeting that Class Counsel attended on March 24, 2012.
[3] On March 9, 2012, the Court entered an order (Dkt. 177), requiring that a Supplemental Notice sent to certain class members whose names had inadvertently been omitted from the list of class members provided by Defendants, and extended the opt-out date for these persons for forty five days, until April 27, 2012. These persons are referred to as "Omitted Tenants."

3

denied by this Court and by the Second Circuit;[4] (2) two submissions from Class Representatives (K. Powell and M./T. Charron) who previously submitted specific objections and a brief opposing the Settlement'[5] (3) four objections from class members who have previously submitted specific objections to the Settlement;[6] (4) one objection from a class member who has not previously objected (G. Harris-Wortham); and (5) two letters from class members detailing their problems with Pinnacle but not raising any objections to the Settlement (M. Stewart, Turapin/Rijkov). All of the objections received after the April 5, 2012 filing simply repeat objections previously submitted to the Court.

In addition to the submissions to the Court, ten class members submitted letters to Class Counsel's post office box that we received after the April 5, 2012 filing.[7] Those submissions include: (1) four timely opt-outs from Omitted Tenants; and (2) six letters from class members detailing their problems with Pinnacle but not raising any objections to the Settlement (A. Allicock, A. Manon, L. Henriquez, F. Cervi, P. Mendoza, A. Vega). Notably, no Omitted Tenants submitted objections after the April 5, 2012 filing.

---

[4] As a non-class member, Mr. Gin has no standing to object to the Settlement and the objections should therefore be given no weight. Mr. Gin's submission contains highly inflammatory accusations regarding this Court, the Second Circuit, and Jenner & Block LLP to which Class Counsel will not respond. Mr. Gin's unfounded and unsupported accusation that the Settlement is "grossly unfair and humiliating" is not supported in his submission by any substantive discussion of those parts of the Settlement he finds objectionable.

[5] Notably the submissions from Ms. Powell and the Charrons include many statements they assert as fact but for which they offer no citation or support.

[6] Merle Augustin previously submitted specific objections which are located at Tab 11, Book 1 and Tab 21, Book 4; Anne Beaumont submitted a specific objection at Tab 22, Book 4 and an unspecified objection at Tab 22, Book 1; Michael Blackman submitted a specific objection at Tab 12, Book 1; and Vanessa Penn submitted a specific objection at Tab 4, Book 1.

[7] Class Counsel has prepared a book containing hard copies of every opt-out and submission received through May 3, 2012 and postmarked by April 27, 2012 (excluding those submissions already transmitted to the Court) entitled "Book 5: Supplemental Class Member Submissions Postmarked by April 27, 2012," which will be delivered to the Court together with this memorandum.

### A. Objection to Settlement Negotiations.[8]

Ms. Powell[9] continues to argue that the Class Representatives should have been more involved in the Settlement negotiations.

First, Ms. Powell dismisses the first five meetings Class Counsel cited as pre-mediation discussion, but the point of those meetings was to prepare for settlement talks and to provide Class Counsel with ample opportunity to listen to and discuss the Class Representatives' positions regarding settlement. Contrary to the assertion that the Class Representatives were marginalized, those meeting helped fundamentally shape Class Counsel's approach and positions during settlement negotiations with Pinnacle.

Second, Ms. Powell asserts as fact that the Class Representatives had "no communication about the substantive [sic] of the proposed settlement for almost an entire five month period." As Mr. Levy pointed out during the Fairness Hearing, and as is evident from the enclosed "Class Counsel's Correspondence with Lead Plaintiffs" book,[10] there is no five month period where there was "no communication" between Class Representatives and Class Counsel about the substance of the Settlement.

Third, Ms. Powell assumes that if a Class Representative made a substantive suggestion that was not incorporated into the Settlement, the reason is because Class Counsel "ignored" those suggestions. Nothing could be further from the truth. We have repeatedly emphasized that the Settlement negotiations were extremely contentious. Class Counsel solicited, listened to, and discussed with Defendants every suggestion from the Class Representatives during the

---

[8] Class Counsel already responded to this argument in the April 5, 2012 filing (Dkt. 192) at pages 23-24, but will respond again briefly here.

[9] Submissions from Ms. Powell, Mr. and Mrs. Charron, Ms. Augustin, Ms. Beaumont, Mr. Blackman, Ms. Penn, and Ms. Wortham were submitted directly to the Court and are not included in Book 5.

[10] In response to this objection at the Fairness Hearing, Mr. Levy informed the Court that we would submit a book containing correspondence between the Class Representatives and Class Counsel for the relevant period.

5

negotiations. Further, every suggestion from the Class Representatives was discussed by them with Magistrate Judge Ellis during a lengthy meeting on October 7, 2010. Some of Class Representatives' suggestions, like the written protocols, are a flagship of the final Settlement Agreement. Pinnacle rejected others. Ultimately, neither side got everything they wanted.

Finally, both Ms. Powell and the Charrons have argued that Class Counsel has levied "unwarranted attacks on our character." Class Counsel's efforts to correct instances where the Class Representatives made material misstatements about the Settlement has nothing to do with their character and, in fact, is fully consistent with counsel's fiduciary duty to the unnamed class members.

### B. Objection to the Notice Program.[11]

Ms. Powell also objects on the grounds that the notice was not received by all class members. Class Counsel's efforts to notify every Class Member have been fully documented and presented to the Court, but Class Counsel acknowledges that no notice program is perfect and that some class members did not receive notices in the mail.[12] As the Court is aware, the relevant question is not whether all class members *received* notice, but rather the efforts Class Counsel undertook to provide notice.[13] Accordingly, the Court need not reconsider its prior

---

[11] Class Counsel already responded to this argument in its Memorandum in Support at pages 15-21 & 46, and the First Supplemental Memorandum at pages 7-8, but will respond again briefly here.

[12] For example, Pinnacle tenants did not always provide a forwarding address when they vacated their apartments. Nevertheless, both Pinnacle and Dahl Administration, LLC attempted to locate those tenants using various address databases to find current contact information so that the notices could be sent. (Dkt. 180, 184.) For that reason, Class Counsel took the additional steps of setting up a toll free hotline and responding to over a thousand class member calls, publishing the notice in English (in the *New York Post*) and in Spanish (in *El Diario*), setting up a website where class members could and did request notices throughout the Initial, Revised, and Supplemental Notice periods, and promptly addressing with Pinnacle's counsel any issues regarding notice that were brought to its attention.

[13] *See* First Supplemental Memorandum at page 8 note 19.

rulings that the Revised Notice, the Supplemental Notice, and the notice program complied with the requirements of Due Process and the Federal Rules of Civil Procedure.

      **C.**      **Objections Related to the Amount of Monetary Relief Available or to the Recipients of the Monetary Relief.[14]**

Multiple class members object to the amount of compensation that is offered and/or the persons or entities who are slated to receive compensation.[15] Mr. Blackman's argument that the total amount of monetary compensation is "an insult" ignores the fact that there is no cap on total damages for the class or on damages to individual class members. His contention that he cannot recoup the "actual time and expense that I spent staying home" waiting for Pinnacle to do repairs is wrong. The Settlement provides for actual damages associated with harassment claims and if Mr. Blackman can establish damages resulting from harassment in a manner satisfactory to the Claims Administrator, he will receive the full amount of his damages.

Ms. Powell, Ms. Beaumont and Ms. Penn take issue with the fact that Ms. Powell's organization (BRUSH) did not receive money under the Settlement, and argue that Harlem-based organizations should have been selected to receive the $150,000 for education and outreach. Mr. Blackman contends that none of the selected organizations is located in his area of Brooklyn. These competing objections demonstrate that it would be virtually impossible to divvy up $150,000 in a way that would satisfy each class member while still providing meaningful assistance to any entity. More importantly, each of these objectors ignores the fact that $2.35 million is going to Legal Aid and Legal Services, organizations that serve all of the boroughs, including Harlem and Brooklyn. Legal Aid and Legal Services, in addition to providing legal assistance, will provide education and outreach about the Settlement. The allocation of the

---

[14] Class Counsel already responded to this argument in its Memorandum in Support at pages 23-24, 42-44, 46-48, and its First Supplemental Memorandum at pages 3-7, but will respond again briefly here.

[15] These class members include: K. Powell; A. Beaumont; M. Blackman; and V. Penn.

remaining 6% of community funds to three organizations from areas that historically have been underserved is both fair and reasonable and should not weigh against final approval.[16]

With respect to the request for incentive awards for the Class Representatives, it is certainly true that Ms. Powell and the other Class Representatives have spent a great deal of time and effort on this lawsuit. Ms. Powell's statement that Class Counsel relied on and used the Class Representatives' individual knowledge and expertise also is true for both the pre- and post-settlement stages of this lawsuit. Class Counsel has never contended that the Class Representatives' efforts should not be compensated. In fact, we advocated for incentive awards and for money to BRUSH and Mirabal during Settlement negotiations, but defendants ultimately refused (and continue to refuse) to agree to any compensation for the Class Representatives or their organizations. As a whole, the Settlement's significant benefits for over 20,000 class members outweigh the omission of extra compensation for the five named plaintiffs and their organizations.

### D. Objections to the Exclusion of Pre-2004 and Prior Owner Rent Overcharge Claims.[17]

The Charrons, Ms. Powell, Ms. Augustin, Ms. Beaumont, and Ms. Penn object to the fact that the Settlement does not include pre-2004 or prior owner claims. In particular, the Charrons

---

[16] Ms. Powell also objects that the removal of BRUSH and Mirabal was due to their refusal to support the Settlement. It is true that the Defendants were not willing to provide funds for education and outreach promoting the Settlement to organizations that not only refused to support the Settlement, but who Defendants may have perceived as being singularly focused on defeating the proposed Settlement. The purpose of the three $50,000 grants is to mobilize community groups to help educate class members about their rights under the Settlement. There is nothing improper about Defendants choosing recipient organizations whom they believe will encourage class members to participate in the proposed Settlement. Ms. Powell offers no support for her contention that Defendant picked organizations "more in line with their personal objective," does not identify what the nefarious "objective" is, and offers no analysis as to how that objective jeopardizes tenant welfare and therefore weighs against approval of the Settlement.

[17] Class Counsel already responded to this argument in its Memorandum in Support at pages 45-46, and its First Supplemental Memorandum at pages 3-7, but will respond again briefly here.

argue incorrectly that the Settlement will "deprive thousands of defenseless citizens of New York their rights" and Ms. Penn argues that the Settlement is "designed to benefit as few tenants as possible." As we have repeatedly explained, most recently in response to the Court's written questions (Dkt. 199), the Settlement neither deprives class members of their rights under New York law, nor extinguishes any claims (including overcharge claims).

First, every class member, including these objectors, had the opportunity to opt out of the Settlement and pursue their rights under existing laws and mechanisms.

Second, these objections focus solely on overcharge claims and ignore the fact that class members with pre-2004 or prior owner claims still get significant benefits from the settlement including the right to bring harassment and/or eviction-related claims, and the protocols where applicable. Third, class members whose <u>overcharge claims</u> cannot be brought through the claims process, may still bring those overcharge claims in any relevant forum other than the Claims Administration Process – the claims are not released. If class members are time-barred from pursuing an overcharge claim in another forum, the restriction exists by operation of the laws of New York and the Order of this Court limiting the class period to claims accruing after July 11, 2004, not by operation of the Settlement.

### E. Objections to the Scope of the Lease Audit.[18]

Ms. Powell, Ms. Augustin, and Ms. Penn contend that the Lease Audit is insufficient in scope. As we pointed out in earlier submissions, the Lease Audit was designed to provide a statistically reliable picture of Pinnacle's rent practices with respect to new leases over a two year period. It is true that not all rents will be examined, but that is the nature of an audit. Those tenants whose rent is audited and determined to be illegal will receive a rollback of their rents

---

[18] Class Counsel already responded to this argument in its First Supplemental Memorandum at pages 22-23, but will respond again briefly here.

and damages relating to the overcharge. If, as Ms. Powell contends, defendants decided to "go back" and "adjust their 2008 records" because of the audit, then the audit will have made a positive impact for those tenants long before any actual auditing was done.

Ms. Penn's contention that because the Lease Audit covers rents only from 2008-2010, it "eliminates many tenants from this Settlement" reflects a misunderstanding of how the Audit will work. No tenants will be "eliminated" from the Settlement because of the Audit. Tenants either do or do not have an overcharge claim, regardless of which rents are audited. Instead, the Audit will help certain tenants who may not have been aware that they were overcharged, and will give them the opportunity to seek redress through the Claims Administration Process. And if the audit turns up improprieties exceeding the threshold provided, every new lease during the class period will be audited – all at the Defendants' expense.

Finally, and as we have noted before, while it is true that the Lease Auditor will not consider rent-controlled rents, the Settlement requires the independent accountant to review "rent increases, including but not limited to, . . . Major Capital Improvement rent increases, . . . " which could affect rent controlled tenants. (Settlement ¶ 63(c)(ii).) Ms. Powell argues that rent controlled tenants should be included in the audit because the audit would "alleviate, and reduce the time element associated with the long protracted process" of securing rent control information from HCR.[19] But she offers no support for her contention that allowing an auditor to request information from HCR will guarantee a faster result than allowing the Claims Administrator to make the same request.

---

[19] Ms. Penn mistakenly argues that there "is no provision mentioned for Rent Control tenants." This argument was addressed in detail in the First Supplemental Memorandum at pages 15-16.

F.     **Objections that Repairs are not expressly included in the Settlement.[20]**

Several class members object to the fact that the Settlement does not expressly state that claims may be submitted for failure to make repairs. As we previously explained, Defendants' persistent failure to undertake repairs can constitute harassment and give rise to actual or approximated damages.[21] There is no need to enumerate every Pinnacle action that could constitute harassment.[22] Class members who have been harassed by Pinnacle employees or whose repairs have been "incomplete" or do not conform to HPD standards may have a viable claim for damages under the Claim Administration Process. As we also explained, damages for harassment under the Settlement may, in some cases, exceed what class members could obtain outside of this lawsuit because harassment damages are often returned to the government rather than to individual tenants. Any repair-related complaints that do not rise to the level of harassment are not part of this lawsuit but may still be litigated in another forum (they are not extinguished).

G.     **Objections Regarding Oversight over Pinnacle.[23]**

Mr. Blackman, Ms. Penn, Ms. Augustin, and Ms. Wortham object on grounds that they believe the Settlement offers no or insufficient oversight over Pinnacle. But none of these

---

[20] Class Counsel already responded to this argument in its Memorandum in Support at page 40, and the First Supplemental Memorandum at pages 11-14, but will respond again briefly here.

[21] *See Belnord Holding Corp. v. Joy*, 52 N.Y. 2d 945 (N.Y. 1981) (affirming determination of New York City Commissioner of Rent Control that failure to repair long-term rain leak constituted harassment); *see also* New York State Attorney General Tenants' Rights Guide (2008) ("A landlord is prohibited from any action intended to force a tenant out of an apartment or to compel a tenant to give up any rights granted the tenant by law. . . . Harassment may take the form of . . . willful denial of services[.]").

[22] Indeed, enumerating a limited list for which tenants could seek compensation could deprive other tenants of a claim simply because their particular situation was not foreseen and added to that list. Class Counsel has repeatedly argued that failure to make repairs constitutes harassment and Defendants have not contested that analysis, despite multiple opportunities to do so.

[23] Class Counsel already responded to this argument in its Memorandum in Support at pages 45-46, and its First Supplemental Memorandum at pages 3-7, but will respond again briefly here.

objectors acknowledges the multiple safeguards to oversee Pinnacle's conduct including the power of this Court to enforce its injunction. For example, Ms. Penn's argument that there is "no third party involvement for review to question and/or approve transactions/decisions" of the Claims Administrator mistakenly assumes that the Claims Administration Process is a two-way street between Pinnacle and a sympathetic Claims Administrator. It is not. The Claims Administrator is an independent party and retired Judge who will render decisions based on input from the class member and from Pinnacle. While Ms. Augustin's statement that the Settlement does not create an ombudsman position to ensure Pinnacle's compliance is technically correct, the Settlement creates an ombudsman-like process where tenants can report issues with Pinnacle's compliance to the Claims Administrator who can take actions to enforce compliance including fines, damages for tenants, and the assistance of the Court to enforce the injunction. As we have previously detailed, the Settlement includes independent review by the Claims Administrator of Pinnacle's reports regarding its compliance with the protocols and includes this Court's power of enforcement over the federal injunction. In addition, the legal assistance from Legal Aid Services and the Legal Aid Society will also serve an important oversight function because these two citywide public interest law firms will become familiar with Pinnacle's behavior and as advocacy organizations will be well-suited to advocate for broad relief if they believe that Pinnacle is violating the Settlement.

      **H.**    **Objections Regarding Major Capital Improvements (MCIs).[24]**

Mr. Blackman contends that "MCI rent increases need to be thoroughly investigated and audited" by the auditor. As noted above and in prior submissions, the Lease Audit will include rent increases due to MCI.

---

[24] Class Counsel already responded to this argument in its First Supplemental Memorandum at pages 15-16 and 22-23, but will respond again briefly here.

## **CONCLUSION**

For the foregoing reasons, Class Counsel respectfully requests that the Court grant final approval of the Settlement.

Respectfully submitted,

Dated: May 7, 2012
      New York, New York

By:   s/ Richard F. Levy

Richard F. Levy
Marisa K. Perry
Chavi Keeney Nana
Joshua H. Rubin
JENNER & BLOCK LLP
919 Third Avenue, 37th Floor
New York, NY  10022-3908
(212) 891-1600 telephone
(212) 891-1699 facsimile

*Class Counsel*

13