UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDS SDN.
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED   6|6|12

—————————————————————————————x

MARJORIE CHARRON, et al.,

      Plaintiffs,

    -against-

PINNACLE GROUP NY LLC, et al.,

      Defendants.

07 Civ. 6316 (CM) (RJE)

—————————————————————————————x

## DECISION AND ORDER GRANTING FINAL
## APPROVAL OF THE SETTLEMENT

McMahon, J.:

On August 8, 2011, after a lengthy pre-suit investigation, more than four years litigation, and eight months of negotiations facilitated by Magistrate Judge Ronald Ellis, Class Counsel, Jenner & Block, LLP, by its Partner, Richard F. Levy, acting on behalf of the members of the Liability Class and Injunctive Class certified by this Court in its April 27, 2010 Order ("Class Members" or "Plaintiffs"), and Defendants, the Pinnacle Group NY LLC and Joel Wiener, entered into a Proposed Settlement Agreement ("Settlement" or "Settlement Agreement") to resolve *Charron, et al. v. Pinnacle Group NY LLC, et al.,* No. 07-6316 ("the Action"), a class action lawsuit alleging that Defendants harassed and intimidated tenants in thousands of rent-regulated apartments throughout New York City, in violation of the federal civil racketeering statute, 18 U.S.C. § 1962(c) ("RICO"), and the New York Consumer Protection Act, N.Y. Gen. Bus. L. § 349 ("NYCPA").

This Court must decide whether to approve the Settlement Agreement.

If the Settlement is approved, Defendants will agree not to contest its liability for violating either the RICO statutes or the NYCPA in proceedings brought before a Claims Administrator by Class Members. (Pinnacle continues to deny any wrongdoing.) In such proceedings, Class Members will be able to recover damages for a variety of claims (though not all conceivable claims). The process will be administratively stream-lined, and tenants can collect either a fixed amount of damages or such greater amount as they can prove, and there is no cap on the amount of actual damages for which Defendants can be found liable. No general releases will be exchanged; the only claim that will be extinguished by the Settlement will be the claims under RICO and the NYCPA that were brought as Counts I and II of the Second Amended Complaint. If a Class Member tenant has a viable rent overcharge claim, he can pursue that claim either through the claims administration process (as long as the claim accrued within the Class Period and is based on a rent increase that Pinnacle caused, see below), or in the New York state courts. Pinnacle will pay $2.5 million to educate and assist tenants regarding their rights under the Settlement Agreement.

Moreover, a rent audit will be performed at Pinnacle's expense; if it reveals a certain percentage of illegal overcharges, all Pinnacle leases will be audited. The rent audit may lead to further rent adjustments.

Finally, Defendants have agreed to follow certain "best practices" in their dealings with tenants, as set forth in detailed protocols, which will be enforceable by an injunction.

This Settlement does not get the class everything it wants; however, it gets the class a good deal that it does not presently have.

By contrast, if the Settlement is not approved, the next step in the continuing litigation will almost certainly be a motion by Defendants to decertify the classes, which has a substantial

2

chance of succeeding in view of the Supreme Court's recent decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011). If the class is not decertified, liability under RICO and the NYCPA will be vigorously contested. Appeals will inevitably follow. And even if the class succeeds in proving the statutory violations alleged in the Complaint, there will have to be individual damage hearings to assess how much is owed to each Class Member – proceedings that will likely resemble the Claims Administration procedures negotiated in the Settlement, except that they will take longer and will be more formal and rule-bound. The entire process will take years.

Following an extended notice period, significant media attention, and efforts by the Class Representatives to highlight the perceived shortcomings of the Settlement Agreement, fewer than 1% of more than 26,000 tenants to whom notice was mailed elected to opt out. Of those who did not opt out, fewer than 1% voiced objections to the Settlement Agreement. Among the objectors are the named Plaintiffs and a number of tenants, whose sincere and deeply felt concerns I have pondered at length.

The Settlement is not, and cannot be, all things to all people. However, I believe that it is fair, reasonable, and adequate to the class as a whole. This is a case where the perfect could easily become the enemy of the good; that would not be in the best interests of the class as a whole. I thus approve the Settlement.

## I.   BACKGROUND

### A.   Litigation leading to the Settlement.

In July 2007, following a year-long investigation, Plaintiffs brought suit pursuant to the federal civil racketeering statute, 18 U.S.C. § 1962(c), and New York's Consumer Protection Act, N.Y. Gen. Bus. L. § 349, alleging that Defendants Pinnacle Group NY LLC ("Pinnacle")

and its CEO Joel Wiener, acting in concert with others (collectively, the "Pinnacle Enterprise"), acquired several hundred apartment buildings during the real estate boom between 1999 and 2006, and then engaged in fraud and harassment to drive rent-regulated tenants out of their apartments. Each vacancy in a rent-regulated apartment would have entitled Pinnacle to a large increase in the legal rent – in some, to complete deregulation of the apartment on a going forward basis. In their Second Amended Complaint ("SAC"), Plaintiffs alleged that the Pinnacle Enterprise thereby sought to: (1) circumvent New York law by deregulating the apartments and obtaining rents in excess of those legally permitted, and (2) sell the illegally deregulated apartments in the then-booming condominium market.

The SAC alleges that Pinnacle carried out these activities by: (1) misrepresenting the legally chargeable rent and the status and cost of renovations; (2) misrepresenting and refusing to acknowledge tenants' succession rights; (3) filing meritless eviction proceedings (more than 5,000 during a 29-month period); (4) harassing and intimidating tenants through a variety of means; and (5) providing false information to government agencies. (*See* 4/27/10 Order Granting In Part and Denying In Part Plaintiffs' Motion for Class Certification at 3, Dkt. 96, hereinafter "Certification Order".) Defendants have denied, and continue to deny, all of these allegations.

Over the course of this lawsuit, there have been several legal battles between the two sides:

- On September 5, 2008, this Court denied Defendants' Motion to Dismiss the SAC, finding that the factual allegations of the SAC stated a cause of action under RICO and the NYCPA. (Dkt. 32.)
- On April 27, 2010, following class certification discovery, this Court overruled Defendants' objections to Plaintiffs' motion for class certification and certified two classes. (Certification Order.)

4

- On September 29, 2010, the Second Circuit denied Defendants' petition for leave to appeal this Court's Order certifying the classes. (2d Cir. Mandate, Dkt. 107.)

If the Settlement is not approved, Defendants have advised that they will move to decertify the classes established by this Court's April 27, 2010 Order in light of *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011), which was handed down in June of last year. *See* Declaration of Richard Levy ("Levy Decl.") ¶ 8.

The Settlement results from arm's-length negotiations spanning more than a year, following the Second Circuit's rejection of Defendants' request to appeal this Court's Order certifying the tenant classes. After many discussions, the parties submitted confidential settlement proposals for the consideration of Magistrate Judge Ronald Ellis, who had been designated by the Court to mediate and supervise the progress of settlement. Class Counsel and Defendants' Counsel attended two additional mediation conferences with Judge Ellis (including a six-hour continuous session) during which the parties' differences were narrowed; additionally, the Class Representatives attended two mediation conferences with Judge Ellis, which is an extraordinary procedure in my experience. Finally, since the Class Certification ruling, Class Counsel has met in person with Class Representatives several times as settlement negotiations progressed, held telephone conferences with individual Class Representatives, and participated in at least three community meetings that included, in each case, hundreds of Class Members.

After extended negotiations, the counsel finally reached a settlement agreement (the "Settlement" or "Settlement Agreement").

**B.      The Terms of the Settlement Agreement.**

1.      Claims Administration Process.

Class Members will eligible to receive redress for: (1) past rent overcharges, subject to certain exclusions, discussed below; (2) harassment, in whatever form, including failure to make

5

necessary repairs and meritless evictions; (3) meritless billings and eviction proceedings related to alleged nonpayment of rent; and (4) interference with occupancy rights through meritless and unduly burdensome queries regarding matters such as succession rights, primary residence, roommates, and subletting. With respect to overcharges, Defendants will pay double the rent overcharge plus interest if the overcharge is deemed "willful." Willfulness will be presumed and Defendants will bear the burden of overcoming that presumption. Class Member Claims will be submitted to a Claims Administrator, former New York Supreme Court Justice Marylin Shafer, on a simplified "Notice of Claim" form. The Claims Administrator will have the power to order document production from Pinnacle, or to request it from State agencies. She will not be required to apply the Rules of Evidence and her decisions will be final and non-appealable.

Tenants may not bring before the Claims Administrator claims for overcharges relating to rents that were set before the beginning of Class Period (July 11, 2004), or rents that were set by a prior owner. However, class members who participate in this lawsuit and do not opt out will not be barred from seeking, and may commence or pursue, money damages for these claims in any other forum. Moreover, tenants who cannot bring any overcharge claims in this lawsuit may still bring any other type of claim (for harassment or otherwise) through the Claims Administration process. Tenants with cognizable harassment claims will be awarded the higher of their actual damages (with no limit) or (1) $500 if the Defendants' conduct was minimal, (2) $1,000 if the Defendants' conduct was "moderate," and (3) $1,500 if the Defendants' conduct was serious. These damages are available whether or not there is provable economic loss.

Defendants have agreed to pay all costs incurred in the claims process for the Claims Administrator and administration.

2.      Lease Audit.

An independent Certified Public Accountant, appointed by the Court, will determine whether new rents set by Defendants between January 1, 2008 and April 27, 2010 are in compliance with applicable rent stabilization and rent control laws. The lease auditor will review a random sample of 25% of all new leases during this period. If the lease auditor determines that 15% or more of the selected sample is being overcharged by $10 or more per month, the auditor will review 100% of new leases from that time period. If the lease audit shows violations of applicable law resulting in overcharges, Defendants will (in addition to paying any damages that may be awarded by the Claims Administrator) adjust rents to legally permissible levels. Defendants have agreed to pay all costs associated with this audit.

3.      "Best Practices" – Protocols Governing Pinnacle's Relationship with its Tenants.

The Settlement also provides equitable and systemic relief designed to ensure that current tenants living in all of Defendants' properties enjoy habitable premises and receive fair treatment from their landlord in accordance with applicable New York State and New York City Rent Control and Rent Stabilization laws, as well as other New York housing laws. These compulsory practices are set forth in 13 pages of "protocols" that form part of the Settlement Agreement regarding: (1) setting and implementing initial rents and rent increases; (2) evaluating potential nonpayment and holdover proceedings; (3) recording and responding to requests for repairs and services; (4) providing a tenant helpline; and (5) training Defendants' staff. Defendants will pay all costs necessary to staff a helpline, establish modern communication systems with tenants, and maintain electronic records of compliance with protocols required by the Settlement Agreement.

The Claims Administrator will monitor Defendants' compliance and will be empowered to award tenants damages through the claims administration procedure if Pinnacle fails to

7

comply with the protocols. Upon the Court's approval of the Settlement, an injunction will be entered that will remain in force for two years. If, during this period, Defendants demonstrate a pattern of material non-compliance with the Protocols or other terms of the Settlement Agreement, the Claims Administrator may impose remedies for such violations. Non-compliance shall be presumed willful. If the Claims Administrator certifies that such remedies as are available to her will be ineffective in enforcing compliance with the injunction, application may then be made to this Court to enforce the injunction, as well as for such other relief as the Court may deem appropriate.

        4.        Defendants Will Pay $2.5 Million for Legal Assistance to Effectuate the Terms of the Settlement.

Up to $2,350,000 will be paid to the Legal Aid Society and Legal Services NYC (to be administered by the New York Bar Foundation) for legal and related assistance in implementing the terms of the Settlement Agreement. In addition, $150,000 will be paid to three community organizations for tenant assistance, including but not limited to, outreach and education of Pinnacle tenants regarding the terms of the Settlement Agreement. If funds remain after the two-year injunction period, the remainder will be distributed to nonprofit groups in New York City to assist tenants.

        5.        Agreement by Defendants to Pay Judicially Approved Legal Fees.

Defendants have also agreed to provide up to $1.25 million for legal fees to Class Counsel, and up to $200,000 to reimburse Class Counsel for documented out of pocket expenses directly related to this case.

        6.        Agreement by Defendants to Assist in Eliminating Blacklisting.

Finally, Defendants have agreed to procedures that should serve to eliminate and prevent "blacklisting" of Class Members by other landlords. If the Claims Administrator finds that a

8

claimant was subject to a meritless eviction proceeding, Defendants will sign a stipulation agreeing to dismiss the underlying eviction proceeding, and will provide the tenant with a letter authorizing the tenant to deliver a copy of the stipulation to any tenant screening bureau or tenant reporting agency that has a record of the proceeding in its database, as well as to any prospective landlord of an apartment that the tenant proposes to rent.

### C.    Subsequent Proceedings.

On August 4, 2011, the Court entered an Order in aid of settlement (Dkt. 124) assigning the case to Magistrate Judge Ellis for the purpose, among others, of holding the Fairness Hearing and preparing a Report and Recommendation to the Court as to whether the Settlement should be finally approved in accordance with Rule 23(e)(3) of the Federal Rules of Civil Procedure.  On August 11, 2011, the parties sought preliminary approval of the Settlement and the forms of notice to all Class Members.

Judge Ellis preliminarily approved the Settlement Agreement at a hearing on August 17, 2011, finding that the Settlement met the test for preliminary approval.    The Class Representatives (named Plaintiffs) vigorously opposed the proposed settlement.    Judge Ellis concluded that the issues raised by the Class Representatives would be more appropriately addressed at the fairness hearing.  (8/17/11 Tr. at 29:2-3, Dkt. 127.)

Class Counsel provided potential Class Members with two notices describing the lawsuit, the Settlement, and the tenants' right to request exclusion from the liability class.  The long-form and short-form initial notices (collectively the "Initial Notices") were approved by Magistrate Judge Ellis on August 31, 2011.  (Dkt.  129.)  The Initial Notices provided a 30-day opt out period that ended on October 7, 2011.  On September 2, 2011, Class Counsel mailed the long-form notice to the last known addresses of all members of the classes from a list of potential

9

Class Members provided by Pinnacle directly to Dahl Administration, LLC (the "Notice Administrator"). In addition, Pinnacle posted the short-form notices in each Pinnacle building. *See* Declaration of Adam Kaplan ("Pinnacle Decl.") ¶ 7.

At an extended hearing before both Judge Ellis and myself on October 28, 2011, in response to certain issues raised by Class Members, I concluded that a Revised Notice should be prepared and sent, in English and Spanish. I also determined that there should be posting of notice and other measures taken to get the word out, including placing advertisements in periodicals. The Revised Notice provided a 57-day opt out period that ended on March 2, 2012. This Court originally approved the form of the Revised Notice, in English and Spanish, on December 16, 2011 (Dkt. 165), and modified that ruling slightly on December 23, 2011 (Dkt. 170). On January 6, 2012, Class Counsel mailed approximately 22,000 Revised Notices to the last known addresses of all members of the classes from a list of potential Class Members provided by Pinnacle directly to the Notice Administrator. *See* Levy Decl. ¶¶ 40, 43. The same day, Class Counsel mailed over 100 "Opt In Letters" to Class Members who had previously opted out of the Settlement, advising them of their right to opt back in to the Settlement during the Revised Notice period. *See* Affidavit of Ruby Melendez ("Melendez Aff.") ¶ 40. Pinnacle posted the Revised Notice in English and in Spanish in each Pinnacle building and provided the Revised Notice to new owners of former Pinnacle buildings with requests to post the notices. *See* Pinnacle Decl. ¶¶ 16-17.

In addition to mailing and posting, a toll-free number was established to assist Class Members with questions concerning the Settlement and their opt out rights, and an informational website was established. *See* Levy Decl. ¶¶ 48-49. The toll-free number and the website address were referenced on the bottom of every page of the Notice and Revised Notice. *Id.* Finally,

Class Counsel published the short-form notice in *The New York Post* and (in Spanish) in *El Diario*. *Id.* ¶¶ 26-29.

A team of Jenner & Block lawyers and personnel (including persons fluent in Spanish) provided responses to more than 1,000 telephone calls and approximately 100 email messages, website submissions, and letters from potential Class Members through March 12, 2012 (the "Calling Team"). *See* Declaration of Marisa K. Perry ("Perry Decl.") ¶ 48. The Calling Team received training on the background of the lawsuit, and the terms, benefits, and tradeoffs of the Settlement. *Id.* ¶ 25. The Calling Team also received training from Andrew Scherer, consultant to Class Counsel and an expert in landlord/tenant law, on subjects related to rent-regulation and applicable state laws. *Id.* ¶ 26. Mr. Scherer provided guidance to the Calling Team throughout each of the notice periods. *Id.*

In addition, at the request of several of the Class Representatives, a team of Jenner & Block lawyers, together with Mr. Scherer, appeared at an "Informational Seminar" on October 5, 2011. More than 200 persons attended that seminar, which continued for several hours. Levy Decl. ¶¶ 54-58. All questions were answered, in English or through simultaneous interpretation by a professional Spanish interpreter. *Id.* The Class Representatives organized another informational seminar for Pinnacle tenants on March 24, 2012. *Id.* ¶ 60.

On March 3, 2012, one day after the opt out period expired, Class Counsel were advised by Ms. Kim Powell, a Class Representative, that it appeared that tenants in a former Pinnacle Building on West 109th Street had not received either the Initial Notices or the Revised Notices of the proposed settlement. Levy Decl. ¶ 45. That same day, Class Counsel transmitted this information to Defendants' counsel, who, after investigation, advised that 3,915 tenants had accidently been omitted from the mailing lists they provided to the Notice Administrator. *Id.* On

March 8, 2012, Defendants' counsel, by letter to the Court, proposed that the opt out date for these omitted tenants be extended to a date 45 days after the mailing to the omitted tenants of a Supplemental Notice, together with the Revised Notice in English and Spanish, with the Court reserving final judgment and keeping the record open for the omitted tenants until such date. On March 9, 2012, the Court approved the proposal. (Dkt. 177.) The Supplemental Notice, in English and Spanish, together with the Revised Notice in English and Spanish, was mailed to the omitted tenants on March 13, 2012. Pinnacle Decl. ¶ 27; *see also* Levy Decl. ¶ 47. The Supplemental Notice specified an extended opt out and objection date of April 27, 2012 for the omitted tenants who had not received prior notice, as required by this Court's order. *See* Pinnacle Decl. ¶ 27.

A fairness hearing was held on April 12, 2012. One hundred and thirty-one purported objectors asked for permission to speak at the hearing, but most did not show up. Thirty-five Pinnacle tenants were allowed the opportunity to speak; nearly all spoke against approval of the Settlement. Not all of those who spoke had previously requested an opportunity to be heard, and some who spoke appeared not to be Class Members. Nonetheless, no one was turned away from the microphone, although time limits were imposed. The Court encouraged Class Members to submit additional statements in writing to chambers. The Court has received, and reviewed, ten such submissions, which were distributed to all counsel on May 1, 2012.

### D.   Reaction to the Settlement.

The final count of Class Member responses to the Settlement is as follows:

- 56 letters supporting the Settlement;
- 118 written objections to the settlement
- 141 opt outs;

12

• 5 opt ins from Class Members, during the revised notice period, who had previously opted out.

Fewer than 1% of the Class Members to whom the Initial Notice, the Revised Notice and/or the Supplemental Notice were mailed opted out of the lawsuit, and an even smaller percentage of the class objected to the lawsuit.

Nevertheless, there has been strident opposition to the Settlement from those who do object.

First, On October 6, 2011, several individual Class Members (the "Objectors"), represented by counsel from the Northern Manhattan Improvement Corporation, the Urban Justice Center, and Yankwitt & McGuire LLP, brought an order to show cause, seeking to halt the original fairness hearing (scheduled for October 20, 2011), obtain discovery, and cancel the Class Notice plan. At a hearing on October 7, 2011, Judge Ellis denied the order to show cause without prejudice. Following that denial, a flurry of correspondence crossed my desk, which led to the joint hearing that is referred to above. At the October 28, 2011, hearing – during which Class Counsel, Defense Counsel, Objectors' Counsel, and the named Plaintiffs spoke at length – I decided to withdraw the reference to Magistrate Judge Ellis and to hear and decide all matters relating to the settlement in the first instance. I also permitted new counsel to appear on behalf of the Objectors, and they have been involved in the settlement proceedings since that time.

A critical objection was the fear that some tenants would lose their right to challenge alleged rent overcharges. In order to allow the Objectors to obtain factual support for their objection, I ordered an 18-building sample review ordered designed to reveal the percentage of Class Members who had signed their leases before July 11, 2004 or with a prior owner. As noted above, tenants meeting this description are not permitted, under the Settlement, to bring rent overcharge claims before the Claims Administrator, unless Pinnacle raised their rent by an illegal

amount during the Class Period. However, they can bring a rent overcharge proceeding against a prior owner, or for a period outside the Class Period, in State court or other forum, subject to the statute of limitations.

By another order to show cause, dated January 4, 2012, the Objectors moved for comprehensive discovery, including the full rent regulation history of every building Pinnacle owned during the Class Period. I denied the motion and order to show cause on January 12, 2012, finding that the 18 building sample previously ordered was enough to permit the Objectors to articulate their objections to the Settlement Agreement. (Dkt. 176.) I also observed that:

> I have defined the class in a particular way; I have specifically excluded from the scope of this litigation any claims that accrued prior to July 11, 2004, which is three years before the date the complaint was filed. The fairness of the settlement must relate to the resolution of claims that are actually before the court; I am not going to re-litigate the bounds of the case or of the class in the context of approving a settlement.

Finally, the named plaintiffs, Class Representatives Marjorie Charron, Ted Charron, Andres Mares-Muro, Raymond Andrew Stahl-David and Kim Powell, do not support the Settlement and have asked the Court not to approve it. I heard from them at hearings held on October 28, 2011 and April 12, 2012. I have read their pre-hearing briefs in opposition to approval of the Settlement, and their post-hearing submissions too. I have carefully considered their objections in reaching my opinion, as detailed further below.

Although I expressed some concern whether the Class Representatives could remain the named plaintiffs notwithstanding their disagreement with Class Counsel, courts in the Second Circuit have long recognized that such disagreements do not require that a settlement be disapproved, and have not required that the objecting named plaintiffs be replaced. *See, e.g.*, *Maywalt v. Parker & Parsley Petroleum Co.*, 864 F. Supp. 1422, 1430 (S.D.N.Y. 1994) (four of five named plaintiffs objected to settlement). Indeed, four Circuit Courts of Appeals have held

14

that unanimous disapproval of the settlement by the named plaintiffs does not require that the court either refuse to accept the settlement or replace the named plaintiffs. *See Flinn v. FMC Corp.*, 528 F.2d 1169, 1174 & n.19 (4th Cir. 1975); *Kincade, v. Gen. Tire and Rubber Co.*, 635 F.2d 501, 503-04 (5th Cir. 1981); *Elliott v. Sperry Rand Corp.*, 680 F.2d 1225, 1226-27 (8th Cir. 1982); *Laskey v. Int'l Union, Etc. (UAW)*, 638 F.2d 954, 956 (6th Cir. 1981).  Class Counsel has not asked that the Class Representatives be replaced, and I see no need to do so.

## II.    NOTICE OF THE PROPOSED SETTLEMENT MEETS THE REQUIREMENTS OF LAW

### A.    Standard of Review.

"The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 113-14 (2d Cir. 2005).  There are no rigid rules for determining whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements; the settlement notice merely must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Id.* at 114 (quoting *Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982)). Courts in this Circuit have explained that a Rule 23 Notice will satisfy due process when it "describe[s] the terms of the settlement generally[,]" *In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 57, 60 (S.D.N.Y. 1993), and "inform[s] the class about the allocation of attorneys' fees, and provide[s] specific information regarding the date, time, and place of the final approval hearing[,]" *Clark. v. Ecolab Inc.*, Nos. 07 Civ. 8623, 04 Civ. 4488, and 06 Civ. 5672 (PAC), 2009 U.S. Dist. LEXIS 108736, at *22 (S.D.N.Y. Nov. 17, 2009).  Notice is considered "adequate if it may be understood by the average class member." *Id.*

The Initial, Revised and Supplemental Notices in this case meet these requirements. In addition to providing a general summary of the terms of the Settlement and detailing tenants' rights and options regarding the lawsuit, the notices detail the allocation of attorney's fees and expenses, clarify that those attorney fee amounts will not affect the recovery of monetary benefits for Class Members through the claims process, and provide details regarding the fairness hearing including the date, time, and location. *See Torres v. Gristede's Operating Corp.*, Nos. 04-cv-3316, 08-cv-8531, and 08-cv-9627 (PAC), 2010 U.S. Dist. LEXIS 139144, at *21 (S.D.N.Y. Dec. 21, 2010) (finding that notice complied with all constitutional requirements where it "adequately advised class members of the terms of the settlement, as well as the right of members of the class to opt out of the class, to object to the settlement, and to appear at the fairness hearing"). As detailed below, the Class Members have received multiple forms and rounds of notice of the Settlement in conformance with Fed. R. Civ. P. 23(e)(1). Class Counsel has complied with every requirement of Rule 23 and has added substantial material to clarify matters and to make the Initial and Revised Notices understandable for Class Members.

**B.      The Notices Were Adequate**

1.      The Initial Notices.

The adequacy of the Initial Notice (which had been approved by Magistrate Judge Ellis and mailed on September 2, 2011 with an opt out date of October 7, 2011) was first raised by the Objectors in a "Show Cause" order one day before the expiration of the 30 day opt out period in the original Notice. (Dkt. 137.) By Order dated October 11, 2011 (Dkt. 138), I stayed all deadlines in this case and set a status hearing for October 28, 2011.

At the October 28 hearing, after reviewing the Objectors' papers and objections, I found the Initial Notice to be "very, very straightforward" and written in "plain English." (10/28/11 Tr. at 32:3-4.) I noted that the Initial Notice was "not a document that's full of legalese" and that

16

"[c]are was taken here to make this document comprehensible to the average person." (*Id.* at 39:12-15.) Overruling objections that the Initial Notice was too technical, this Court stated that "I don't see how [the Initial Notice] can be less technical and still be complete and informative." (*Id.* at 39:16-18.)

Nevertheless, after hearing from all parties, including the five Class Representatives, I directed that certain changes be made to improve the Initial Notice (including the translation of the long-form notice into Spanish), and suggested (but did not require) that Class Counsel make other changes that had been offered by the Objectors and Class Representatives.

2.    The Revised Notice.

Following the October 28, 2011 Hearing, the Court entered an Order directing that the original notice "be amended to":

> (a) Identify the buildings that are involved in this litigation (at least by address);
>
> (b) Include information from the recently amended settlement agreement that clarified that class members whose rents were set by other landlords or were set by Pinnacle prior to 2004, could not pursue rent overcharge claims through the Settlement Administrative Process, but were free to assert such claims in any other forum; and
>
> (c) Be sent in both English and Spanish.

(11/1/11 Order at 1, Dkt. 146.) The Order also:

- mandated that the Revised Notice be "posted in its entirety in English and Spanish in each building;"

- authorized "Marjorie Charron . . . [to] check compliance and report to Mr. Levy and the Court if there is a problem;"

- imposed a 45-day period from the mailing of the Revised Notice for filing objections and opting out of the lawsuit; and

17

- required that Defendants perform a hand inspection of a random selection of buildings to determine the percentage of Class Members who signed their leases before July 11, 2004 and who signed their lease before Pinnacle purchased the building.

Class Counsel incorporated all of the required changes set forth above into a Revised Notice. In addition, a number of changes that were suggested, but not mandated, by the Court were incorporated into the Revised Notice. With respect to the Spanish translation, Class Counsel incorporated every suggestion from the Objectors and the Class Representatives, both of whom agreed that the translation was in appropriate colloquial Spanish. On November 22, 2011, the Court entered an Order overruling objections to the Revised Form of Notice from both the Class Representatives and the Objectors. (Dkt. 156.) The Order generally approved the form proposed by Class Counsel. On December 23, 2011, the Court entered an Amended Order Directing Revised Notice to Potential Class Members and Setting Schedule for Fairness Hearing. (Dkt 170.)

On January 4, 2012, the Objectors filed a second order to show cause seeking the same discovery from Defendants that the Court had previously denied. They alleged that the requested discovery was required "on due process" grounds. (Dkt. 127.) In a January 12, 2012 Order, I Court reaffirmed my previous finding that the Revised Notice met due process standards, saying:

> I am also not inclined to revisit my prior order concerning notice, and I believe that the order that I have already authorized, indeed directed, more than complies with the rights of the members of the class. I thus decline the request that the objector's counsel be provided with the discovery they seek on "due process" grounds.

(Dkt. 176 (emphasis added).)

### 3. Class Members Had a Total of 89 Days to Opt Out and 115 Days to Object to the Settlement.

Through the two Notice periods, Class Members had a total of 89 days during which they could exercise their rights to participate in or opt out of the Settlement, and a total of 115 days to

submit written objections to the Court. The initial notice period lasted 32 days, from September 6, 2011 to October 7, 2011 (including October 7, 2011). The revised notice period lasted 57 days, from January 6, 2012 to March 2, 2012 (including March 2, 2012). Class Members who wished to object to the Settlement were given a total of 115 days to do so (32 days in the initial notice period plus 83 days (from January 6, 2012 to March 28, 2012) during the revised notice period).

Courts have held that opt out periods of less than 45 days satisfy due process, even where unsophisticated class members must make decisions regarding complex issues of law or fact. *See, e.g.*, *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 U.S. Dist. LEXIS 120953, at *40 (S.D.N.Y. Dec. 23, 2009) (approving a pre-certification settlement with a 30-day opt out period in a complex securities fraud class action case); *Rowe v. E.I. du Pont de Nemours & Co.*, Civil Nos. 06-1810 and 06-3080 (RMB/AMD), 2011 U.S. Dist. LEXIS 96450, at *25 (D.N.J. Aug. 26, 2011) (approving thirty-five day opt out period for class action settlement of water pollution claims over the objection of intervenors who claimed that longer notice was required because the "issues involved in the settlement are complex, thereby demanding highly specialized, scientific knowledge"). The 89-day period for opting out here is far longer than the 35-day period in *Rowe* or the 30-day period in *Marsh*, and is more than sufficient to protect Class Members' due process rights.

Additionally, all opt out requests received between September 6, 2011 – the mailing date of the initial notice – and March 2, 2012 – the opt out deadline in the Revised Notice – will be honored. A few opt out requests were postmarked after the original October 7, 2011, deadline and normally would not have been considered timely. Given the unique procedural history of this case, however, and the fact that this Court stayed all deadlines (10/11/11 Order, Dkt. 138),

the October 7, 2011, initial opt out deadline became moot, and the opt out period effectively lasted from September 6, 2011, to and including March 2, 2012, or 179 days.

Thus, the Notice Program in this action complied with the orders of this Court, the Due Process Clause, and the Federal Rules. Both this Court and Magistrate Judge Ellis have considered the arguments raised by those who oppose the Settlement and concluded that they do not have merit. The notices meet all Constitutional and Rule 23(e) standards.

## III.   THE PROPOSED SETTLEMENT IS FAIR, ADEQUATE, AND REASONABLE.

The law favors compromise and settlement of class action suits. *Wal-Mart Stores,* 396 F.3d at 116 (2d Cir. 2005) (noting the "strong judicial policy in favor of settlements, particularly in the class action context") (quoting *In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998)) (internal quotation marks omitted); *see also* Alba Conte & Herbert Newberg, 4 *Newberg on Class Actions* § 11.41 (4th ed. 2002) ("The compromise of complex litigation is encouraged by the courts and favored by public policy."). Approval of a proposed class action settlement is within the discretion of the district court. *Joel A. v. Giuliani*, 218 F.3d 132, 139 (2d Cir. 2000). Before granting final approval of a class action settlement, a reviewing court must find that the settlement is procedurally and substantively fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(1).

### A.   Procedural Fairness.

To demonstrate that a settlement is procedurally fair, its proponents bear the burden of showing: (1) that the settlement was reached through arm's-length negotiation and is not collusive; (2) that the proponents are counsel experienced in similar cases; (3) that there has been sufficient discovery to enable counsel to act intelligently; and (4) that the number of objectors or their relative interest is small. *In re McDonnell Douglas Equip. Leasing Sec. Litig.*, 838 F. Supp. 729, 737 (S.D.N.Y. 1993). That burden has been more than met here.

20

1.     The Settlement is the Product of Arm's-Length Negotiations.

As detailed above, every aspect of the proceedings, from discovery and motion practice through completion of the settlement negotiations, has been vigorously contested. The arm's-length settlement negotiations, lasting approximately eight months, involved counsel and an experienced mediator, Judge Ellis, whose oversight of earlier proceedings made him fully familiar with the details of the case. There is no evidence of collusion between the parties. Levy Decl. ¶ 7. These facts raise a presumption that the Settlement satisfies due process requirements. *See Prasker v. Asia Five Eight LLC*, 08 Civ. 5811 (MGC), 2010 U.S. Dist. LEXIS 1445, at *10 (S.D.N.Y. Jan. 6, 2010).

2.     Proponents are Experienced Counsel.

As recognized in this Court's Certification Order, Class Counsel are "qualified, experienced and more than able to conduct this litigation, no matter how complicated[.]" (Certification Order at 22.) Mr. Levy's declaration attesting to his extensive experience with complex litigation, class actions, corporate reorganization, debt restructuring, commercial and bankruptcy litigation, bank regulation, and corporate transactions and governance is attached to the Motion for Attorneys' Fees which was initially filed on September 2, 2011. (Dkt. 126.) Recommendations of experienced counsel are entitled to great weight in evaluating a proposed settlement in a class action because such counsel are most closely acquainted with the facts of the underlying litigation. *See In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997). Class Counsel supports the proposed Settlement and believes that it is in the best interests of the tenant classes.

Although Mr. Levy does not boast personal experience with the New York City rent statutes and regulations, often described as "an impenetrable thicket, confusing not only to laymen but to lawyers," *Roberts v. Tishman Speyer Properties, L.P.*, 13 N.Y.3d 270, 295 (2009)

21

(Read, J., dissenting) (citation omitted), Class Counsel retained Andrew Scherer, an expert in the field, to assist.   Mr. Levy's legal acumen and professional experience, particularly when combined with Mr. Scherer's expertise, weigh in favor of approving the Settlement.

### 3.    There Has Been Sufficient Discovery to Enable Counsel to Act Intelligently.

Before filing this lawsuit, Class Counsel undertook a comprehensive pre-suit investigation lasting over a year.  The pre-suit investigation in this case far exceeded what is customary in the class action lawsuits I usually see.  Counsel spoke with tenants, reviewed tenant documents, and researched potential claims.  After filing the lawsuit, Class Counsel and Defendants engaged in certification discovery involving the exchange of documents and several depositions, and extensive motion practice involving the strength and weaknesses of the claims in the SAC.  Additional merits discovery will do little to help Class Counsel "act intelligently" regarding the Settlement.

Defendants have agreed, as part of the Settlement, to pay whatever amounts the Claims Administrator tells them to pay, without any caps on actual damages, and with no chance for appeal.  Contrary to the contention of some Class Members, there is no need for additional discovery about Pinnacle's "ill-gotten gains." Disgorgement is unavailable to the Plaintiffs as a remedy for Defendants' RICO violations, unless it serves solely to prevent and restrain future RICO violations. *See United States v. Sasso*, 215 F.3d 283, 289-92 (2d Cir. 2000); *United States v. Carson*, 52 F.3d 1173, 1182 (2d Cir. 1995), *overruled on other grounds by Pegram v. Herdrich*, 530 U.S. 211, 225 (2000).  Here, that purpose is achieved through a series of protocols that will govern Pinnacle's relationships with its tenants, and a two-year injunction against violations of those protocols and state and federal laws.  And punitive damages are not available under any circumstances as a remedy for Plaintiffs' RICO claims. *See Bingham v. Zolt*, 823 F.

22

Supp. 1126, 1135 (S.D.N.Y. 1993) ("RICO's treble damages provision precludes recovery of punitive damages.").

Although further merits discovery might have allowed Class Counsel to assess the risks of continuing with litigation even more thoroughly than has already been done, that is true in every case that settles before discovery concludes. And in this case, the most significant litigation risk may not be establishing liability under RICO; it is the very real possibility that the liability class will be decertified in the wake of the Supreme Court's decision in *Wal-Mart v. Dukes*. Were that to happen, the Class Members would be forced to proceed individually against a sophisticated and well-financed adversary.

So while the parties have not engaged in full merits discovery, I believe that discovery has proceeded far enough for Class Counsel to evaluate the relative benefits of Settlement against the risk of continued litigation, and to reach an intelligent decision regarding the desirability of settlement.

4.    The Number of Objectors is Small.

As of April 12, 2012, only 118 Class Members filed objections – less than 1% of the Class.

For all these reasons, the Settlement is entitled to an initial presumption of fairness, reasonableness, and adequacy. *See Wal-Mart Stores*, 396 F.3d at 116.

**B.    Substantive Fairness: The *Grinnell* Factors Demonstrate That the Settlement is Substantively Fair, Reasonable, and Adequate, and Weigh in Favor of Approval.**

In the Second Circuit, courts look to a non-exhaustive list of factors set forth in *Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), and more recently applied in *Wal-Mart Stores*, 396 F.3d at 116, when considering whether a proposed class action settlement, on substantive grounds, is fair, reasonable, and adequate. The *Grinnell* factors are: (1) the complexity, expense

23

and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Grinnell,* 495 F.2d at 463.

On balance, the *Grinnell* factors weigh heavily in favor of final approval of the Settlement Agreement.

1.   Litigation Through Trial Would Be Complex, Costly, and Long (*Grinnell* Factor 1).

This Court has noted that where a settlement results in "substantial and tangible present recovery, without the attendant risk and delay of trial," the first factor weighs in favor of settlement. *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001); *see also Slomovics v. All for a Dollar, Inc.*, 906 F. Supp. 146, 149 (E.D.N.Y. 1995).

The path from this stage of the litigation to a final judgment on the issue of Defendants' liability for violation of the RICO statutes and the New York Consumer Protection Act would be long, complicated, and expensive. As this Court has explained: "It could be ten years from now before you get anything if everybody goes after everything that he wants." (10/28/11 Tr. at 15:1-3, Dkt. 154.) Notwithstanding the strength of the evidence Plaintiffs elicited during the pre-suit investigation and discovery, additional discovery would be required to establish liability and damages, including depositions of Class Members, Defendants, and Defendants' employees, managers, and partners. A fact-intensive trial would be necessary, and while the Class Members are sure they will win, they might in fact lose. Preparing and putting on evidence at such a trial

24

would consume tremendous amounts of time and resources and demand substantial judicial resources. Plus, only certain issues would be tried. In particular, damages to the individual Class Members would not be awarded; those would require additional trials, which would be costly and further defer closure. Establishing a mechanism for adjudicating causation and damages will present many of the difficulties that the Claims Administration Process redresses. Thus, if the Settlement is denied, individual Class Members could find themselves in approximately the same position as if it were approved, except that time, resources, and effort would have been bled out of both sides along the way. Finally, post-trial motions and appeal would delay resolution and increase costs still more.

By obtaining prompt approval of this Settlement as fair, reasonable and adequate prior to decertification motions, summary judgment proceedings or trial, Class Members will avoid significant expense and delay and ensure a speedy, risk-free recovery for the class.

Even if the class remained certified – by no means a certainty given recent Supreme Court decisions – going to trial puts Class Members in a worse – not better – position relative to the Settlement. Significantly, Plaintiffs' suit was intended, not only to obtain redress for injuries, but to restrain and prevent Defendants from engaging in practices that may adversely affect the Class Members in the future. The Settlement Agreement achieves this significant goal, by requiring that Defendants adhere to a set of protocols and implementing a monitoring system, with compliance insured by a two-year injunction. Plaintiffs' suit has also resulted in Defendants agreeing to an audit of certain leases.

   2.   The Reaction of the Class as a Whole Supports Approval (*Grinnell* Factor 2).

In class action settlements, the notice and approval process generally solicits negative feedback regarding a settlement, because it is designed to solicit opt outs and objections by

25

advising class members of the procedures and deadlines for filing such responses with the court. "A certain number of opt outs and objections are to be expected in a class action," *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 527 (E.D. Mich. 2003), and in litigation involving a large class, such as that here, "it would be 'extremely unusual' not to encounter objections." *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 478 (S.D.N.Y. 1998). Statements of support are not similarly solicited, but nevertheless, Class Counsel received 56 unsolicited letters of support.

Over 22,000 Revised Notices were mailed on January 6, 2012. Almost 4,000 more were mailed to the Omitted Tenants in March. The deadline for opt outs passed on March 2, 2012 and April 27, 2012, for Omitted Tenants. As of April 27, 2012, including all submissions from the Initial and Revised Notice periods, Class Counsel received:

- 56 letters supporting the Settlement;
- 118 objections to the Settlement;
- 141 opt outs; and
- 5 opt ins from persons who had previously opted out.

In sum, fewer than 1% of the tenants who received notice opted out of the lawsuit, and an even smaller percentage objected. In addition, the Jenner & Block employees who responded to more than 1,000 phone calls and over 100 website and Post Office box submissions report that many of the persons reaching out for assistance were supportive of the Settlement and intend to participate in the claims process. *See* Perry Decl. ¶¶ 49-53; Melendez Aff. ¶¶ 34-37.

"That the overwhelming majority of class members have elected to remain in the Settlement Class, without objection, constitutes the 'reaction of the class,' as a whole," and supports a finding that "the Settlement is 'fair, reasonable, and adequate.'" *In re Cardizem CD*

*Antitrust Litig.*, 218 F.R.D. at 527. Courts in this circuit have regularly approved settlements even where substantial portions of the class have objected. *See, e.g.*, *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1325 (2d Cir. 1990) (affirming approval of settlement over objections of "a majority" of class); *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 462 (2d Cir. 1982) (affirming approval of settlement where between 54 and 58 percent of class objected). This factor therefore weighs in favor of final approval.

The Court acknowledges, as it must, the strenuous opposition so eloquently expressed by the Class Representatives, as well as more than thirty Pinnacle tenants who spoke against the Settlement at the April 12, 2012 Fairness Hearing. Their concerns, which are legitimate, are discussed at greater length below. However passionately the Class Representatives object, and however sympathetic the individual situations of the objecting Class Members, those who have opposed or objected to the Settlement represent a tiny fraction of the approximately 26,000 tenants to whom notice was mailed. Great efforts were made over more than six months to educate those tenants about the pros and cons of the Settlement, in phone calls, public meetings, and otherwise. The Court cannot help but conclude that the silence and acquiescence of 99% of the Class Members speaks more loudly in favor of approval than the strident objections of the 1% against it.

3. The Proceedings and Discovery Have Advanced Far Enough to Allow the Parties to Responsibly Resolve the Case (*Grinnell* Factor 3).

This factor requires the Court to consider whether the parties have adequate information about their claims. *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 458 (S.D.N.Y. 2004). Although settlement agreements reached before class certification are subject to additional scrutiny, see *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001), no such

27

scrutiny is required here, since the Settlement was reached after the classes were certified. *See*
*Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 240 n.6 (E.D.N.Y. 2010).

The parties here have enough information about their claims.  The pretrial negotiations,
motion practice, and certification discovery were not designed to justify a settlement, but were
rather "an aggressive effort to ferret out facts helpful to the prosecution of the suit." *See In re*
*Austrian & German Bank Holocaust Litig*, 80 F. Supp. 2d 164, 176 (S.D.N.Y. 2000) (quoting
*Martens v. Smith Barney, Inc.*, 181 F.R.D. 243, 263 (S.D.N.Y. 1998)) (internal quotation marks
omitted).  And as discussed above, one primary litigation risk (if not *the* primary risk) if the
Settlement is that the classes in this case would need to be decertified in light of intervening
controlling precedent.  If that risk eventuates, the Class Members will get nothing for their RICO
claims except what they can individually prove after retaining and paying for their own counsel.
No discovery is needed for counsel to "understand" what that entails.

Additional damages discovery is unnecessary, because Pinnacle's liability to individuals,
and the Class as a whole, for rent overcharges and other money claims is not subject to any cap,
except what the Class Member can prove.  Everyone who establishes a claim will receive the
amount awarded by the Claims Administrator.  Class Representatives argue that discovery has
been insufficient to establish that Defendants can pay all the damages that have been awarded.
Defendants have presented information to the Magistrate Judge for *in camera* review, and to
Class Counsel on an attorneys' eyes only basis, and both Judge Ellis and Class Counsel believe
that Defendants have an annual income and net worth sufficient to meet their potential liabilities
under this Agreement. In the hearing before Judge Ellis, Mr. Levy – after meeting in chambers
with Judge Ellis, Mr. Wiener, and Mr. Wiener's counsel and examining Pinnacle's sworn
financial statements – stated: "I conclude that the assets appear, based on that financial

statement, to be sufficient to satisfy any liabilities that may be awarded as we move forward."
(8/17/11 Tr. at 11:14-16, Dkt. 127.) Pinnacle's financial statements included representations and
warranties as to their accuracy and completeness in a form that would be accepted by federally
insured banks for the purpose of obtaining credit.   Were those representations to prove
fraudulent, that would give rise to an independent cause of action, which the Settlement would
not bar.

        The Objectors argue that Class Counsel should have forced Pinnacle to open its books so
that the full extent of its malfeasance could be exposed. However, while such discovery might
embarrass Pinnacle, and gratify the tenant activists, it would not do anything to help the Class
Members were the case to proceed. As discussed above, the Class Members would not be
entitled to disgorgement of "ill-gotten gains" if they litigated the RICO claim to victory, as
numerous other mechanisms, including injunctive relief and treble damages, would be in place to
restrain future RICO violations. So learning the extent of Pinnacle's ill-gotten gains would not
"raise the stakes" for the parties.

### 4.    The Risks of Establishing Liability and Damages are Significant (*Grinnell* Factors 4 and 5).

        Class Counsel believes that Plaintiffs have a strong case, both under the civil RICO
statute and under the NYCPA.   However, "Litigation inherently involves risks." *In re
PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. at 126. Defendants deny any wrongdoing whatever.
They contend that they have complied with all applicable State and Federal laws. Establishing
otherwise will require considerable additional pre-trial effort and a lengthy trial, the outcome of
which is uncertain. Even if I were to assume that the plaintiff class was likely to succeed on the
merits of a liability trial, I would have to weigh that likelihood against the certainty that the class
was going to receive the following benefits:  a simplified claims process for establishing rent

overcharges and harassment claims against Pinnacle, with Pinnacle agreeing not to contest liability and no possibility that Pinnacle could appeal any adverse finding by the Claims Administrator; establishment of a set of Best Practices for the management of Pinnacle's buildings on a going-forward basis, and an audit of leases that conceivably could lead to a correction of illegal base rents for thousands of Pinnacle tenants. Add to this the fact that each individual plaintiff would have to prove his or her own damages whether the case settled or not; this Court has always contemplated decertification after a liability trial, see *Charron v. Pinnacle Group N.Y. LLC*, 269 F.R.D. 221, 243 (S.D.N.Y. 2010). With a settlement the tenants will not have to wait years to present their rent relief and other claims to an adjudicator, but can have those claims heard within the next twenty-four months, so the benefit of settling, rather than running the litigation risk, is clear.

5.   Establishing a Class and Maintaining It Through Trial (*Grinnell* Factor 6).

This case presents complicated class certification issues.   Plaintiffs obtained class certification for two classes – a Liability class and an Injunction class – on April 27, 2010. Given Defendants' vigorous motion practice in this case, a motion to decertify is a virtual certainty, see Levy Decl. ¶ 8, particularly in light of the Supreme Court's recent decision in *Dukes*, 131 S. Ct. 2541 (2011). *Dukes* changed the state of play hugely. As this Court noted, "If the settlement is not approved[, t]here will be a motion under the new Supreme Court precedents to decertify the class and everybody can go on his own individual way." (10/28/11 Tr. at 18:14-17, Dkt. 154.) While Plaintiffs believe that any such motion would not succeed, I am far from confident that they are correct.   Whatever the risks, the prospect of decertification adds considerable uncertainty as to whether the Class could be maintained through trial. Furthermore,

30

as noted about, this Court long ago discounted the possibility that the damages phase of the case could be litigated as a class action.

It is well-settled in the Second Circuit that, in approving a class settlement, a court must take into consideration the specter of class decertification. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds, Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000). The Court considers the risk of decertification in the context of *Grinnell* factor number six: "the risks of maintaining the class action through the trial." *Id; In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-cv-3400 (CM) (PED), 2010 WL 4537550, at *14 (S.D.N.Y. Nov. 8, 2010). The stronger the possibility of decertification, the more that factor weighs in favor of approving the settlement. *See id. Dukes* increases the risk that the classes here might be decertified. *McDonough v. Toys "R" Us, Inc.*, Nos. 06-cv-0242-AB, 2:09-cv-06151-AB, 2011 WL 6425116, at *6 (E.D. Pa. Dec. 21, 2011) ("relatively recent higher court opinions are still being interpreted and therefore present a challenge to class counsel and increase the likelihood of unfavorable appellate review . . . therefore this [risk of maintaining the class action through trial] factor weighs in favor of the settlement"). This factor therefore weighs in favor of final approval of the Settlement.

A number of courts have considered the increased risk of decertification in their settlement analyses post-*Dukes*. *See, e.g., Ebbert v. Nassau County*, No. 05-cv-5445 (AKT), 2011 WL 6826121, at *12 (E.D.N.Y. Dec. 22, 2011); *McDonough*, 2011 WL 6425116, at *6; *Cohorts v. BRE Prop., Inc.*, 3:10-CV-266 JMBGS, 2011 WL 7061923, at *16 (S.D. Cal. Nov. 14, 2011); *In re Wells Fargo Loan Processor Overtime Pay Litig.*, No. 07-cv-1841 (EMC), 2011 WL 3352460, at *6 (N.D. Cal. Aug. 2, 2011). In *Ebbert*, for example, a court in the Eastern District of New York held that, "Like other class actions in the wake of the *Wal-Mart* case, it

31

would not be unusual for the Defendants to move for de-certification . . . The Settlement eliminates that risk as well as the expense and delay inherent in such process and, to that extent, this factor weighs in favor of final approval." 2011 WL 6826121, at *12; *see also In re Wells Fargo Loan Processor Overtime Pay Litig.*, 2011 WL 3352460, at *6 ("These arguments [regarding the employer's common practice pattern, or policy of overtime approval] could be particularly challenging for Plaintiffs in light of the Supreme Court's recent decision in *Wal-Mart v. Dukes* . . . The class settlement successfully removes [the risk of decertification] from the class members and allows them to claim a guaranteed settlement without further delay."); *Cohorts*, 2011 WL 7061923, at *16 ("Given the possibility that individualized issues could arise during litigation and certification could be challenged [under *Wal-Mart Stores, Inc. v. Dukes*], the Special Master concludes that [this] factor also weighs in favor of settlement.").

This factor weighs strongly in favor of approval.

    6.  Defendants' Ability to Withstand a Greater Judgment (*Grinnell* Factor 7).

A "defendant['s] ability to withstand a greater judgment, standing alone, does not suggest that the settlement is unfair." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d at 178 n.9. Class Counsel does not contend that the Defendants could not collectively withstand a greater judgment, and does not rely on an inability to pay as a basis to justify this Settlement. Rather, given the duration of the litigation, the complexity of the issues, and the fact that the Settlement provides Class Members with more prompt relief that they would receive at the conclusion – whenever that might occur – of a litigation process, Class Counsel believes that the proposed Settlement is fair, reasonable, and adequate.

It is difficult to evaluate this factor, because the extent of Pinnacle's ultimate liability to members of the Class will not be known until the Claims Administration process and Rent Audit

32

are complete. However, Defendants' ability to satisfy a judgment is more important to this Court than their ability to pay yet more.

> 7.    The Settlement is Substantial in Light of the Possible Recovery and the Attendant Risks of Litigation (*Grinnell* Factors 8 and 9).

"[T]here is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion[.]" *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972). Moreover, when settlement assures immediate payment of substantial amounts to Class Members, "even if it means sacrificing speculative payment of a hypothetically larger amount years down the road[,]" settlement is reasonable under this factor. *Gilliam v. Addicts Rehab. Center Fund*, No. 05 Civ. 3452 (RLE), 2008 U.S. Dist. LEXIS 23016, at *13 (S.D.N.Y. March 24, 2008) (quotation marks omitted).

Here, the Settlement Agreement provides a swift and reliable process for thousands of tenants to obtain relief that it might otherwise take years to establish. It offers them redress for past injuries, while affording significant systemic benefits (protocols, monitoring, lease audit, injunction). When weighed against the prospect of a speculative payment years down the road – no doubt following a protocol something like the one on offer here – this factor supports final approval.

Pinnacle's liability to Class Members for rent overcharges and for actual (i.e., provable) damages caused by harassment is not capped, either in the aggregate or for individual Class Members. Harassment claims can also lead to a sort of "statutory" damages in fixed amounts. Class Members do not have to hire lawyers (although they may do so) or pay a filing fee, so their claims for money damages will be processed without the costs, formalities, and potential delays inherent in federal court proceedings. The Second Circuit has stated, "there is no reason, at least

33

in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Grinnell Corp.*, 495 F.2d at 455 n.2; *see also Cagan v. Anchor Sav. Bank FSB*, No. CV-88-3024, 1990 U.S. Dist. LEXIS 11450, at *34-35 (E.D.N.Y. May 22, 1990) (approving $2.3 million class settlement over objections that the "best possible recovery would be approximately $121 million").

The principal objection against the "substantiality" of the Settlement raised by the Objectors is that the Settlement does not establish a fund from against which Class Members can assert claims – which, the Objectors argue, makes the money part of the case effectively no settlement at all.

It is absolutely true that Pinnacle has not agreed to give up any specific sum of money as part of the settlement for payment of Claims, whether for rent overcharges or harassment or any other conduct complained of in the RICO or NYCPA causes of action by the Class Members; the only fixed sum of money Pinnacle has agreed to pay are $2.5M for legal fees and counseling (which will be discussed below) and $1.45M to Class Counsel for fees and expenses.

The failure to set up a settlement fund is not, however, troubling to the Court, for several reasons.

First, Pinnacle's liability for rental overcharges and other damages could be capped for Class Members who did not opt out if there were a fund out of which all damages had to be paid. At present, Pinnacle's liability is not capped, either for any individual Class Member or in the aggregate; the landlord is potentially liable for all provable damages.  Under the Settlement, Pinnacle has agreed that its liability will not be capped in exactly the same way; whatever actual damages (including rent overcharges) can be proved will have to be paid. So Class Members are no worse off than if they had litigated the case to conclusion (or brought their own individual

34

cases), and are substantially better off than they would be if damages were limited to a dedicated fund.

Second, a dedicated fund that capped Pinnacle's liability for rent overcharges might quite possibly run afoul of New York public policy – a thorny legal issue we need not reach, since under the Settlement, Pinnacle's liability for actual damages is not capped.

Third, if there were a settlement fund, Class Counsel's fees would undoubtedly come out of that fund, reducing the amount available to Class Members. Class Counsel's fee is being paid by Pinnacle separate and apart from any payments it is ordered to make by the Claims Administrator.

Fourth, and most important, the real benefit of the Settlement lies in: (1) the expedited and simplified claims process for establishing claims against the landlord – one that does not require tenants to hire counsel (but that includes a substantial sum of money that will offer them legal assistance should they wish it) and that guarantees an end to the process in under twenty-four months, rather than after years of additional litigation; and (2) the Best Practices and injunctive relief that are designed to alter how Pinnacle deals with its tenants on a going-forward basis. Neither of these would be available to Class Members in any context outside of the Settlement – whether if the Class were decertified and they were forced to start from scratch, or if the liability claims under RICO and the NYCPA went to trial and the Class Members were then forced to prove their individual damages claims.

Finally, any Class Member who believed that the Settlement did not secure substantial benefits was free to opt out. The settlement process has been going on for nearly a year. The Class Representatives and Objectors have been extremely active in their efforts to educate Class Members regarding the perceived shortcomings of the Settlement, while Class Counsel has been

equally active in advising Class Members of its benefits.   Two rounds of notices have been

mailed and the total length of the opt-out period has spanned more than five months.   Anyone

who thought the Settlement unfair, or that he or she could do better on his or her own, was free to

elect not to participate in the Settlement.

Given the substantial benefits afforded to Class Members, there are no "obvious defects"

– or any genuine deficiencies at all – in the Settlement Agreement that would justify denying

final approval.

## IV.   SPECIFIC OBJECTIONS

### A.   Clarifying Riders.

During the preliminary approval hearing and thereafter, several Class Representatives

objected to possible ambiguities in the Settlement Agreement.   Those concerns were addressed

by Class Counsel and Defendants and are reflected in two Riders to the Settlement clarifying the

language of the Settlement Agreement.

*Rider 1.*   In response to objections that the Settlement appeared to exclude claims from

tenants who had brought prior administrative or judicial proceedings against Defendants (or who

had raised claims as defenses to actions brought by Pinnacle), Class Counsel and Defendants

executed Rider No. 1.   (Dkt. 129, filed August 31, 2011.)   Rider No. 1 clarifies that only those

claims that were previously *resolved* in an administrative or judicial proceeding involving the

Class Member and the Defendants, Pinnacle, or any of its affiliates are barred.   Put otherwise,

only claims that have been actually adjudicated will be precluded, and cannot be raised anew

before the Claims Administrator.   That is no more than a straightforward application of the

doctrines of former adjudication and election of remedies – doctrines that would bind Class

Members if this case went to trial, and that Pinnacle has no obligation to waive. As I previously

observed, in response to this complaint, "It happens to be the law that even if you don't like a

decision that you got from a forum, because you have elected to go to that forum or you have been in that forum, the decision is the decision. . . .  We don't get to set aside decisions." 10/28/11 Tr. at 12:24-25, 13:1-5, Dkt. 154.

*Rider 2.*  In response to objections that the Settlement improperly extinguished certain rent overcharge claims, Class Counsel and Defendants executed a second rider to the Settlement Agreement.  (Dkt. 153, filed November 8, 2011.)  Rider No. 2 clarifies that Liability Class members are *not* barred from seeking money damages for rent overcharge claims based either on (1) rents set before July 11, 2004, which is the first day of the class period, or on (2) rents set by a prior owner ("Pre-2004 and Prior Owner Claims").  Such claims may be pursued in any available forum *other than* the Settlement Claims Administration Process.

### B.  The Court's Concerns.

#### 1.  Intra-Class conflicts.

The clarity added by the Rider 2 is very important to the Court's decision to approve the Settlement Agreement.  Counsel for the Objectors raised the possibility that the Settlement Agreement would extinguish some Class Members' rent overcharge claims without providing any forum where they could be remedied.  If the effect of the Settlement were that some *Class Members* would receive benefits, while other Class Members would exchange their rights for no benefits at all, then there would exist a conflict between subclasses that would require denial of the Settlement.

However, since the Settlement Agreement guarantees that every viable tenant claim that cannot be brought before the Claims Administrator (because it is not part of the lawsuit) will not be compromised in any way, the potential for conflict disappears.

37

Rider 2, and the responses to questions propounded by the Court at the April 12, 2012, Fairness Hearing, convince me that no conflict exists. A rent overcharge claim accrues when rent is raised by an illegal amount over the base rent (regardless of the legality of the base rent), and the Settlement Agreement neatly separates claims into two groups. Any pre-July 2004 illegal increase gives rise to a claim that is not affected in any way by the Settlement, as is any illegal increase charged by an owner other than Pinnacle. Illegal rent increases that Pinnacle imposed (regardless of the legality of the underlying base rent) during the Class Period give rise to claims that Class Members who do not opt out must bring before the Claims Administrator.

      2.    <u>Public policy.</u>

The Court was also concerned that New York public policy might disfavor resolution of rent claims in a forum, like the Claims Administration process, that lacks the procedural safeguards of a court or that might result in less generous relief. But the parties' responses to my questions have persuaded me that no such policy impediment exists.

It does not offend New York public policy for a settlement to provide an alternative to resolving rent claims before the New York State Housing and Community Renewal (HCR) (formerly the New York State Division of Housing and Community Renewal, or DHCR). Indeed, it is well-established that the Rent Stabilization Law does not confer exclusive jurisdiction on HCR. *See Vazquez v. Sichel*, 12 Misc. 3d 604, 607 (N.Y. Civ. Ct. 2005) (HCR is not "the exclusive initial arbitrator of challenges to . . . rent overcharges"); *Bridgeview Garden Apartments LLC v. New York State Div. of Hous. and Cmty. Renewal*, No. 8157/04, 2004 WL 2059552, at *6 (N.Y. Sup. Ct. Sept. 9, 2004) ("DHCR does not have exclusive jurisdiction to entertain rent overcharge complaints."). The *Vazquez* court explained, "Nowhere does the plain language of the statute and regulation exclude a body other than DHCR from finding that a

housing owner has collected a rent overcharge." Vazquez, 12 Misc. 3d at 606. Therefore, New York law permits tenants to bring their rent overcharge claims in any competent forum, whether that be the HCR, New York state courts, or in an arbitration.

Resolution of the claims by settlement – including a settlement-administered third party process for adjudicating individual claims – is also perfectly legal. In fact, the Settlement's Claims Administration process is similar to the third-party claims process approved in the settlement between the New York Attorney General and Vantage Properties, LLC. *In the Matter of the Investigation of Andrew M. Cuomo, Attorney General of the State of New York of Vantage Properties, LLC et al.*, AOD No. 10-016, part seven, *available at*: http://www.ag.ny.gov/civil-rights/legal-documents (last accessed May 16, 2012).

In order for a settlement to offend New York public policy, the Court would have to find that "judicial enforcement of [the] agreement would be the approval of a transaction which is inherently vicious, wicked or immoral, and shocking to the prevailing moral sense." *1420 Concourse Corp. v Cruz*, 135 A.D.2d 371, 372 (N.Y. App. Div. 1987). No such argument could be made here about the Claims Administration process.

## C.    Class Representatives' Objections.

The five Class Representatives, the named Plaintiffs in this case, remain unwilling to support the Settlement. As discussed above, this fact in no way precludes approval. *See Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1078-79 (2d Cir. 1995). Nevertheless, the Court takes their opposition very seriously, due to the importance these issues clearly hold for them and their intimate familiarity with the litigation. I have already gone on record as saying that no class representative in my experience has pursued their case as assiduously, and I adhere to my assessment of their dedication and diligence. Below, I address several of their objections

that have not already been the subject of discussion, as well as the objections of those Class Members who filed written objections and spoke at the Fairness Hearing.

### 1.    The objection that the Settlement extinguishes carryover claims.

Although Class Members may not receive compensation through this administrative process for rent overcharges based on rents set by a prior owner of their building, these claims are not extinguished.  Settlement ¶ 66(b); Rider No. 2.  The Class Representatives object to the "exclusion" of prior owner claims from the Settlement (8/17/11 Tr. at 18:7-10, Dkt. 141), but as provided in Rider No. 2, Class Members retain the right to litigate these claims (which lie against non-parties to this lawsuit) in a forum other than this lawsuit.  (*See* Settlement, Rider 2; 10/7/11 Tr. at 7: 20-25, 8:1, Dkt. 141.)  In addition, even if a Pinnacle tenant signed his or her original lease with a prior owner, if during the class period Pinnacle did not rely on rents registered or otherwise documented by a prior owner, illegally overcharged that tenant, or set an illegal rent increase on a renewal, the claim could be brought in the Claims Administration Process.

As discussed above, the fact that the Settlement Agreement does not "extinguish" any otherwise valid claims is crucial.  Class Members with claims that cannot be brought before the Claims Administrator retain whatever rights they had before this action was brought.  The Settlement does not prejudice them in any way.

The objection is made that Class Members with Excluded Claims will face significant difficulties obtaining relief in the State courts and agencies, due to issues like insolvent prior owners, statute of limitations, and otherwise.  But these realities have nothing to do with the approval or non-approval of the Settlement; these obstacles are creatures of New York law and the passage of time, not anything the Settlement does.

2.   The objection that overcharges for major capital improvements ("MCIs")
     are excluded from the Settlement.

Certain objections relate to the scope of the Settlement's coverage and erroneously
contend that it does not include rents raised due to a MCI.   These objections reflect a
misunderstanding of the Settlement.   Class members with MCI rents fall within the ambit of the
Settlement because the Liability and Injunctive Classes are defined to include "[a]ll persons who
. . . were tenants in rent-controlled or rent-stabilized apartments" (Settlement ¶ 4), and because
Class Members who suspect that their rents have been impermissibly increased on the basis of an
MCI can include this information in their claim, requiring Pinnacle to justify its decision to
increase the rent before the Claims Administrator.

3.   The objection that the Settlement does not cover Pinnacle's failure to
     make repairs.

Class Representatives erroneously contend that the Settlement does not provide relief to
Class Members who have suffered under Defendants' failure to make repairs.   (*See* 8/17/11 Tr.
19:20-22, Dkt. 127.)   Defendants' persistent failure to undertake repairs *can* constitute
harassment and give rise to actual or approximated damages. *See Belnord Holding Corp. v. Joy*,
52 N.Y. 2d 945 (1981) (affirming determination of New York City Commissioner of Rent
Control that failure to repair long-term rain leak constituted harassment); *see also* New York
State Attorney General Tenants' Rights Guide (2008) ("A landlord is prohibited from any action
intended to force a tenant out of an apartment or to compel a tenant to give up any rights granted
the tenant by law. . . .   Harassment may take the form of . . . willful denial of services[.]").

Class members who have been harassed by Pinnacle employees or whose repairs were
"incomplete" or did not conform to HPD standards – concerns expressed by objectors Jinks,
Correa, and Holt – may have a viable claim for damages under the Claim Administration
procedure.   Any repair-related complaints that do not rise to the level of harassment may be

litigated in another forum and are not extinguished by this lawsuit. In addition, Class Members like Shrieves should not be concerned that "$1,500 [the highest level of damages available for harassment without showing actual damages] will not even begin to compensate;" she may be compensated for the full amount of her injury due to Pinnacle's harassment and failure to make repairs if she can prove actual damages. She could do no better on her own in court or at DHCR.

With respect to harassment claims (including those based on repairs), the damages limitations apply only where a tenant is unable to prove actual damages; where he/she can so prove, the tenant is eligible to receive the full amount of actual damages suffered. The Settlement's provision for $500-$1,500 in presumed damages is in line with that used by DHCR, which can impose fines ranging between $1,000 and $5,000. *See* 9 N.Y.C.R.R. § 2526.2(c)(2). These civil penalties are higher than those provided for in the Settlement, but the civil penalties are paid to the Department, whereas the stipulated damages under the Settlement Agreement go to the individual tenants. *See 374 E. Parkway Common Owners Corp. v. Albernio*, 2011 N.Y. Misc. LEXIS 4334, at *10-11 (N.Y. Civ. Ct. Sept. 9, 2011); *226-228 E. 26th St. LLC v. Rhodes*, 2008 N.Y. Misc. LEXIS 7516, at *5-6 (N.Y. Civ. Ct. Dec. 26, 2008). Under the terms of the Settlement, Class Members enjoy an expedited and simplified Claims Administration process, in which they do not have to show actual damages, and through which they, and not the city, are the recipients of any penalty for harassment assessed against the Defendants.

Beaumont and Watson suggest that Pinnacle be required to produce evidence of improvements made to individual apartments by providing tenants with a contractor's invoice including the complete name of the tenant, address, and contact information and license number of the contractor. This suggestion is directed at what Ms. Watson describes as Pinnacle's "documented history of using the same invoice to document repairs at several different

locations." Ms. Beaumont, joined by Ms. Conner, also suggests that tenants be provided with the tracking number generated by Helpline staff when a request for repairs is reported.

Under the terms of the Settlement Protocols, Helpline staff will collect the detailed information listed above and register it with the complaint of the tenant, assigning it an electronic tracking number. (*See* Settlement Protocols § IV.)  This information will be accessed, and the tenant may obtain the electronic tracking number, in the event that Pinnacle does not complete the repairs or does so unsatisfactorily.  Should Pinnacle so fail to do what is required, the tenant may submit a claim for ongoing violations to the Claims Administrator during the Injunctive Period.

> 4.    The objection that the time period covered by the Settlement is limited from 2008 to 2010.

Class Representatives object to the Settlement on the grounds that it reduces the time period for which claimants may be compensated from six (2004-2010) to two (2008-2010) years. (8/17/11 Tr. at 17:24-25, Dkt. 127.)  This objection is based on a misreading of the terms of the Settlement, which clearly sets the time period for Liability Class compensation as July 11, 2004 through April 27, 2010 – the entire length of the Class Period. (Settlement ¶¶ 4, 61(a).)  The applicable time period of compensation claims was established by this Court in its April 27, 2010 Certification Order. (*See* Certification Order at 35.)

The Lease Audit, intended to "determine whether selected rents set by Pinnacle are in compliance with applicable law, and in accordance with the parameters agreed to under Paragraph 61(a) and (b)" – under which an independent accountant will examine a random sampling of 25% of all new Pinnacle leases – runs between January 1, 2008 and April 27, 2010. *Id.* ¶ 63(a), (c).  The Lease Audit does not affect the scope of the Claims Process which covers conduct from July 2004 to April 2010. *Id.* ¶ 63(d).

5.      The objection that the Settlement reduces tenant access to independent counsel.

The Class Representatives claim that the rights of individual Plaintiffs will be curtailed under the Claims Administration process because Defendants are not required to compensate them for fees charged by independent counsel. (*See* 8/17/11 Tr. at 20:12-14, Dkt. 127.) Since the Claims Administration Process envisioned under the Settlement increases individual access to legal counsel by: (1) creating a $2.35 million fund, to be paid to the Legal Aid Society and Legal Services NYC for legal assistance, (2) allocating an additional $50,000 each to Brooklyn Housing and Family Services, Bushwick Housing and Legal Assistance Program, and the Metropolitan Council on Jewish Poverty for tenant outreach and education, and (3) limiting the need for individual representation through the creation of a straightforward and simple procedure for claims submission, I assume this complaint is really directed to the fact that the Settlement does not cover the cost of Objectors' counsel, who appeared late in the litigation after the Class Representatives fell out with Class Counsel. That is true; the Settlement does not cover those costs. No settlement is perfect. This is not a reason to disapprove the Settlement.

Returning to the Claims Administration process, lawyers from Legal Aid and Legal Services will assist Class Members in preparing and submitting their claims to the Claims Administrator, free of charge, enabling them to participate in a simple process to recover damages and eliminating any need for them to locate, hire, and pay for independent counsel out of their own pocket. Settlement ¶ 51(a), (b). Additionally, there is nothing in the Proposed Settlement that would preclude individual Class Members from retaining independent representation at their own expense, if they so desire, or barring the Claims Administrator from imposing attorneys' fees in such a situation. And there is nothing in the Settlement that

44

prevented any Class Member who wanted to hire a lawyer and fight Pinnacle on her own from opting out and doing just that.

> 6.    The objection that the Settlement does not provide separate compensation for Class Representatives.

It is not uncommon, in the settling of class action lawsuits, for the named plaintiffs to be compensated. The Class Representatives request, in their joint brief objecting the Settlement, that each of them be awarded $100,000 to compensate them.

Incentive award may be justified under "special circumstances," *In re AOL Time Warner ERISA Litig.*, No. 02 Cv. 8853 (SWK), 2007 U.S. Dist. LEXIS 79545, at *9 (S.D.N.Y. Oct. 26, 2007), including to "compensate the named plaintiff for any personal risk incurred by the individual or any additional effort expended by the individual for the benefit of the lawsuit[,]" *Dornberger v. Metro. Life Ins. Co.*, 203 F.R.D. 118, 124 (S.D.N.Y. 2001). However, in the settlement context, they are the product of an agreement. Here, Defendants refused to agree to an incentive award for the Class Representatives in the Settlement Agreement. This Court cannot modify the terms of the settlement sua sponte. "Fed. R. Civ. P. 23(e) wisely requires court approval of the terms of any settlement of a class action, but . . . does not authorize the court to require the parties to accept a settlement to which they have not agreed." *Evans v. Jeff D.*, 475 U.S. 717, 726 (1986). Thus, the Court cannot award the compensation the Class Representatives seek. Instead, I must ask whether the Settlement Agreement is fair, adequate, and reasonable to the Class as a whole despite the absence of payment to the Class Representatives.

This is the rare case where I believe the Class Representatives have actually done something that might entitle them to compensation as part of the settlement. But they remain implacably opposed to the Settlement, for reasons having little to do with whether they stand to

get a penny, so I can understand why Pinnacle will not agree to it. I wish it were otherwise, but I cannot say that the Settlement is unfair, inadequate or unreasonable to the Class as a whole because of the Class Representatives are not recovering individual compensation.

        7.     The objection that the six-month time period for claims submission should be extended.

Class Representatives contend that Class Members need more than 180 days to submit claims to the Claims Administrator. Class Representatives cite no legal precedent to support the proposition that a six-month claim submission period is inadequate; indeed, this Court has consistently approved far shorter submission periods for claims with arguably less streamlined administration procedures. *See, e.g., Velez v. Novartis Pharms. Corp.*, No. 04 Civ. 09194 (CM), 2010 U.S. Dist. LEXIS 125945, at *18-19 (S.D.N.Y. Nov. 30, 2010) (approving three month claims submission period for detailed claims form to recover compensatory damages for physical and/or emotional pain and suffering); *Zwickel v. Taro Pharm. Indus.*, No. 04-cv-5969, 2009 U.S. Dist. LEXIS 48978, at *12 (S.D.N.Y. June 9, 2009) (ordering participating class members in securities class action to file a proof of claim within a period of less than three months). Moreover, the Settlement allocates significant funds to multiple legal service organizations for the purpose of assisting Class Members in promptly and timely filing notices of claims.

        8.     The objection that damages are inadequate.

Class Representatives also challenge the provision in the Settlement that awards double, rather than triple, damages for rent overcharges. This, of course, is why it is called a settlement – it nets the Class Members something that is generally less than they could get if they litigated individually in court – assuming they win. The Claims Administration Process provides Class Members with a relatively simple means of asserting overcharge claims, with no need to pay a lawyer (though legal advice is available and encouraged, and anyone who wishes to retain a

lawyer can do so), no rules of evidence, and a much swifter resolution than a traditional courtroom battle.

Additionally, the Class Representatives have not articulated why, other than a difference in dollars, double damages fundamentally undermine the fairness of the Settlement. Class Members who wished to pursue overcharge claims and who preferred to go for every last dollar, had ample opportunity to opt out of the Class; had they done so, they could have pursued treble damages.

Class Counsel fought for treble damages during settlement negotiations, but it was a point on which Pinnacle would not move. Given the overall benefits of the Settlement, a compromise for double rather than triple damages does not undermine the essential fairness of the overall Settlement.

9.  The objection that rent-controlled tenants are not covered by the Settlement.

Class Representatives incorrectly claim that rent-controlled tenants are excluded from the Settlement. (*See* 8/17/11 Tr. at 19:9-10, Dkt. 127.) The definition for both the liability and injunctive classes includes "[a]ll persons who . . . were tenants in rent-controlled or rent-stabilized apartments[.]" Settlement ¶ 4. Illegal rent increases imposed on rent-controlled tenants would form the basis of a claim in this lawsuit. Class Representatives' concern may relate to the terms of the Lease Audit, where an independent accountant is to "review new rents and special [non-Rent Guidelines Board-based] rent increases." Settlement ¶ 63(c)(ii). Because the audit only examines new leases, rents for rent-controlled tenants and tenants who signed leases prior to January 1, 2008 will not be audited. But the Lease Audit has nothing to do with whether or not a rent-controlled tenant can bring a claim to redress a rent overcharge before the Claims Administrator. Accordingly this objection does not weigh against the Settlement.

### 10.   The objection that the Class Representatives were not included in the Settlement negotiations.

Several Class Representatives have objected that, while the proposed Settlement Agreement went through at least twelve drafts, they were not consulted until the ninth version. Moreover, they claim not to have been told that they were permitted to sit in on negotiation sessions with Class Counsel and counsel for the Defendants, and that Class Counsel ignored their negotiation suggestions.

Class Counsel, meanwhile, denies that the Class Representatives were excluded from the Settlement process, citing nine in-person meetings, numerous phone conversations, and Class Counsel's prior representation that it included some (though admittedly not all) of the Class Representatives' proposal in its negotiations with Pinnacle.

I have noticed and commented on the unfortunate breakdown in trust between Class Counsel and the Class Representatives. But this situation does not meaningfully impact the Court's analysis. The question before me is whether the Settlement Agreement is fair, adequate, and reasonable to the Class as a whole. The bad blood between some Class Members and Class Counsel does not, in itself, make the deal Class Counsel struck any more or less fair, reasonable or adequate.

To the extent that the Class Representatives objections relate to the thoroughness of Class Counsel's efforts, or even Class Counsel's good faith, I reject those objections as unfounded. Whatever disagreements may exist, the Court is completely assured of Class Counsel's competence, integrity, and good faith. The conduct of the litigation lay ultimately in Class Counsel's hands, and I am satisfied that he discharged his fiduciary duty to the best of his professional ability. Neither the Class nor the Court can demand more.

48

**D.**     **Objections Related to the Class Period and the Exclusion of Parties "Deserving Relief."**

Several Class Members object to the Settlement on the grounds that it fails to cover individuals whose rent in-class period was set by a prior owner (not Pinnacle), or whose rent was set before the beginning of the class period. Such claims (to the extent they are not already time-barred, a situation the Settlement does not affect) are not extinguished by the Settlement. As detailed above and as set forth in the Revised Notice, Rider No. 2 clarifies that Liability Class Members are not barred from seeking, and may commence or pursue money damages for Pre-2004 and Prior Owner Claims in any relevant forum.

There is no basis to object to the duration of the Class Period. It was not determined in the context of the Settlement negotiations; I fixed it in back in 2010, before the Settlement was on the table. (Certification Order at 35; *see supra*, Section II(A)(2).) That Order limited the temporal scope of the class because the statute of limitations on all non-fraud related claims prior to 2004 had expired. Notwithstanding the scope of the Class Period, Class Counsel engaged in vigorous negotiations with Defendants over otherwise viable pre-2004 and Prior Owner Claims, but this was eventually a point on which Class Counsel had to yield in exchange for agreement on the comprehensive package of compensation and structural reform contained in this Settlement.

Third, and perhaps most important, tenants who cannot litigate their rent overcharge claims in this lawsuit remain free to bring claims for other damages (including harassment) to the Claims Administrator, and can litigate their overcharge claims in any other forum. Thus, it is simply not true that either 77%, or 73% of the Liability Class Members – the percentage of tenants whose leases were entered into either prior to the Class Period or with prior owners – are entitled to "no relief" under the Settlement Agreement. They are entitled to a speedier and easier

forum for all but their rent overcharge claims – and even some of those can be brought to the Claims Administrator if Pinnacle caused an illegal renewal increase within the Class Period.

Finally, Class Members dissatisfied with the Settlement were free to opt out, and were given a great deal of information and time to allow them to do so. Fewer than 1% did.

This Settlement does not afford complete relief to every person Pinnacle ever allegedly harmed – nor could it. The question for this Court is whether the Settlement is fair, adequate and reasonable *to the Class Members* as a group. A common refrain is that more could have, and should have been obtained for the Class Members and for other tenants out of this *in terrorem* RICO suit. And indeed, it is conceivable that Pinnacle might be obligated to pay a much larger definite sum than the amount it risks being forced to pay through the Claims Administration process.

But there are other ways this litigation could have ended. The Class could have been decertified, in which case the net gain to tenants from this class action would be zero, and everyone would have to start anew. Were that to occur, each tenant would be required to retain counsel to pursue RICO damages through motion practice, discovery, trial, and appeals, that almost certainly would not justify the legal fees necessary to obtain them.

The Settlement does not extinguish any pre-existing State law claims, so approval will not leave anyone worse off. That they could have been even better off than the Settlement makes them does not make the Settlement Class Counsel negotiated unfair, inadequate, or unreasonable.

**E.     Objections Related to the Choice of Recipients of $150,000 of the $2.5 million from Pinnacle for legal assistance, education, and outreach.**

Numerous Class Members have objected on the ground that some of the funds  that Pinnacle has agreed to pay to help educate tenants about their rights under the Settlement Agreement – $150,000 of $2.5 million – are being directed to community groups located outside

of Northwest Manhattan. In particular, many Class Members felt that Buyers and Renters to Save Harlem ("BRUSH") and Mirabal Sisters should receive a portion of the funds to recognize their tireless service to Class Members throughout this litigation.

The Court understands that the refusal to fund these organizations, which participated in the long campaign against Pinnacle, was quite possibly motivated by spite. However, that does not lead me to the conclusion that the Settlement as a whole is unfair, inadequate, or unreasonable, or that, standing alone, the selection of legal service providers is was inherently unfair or unreasonable.

First, the vast majority of the funds dedicated to legal assistance, $2.35 million, will go to legal services organizations with both strong city-wide networks and an established presence in North Manhattan: Legal Aid Society's Housing Development Unit is located at E. 106th Street and Legal Services NYC at W. 125th Street.

Second, the Class Representatives appear to significantly overstate the population of Class Members who live in North Manhattan and Harlem. The $150,000 for outreach and education has been allocated to three organizations based in Brooklyn and Lower Manhattan where a combined total of approximately 33% of Class Members live.[1] These organizations target areas that, to date, have not enjoyed the strong organizing presence found in North Manhattan. They are arguably more in need of the funds.

Furthermore, Beaumont's concerns that the $2.35 million allocated to the legal services organizations "need not be spent helping tenants," and that "UNSPENT monies remain with these legal service organizations WITHOUT RESTRICTION," are incorrect. First, the

---

[1]    An analysis of current Pinnacle tenant zip codes using a list provided by Pinnacle shows that the largest percentage of Class Members reside in Brooklyn (30.67%), followed by North Manhattan/Harlem (25.09% to 28.89% depending on whether zip code 10025 is included), the Bronx (20.50%), Queens (16.50%), other areas in Manhattan (13.19%), and Staten Island (0.93%).

Settlement charges the New York Bar Foundation with overseeing the legal service organizations

to "ensure that the funds are used solely for the [Settlement's] purpose" and to report to the

Court regarding Pinnacle's compliance.  (Settlement ¶¶ 52, 53, 55.)  Second, should any funds

remain after the aims of the Settlement have been achieved, 85% of these remaining funds must

be distributed evenly among the legal services organizations for general tenant assistance and

15% to non-profit organizations selected by the New York Bar Foundation for social services to

tenants across the five boroughs.  (Settlement ¶ 56.)

Ultimately, the omission of BRUSH and Mirabal Sisters is the sort of "slap in the face"

that seems to have turned many of the objecting Class Members away from what is otherwise an

advantageous settlement.   This Court must put hurt feelings aside and decide what is in the best

interests of the Class as a whole.

**F.      Objections Related to the Failure of the Settlement to Address Substantive
         Deficiencies in Defendants' Administration or to Monitor Compliance for More
         Than Two Years.**

Several Class Members assert that the Settlement neither remedies Defendants'

mismanagement nor provides adequate monitoring of Defendants' actions to ensure compliance.

As discussed above, Class Members are afforded relief under this Settlement through a

comprehensive Claims Administration Process that is independently implemented and

monitored, and that costs them nothing.  The aim of this procedure is to address issues with

Defendants' record keeping practices, responses to tenant issues, and other potential violations of

tenants' rights.    The Settlement does indeed address the concerns raised by Objectors

Hollingsworth, Bernier, and Moore.

In addition, the Settlement provides for a lease audit and a two-year injunction, during

which time Defendants' compliance with the Settlement will be closely monitored, and during

which Defendants will be required to pay damages for any violations of the "best practice"

protocols. *See supra*, Section II.B. Among its other safeguards, the Settlement stipulates that Pinnacle must submit semi-annual reports to the Claim Administrator, who has the power to demand more frequent reports as a subset of her general duty to "monitor[] [Pinnacle's] compliance with the Settlement's protocols." (Settlement ¶ 34, 44.) The Claims Administrator in turn reports to the Magistrate Judge and to the parties on the semi-annual basis on the information provided by Pinnacle and her evaluation of it. This means that Pinnacle's reports are vetted by independent and impartial observers on two occasions, first by the Claims Administrator and later by the Magistrate Judge.

The Settlement, in addition to providing for independent review of Pinnacle's semi-annual reports, establishes the "checks and balances" called for by Bernier. The Claims Administration Process will be independently managed and monitored by an impartial Claims Administrator; this Claims Administrator, along with the staff of the organizations funded to provide tenant assistance, and the Tenant Helpline employees, will function as Ombudspersons, resolving tenant concerns about their treatment at Pinnacle's hands and monitoring Pinnacle's compliance with the Settlement's protocols. The structures established by the Settlement should allay Tate's "serious reservation about the good faith of a claim process administered by Pinnacle," simply because that claims process operates wholly independently of Pinnacle.

Finally, the protocols being implemented will be built into the Defendants' operations and should, ideally, last beyond the term of the injunction. Over the long term, compliance can only be enforced by continued vigilance from multiple parties, supported in this Agreement by the provision of Tenant Assistance and the creation and maintenance of a Tenant Hotline. *Id.* To the extent that Objectors Penn and Clyde have concerns about Defendants' compliance

during or after the two-year injunctive period (tabs 4, 14), they can raise these concerns to the Claims Administrator or to the Court.

## CONCLUSION

In conclusion, applying the *Grinnell* factors as set forth above, and weighing all of the submissions and arguments of all the parties and the Class Members who made them, the Court concludes that Settlement Agreement is fair, adequate and reasonable, and that its approval is in the best interests of the members of the Classes. It is therefore hereby APPROVED.

The Court also approves, in its discretion, Class Counsel's motion for attorney's fees and costs under New York General Business Law § 349, for the reasons expressed in Class Counsel's memorandum in support of the award. (Dkt. # 182.) These fees – $1.25 million in fees and $200,000 in expenses – will be paid directly by Pinnacle from funds not otherwise earmarked for Class Member recovery, and represent a small proportion of the amount Class Counsel would bill a paying client. Considering the time and skill required to litigate the case, the complexity of the issues involved, the customary fee for the work provided, and the result achieved, the fees Class Counsel seeks – which are far less than the lodestar calculation of hours worked multiplied by a reasonable hourly rate – are appropriate. *Serrin v. N. Leasing Sys. Inc.*, No. 06-cv-1625, 2011 U.S. Dist. LEXIS, at *10 (S.D.N.Y. Apr. 11, 2011).

The Clerk of Court is directed to close the open motion at Dkt. # 130 from the Court's active docket, and, following the entry of judgment (the form of which should be submitted by Counsel), to close the file.

Dated: June 6, 2012

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

54